Michael J. Garcia
United States Attorney for the
Southern District of New York
By: Rua M. Kelly (MA 643351)
One Saint Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-2471



RECEIVED
OCT 15 2007
U.S.D.C. S.D.N.Y.
CASHIERS

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>LLOYDS TSB BANK PLC,<br><br>                    Defendant. | COMPLAINT<br><br>**07** 07 **CIV** 9235 |

Plaintiff, the United States of America, by its attorney, Michael J. Garcia, United States Attorney for the Southern District of New York, for its complaint alleges as follows:

1.    Defendant Lloyds TSB Bank plc ("Lloyds"), a financial institution, violated the money laundering laws of the United States by knowingly concealing or disguising the nature, the location, the source, the ownership, and the control of proceeds of specified unlawful activity in furtherance of a fraud perpetrated against AremisSoft Corporation ("AremisSoft" or the "Company") by Lycourgos Kyprianou ("Kyprianou") and his co-conspirators. Kyprianou, the founder and former Chairman of the Board of Directors of AremisSoft, a company traded on the NASDAQ National Market, engaged in an insider trading scheme in which he artificially inflated the price of AremisSoft's publicly traded stock, used nominee companies to hold and sell the stock, misled the American investing public into thinking that the sales were genuine arms-length transactions while concealing his illegal conduct, and in furtherance of the fraudulent

scheme, with the assistance and participation of Lloyds, engaged in money laundering transactions with an aggregate value of at least approximately $130 million.[1] As discussed in greater detail at paragraph 13, Kyprianou was indicted in the Southern District of New York in 2002 for the AremisSoft securities fraud, and is currently a fugitive believed to be living in Cyprus.

## NATURE OF THE ACTION

2.       This action is brought by the United States of America, pursuant to 18 U.S.C. § 1956(b), to obtain monetary civil penalties for Defendant's violation of sections (a)(1), (a)(2) and (h) of 18 U.S.C. § 1956.

## JURISDICTION AND VENUE

3.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.       Venue is proper in this District pursuant to 18 U.S.C. § 1956(i) because acts and omissions giving rise to the money laundering occurred within the Southern District of New York.   These acts include the inside trading of stock by Kyprianou and his co-conspirators through New York-based brokerage accounts, the transfers of funds used for fraudulent purposes initiated by an AremisSoft director and officer based in New York, the participation by Kyprianou at board of directors meetings held in New York in which false financial reports were discussed, and the wire transfers of tens of millions of United States dollars in fraudulently obtained proceeds through correspondent bank accounts located in New York.   Among other

---

[1] Due to the extensive and pervasive nature of Kyprianou's money laundering scheme, intended to conceal, mislead and frustrate the tracing of assets, Plaintiff is currently unaware of the full extent of the value of the money laundered through Lloyds and reserves the right, as additional evidence is uncovered, to amend this Complaint to increase the total civil money judgment sought from Lloyds.

things, the U.S. dollars laundered through Lloyds included proceeds from illegal insider trading sales of stock of AremisSoft, a U.S. public company traded on the U.S. NASDAQ exchange.

5.     This Court has personal jurisdiction over the Defendant pursuant to 18 U.S.C. § 1956(b)(2); the New York Banking Law, §§ 200-b(2)(e) and 221-c; the Federal Reserve Act of 1913, 12 U.S.C. § 632; and the New York "long-arm" statute, N.Y.C.P.L.R. § 302(a)(1).

## OVERVIEW OF THE AREMISSOFT FRAUD

6.     From in or about 1998 through July of 2001, Kyprianou and his co-conspirators, including but not limited to former AremisSoft co-CEO Roys Poyiadjis ("Poyiadjis"), caused AremisSoft, purportedly a leading international software company, to issue false and misleading public statements and regulatory filings, representing to the investing public and regulators that the Company's business was experiencing rapid growth, with annual revenues exceeding $100 million.

7.     In particular, and as part of their fraudulent conduct, Kyprianou and Poyiadjis, assisted by others, caused AremisSoft to announce publicly that it had acquired software companies with substantial revenues for prices totaling tens of millions of dollars when, in reality, the acquired companies were small, with minimal revenues, and the prices paid were only a small fraction of the claimed amount. Similarly, Kyprianou and Poyiadjis, assisted by others, caused AremisSoft to publicly announce that it had entered into a contract worth $37.5 million with the Bulgarian Health Ministry, when the contract's value was no more than $3.9 million, and AremisSoft was paid only $1.7 million. In furtherance of the fraud, Kyprianou and Poyiadjis, assisted by others, fabricated books and records to give the false appearance that AremisSoft was generating the reported revenues. Kyprianou and Poyiadjis, for example, caused AremisSoft to report approximately $90 million in revenue that was almost entirely fictitious.

8.      The effect of these fraudulent misrepresentations was that the perceived value and profitability of AremisSoft was far higher than its actual value and profitability.  As a result, the value of AremisSoft shares traded on NASDAQ National Market was artificially inflated.  Privy to this knowledge, Kyprianou, Poyiadjis and others secretly and illegally sold their AremisSoft shares at these inflated prices to investors who were not privy to such knowledge and believed that the share price accurately reflected the Company's fair market value.

9.      In order to conceal the illicit sales of AremisSoft stock and mislead the public into thinking that the sales were genuine arm's length sales, Kyprianou and Poyiadjis engaged in a sophisticated money laundering scheme, employing numerous entities to hold and sell AremisSoft stock, and utilizing multiple bank accounts to hold and transfer the proceeds of the fraudulent scheme.  Kyprianou and his co-conspirators could not have succeeded without the knowing and substantial assistance provided by other individuals, entities, and financial institutions, and in this particular case, Kyprianou utilized Lloyds to launder his ill-gotten proceeds in banking transactions with an aggregate value in excess of $130 million.

10.     By May 2001, worldwide attention began to focus on AremisSoft for reporting fraudulently inflated income.  Specifically, on May 17, 2001, the *New York Times* reported that the true value of the AremisSoft contract with the Bulgarian Health Ministry was less than $4 million instead of the $37.5 million claimed by the Company.  Moreover, at least one class action lawsuit had been filed against AremisSoft and its directors by May 24, 2001.  At the same time, international news organizations began reporting that Kyprianou and Poyiadjis fraudulently misrepresented the value and profitability of AremisSoft.

4

11.     When the truth about AremisSoft's financial condition and business was revealed, the price of AremisSoft's publicly held shares plummeted. By the time the fraud was uncovered in 2001, the investing public had sustained losses of approximately $500 million, plus interest.

12.     Trading in AremisSoft was halted by NASDAQ on July 30, 2001. On July 31, 2001, AremisSoft announced that it was delaying the release of its results indefinitely and that Kyprianou had resigned from the Company. The NASDAQ delisted the Company's securities on August 29, 2001 due to, *inter alia*, the failure of the Company to file its Form 10-Q for the second quarter ending on June 30, 2001.

13.     On December 19, 2001, a federal grand jury in the Southern District of New York indicted Poyiadjis for securities fraud in connection with the AremisSoft fraud. On February 11, 2002, the Government obtained a restraining order as to certain of Poyiadjis's assets, including four bank accounts held in the Isle of Man in the names of Olympus Capital Investment, Inc. and Oracle Capital, Inc.. On June 24, 2002, the grand jury returned a superseding indictment that charged Poyiadjis, Kyprianou, and M.C. Mathews ("Mathews"), the top AremisSoft executive in India, with securities fraud (both on the market and insider trading), money laundering, and conspiracy to commit securities fraud, money laundering, mail fraud and wire fraud.

14.     On March 15, 2002, AremisSoft filed for bankruptcy protection pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq.

15.     Throughout the period of the fraud, the Defendant Lloyds:

> • maintained numerous bank accounts beneficially owned or controlled by Kyprianou, and actively aided and abetted Kyprianou's fraudulent activities at AremisSoft by knowingly allowing Kyprianou to use Lloyds accounts to launder the proceeds of the fraud;

5

- knowingly permitted Kyprianous to launder proceeds from the AremisSoft fraud via a significant number of rapid financial transactions through at least in or about January 2004, well after the widely publicized downfall of AremisSoft and the indictment of Kyprianou and others for securities fraud;

- facilitated concealment of AremisSoft fraud proceeds by allowing transfers to occur anonymously, without reference to Kyprianou's name or account number, and without reference to a remitter's name or account number;

- participated in the fraudulent scheme by crafting a false confirmation of nonexistent AremisSoft cash holdings, knowingly that AremisSoft and its auditors would rely on the confirmation in opining on the financial statements of AremisSoft, and thus promoted Kyprianou's insider trading scheme;

## THE RELEVANT PARTIES

16.     Lloyds is a wholly owned bank subsidiary of Lloyds TSB Group plc, both of which have principal places of business at 25 Gresham Street, London, Greater London EC2V 7HN, United Kingdom.  Lloyds is a global financial network with 30 main offices including, but not limited to, branches in Geneva, Switzerland and New York, New York.

17.     The corporate banking arm of Lloyds operates out of, among other locations, the branch located at 1251 Avenue of the Americas, 39th Floor, New York, New York, 10020.  The international private banking arm of Lloyds operates out of, among other locations, a branch located in Geneva, Switzerland with an address of Place Bel-Air 1, P.O. Box 5145, CH-1211.

18.     Lloyds maintains a "Supervised Institution, Foreign Branch" according to the State of New York Banking Department and is licensed under Article 5, section 200 of the New

York Banking Law, which requires that a license be obtained by a foreign banking corporation in order to establish and maintain a branch in New York. The New York Office is regulated, supervised and examined by the New York State Banking Department and the Board of Governors of the Federal Reserve System. Lloyds routed U.S. dollar transactions in support of Kyprianou's fraud and money laundering through the New York branch of Bankers Trust (now Deutsche Bank). Lloyds currently lists Wachovia Bank and Bank of America as its correspondent banks in New York.

19.    AremisSoft was reincorporated in 1998 in the State of Delaware in the United States and had its principal place of business in the State of New Jersey. Beginning on April 22, 1999, AremisSoft's shares were publicly traded on the NASDAQ. The Company's main business was the development and sale of computer software technology. Kyprianou was the founder of AremisSoft and served from its inception as the Chairman of the Board of Directors and Chief Executive Officer ("CEO") until May 2000 and, together with Poyiadjis, as co-CEO from February 2001 to July 31, 2001, when Kyprianou resigned.

## RELATED ACTIONS

20.    On October 4, 2001, the SEC filed a civil enforcement action in this district in connection with the AremisSoft fraud. That action, No. 01 Civ. 8903 (CSH), alleges that the Company overstated the value of its contracts, revenue, and acquisitions while, at the same time, Poyiadjis and Kyprianou engaged in massive insider trading. On October 22, 2001, the Honorable Charles S. Haight, Jr. issued an order, with the consent of AremisSoft, enjoining the Company and its officers from, among other things, making further false statements regarding its financial condition. The Court also granted an injunction freezing all assets of Poyiadjis and

Kyprianou and ordering them to repatriate to the United States all proceeds of their sales of AremisSoft stock.

21.    On March 22, 2002, the United States commenced a civil forfeiture action in this district, 02 Civ. 2319 (TPG), seeking to forfeit the contents of certain bank accounts in the Isle of Man, and alleging that there was probable cause to believe the accounts contained proceeds of securities fraud and constituted property of money laundering (the "Civil Forfeiture Action"). On or about July 31, 2002, the Court entered a default judgment in that action with respect to all potential claimants.

22.    In or about January 2005, Poyiadjis, among other parties, entered a guilty plea to the Indictment, and reached a settlement of the Civil Forfeiture Action, whereby Poyiadjis agreed to forfeit to the United States and pay the AremisSoft Liquidating Trust a total of € 151,768,098.35 (which equaled approximately $200 million U.S. dollars at the exchange rate in effect on January 7, 2005), representing all of the proceeds from Poyiadjis's individual sales of AremisSoft stock, plus interest. The AremisSoft Liquidating Trust was formed in 2002 pursuant to orders by the Honorable Joel A. Pisano, United States District Judge for the District of New Jersey, and represents the claims of AremisSoft as well as those of the Company's former shareholders.

23.    On September 15, 2005, the AremisSoft Liquidating Trust filed a civil complaint against Bordier et Cie and Dominick Company AG, 05 Civ. 4520 (JAP) in the District of New Jersey alleging aiding and abetting breach of fiduciary duty and violations of Swiss money laundering statutes. The Honorable Joel A. Pisano determined the action was preempted under the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb. On December 11,

2006, the AremisSoft Liquidating Trust appealed the matter to the United States Court of Appeals for the Third Circuit. Oral argument is tentatively scheduled for November 2007.

24.     On March 3, 2006, the AremisSoft Liquidating Trust filed a civil complaint in this district against UBS AG, No. 06 Civ. 1736 (CSH), alleging aiding and abetting breach of fiduciary duty and violations of Swiss money laundering statutes.

25.     On March 21, 2006, the SEC filed a civil complaint in this district against AremisSoft's former Cypriot-based outside auditor and an accountant for violations of the anti-fraud provisions of the federal securities laws, No. 06 Civ. 2223 (CSH). This action is pending before the Honorable Charles S. Haight, Jr.

26.     On April 12, 2006, the SEC filed a second civil complaint concerning AremisSoft's former auditors, this one against AremisSoft's former UK-based outside auditor and that firm's principal auditor for AremisSoft, No. 06 Civ. 2853 (CSH). On April 18, 2007, the Court entered final judgment requiring payment of approximately $2.4 million in penalties and disgorgement.

27.     On June 8, 2006, the AremisSoft Liquidating Trust filed a civil complaint against Lloyds TSB Bank plc, 06 Civ. 4335 (CSH), alleging aiding and abetting breach of fiduciary duty, aiding and abetting fraud, fraud, negligent misrepresentation, and violations of Swiss money laundering statutes. On August 15, 2007, the Honorable Charles S. Haight, Jr. granted the defendant's motion to dismiss on the ground of *forum non conveniens*. The AremisSoft Liquidating Trust has filed a motion to reconsider the Court's decision.

28.     On September 1, 2006, the AremisSoft Liquidating Trust filed a civil complaint against Bank of Cyprus Public Company Ltd., 06 Civ. 6673 (CSH), alleging aiding and abetting breach of fiduciary duty, constructive trustee, breach of contract, breach of implied covenant of

9

good faith and fair dealing, and negligence. On August 15, 2007, the Honorable Charles S. Haight, Jr. granted the defendant's motion to dismiss on the ground of *forum non conveniens*. The AremisSoft Liquidating Trust has filed a motion to reconsider the Court's decision.

## LLOYDS KNOWLEDGE OF AND
## PARTICIPATION IN THE MONEY LAUNDERING SCHEME

*Lloyds Conducted Financial Transactions for Kyprianou*

29.    In or about June 2000, Kyprianou opened an account at Lloyds through Evangelos Embedoklis ("Embedoklis"), the Deputy General Manager and Chief of Private Banking. Embedoklis is Kyprianou's cousin through marriage. Lloyds assigned Jane Moore ("Moore"), the branch manager at Lloyds in Geneva ("Lloyds Geneva"), to manage Kyprianou's accounts.

30.    Lloyds operated numerous accounts out of its Geneva branch for the benefit of Kyprianou, including but not limited to Account Nos. ████0-110, ████0-190, ████0-210, ████2-110, ████7-110, ██ *██7-112, ████7-190, ████3-212 and ████3-210.

| Account Number | Account Name | Currency |
|---|---|---|
| ██2-100 | Quayside Finance Corp | USD |
| ██7-100 | Cassiere Enterprises, Inc. | USD |
| ██7-112 | Cassiere Enterprises, Inc. | GBP |
| ██7-190 | Cassiere Enterprises, Inc. | EUR |
| ██0-110 | Lady Moura | USD |
| ██0-190 | Lady Moura | EUR |
| ██0-210 | Lady Moura | USD |
| ██3-212 | UG Business Account | USD |
| ██3-210 | UG Business Account | USD |

31.    From at least in or about June 2000 through at least in or about January 2004, Kyprianou laundered hundreds of millions of dollars in proceeds of the AremisSoft fraud through his accounts at Lloyds via almost 200 financial transactions. Further, the vast majority of the financial transactions occurred after the story of the AremisSoft fraud first broke in the

worldwide press in May 2001, and at least 50 of those transactions occurred after Kyprianou was indicted by a federal grand jury for, *inter alia*, securities fraud and money laundering. These financial transactions at Lloyds were a critical part of Kyprianou's overall unified scheme to defraud US investors of over $500 million dollars.

32.    Instead of exercising caution and due diligence in the wake of these suspicious transactions, which included all of the class hallmarks of money laundering, Lloyds disregarded its obligations under the Swiss Federal Law on Combating Money Laundering in the Financial Sector (the "Swiss Money Laundering Law"), the Swiss banks' Code of Conduct with Regard to the Exercise of Due Diligence (the "Due Diligence Law"), the Swiss Federal Banking Commission's Guidelines (the "Banking Guidelines"), and provisions of the Swiss Criminal Code, and knowingly assisted Kyprianou to indiscriminately launder the proceeds of his insider trading through accounts beneficially owned and controlled by him at Lloyds.

33.    The Swiss Money Laundering Law applies to all financial intermediaries and is based on the Due Diligence Law and Banking Guidelines that impose obligations on banks to properly identify their customers and to exercise due diligence if faced with circumstances suggesting money laundering. Among the core principles of the Due Diligence law is to "know your customer." It is not sufficient for banks and other financial intermediaries to merely request an individual's passport or driver's license or a corporation's records to verify the identity of the customer. The banks must also conduct due diligence as to whether the assets to be deposited in the account belong to the contracting party or some third party. In circumstances where it appears that the contracting party is not the beneficial owner of the assets, the banks must take steps to clarify the identity of the beneficial owner or refrain from opening an account.

34.    The Banking Guidelines also impose certain obligations on banks when customer transactions bear certain characteristics that are suggestive of money laundering. These obligations are triggered, *inter alia*, in the following situations: where the economic justification is not discernible or which may not make economic sense; where assets are withdrawn shortly after being deposited and there is no plausible reason for such an immediate withdrawal, which lead to substantial activity without any apparent reason; where account activity is inconsistent with the bank's knowledge and experience concerning the customer and the stated purpose of the relationship; and/or where the client's reason for selecting the particular bank to carry out its transaction is unclear.

35.    In transactions bearing classic indicia of money laundering, the bank is required to investigate and exercise due diligence to determine whether any economic justification exists for the suspicious transactions. In certain situations, the bank may be required to freeze the account without notifying the customer and, at times, report the customer to law enforcement.

36.    The Swiss Criminal Code also contains provisions prohibiting financial intermediaries from assisting money laundering. Article 305[bis] of the Criminal Code prohibits a bank from committing an act designed to obstruct the identification or confiscation of assets it knows, or must assume based on the circumstances, to be derived from criminal activity. It is also a violation of Article 305[ter] of the Criminal Code for a bank to accept, preserve, invest or assist to transfer assets and to neglect to determine the identity of the beneficial owner of the assets with the necessary diligence according to the circumstances.

37.    As set forth below and in contravention of these laws and regulations, Lloyds unlawfully and knowingly conspired with Kyprianou and enabled him to engage in money laundering transactions involving more than $130 million in proceeds of the AremisSoft fraud.

38.     Among the transactions engaged in at Lloyds by Kyprianou bearing the classic hallmarks of money laundering are the following deposits and withdrawals into his many accounts at Lloyds:

| | Date of Transfer | Amount of Transfer | From Whom | To Whom |
|---|---|---|---|---|
| 1 | December 13, 2000 | $6,007,350.00 | Bordier et Cie Inlay Group Corp.[2] Acct.# ▮▮/03 03 | **Lloyds TSB** Lady Moura[3] Acct.# ▮▮0-110 |
| 2 | December 18, 2000 | $6,007,350.00 | Dominick Inlay Group Corp. Acct.# ▮0 237 | **Lloyds TSB** Lady Moura Acct.# ▮▮0-110 |
| 3 | December 21, 2000 | $12,575,023.87 | Bordier et Cie Inlay Group Corp. Acct.# ▮0 237 | **Lloyds TSB** Lady Moura Acct.# ▮▮0-110 |
| 4 | December 21, 2000 | $6,000,043.00 | **Lloyds TSB** Lady Moura Acct.# ▮▮0-110 | Bank of Cyprus UK Aremis Holdings[4] Acct.# ▮▮9110 |
| 5 | December 28, 2000 | $11,424,993.00 | Dominick Inlay Group Corp. Acct.# ▮▮/03 03 | **Lloyds TSB** Lady Moura Acct.# ▮▮0410 |
| 6 | December 29, 2000 | $1,600,018.00 | **Lloyds TSB** Lady Moura Acct.# ▮▮0-110 | UBS Zurich K. Sedlmayer[5] Escrow Account Acct.# ▮▮0.608 |
| 7 | December 29, 2000 | $4,500,018.00 | **Lloyds TSB** Lady Moura Acct.# ▮▮0-110 | UBS Zurich Lion Enterprises Ltd.[6] Acct.# ▮▮0.60X |
| 8 | January 5, 2001 | $7,500,000.00 | Bordier et Cie Quantum Group Management Ltd.[7] Acct# ▮2 408 | **Lloyds TSB** Lady Moura Acct.# ▮▮0-110 |
| 9 | January 26, 2001 | € 6,881,004.79[8] | **Lloyds TSB** Lady Moura Acct.# ▮▮0-190 | Bank of Cyprus UK Aremis Holdings Acct.# ▮▮9510 |

---

[2] Inlay Group Corp. was a Poyiadjis company to which Kyprianou "gifted" his AremisSoft shares and through which Poyiadjis, on behalf of Kyprianou, fraudulently sold the shares in open market transactions to US investors.

[3] The Lady Moura account was an account beneficially owned or controlled by Kyprianou.

[4] Aremis Holdings was a Kyprianou nominee company incorporated in the British Virgin Islands ("BVI").

[5] Kurt Sedlmayer is an Austrian business acquaintance of Kyprianou, and this transaction represents a repayment of a personal loan in which he acted as an escrow agent.

[6] Lion Enterprises Ltd. was a UK entity which extended a line of credit to Kyprianou.

[7] Quantum Group Mgmt. Ltd. was another Poyiadjis company to which Kyprianou "gifted" his AremisSoft shares and through which Poyiadjis, on behalf of Kyprianou, fraudulently sold the shares in open market transactions to US investors.

[8] Equivalent to approximately $6,363,535.66 in U.S. dollars.

| | | | | |
|---|---|---|---|---|
| 10 | January 26, 2001 | $ 6,415,831.15 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-110 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-190 |
| 11 | January 29, 2001 | € 23,624.91 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-190 | Bank of Cyprus UK<br>Aremis Holdings<br>Acct.# ████9510 |
| 12 | February 7, 2001 | $9,980,000.00 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-110 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-210 |
| 13 | February 14, 2001 | $781,536.00 | Bordier et Cie<br>Quantum Group<br>Management Ltd.<br>Acct# ██2 408 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-110 |
| 14 | March 7, 2001 | $40,441.47 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-210 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-110 |
| 15 | March 9, 2001 | $5,000,000.00 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-110 | Cash Withdrawal |
| 16 | April 3, 2001 | $5,144,327.00 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-110 | Bordier & Cie Geneva<br>Quantum Group<br>Management, Ltd.<br>Acct.# ██2408 |
| 17 | April 18, 2001 | $10,020,133.46 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-210 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-110 |
| 18 | April 30, 2001 | £4,000.00 | HSBC UK<br>Acct.# ██5151 | **Lloyds TSB**<br>Velvet Underground[9]<br>Acct.# ██4203 |
| 19 | May 16, 2001 | $75,000.00 | **Lloyds TSB**<br>Lady Moura<br>Acct.# ███0-110 | **Lloyds TSB**<br>Quayside Finance Corp.[10]<br>Acct. # ███2-110 |
| 20 | May 16, 2001 | $75,000.00 | **Lloyds TSB**<br>Quayside Finance<br>Acct.# ███2-110 | **Lloyds TSB**<br>Cassiere Enterprises Inc[11]<br>Acct.# ███7-110 |
| 21 | May 31, 2001 | £4,000.00 | HSBC UK<br>Acct.# ██5151 | **Lloyds TSB**<br>Velvet Underground<br>Acct.# ██4203 |
| 22 | May 31, 2001 | $815,039.00 | **Lloyds TSB**<br>Lady Moura<br>Acct. # ███0-110 | HSBC<br>Kyprinaou & Hermione<br>Acct.# ██5251 |

---

[9] Velvet Underground was an alter-ego company used to pay Michael Miragliotta, Kyprianou's personal financial assistant in the UK responsible for the banking and money laundering involving UK and Swiss banks.

[10] Quayside Finance Corp. was a Kyprianou shell company incorporated in the BVI used in the fraud, which listed Miragliotta as its correspondent and a Kyprianou associate, Michael Tymvios, as its director.

[11] Cassiere Enterprises, Inc., is a holding company for Kyprianou's private yacht (M/Y Noni) incorporated in the British Virgin Islands. Accordingly, Kyprianou directed a number of transfers from Cassierie-named accounts to pay for expenditures for his private yacht. For example, Thomas Graham, captain of Kyprianou's private yacht, received at least 29 separate transfers Kyprianou's Lloyds TSB accounts from May 2001 through October 2002.

| | | | | |
|---|---|---|---|---|
| 23 | June 11, 2001 | $88,798.67 | **Lloyds TSB**<br>Lady Moura<br>Acct. # ██0-110 | HSBC<br>Kyprianou<br>Acct.# ██5151 |
| 24 | June 11, 2001 | $3,500,000.00 | Lloyds TSB<br>Lady Moura<br>Acct. # ██0-110 | One of Our Clients |
| 25 | June 11, 2001 | $10,184,864.44 | **Lloyds TSB**<br>Lady Moura<br>Acct. # ██0-110 | **Lloyds TSB**<br>AremisSoft (EE,ME,A)<br>Limited[12] |
| 26 | June 13, 2001 | $88,757.17 | **Lloyds TSB**<br>Lady Moura<br>Acct. #. ██0-110 | HSBC<br>Kyprinaou & Hermione<br>Acct.# ██5251 |
| 27 | June 22, 2001 | $400,000.00 | HSBC UK<br>Acct.# ██5151 | **Lloyds TSB**<br>Quayside Finance Corp.<br>Acct. # ██2-110 |
| 28 | June 26, 2001 | $400,000.00 | **Lloyds TSB**<br>Quayside Finance<br>Corp.<br>Acct. # ██2-110 | **Lloyds TSB**<br>Cassiere Enterprises Inc<br>Acct. # ██7-110 |
| 29 | June 28, 2001 | $383,197.56 | **Lloyds TSB**<br>Cassiere Enterprises<br>Inc<br>Acct. # ██7-110 | Deutsch Bank AG<br>Daimler Chrysler<br>Corporation<br>Acct.# ██45 00 |
| 30 | June 29, 2001 | $200,039.00 | **Lloyds TSB**<br>AremisSoft (EE,ME,A)<br>Ltd<br>Acct.# ██1-110 | Bulbank AD GQ,<br>SofiaAremisSoft (EE, ME,<br>A) Ltd.██5203 BGN |
| 31 | July 6, 2001 | £4,000.00 | HSBC UK<br>Acct.# ██5151 | **Lloyds TSB**<br>Velvet Underground<br>Acct.# ██4203 |
| 32 | July 10, 2001 | $10,012,966.04 | **Lloyds TSB**<br>AremisSoft (EE.ME.A)<br>Ltd<br>Acct.# ██1-110 | Bank of Cyprus Ltd.<br>AremisSoft (EE, ME, A)<br>Ltd.<br>Acct.# ██55-06 |
| 33 | August 1, 2001 | $50,000.00 | HSBC UK<br>Acct.# ██5151 | **Lloyds TSB**<br>Quayside Finance Corp.<br>██2-110 |
| 34 | August 2, 2001 | $50,000.00 | **Lloyds TSB**<br>Quayside Finance<br>Corp.<br>Acct.# ██2-110 | **Lloyds TSB**<br>Cassiere Enterprises Inc<br>Acct.# ██7-110 |
| 35 | August 22, 2001 | £4,000.00 | HSBC UK<br>Acct.# ██5151 | **Lloyds TSB**<br>Velvet Underground<br>Acct.# ██4203 |
| 36 | September 14, 2001 | £4,000.00 | Bank of Cyprus UK<br>Acct.# ██4-060 | **Lloyds TSB**<br>Velvet Underground<br>Acct.# ██4203 |

---

[12] AremisSoft EE.ME.A. Ltd. was a subsidiary of AremisSoft based in Cyprus.

| 37 | October 2, 2001 | £4,000.00 | Bank of Cyprus UK account Acct.# ███████4-060 | **Lloyds TSB** Velvet Underground Acct.# ████4203 |
|----|----|----|----|----|
| 38 | October 3, 2001 | £4,000.00 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB** Velvet Underground Acct.# ████4203 |
| 39 | October 10, 2001 | £12,000.00 | Bank of Cyprus UK Acct.# ███████4-060 | **Lloyds TSB** Velvet Underground Acct.# ████4203 |
| 40 | October 10, 2001 | £25,000.00 | Bank of Cyprus UK Acct.# ███████4-750 | **Lloyds TSB** Cassiere Enterprises, Inc. Acct.# ████7-110 |
| 41 | October 31, 2001 | $35,922.33 | Bank of Cyprus UK | **Lloyds TSB** Cassiere Enterprises Inc ████7-110 |
| 42 | November 26, 2001 | £270,000.00 | Bank of Cyprus UK account Acct.# ███████7-060 | **Lloyds TSB** UG Business Account[13] Acct.# ████3212 |
| 43 | November 29, 2001 | $191,619.28 | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 | Deutsch Bank AG Daimler Chrysler Corporation Acct.# ████████45 00 |
| 44 | November 29, 2001 | $191,579.28 | One of Our Clients | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 |
| 45 | January 4, 2002 | $191,619.28 | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 | Deutsch Bank AG Daimler Chrysler Corporation Acct.# ████████45 00 |
| 46 | January 4, 2002 | $191,174.67 | One of Our Clients | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 |
| 47 | January 8, 2002 | £28,000.00 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB** UG Business Acct.# ████3212 |
| 48 | February 7, 2002 | £4,000.00 | Bank of Cyprus UK account Acct.# ███████7-060 | **Lloyds TSB** Velvet Underground Acct.# ████4203 |
| 49 | February 25, 2002 | $12,029.00 | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 | **Lloyds TSB** Thomas Graham Acct.# ████2000 |
| 50 | March 5, 2002 | £4,000.00 | Bank of Cyprus UK account Acct.# ███████7-060 | **Lloyds TSB** Velvet Underground Acct.# ████4203 |

---

[13] The UG Business Account was another account owned or beneficially controlled by Kyprianou.

16

| 51 | April 3, 2002 | £4,000.00 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB** Velvet Underground Acct.# ███4203 |
| 52 | April 9, 2002 | £126,000.00 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB** UG Business Account Acct.# ████3212 |
| 53 | April 11, 2002 | $179,172.00 | **Lloyds TSB** UG Business Account Acct.# ████3-212 | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 |
| 54 | April 15, 2002 | $178,865.80 | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 | Deutsch Bank AG Daimler Chrysler Corporation Acct.# ██████45 00 |
| 55 | April 22, 2002 | $50,000.00 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB** UG Business Account Acct.# ████3210 |
| 56 | April 25, 2002 | $50,000.00 | One of Our Clients | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 |
| 57 | April 26, 2002 | $8,035.00 | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 | Hellenic Bank Limited Thomas Graham Acct.# ███████34-00 |
| 58 | May 8, 2002 | £4,000.00 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB** Velvet Underground Acct.# ███4203 |
| 59 | May 14, 2002 | $16,200.00 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB** UG Business Account Acct.# ████3212 |
| 60 | May 15, 2002 | $22,040.00 | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 | Hellenic Bank Limited Thomas Graham Acct.# ███████34-00 |
| 61 | May 30, 2002 | £11,195.35 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB** UG Business Account Acct.# ████3212 |
| 62 | June 5, 2002 | £4,000.00 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB** Velvet Underground Acct.# ███4203 |
| 63 | June 5, 2002 | $15,735.91 | **Lloyds TSB** UG Business Account Acct.# ████3-212 | **Lloyds TSB** Cassiere Enterprises Inc Acct.# ████7-110 |
| 64 | July 3, 2002 | £6,000.00 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB**Velvet Underground Acct.# ███4203 |
| 65 | July 3, 2002 | £125,000.00 | Bank of Cyprus UK Acct.# ███████7-060 | **Lloyds TSB** UG Business Account Acct.# ████3212 |

| | | | | |
|---|---|---|---|---|
| 66 | July 5, 2002 | £118,903.67 | **Lloyds TSB**<br>Cassiere Enterprises Inc<br>Acct.# ███7-112 | Deutsch Bank AG<br>Daimler Chrysler Corporation<br>Acct.# ███████45 00 |
| 67 | July 5, 2002 | £125,000.00 | **Lloyds TSB**<br>UG Business Account<br>Acct.# ████3-212 | **Lloyds TSB**<br>Cassiere Enterprises Inc<br>Acct.# ███7-112 |
| 68 | July 16, 2002 | £40,000.00 | Bank of Cyprus UK<br>Acct.# ████7-060 | **Lloyds TSB**<br>UG Business Account<br>Acct.# ███3212 |
| 69 | July 16, 2002 | $15,899.50 | **Lloyds TSB**<br>Cassiere Enterprises Inc<br>Acct.# ███7-110 | Barclays Bank Plc<br>Arthur Gallagher (UK) Ltd.<br>Acct.# ███3866 |
| 70 | July 18, 2002 | £35,000.00 | One of Our Clients | **Lloyds TSB**<br>Cassiere Enterprises Inc<br>Acct.# ███7-112 |
| 71 | August 7, 2002 | £4,000.00 | Bank of Cyprus UK<br>Acct.# ████7-060 | **Lloyds TSB**<br>Velvet Underground<br>Acct.# ███4203 |
| 72 | August 28, 2002 | £25,000.00 | Bank of Cyprus UK<br>Acct.# ████7-060 | **Lloyds TSB**<br>UG Business Account<br>Acct.# ███3212 |
| 73 | August 29, 2002 | £22,163.17 | **Lloyds TSB**<br>Cassiere Enterprises Inc<br>Acct.# ███7-110 | Commercial Bank of Greece<br>Anna & Katerina Papageorgopoulou<br>Acct.# ███9120 |
| 74 | August 29, 2002 | £25,000.00 | **Lloyds TSB**<br>UG Business Account<br>Acct.# ████3-212 | **Lloyds TSB**<br>Cassiere Enterprises Inc<br>Acct.# ███7-112 |
| 75 | September 5, 2002 | £4,000.00 | Bank of Cyprus UK<br>Acct.# ████7-060 | **Lloyds TSB**<br>Velvet Underground<br>Acct.# ███4203 |
| 76 | October 16, 2002 | $119,995.25 | Cassiere Enterprises Inc. | **Lloyds TSB**<br>Cassiere Enterprises Inc.<br>███7-110 |
| 77 | October 16, 2002 | $100,041.00 | **Lloyds TSB**<br>Cassiere Enterprises Inc.<br>Acct.# ███7-110 | Deutsch Bank AG<br>Daimler Chrysler Corporation<br>Acct.# ███████45 00 |
| 78 | October 16, 2002 | $17,528.85 | **Lloyds TSB**<br>Cassiere Enterprises Inc.<br>Acct.# ███7-110 | Barclays Bank Plc<br>Arthur Gallagher (UK) Ltd.<br>Acct.# ███3866 |
| 79 | October 17, 2002 | $78,866.80 | **Lloyds TSB**<br>Cassiere Enterprises Inc.<br>Acct.# ███7-110 | Deutsch Bank AG<br>Daimler Chrysler Corporation<br>Acct.# ███████45 00 |

| 80 | October 17, 2002 | $76,969.00 | One of Our Clients | Lloyds TSB<br>Cassiere Enterprises Inc<br>Acct.# ███7-110 |
|----|------------------|------------|--------------------|------------------|

***The Funds Laundered by Lloyds are the Proceeds of the Fraud in the United States***

39.    The monies involved in the financial transactions set forth above were the proceeds of the fraudulent activity orchestrated by Kyprianou as a result of the full cooperation he was afforded by Lloyds, and, as such, with the knowledge and assistance of Lloyds he was allowed to indiscriminately transfer funds and launder the proceeds of his fraud.

40.    In May 2000, Kyprianou, along with Poyiadjis, attended an AremisSoft Board of Directors meeting at the Four Seasons hotel in New York at which he was re-elected as Chairman of AremisSoft and permitted to continue as Chairman of GlobalSoft, a Cypriot software company related to AremisSoft.  During this meeting in New York, a report was given on the financial results of the Company, which Kyprianou and Poyiadjis knew to be falsely inflated, including the 10Q for the quarter ended March 31, 2000.

41.    As a director and officer of the Company, Kyprianou held stock of AremisSoft and received options to acquire additional shares of AremisSoft as part of his compensation. Throughout 1999-2000, Kyprianou gifted 1,450,000 AremisSoft shares through Sincock Holdings, a Kyprianou alter-ego entity, to Quantum Management, a Poyiadjis company through which Poyiadjis, on behalf of Kyprianou, fraudulently sold the shares in open market transactions to US investors.  In November 2000, Kyprianou publicly reported that he gifted 1,600,000 AremisSoft shares to two unnamed donees for "overall tax and estate planning" purposes and claimed that he had "no voting, beneficial or pecuniary interest" in the donees.

42.    In furtherance of the fraud and illegal insider trading conspiracy, Poyiadjis directed his financial manager Roger Meyer ("Meyer") to sell the stock and options of

Kyprianou, and further directed that the sale proceeds be transferred at Kyprianou's direction to accounts at Lloyds. These transfer instructions, provided by Moore at Lloyds, were faxed by Kyprianou to Poyiadjis in New York, and from Poyiadjis in New York to Meyer in Switzerland. Kyprianou's AremisSoft stock holdings were traded through a brokerage account at Brown Brothers Harriman & Co. ("Brown Brothers") in New York. Poyiadjis also directed Meyer to transfer some of the proceeds from the illegal insider trading to AremisSoft to pay the option exercise price. These transfers were wired through correspondent banks in New York. Poyiadjis provided all of these directions to Meyer from his home office in New York.

43.    Shortly after the AremisSoft share gifts were made and the sales were complete, and over the course of two weeks in December 2000, more than $36 million was transferred into Kyprianou's Lady Moura account at Lloyds in four tranches from two different accounts at Bordier et Cie ("Bordier") and Dominick & Dominick Company AG ("Dominick"), each account in the name of Inlay Group Management ("Inlay"), another Poyiadjis company to which Kyprianou "gifted" his AremisSoft shares and through which Poyiadjis, on behalf of Kyprianou, fraudulently sold the shares in open market transactions to US investors, (*see supra* p. 13, chart at entries 1-3 and 5). Further, the over $7.5 million in proceeds from the sale of stock after the exercise of AremisSoft options that Kyprianou gifted were transferred to Lloyds (*see supra* p. 13, chart at entries 8 and 13). Each transaction involving U.S. dollar denominated transactions were necessarily routed through Bankers Trust, Lloyds' correspondent bank in New York. The initial $44 million laundered through Lloyds clearly constituted proceeds of Kyprianou's insider trading scheme. The subsequent financial transactions continued the scheme by routing and churning the funds through Lloyds accounts so as to conceal the proceeds of Kyprianou's fraud.

*Lloyds Knew the Funds Involved Represented the Proceeds of the Fraud*

44.    As set forth herein, Lloyds knew that the monies deposited at Lloyds were proceeds of Kyprianou's illegal activities. At the time that Kyprianou opened his Lloyds accounts, Lloyds knew that Kyprianou was the Chairman and a corporate insider of AremisSoft, a United States publicly traded company, and that the purpose of the Lady Moura account was to deposit the proceeds of his sale of AremisSoft securities.

45.    A number of Lloyds upper level managers were involved with the Kyprianou accounts and financial transactions at Lloyds. Kyprianou opened the Lady Moura account, through which the proceeds of the fraud were transferred, in the United Kingdom, referencing both Embedoklis and Moore. Moore, in particular, had full knowledge of the amounts of money being transferred by Kyprianou, as well as the sources of the funds and the value dates. In fact, Moore provided the routing instructions for each transaction and received an electronic report (i.e. SWIFT report) of the transfers. In addition, Meyer -- Poyiadjis' financial manager -- specifically told Jane Moore that the funds being transferred to Kyprianou's Lloyds accounts were proceeds of his AremisSoft share sales. Finally, Sylvie Orsatti ("Orsatti"), the Assistant Manager at Lloyds in Geneva, co-signed correspondence confirming AremisSoft cash holdings at Lloyds, *infra*, knowing that such confirmation was false.

46.    Lloyds also knew that Kyprianou publicly reported that he had gifted in late 2000 all of his stock options and 1.6 million shares of AremisSoft securities to two entities in which he claimed "he had no voting, beneficial or pecuniary interest." Lloyds' banking records make clear that this brief burst of activity originated from a total of three different accounts at two different banks, and involved large amounts of money at a time when Kyprianou had purportedly gifted large amounts of shares and options. Further, these large transfers were from accounts for

which Kyprianou was neither listed as the record nor beneficial owner, and were transferred through Kyprianou's personal account as well as the Lloyds Lady Moura account, which Lloyds knew was beneficially owned and controlled by Kyprianou.

47.    Lloyds not only enabled Kyprianou to launder the proceeds of his fraudulent conduct through Lloyds' accounts, but Lloyds misrepresented material information that it knew would be relied on by AremisSoft and its auditors in reporting the Company's financial condition and thereby provided further active assistance for Kyprianou's fraud and crimes against the Company.  On March 29, 2001, in response to an audit inquiry regarding cash in AremisSoft's bank accounts, Lloyds sent a letter to Pavlos Meletiou ("Meletiou"), a co-conspirator of Kyprianou, who purported to act as AremisSoft EE.ME.A's (an AremisSoft subsidiary based in Cyprus) auditor.  The letter stated that **"since 29th December 2000" Lloyds had been holding $9,980,000.00 "blocked in favour of AremisSoft (EE.ME.A) Ltd."** ("Confirmation Letter") **(emphasis added)**.  The Confirmation Letter, signed by Moore and Orsatti, was simply false.  In fact, Moore and Orsatti knew or should have known that no funds were blocked "in favour of AremisSoft" on March 29, 2001, the date of the letter – nor were there funds blocked on December 29, 2000, as the letter claimed.  Moreover, Lloyds knew that the information in the Confirmation Letter would be relied on in AremisSoft's annual audit of its financial statements.

48.    Accordingly, Lloyds' issuance of the Confirmation Letter constituted fraud.  In fact, at the time the Confirmation Letter was issued in March 2001, Lloyds did *not* hold $9.98 million blocked in favor of AremisSoft EE.ME.A.  It was not until nearly three months later, in June 2001, that the AremisSoft EE.ME.A account was opened and approximately $10 million in funds were transferred in from the Kyprianou Lady Moura account (*see supra* at p. 15 at chart entry 25).

22

49.    The Lloyds Confirmation Letter was false and misleading because (a) AremisSoft EE.ME.A. only received the $9.98 million at its account at Lloyds in June 2001, three months after the Confirmation Letter was sent and (b) Lloyds affirmed that there were monies blocked in favor of AremisSoft EE.ME.A in December 2000 but omitted to disclose that (i) neither AremisSoft EE.ME.A nor any other AremisSoft entity had an account at Lloyds either at December 29, 2000, or at the date of the confirm in March 2001; and (ii) the supposedly blocked funds, if ever blocked at all, were in the Lady Moura account, an account beneficially owned and controlled by Kyprianou.

50.    Additionally, Moore, Orsatti and Embedoklis knew that AremisSoft EE.ME.A did not have an account at Lloyds at the time the letter was written. Rather, the monies were held in a Kyprianou account at Lloyds. There was no apparent reason that said amount was either blocked or transferred to AremisSoft EE.ME.A. Indeed, no AremisSoft EE.ME.A account was opened until June 11, 2001.

51.    The issuance by Lloyds of the misleading Confirmation Letter, which falsely stated that monies were blocked and had been since December 29, 2000, and which falsely suggested that AremisSoft had an account at Lloyds when it did not, enabled AremisSoft to include false and misleading material information in AremisSoft's publicly filed financial statements and further delayed for months discovery of the massive AremisSoft fraud. Further, this false and misleading information was relied on by the Company and by the auditors of AremisSoft in auditing the financial statements for the Company and in preparing their opinion thereon.

52.    Investors continued to buy millions of shares of AremisSoft stock not knowing that its financial results and financial statements were false and misleading.

53.     Amidst the flurry of media reports beginning in May 2001 which discussed allegations of Kyprianou's involvement in the AremisSoft fraud and Kyprianou's numerous false and misleading statements as to AremisSoft's purported revenues, Lloyds nonetheless for years thereafter continued to conduct business with Kyprianou thereby providing continued assistance to his money laundering and concealment scheme.

54.     In June 2001, Kyprianou instructed Lloyds to open an account in the name of AremisSoft EE.ME.A, Account Number ████1-110 ("Lloyds-EE.ME.A").   Lloyds did this even though (a) AremisSoft EE.ME.A, had no offices, personnel, nor business operations in Switzerland and its reason for selecting Lloyds was unclear, and (b) by that time, there were widespread public allegations that Kyprianou had engaged in fraudulent conduct at AremisSoft.

55.     Then, on June 11, 2001, Lloyds transferred over $10 million (the $9.9 million purportedly "blocked in favour of AremisSoft (EE.ME.A) Ltd" plus interest) from the Kyprianou Lady Moura account, to the newly opened Lloyds-EE.ME.A account for no apparent economic or business purpose (*see supra* at p. 15 at chart entry 25).   Lloyds further participated in money laundering and assisted Kyprianou's theft of AremisSoft's assets by then transferring said funds to an AremisSoft EE.ME.A. account controlled by Kyprianou at the Bank of Cyprus in Nicosia, Cyprus (*see supra* at p. 15 at chart entry 32).

56.     Even after the disclosure of fraud in the reporting of the revenues generated by the NHIF Contract, Lloyds permitted the transfer of $200,000 from the Lloyds-EE.ME.A account to an AremisSoft EE.ME.A account at Bulbank, Sofia, Bulgaria on June 29, 2001 (*see supra* at p. 30 at chart entry 15).

57.     In August 2001, counsel for AremisSoft contacted Lloyds as part of its investigation of the AremisSoft fraud, requesting details of the AremisSoft EE.ME.A. account as

well as any other AremisSoft account information at Lloyds. Indeed, counsel for AremisSoft specifically demanded that signatory authority for Kyprianou and Matthews be terminated. AremisSoft counsel requested all account statements, debit and credit documents, and wire instructions for the express purpose of discovering from where the funds came, to where the funds were directed and who gave the instructions. Such a request should have made it clear to Lloyds that the AremisSoft EE.ME.A. account had a questionable relationship to the Company, and that the transactions through the account occurred without AremisSoft's knowledge or approval. Despite gaining such knowledge about its customer, Lloyds nonetheless continued to do business with Kyprianou for at least the next three years.

58.     Moreover, counsel for AremisSoft inquired at that time as to whether AremisSoft or its subsidiaries, six of which were listed, had established accounts with Lloyds. In response, Moore responded only that none of the AremisSoft companies mentioned held an account with Lloyds. Moore did not answer the question of whether AremisSoft or any of its subsidiaries ever held an account at Lloyds, but rather only responded that no such accounts existed at the time of her October 29, 2001 letter. Moore's evasive response suggests that she was attempting to conceal the fact that Lloyds was complicit in Kyprianou's efforts to utilize his accounts at Lloyds to launder the proceeds of the AremisSoft fraud.

*For Years, Lloyds Engaged in Continuous Transactions for Kyprianou with the Knowledge that They Were Designed to Conceal or Disguise the Nature, Location, Source, Ownership or Control of the Proceeds of the Fraud*

59.     Lloyds intentionally facilitated the concealment of Kyprianou's identity as the beneficial owner of accounts at Lloyds, and masked his identity in transactions through Lloyds. One method of concealment utilized by Kyprianou at Lloyds was the use of sham names to identify his bank accounts to conceal the identities of the parties engaged in certain transactions.

For example, Kyprianou established Lloyds accounts under the names "CEI" and "UG Business". These generically named accounts with no apparent connection to Kyprianou or AremisSoft were, in fact, vehicles for funding the maintenance of Kyprianou's yacht. From May 2001 through October 2002, almost $350,000 was funneled into these accounts to pay for yacht expenses, including the payment of yacht captain Thomas' Graham's $200,000 salary, and payment of $56,844 in insurance coverage. The use of the sham account names furthered Kyprianou's ability to shield the identity of the yacht's owner and the account's owner, while concealing the origin of the funds for the yacht. Indeed, Kyprianou funded both the CEI and UG Business accounts with the proceeds of the AremisSoft fraud through his Lloyds and Bank of Cyprus accounts. By permitting the use of these fictitious account names, Lloyds facilitated the pattern of concealment and misdirection employed by Kyprianou in this scheme.

60.     Lloyds also permitted the use of a fictitious account name for the benefit of Kyprianou when an account was opened for Michael Miragliotta ("Miragliotta"), the Kyprianous' personal assistant. Miragliotta was responsible for the Kyprianou's banking activities as well as other administrative activities in the United Kingdom, including moving their money through a web of pseudonym accounts. He maintained an account at Lloyds in the name of Velvet Underground, with an account number almost identical to that of the UG Business account, ████4203, but for the suffix. The name Velvet Underground was used for Miragliotta's account because he and Kyprianou wanted to keep it confidential to conceal his salary. Lloyds provided a list of names from which Miragliotta chose the name Velvet Underground. Lloyds not only knew that Miragliotta and Kyprianou wished to conceal the identity of the beneficial owner of the Velvet Underground account, as it did with Kyprianou, Lloyds assisted by providing the account alias. Between April 2001 and December 2002,

Kyprianou transferred £58,000 in 17 tranches from his Bank of Cyprus and HSBC accounts to Velvet Underground for Miragliotta's salary.

61.    Another method that Lloyds employed to conceal the origins of certain transfers and the beneficial owner of the Kyprianou accounts was transferring money without reference to the remitter's name or appropriate account number. Instead, Lloyds would permit Kyprianou to remit payments to his Lloyds accounts by simply referencing "Jane Moore", his account manager. In other words, the transfer documents made no reference to Kyprianou or any of his business entities as either the transferor or the transferee. Similarly, Lloyds permitted Kyprianou to transfer money out of his account by simply stating on the transfer document "by order of one of our clients." Alternatively, so as to frustrate any effort to trace the proceeds of the fraud, money was often transferred into Kyprianou's account with reference to "house account" numbers for institutional house accounts, rather than referencing the individual accounts belonging to Kyprianou.

62.    Even after the SEC had already filed a civil injunction action against Kyprianou, Lloyds Geneva received a transfer of £25,000 on October 10, 2001, from Kyprianou's Bank of Cyprus account and credited the amount to an account identified with the number ■0047 (*see supra* at p. 16 at chart entry 40) for the benefit of CEI. This transfer also referenced "Jane Moore."

63.    Likewise, between November 2001 and August 2002, Lloyds received at least ten transfers totaling over $1 million from Kyprianou's Bank of Cyprus account (■7-060) and credited the amounts to accounts in the name of "UG Business". At least three of these transfers occurred after Kyprianou had been indicted. According to documents in the Plaintiff's possession, all but two of those transfers also reference "Jane Moore".

## COUNT I

### FOR CIVIL PENALTIES FOR MONEY
### LAUNDERING IN VIOLATION OF 18 U.S.C. §§1956(a)(1)(A) and (b)

64.    Plaintiff repeats and realleges and incorporates by reference herein the entirety of the allegations contained in the foregoing paragraphs.

65.    Lloyds is a financial institution which is engaged in interstate and foreign commerce. The financial transactions which represented the proceeds of Kyprianou's specified unlawful activity involved the use of Lloyds and other financial institutions. In addition, the financial transactions which represented the proceeds of Kyprianou's specified unlawful activity affected interstate and foreign commerce and involved the movement of funds by wire and other means and involved the use of investment securities, specifically securities issued by AremisSoft.

66.    The financial transactions alleged herein involved the proceeds of Kyprianou's unlawful activity including, but not limited to, fraud in the sale of securities in violation of 18 U.S.C. §1961(1), 78 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5, mail fraud in violation of 18 U.S.C. §1341, wire fraud in violation of 18 U.S.C. §1343, and money laundering in violation of 18 U.S.C. §§1956(a)(2)(B)(i) and 1957.

67.    Lloyds knew that the funds transferred to and out of accounts maintained by it for Kyprianou represented the proceeds of unlawful activity.

68.    For several years through and including at least January 2004, Lloyds continuously acted with the intent to promote Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering, and to aid him in concealing his money laundering.

69.     Lloyds is liable to the United States for the value of the funds and monetary instruments involved in the transactions.

## COUNT II

### FOR CIVIL PENALTIES FOR MONEY LAUNDERING UNDER 18 U.S.C. §§1956(a)(1)(B) and (b)

70.     Plaintiff repeats and realleges and incorporates by reference herein the entirety of the allegations contained in the foregoing paragraphs.

71.     Lloyds is a financial institution which is engaged in interstate and foreign commerce. The financial transactions which represented the proceeds of Kyprianou's specified unlawful activity involved the use of Lloyds and other financial institutions. In addition, the financial transactions which represented the proceeds of Kyprianou's specified unlawful activity affected interstate and foreign commerce and involved the movement of funds by wire and other means and involved the use of investment securities, specifically securities issued by AremisSoft.

72.     The financial transactions alleged herein involved the proceeds of Kyprianou's unlawful activity including, but not limited to, fraud in the sale of securities in violation of 18 U.S.C. §1961(1), 78 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5, mail fraud in violation of 18 U.S.C. §1341, wire fraud in violation of 18 U.S.C. §1343, and money laundering in violation of 18 U.S.C. §§1956(a)(2)(B)(i) and 1957.

73.     Lloyds knew that the funds transferred to and out of accounts maintained by it for Kyprianou represented the proceeds of unlawful activity.

74.     For several years Lloyds continuously knew that the financial transactions it executed for Kyprianou were designed in whole or in part to conceal or disguise the nature,

location, source, ownership or control of the proceeds of Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering.

75.    Lloyds is liable to the United States for the value of the funds and monetary instruments involved in the transactions.

## COUNT III

### FOR CIVIL PENALTIES FOR MONEY LAUNDERING UNDER 18 U.S.C. §§1956(a)(2)(A) and (B) and (b)

76.    Plaintiff repeats and realleges and incorporates by reference herein the entirety of the allegations contained in the foregoing paragraphs.

77.    Lloyds is a financial institution which is engaged in interstate and foreign commerce. The financial transactions which represented the proceeds of Kyprianou's specified unlawful activity involved the use of Lloyds and other financial institutions. In addition, the financial transactions which represented the proceeds of Kyprianou's specified unlawful activity affected interstate and foreign commerce and involved the movement of funds by wire and other means and involved the use of investment securities, specifically securities issued by AremisSoft.

78.    The financial transactions alleged herein involved the proceeds of Kyprianou's unlawful activity including, but not limited to, fraud in the sale of securities in violation of 18 U.S.C. §1961(1), 78 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5, mail fraud in violation of 18 U.S.C. §1341, wire fraud in violation of 18 U.S.C. §1343, and money laundering in violation of 18 U.S.C. §§1956(a)(2)(B)(i) and 1957.

79.    Lloyds knew that the funds transferred to and out of accounts maintained by it for Kyprianou represented the proceeds of unlawful activity.

80.    For several years, Lloyds and Kyprianou would and did transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering.

81.    For several years, Lloyds and Kyprianou, with knowledge that the funds involved represented the proceeds of some form of unlawful activity, would transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, to conceal or disguise the nature, location, source, ownership or control of the proceeds of Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering.

## COUNT IV

### FOR CIVIL PENALTIES FOR MONEY LAUNDERING UNDER 18 U.S.C. §§1957 and 1956(b)

82.    Plaintiff repeats and realleges and incorporates by reference herein the entirety of the allegations contained in the foregoing paragraphs.

83.    Lloyds knowingly engaged in financial transactions of greater than $10,000 involving the proceeds of Kyprianou's unlawful insider trading, which were denominated in United States Dollars and were transferred to and from the accounts maintained by Lloyds for Kyprianou in United States Dollars.

## COUNT V

### FOR CIVIL PENALTIES FOR CONSPIRACY TO
### COMMIT MONEY LAUNDERING UNDER 18 U.S.C. §§1956(h) and (b)

84.     Plaintiff repeats and realleges and incorporates by reference herein the entirety of the allegations contained in the foregoing paragraphs.

85.     From in or about June 2000 through in or about January 2004, Lloyds and Kyprianou unlawfully, willfully and knowingly did combine, conspire, confederate and agree together and with each other to violate 18 U.S.C. §§1956(a)(1), (A), (a)(1)(B), (2)(A) and (2)(B)(i).

86.     It was a part and an object of the conspiracy that Lloyds and Kyprianou engaged in financial transactions involving the proceeds of Kyprianou's unlawful activity in order to promote Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering.

87.     It was a further part and an object of the conspiracy that Lloyds and Kyprianou engaged in financial transactions in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering.

88.     It was a further part and an object of the conspiracy that Lloyds and Kyprianou would transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering.

89.    It was a further part and an object of the conspiracy that Lloyds and Kyprianou, with knowledge that the funds involved represented the proceeds of some form of unlawful activity, would transport, transmit, and transfer monetary instruments and funds from a place in the United States to or through a place outside of the United States, or to a place in the United States from or through a place outside the United States, to conceal or disguise the nature, location, source, ownership or control of the proceeds of Kyprianou's underlying acts of securities fraud, mail fraud, wire fraud and money laundering.

90.    Lloyds is liable to the United States for the value of the funds and monetary instruments involved in the transactions.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff requests that this Court, as authorized by Section 1956(b) of Title 18:

A.    Enter judgment against Defendant Lloyds and in favor of Plaintiff for each violation alleged in the Complaint;

B.    Award Plaintiff monetary civil penalties from Defendant Lloyds for the value of the funds involved in the financial transactions in violation of Sections (a)(1), and (h) of 18 U.S.C. § 1956 and 18 U.S.C. § 1957, which total at least $130 million;

C.    Order Defendant Lloyds to pay costs of this action; and

D.    Award Plaintiff such other and additional relief as the Court may determine to be just and proper.

Plaintiff demands a trial by jury.

Dated:          New York, New York
                October 15, 2007

                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States of America

                       By: _____
                              RUA M. KELLY (MA-643351)
                              Assistant United States Attorney
                              One Saint Andrew's Plaza
                              New York, New York 10007
                              Telephone:  (212) 637-2471
                              Facsimile:   (212) 637-0421