# EXHIBIT 3

DOC #1

01 CV          8903

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------
UNITED STATES SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

AREMISSOFT CORPORATION, ROYS
POYIADJIS and LYCOURGOS KYPRIANOU,

Defendants,

OLYMPUS CAPITAL INVESTMENT, INC.
and ORACLE CAPITAL, INC.,

Relief Defendants.
------------------------------

Civil Action No:

COMPLAINT FOR
EMERGENCY,
PRELIMINARY
AND PERMANENT
INJUNCTIVE
RELIEF

The Securities and Exchange Commission ("the Commission") alleges:

Defendant AremisSoft Corporation ("AremisSoft"), aided and abetted by defendants Roys Poyiadjis ("Poyiadjis") and Lycourgos Kyprianou ("Kyprianou"), violated antifraud and other provisions of the federal securities laws by overstating revenues, overestimating the value of customer contracts and acquisitions and otherwise misrepresenting to shareholders and the public in filings with the Commission, press releases and other public statements that AremisSoft's business was substantially greater than its true financial condition warranted. Defendants Poyiadjis and Kyprianou, who were senior officers of AremisSoft, took advantage of AremisSoft's misrepresentations

selling over $175 million of overvalued securities before the fraudulent scheme began to unravel.

The Commission requests emergency injunctive and other relief to freeze bank and brokerage accounts and to discover additional proceeds of unlawful trading, and for other preliminary and permanent relief.

## SUMMARY OF THE COMPLAINT

1.    Defendant AremisSoft claims to be a multinational software development and marketing company.  Its securities were listed on the NASDAQ National Market System until trading was halted on July 30, 2001.  On August 29, 2001, AremisSoft was delisted by the NASDAQ and its securities are now quoted in the Pink Sheets, an inter-dealer quotation system.  The stock sold for under one dollar a share when it debuted in the Pink Sheets.

2.    AremisSoft stated in a press release issued on December 17, 1999 that it had obtained a contract worth $37.5 million with the National Health Insurance Fund ("NHIF") of Bulgaria to automate that country's health care system over an 18 to 24 month period.  Thereafter, in filings with the Commission and in statements made publicly to analysts and others, AremisSoft repeated the $37.5 million valuation of the Bulgarian contract. The purported contract value was material to AremisSoft's business prospects.  The valuation equaled nearly half of the company's 1999 gross revenue.

3.    However, in late spring or early summer of 2001, the Bulgarian government confirmed press reports that the contract's value was no more than $3.9 million.

4.    AremisSoft nonetheless reported $7.1 million in revenue from the Bulgarian contract in financial statements filed with the Commission for the fiscal year 2000 and

2

adjis publicly stated the company realized an additional $2 million in the first quarter of 2001. But the Bulgarian government has since confirmed it paid AremisSoft only $1.7 million. AremisSoft recently announced that it cannot substantiate receipt of $5.4 million of the $7.1 million it reported to the Commission and to the public.

5. AremisSoft also materially overstated reported revenues realized from its Emerging Markets Group located in Bangalore, India, and materially overstated the prices it paid to acquire several companies, all for the purpose of making AremisSoft appear more successful than true business results warranted. The company then caused most of the accounting records at the Bangalore office to be destroyed to hide evidence of the defendants' unlawful conduct.

6. AremisSoft's press releases, filings with the Commission and other public statements which materially misrepresented the value of customer contracts, company revenues and the costs of company acquisitions, violated the antifraud and, with respect to Commission filings, the false filing provisions of the federal securities laws. Defendants Poyiadjis and Kyprianou aided and abetted AremisSoft's violations of these statutes.

7. Defendant Poyiadjis was until October 1, 2001 AremisSoft's chairman and chief executive officer. Through entities he controlled, Poyiadjis sold millions of shares of AremisSoft stock, sometimes through secret transactions, including at least 2,162,953 shares between September and December 2000. His stock sale proceeds of approximately $175 million were routed through a U.S. broker-dealer and Swiss banks. In July 2001, these proceeds were deposited in accounts in the Isle of Man held in the names of the relief defendants. On October 2, 2001, at the request of the United States

...ney for the Southern District of New York, the Attorney General of the Isle of Man obtained an order from an Isle of Man Court directing that Poyiadjis's accounts be frozen.

8.   At all times Poyiadjis was directing the sale of AremisSoft stock for his personal benefit, he knew, or was reckless in not knowing, that public statements, press releases and Commission filings materially misrepresented the financial condition of AremisSoft.

9.   Poyiadjis violated, among other statutes and rules, the antifraud provisions of the federal securities laws by causing AremisSoft to materially misstate, among other things, its revenues, the values of customer contracts and the cost of acquisitions. He also violated the laws against insider trading by selling AremisSoft stock in breach of his fiduciary duty to AremisSoft and its shareholders not to profit from his knowledge that AremisSoft repeatedly misstated its financial condition.

10.   Defendant Kyprianou founded AremisSoft and was its chairman and chief executive officer from October 1997 to May 2000. He was named co-chief executive officer with Poyiadjis in February 2001. On July 31, 2001, the day after trading in AremisSoft was halted on the NASDAQ at the company's request, the company announced that Kyprianou retired as chairman, board member and co-chief executive officer.

11. Through entities he controlled, Kyprianou sold millions of shares of AremisSoft stock, including at least 2,166,666 shares sold during November and December 2000. The amount and whereabouts of the proceeds of those sales are not yet known to the plaintiff.

4

12. At all times Kyprianou was directing the sale of AremisSoft stock for his personal benefit, he knew, or was reckless in not knowing, that public statements, press releases and Commission filings materially misrepresented the financial condition of AremisSoft.

13. Kyprianou violated, among other statutes and rules, the antifraud provisions of the federal securities laws by causing AremisSoft to materially misstate, among other things, its revenues, the values of customer contracts and the cost of acquisitions. He also violated the laws against insider trading by selling AremisSoft stock in breach of his fiduciary duty to AremisSoft and its shareholders not to profit from his knowledge that AremisSoft repeatedly misstated its financial condition.

## VIOLATIONS ALLEGED

14. By virtue of the conduct described herein, defendants AremisSoft, Poyiadjis and Kyprianou violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §10b-5]. Defendants Poyiadjis and Kyprianou also aided and abetted AremisSoft's violations of the provisions of the securities laws cited above and are liable for AremisSoft's violations of these provisions as controlling persons of AremisSoft under Section 20 of the Exchange Act. (Securities fraud).

15. By virtue of the conduct described herein, defendant AremisSoft violated Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. 240.12b-20, 13a-1 and 13a-13]. Defendants Poyiadjis and Kyprianou aided and abetted AremisSoft's violations of the provisions of

securities laws cited above and are liable for AremisSoft's violations of these provisions as controlling persons of AremisSoft under Section 20 of the Exchange Act. (False filings).

16. By virtue of the conduct described herein, defendants Poyiadjis and Kyprianou violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)]. (Reporting securities transactions by officers and directors).

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Venue lies in this Court pursuant to Section 20 of the Securities Act and Section 27 of the Exchange Act.

18. In connection with the transactions, acts, practices, and courses of business described in this Complaint, each of the defendants, directly and indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means or instrumentalities of transportation or communication in interstate commerce.

## DEFENDANTS

19. AremisSoft is a Delaware corporation with its U.S. headquarters in Westmont, N.J. Other offices are in London , Cypress and India. The company claims that it develops, markets, implements and supports enterprise-wide software applications for mid-sized organizations in the manufacturing, hospitality, healthcare and construction industries. Trading in AremisSoft was halted by the NASDAQ on July 30, 2001 at the request of the company. The NASDAQ delisted the company's securities on August 29,

AremisSoft securities are now quoted on the Pink Sheets. AremisSoft has approximately 39.3 million shares of stock outstanding.

20. Poyiadjis was AremisSoft's chairman and chief executive officer until October 1, 2001, when he resigned "for personal reasons," according to AremisSoft. He maintains a residence in New York City but is a British citizen. At all relevant times, Poyiadjis was a "control person" of AremisSoft as defined in Sec. 20 of the Exchange Act.

21. Kyprianou is the founder of AremisSoft. From October 1997 until July 31, 2001, Kyprianou was the chairman and chief executive officer of the company (co-CEO with Poyiadjis as of February 2001). On July 31, 2001, he retired his board and officer positions. According to filings with the Commission, Kyprianou resides in Cyprus and is a citizen of that nation. At all relevant times, Kyprianou was a "control person" of AremisSoft as defined in Sec. 20 of the Exchange Act.

## RELIEF DEFENDANTS

22. Olympus Capital Investment, Inc., a relief defendant, was incorporated in the British Virgin Islands on December 14, 2000. Its stock is wholly owned by The Atlas Trust, an Isle of Man trust that was settled on December 29, 2000 by defendant Poyiadjis. The beneficiaries of the trust include Poyiadjis, his wife and other family members. During July 2001, part of the proceeds of the unlawful sales of AremisSoft stock by or at the direction of Poyiadjis were deposited in an account in the name of Olympus Capital at Fleming Isle of Man Limited, a bank in the Isle of Man.

23. Oracle Capital Inc., a relief defendant, was incorporated in the British Virgin Islands on December 14, 2000. Its stock is wholly owned by The Trident Trust, an Isle of

trust that was settled on December 29, 2000 by Spyros Poyiadjis, Roys Poyiadjis's father. The beneficiaries of the trust are Roys Poyiadjis's mother and his two brothers. During July 2001, part of the proceeds of the unlawful sales of AremisSoft stock by or at the direction of Poyiadjis were deposited in an account in the name of Oracle Capital at Fleming Isle of Man Limited, a bank in the Isle of Man.

## FIRST CLAIM

### (Securities Fraud)

### AremisSoft, Poyiadjis and Kyprianou Violated Sec. 17(a) of the Securities Act, Sec. 10(b) of the Exchange Act and Rule 10b-5 Thereunder and Poyiadjis and Kyprianou Aided and Abetted AremisSoft's Violations of These Provisions

A.    **The Bulgarian Contract**

24. AremisSoft issued a press release on December 17, 1999 announcing "the signing of a $37.5 million agreement to automate the nationwide healthcare system of Bulgaria" with that country's National Health Insurance Fund ("NHIF"). The press release added that "the contract will be recognized over an 18 to 24 month installation period, beginning in January 2000."

25. According to the press release, Kyprianou called the contract award "a tremendous achievement for AremisSoft and Bulgaria." Poyiadjis said the contract "represents a stepping-stone for further expansion into emerging markets, a key initiate of our business model." Poyiadjis was listed in the December 17 press release as the contact for AremisSoft for further information. The $37.5 million contract valuation was referenced again in AremisSoft's S-1 registration statement filed in March 2000, in its Form 10-K for the fiscal year 1999 filed in March 2000 and in public presentations to analysts and others.

26. The December 17, 1999 announced value of $37.5 million was material. AremisSoft reported in Commission filings revenues of $25.3 million for the nine month period ended September 30, 1999 and $73.3 million in revenues for the full year 1999. The contract announcement represented a material increase in anticipated revenues for subsequent reporting periods.

27. On or about May 14, 2001 a short-seller's report detailed numerous allegations of irregularities and misrepresentations by AremisSoft, including several relating to terms of the Bulgarian contract. News reports on the internet and in *The New York Times*, among other places, began reporting some of these same contentions. Shares of AremisSoft stock declined from $18.47 per share on May 14 to $14.55 on May 15. Volume on May 15 was 12.5 million shares, 12 times the average volume for the year and five times the volume on May 14.

28. In an effort to staunch the sharp decline in AremisSoft share price, the company issued a press release on May 15, 2001 announcing that Poyiadjis had purchased 100,000 shares of the company's stock. According to the press release, Poyiadjis said, "we believe the shares of AremisSoft are undervalued in the marketplace due to the concerted activities of unscrupulous short sellers who have been spreading false and misleading information . . . We remain highly optimistic about our business prospects and the recent stock activity has created an opportunity for me to invest at what I believe is an attractive valuation."

29. On May 16, 2001, AremisSoft issued another press release "responding to the circulation of a specious anonymous 'short report' and other spurious and unsubstantiated rumors. . ." The stock price declined to $13.28 on heavy volume.

9

30. AremisSoft issued another press release on May 17, 2001, this time focused on the NHIF contract. Although AremisSoft reasserted the contract's value was $37.5 million, the company acknowledged that the contract contemplated multiple phases subject to competitive bidding and that $20 million of the contract value was subject to third-party financing. Despite these qualifications, the company said, "we believe that numerous reporters and others have combined incorrect statements with misunderstandings of the contract phases which has led them to publish inaccurate stories about our contract and relationship with the NHIF."

31. The May 17, 2001 press release also claimed that Phase One alone of the project was worth $37.5 million and that subsequent phases would be subject to competitive bidding. The company stated that "confusion" had arisen because within NHIF and AremisSoft "an internal nomenclature discussed the current contract in terms of multiple sub-phases, the first two of which were valued at $3.6 million."

32. On May 18, 2001, AremisSoft issued another press release, this time providing the press and public with a statement by Dr. B. Penkov, director of the NHIF. Although AremisSoft had claimed in the previous day's press release that Dr. Penkov substantiated the "content of the contract," Dr. Penkov's actual statement in the May 18 press release did not support that AremisSoft had executed a $37.5 million contract. Instead, the press release quoted Penkov as stating that AremisSoft had contracted to provide Phases One and Two of the system for $3.7 million and was required "to participate in lender procedure according [to] the laws for Phase 3 and 4 in year 2001 and to offer a price not higher than BGL: 8,400,000 which was a commitment required in the bid (USD: 4,375,000)." The stock market responded with another sell off, closing at

10

...ion volume of 9.4 million shares. In the space of four days, AremisSoft's market capital declined $254,408,000.

33. On May 20, 2001, NHIF issued an "Official Statement" describing the contract with AremisSoft. It stated that AremisSoft had contracted to provide Phases One and Two of the four-phase project for $3,686,000. In addition, AremisSoft was obliged by the contract to submit a bid for Phases 3 and 4.

34. AremisSoft issued another press release on May 22, 2001, again describing the contract as one for $37.5 million and decrying press reports that the value was only a tenth that size. The company asserted that differences in legal concepts between the U.S. and Bulgaria and translation difficulties between American reporters and Bulgarian officials accounted for the confusion. The press release did not mention the NHIF statement issued the previous day. The NHIF statement was published on the Internet in *TheStreet.com* on May 21, 2001. AremisSoft's May 22 press release specifically named *TheStreet.com* as "the source of confusion in the marketplace" about the Bulgarian contract.

35. The NHIF contract clearly provides that AremisSoft was to receive approximately 7,078,000 Bulgarian Leva ($3,686,000) million for completion of the first two phases of the upgrade to the Bulgarian health computer systems. The contract states that the NHIF shall pay AremisSoft Leva 1,415,600 ($737,200) in advance for providing phases one and two of a four-phase program. Under paragraph 12, Prices and Terms of Payment, the contract provides that "the SELLER is entitled to remuneration in the amount of Leva 7,078,000.00 . . ." Paragraph 1.2 of the draft states that "the parties agree to start negotiations for the supply of Application Software – Integrated Information

11

PHASE 3 and PHASE 4, which negotiation shall be in conformity with the provisions of Law for Public Offers." Another paragraph states that "the terms for payment for Phases 3 and 4 of this Contract shall be negotiated in the year of 2000 . . ."

36. The contract nowhere asserts that NHIF and AremisSoft have concluded negotiations on future phases of the project or that the total value of the contract is $37.5 million.

37. AremisSoft's misrepresentation of the value of the NHIF contract by ten-fold in the December 1999 press release, in Commission filings and in other public statements, as well as repeated claims by Poyiadjis, Kyprianou and the company defending that valuation, were materially false and misleading. All three defendants knew, or were reckless in not knowing, that the value of the contract reported to the public was materially misrepresented.

**B.  AremisSoft Overstates Revenue from the Bulgarian Contract**

38. In its Annual Report on Form 10-K for the fiscal year ended December 31, 2000, AremisSoft reported $7.1 million in revenue supposedly received from the NHIF contract in 2001. In a meeting with analysts on or about April 25, 2001, Poyiadjis claimed that additional revenue from the NHIF contract during the first quarter of 2001 was almost $2 million.

39. On May 20, 2001, NHIF reported that it paid only 3,796,100 Leva to AremisSoft pursuant to the contract, or $1.7 million.

40. AremisSoft announced on July 31, 2001 that its auditors, PKF in London, were able to confirm receipt of only $1.7 million from NHIF. The statement claimed that AremisSoft was "still seeking additional documentation to confirm the receipt of an

...itional $5.4 million of revenue recognized by the Company in fiscal year 2000." The statement added that because AremisSoft had been unable "over the last several days to contact executives who are most knowledgeable about the NHIF contractual arrangements within its Indian based Emerging Markets Group, it has been unable to provide PKF with the information it needs to complete its review of the NHIF contract."

41. A lawyer for AremisSoft told the Commission staff on August 6, 2001 that accounting records at AremisSoft's offices in India could not be found and that it was unlikely individuals could be located who could explain the additional $5.3 million in recognized revenue.

42. AremisSoft's recording of an excess $5.4 million in revenue from the NHIF contract in 2000 was a material misstatement. The amount represented 16.5 percent of net income of $32.7 million, or 17 cents per share in earnings out of a reported 93 cents.

C.  **Emerging Market Revenues and Acquisition Costs Were Overstated**

43. According to its Form 10-K for 2000, AremisSoft reported roughly $89 million in revenues from Emerging Markets Group customers in fiscal year 2000 out of total reported revenues of $120 million. These revenues were substantially overstated and possibly were entirely fictional. Precise quantification of the revenues from the Emerging Markets customers is difficult due to destruction of accounting records by AremisSoft in India

44. AremisSoft also falsely inflated acquisition costs for several companies acquired in India. These companies were E-nnovations.com, e-ChaRM India Pvt. Ltd. and Denon International Ltd.

45. On December 16, 1999, AremisSoft announced that it had acquired E-nnovations.com for $14.5 million. The company's 1999 Form 10-K stated that E-nnovations.com had $3.1 million in revenues in 1999 and attached a set of what purported to be E-nnovations.com financial reports dating back to 1998.

46. However, records obtained in India by AremisSoft's accountants and other information show that E-nnovations.com did not exist until AremisSoft created the company in 1999 from five existing small companies. The cost of acquiring those companies was no more than $300,000, but was reported publicly as 48 times that amount.

47. Poyiadjis and Kyprianou described E-nnovations.com as a major acquisition for AremisSoft and claimed E-nnovations.com performed extremely well subsequent to the acquisition. These statements, and the reported acquisition price for E-nnovations.com, were materially false and misleading.

48. AremisSoft also claimed in public statements to have acquired e-ChaRM India Pvt. Ltd. for $10.9 million. However, company documents corroborate that the companies were acquired for less than $100,000.

49. AremisSoft also claimed in its year 2000 Form 10-Kc that it acquired Denon, a Dubai, United Arab Emirates software company, for $7.34 million. However, AremisSoft company counsel interviewed the principal of Denon, who stated that Denon was not acquired until January 2001 and that the purchase price was $250,000.

50. AremisSoft issued a press release on September 28, 2001, acknowledging that its internal investigation disclosed that revenues reported from customers of the Emerging Market Group had been substantially overstated. The release also stated that

14

costs of acquiring e-nnovations.com, E-ChaRM and Denon had been overstated as described above.

51. Representations by AremisSoft in public statements and in filings with the Commission concerning the value of contracts and acquisitions by the Emerging Markets Group were false and misleading.

**D.     Poyiadjis and Kyprianou Knew About AremisSoft's Misstatements**

52. Poyiadjis was president of AremisSoft when the NHIF contracts were first announced in December 1999 and in March 2000 when the year 2000 Form 10-K repeated the false valuation and overstated the revenues from the contract. He personally made false statements to analysts about the value of the contract and the revenues the company obtained from the NHIF in the first quarter of 2001. Poyiadjis also was identified in December 1999 as the contact person for information about the Bulgarian contract.

53. Poyiadjis knew, or was reckless in not knowing, that AremisSoft had overstated the value of the Bulgarian contract by 10-fold and falsely quadrupled fiscal year 2000 revenues from the contract in its publicly filed reports with the Commission and in press releases. Poyiadjis also knew, or was reckless in not knowing, that he had materially overstated the first quarter 2001 revenues from the contract during a meeting with analysts in April 2001.

54. Poyiadjis also knew, or was reckless in not knowing, that AremisSoft materially overstated revenues from the Emerging Markets Group in 2000 and knew, or was reckless in not knowing, that AremisSoft materially overstated the costs of acquisitions of at least three companies in 1999 and 2000.

55. Poyiadjis was a "control person" of AremisSoft as defined by Sec. 20 of the Exchange Act.

56. Kyprianou was chairman of the AremisSoft board and chief executive officer of the company when the NHIF contract was first announced in December 1999 and in March 2000 when the year 2000 Form 10-K repeated that valuation and overstated the revenues from the contract.

57. Kyprianou knew, or was reckless in not knowing, that AremisSoft had overstated the value of the Bulgarian contract by 10-fold and falsely quadrupled fiscal year 2000 revenues from the contract in its publicly filed reports with the Commission and in press releases.

58. Kyprianou also knew, or was reckless in not knowing, that AremisSoft materially overstated revenues from the Emerging Markets Group in 2000 and knew, or was reckless in not knowing, that AremisSoft materially overstated the costs of acquisitions of at least three companies in 1999 and 2000.

59. Kyprianou was a "control person" of AremisSoft as defined by Sec. 20 of the Exchange Act.

60. By virtue of the conduct alleged in paragraphs 24 to 59 above, defendants AremisSoft, Poyiadjis and Kyprianou employed a device, scheme or artifice to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in acts, practices and courses of business which operated or would operate as a fraud or deceit.

16

61. By virtue of the conduct alleged in paragraphs 24 to 59 above, defendant AremisSoft violated Sec. 17(a) of the Exchange Act and Section 10(b) of the Securities Act and Rule 10b-5 thereunder. Defendants Poyiadjis and Kyprianou, directly and as control persons of AremisSoft, violated Sec. 17(a) of the Exchange Act and Section 10(b) of the Securities Act and Rule 10b-5 thereunder and aided and abetted AremisSoft's violations of those provisions.

## SECOND CLAIM
### (False Filings)

**AremisSoft Violated Sec. 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 Thereunder and Poyiadjis and Kyprianou Caused and Aided and Abetted AremisSoft's Violations of These Provisions**

62. By virtue of the conduct alleged in paragraphs 24 to 59 above, defendant AremisSoft filed annual and quarterly reports with the Commission in 2000 and 2001 that included material misstatements of fact with respect to the value of the Bulgarian and other contracts and materially overstated revenues and the true acquisition costs of companies

63. By virtue of the conduct alleged in paragraphs 24 to 59 above, defendant AremisSoft and, as control persons of AremisSoft as defined under Sec. 20 of the Exchange Act, defendants Poyiadjis and Kyprianou, violated Sec.13 of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder. Defendants Poyiadjis and Kyprianou also and aided and abetted AremisSoft's violations of these provisions.

17

## THIRD CLAIM
### (Insider Trading)

### Poyiadjis and Kyprianou Violated Sec. 17(a) of the Securities Act, Sec. 10(b) of the Exchange Act and Rule 10b-5 Thereunder

A.    <u>Insider Trading by Poyiadjis and Kyprianou</u>

64. Beginning no later than the fall of 2000, during the period in which AremisSoft disseminated materially false and misleading information about the value of and revenues realized from the Bulgarian and other contracts and overstated the value of AremisSoft acquisitions, defendants Poyiadjis and Kyprianou, who at all times knew of the material misstatements, sold millions of shares of AremisSoft securities through entities they controlled, in breach of their fiduciary duties to AremisSoft and its shareholders. Many of these sales were in secret through entities the defendants controlled.

65. In July 2001, Poyiadjis caused the transfer of $175 million of the proceeds of his sales of AremisSoft securities to an Isle of Man bank. Plaintiff has been unable to identify where proceeds of sales by Kyprianou were deposited. Although many details of the transactions in which most of the shares were sold will not be known until an accounting is provided, Poyiadjis and Kyprianou profited handsomely from this insider trading.

66. For example, between October 19 and November 2, 2000, Poyiadjis sold one block of 400,000 shares of AremisSoft stock during this period for $14,299,637. Extrapolating that price to all shares known to have been sold by or at the direction of Poyiadjis, based on incomplete records, the proceeds exceed $175 million, the amount deposited in the Isle of Man.

18

67. At least some of these stock sales were executed in accounts in the names of Swiss banks at Brown Brothers Harriman & Company ("Brown Brothers"), a New York broker-dealer. Some of the proceeds were then transferred to the Swiss banks and later transferred to accounts controlled by Poyiadjis at a bank on the Isle of Man. Other proceeds were transferred from Brown Brothers directly to the Isle of Man. At the request of the United States Attorney for the Southern District of New York, the Attorney General of the Isle of Man obtained a court order freezing all funds derived from Poyiadjis sale of AremisSoft stock which were deposited in the Isle of Man bank accounts.

## B. Poyiadjis's AremisSoft Stock Holdings

68. As an officer and director of a public company, Poyiadjis is required to file forms with the Commission pursuant to Sec. 16(a) of the Exchange Act disclosing purchase, sale or other disposition of AremisSoft stock in which he has a beneficial interest. Poyiadjis's forms, however, are incomplete, and Commission access to trading records has been limited.

69. Nevertheless, it is clear that Poyiadjis realized millions of dollars from selling AremisSoft stock while he knew, or was reckless in not knowing, that the company had drastically overstated the value of the Bulgarian contract and the revenues received by virtue of the contract, that the company had overstated its revenues from customers of the Emerging Markets Group and that it had overstated the acquisition costs of e-nnovations, E-ChaRM and Denon, all of which was material, non-public information when the stock sales occurred.

70. According to AremisSoft's 1999 Form 10-K, filed with the Commission, as of March 14, 2000, Onyx Capital, Inc. held 1,162,953 shares of AremisSoft stock. Onyx Capital is a British Virgin Islands corporation. Reports filed with the Commission stated that Poyiadjis had "sole voting and investment power" over Onyx. Of these shares, 200,000 were registered for sale in a Form S-1 registration statement that went effective on March 20, 2000. On April 28, 2000 Poyiadjis signed a proxy statement again disclosing Onyx's ownership of 1,162,953 shares as of April 20, 2000. No forms have been found disclosing the sale of the 200,000 shares registered for sale in the Form S-1.

71. On February 13, 2001, Poyiadjis disclosed in a filing on Form 5 that on September 9, 2000 he had disposed "by gift" of 779,620 of the shares held by Onyx. The same filing claimed that Poyiadjis owned no more AremisSoft stock as of December 31, 2000. No forms were found disclosing the disposition of the remaining 183,333 shares owned by Onyx and under Poyiadjis' control which were reported in AremisSoft's 1999 Form 10-K, assuming the 200,000 shares registered for sale in the Form S-1 also were sold.

72. The February 13 filing with the Commission also disclosed that Prime Growth, Inc., another British Virgin Islands corporation controlled by Poyiadjis, "gifted away" 1,450,000 AremisSoft stock options on October 17 and December 7, 2000, leaving it with no AremisSoft securities as of December 31, 2000. The AremisSoft 2000 Form 10-K states that the options went to entities "in which [Poyiadjis] has no voting, beneficial or pecuniary interest."

73. The AremisSoft 2000 Form 10-K also reported that, as of March 8, 2001, all of the 779,620 gifted shares, as well as 1,383,333 shares obtained from the exercise of the

gifted options, had been sold by the purported donees, for a total of 2,162,953 shares. The Form 10-K does not account for the remaining 66,667 options.

74. As described below, the reports which were submitted by AremisSoft and Poyiadjis were false in that Poyiadjis maintained control over those securities he claimed to have disposed of to independent donees and over the proceeds of their subsequent sale.

## C.    Poyiadjis's Sales of AremisSoft Stock

### 1.    Sales of AremisSoft Stock Owned by Onyx

75. Plaintiff has reasonably accounted for the disposition of 400,000 shares of AremisSoft stock nominally owned by Onyx, for which Poyiadjis realized $14,299,637.24. Plaintiff also has accounted for the remaining 379,620 shares held by Onyx which were sold contemporaneously. Although the proceeds from this sale are not yet known, based on the proceeds realized from the sale of the 400,000 share block at approximately $35 per share, the proceeds from the sale of the remaining 379,620 shares nominally held by Onyx are estimated at $13,286,700. Thus the estimated proceeds from the sale of the Onyx shares total approximately $27,863,337.24.

76. Stock transfer and trading records disclose that in September 2000 Poyiadjis sent a handwritten request to the transfer agent asking that restrictive legends be removed from the stock certificates for the stock held by Onyx. He then directed the transfer of the Onyx shares to an associate in Monaco. Another associate in Monaco then assigned the shares to Brown Brothers and routed the stock certificates through two Swiss banks, which deposited the shares in accounts newly opened in their names at Brown Brothers in New York.

21

77. On October 3, 2000, Swiss bank Bordier et Cie ("Bordier") forwarded to Brown Brothers a certificate for 400,000 shares of AremisSoft stock which was deposited in the Bordier account at Brown Brothers the next day. Brown Brothers sold these shares between October 19 and November 2, 2000, realizing $14,299,637.24, which was deposited in the Bordier account at Brown Brothers.

78. On or before October 17, 2000, the Monaco associate forwarded a stock certificate for 379,620 shares to Dominick Co., AG, Privatbak ("Dominick"), another Swiss bank. Dominick caused these shares to be deposited in an account in its name at Brown Brothers, from which they were then sold. Plaintiff does not yet have records showing the disposition of these shares through Brown Brothers. Based on proceeds realized from the sale of the 400,000 shares block nominally owned by Onyx at approximately $35 per share, plaintiff estimates that Poyiadjis realized approximately $13,286,700.

## 2. Sales of AremisSoft Stock Owned by Prime Growth

79. AremisSoft's 2000 Form 10-K states that all of the shares issued upon the exercise of options held by Prime Growth had been sold. Plaintiff has accounted for the sale of 633,333 of these options, leaving a balance of 750,000. Plaintiff has not yet determined where or how these shares were sold. Based on the proceeds realized from the sale of the 400,000 share block nominally owned by Onyx at approximately $35 per share, plaintiff estimates that the proceeds from the remaining 750,000 shares were approximately $26,250,000.

80. On December 12, 2000, AremisSoft's counsel wrote to AremisSoft's transfer agent stating that "options have been exercised by Drax Trading, Ltd., as assignee for

22

Prime Growth, Inc." AremisSoft's counsel explained that the options were in two blocks of 133,333 and 500,000, advised the transfer agent to expect transfer instructions a Poyiadjis's associate, and stated that confirmation of the instructions could be obtained from Poyiadjis himself. A notation indicated that a copy of counsel's letter was sent to Poyiadjis. Poyiadjis confirmed the instructions in a handwritten letter to the transfer agent dated December 12, 2000. Roger Meyer also sent a fax to the transfer agent on December 12, 2000 instructing the delivery of the shares by DTC (that is, electronically) to Brown Brothers in favor of a Bordier account at Brown Brothers through which the stock was sold.

81. Plaintiff does not have records showing the disposition of these shares through Brown Brothers. Based on proceeds realized from the sale of 400,000 shares nominally owned by Onyx, plaintiff estimates that Poyiadjis realized approximately $22,166,655 from the sale of these blocks, totaling 633,333 shares.

### 3.    Sales Proceeds are Transferred to Switzerland, then the Isle of Man

82. Proceeds from the sale of the AremisSoft stock nominally owned by Onyx and from the sale the AremisSoft shares issued upon the exercise of the options nominally owned by Prime Growth total approximately $76,000,000. Of this amount, approximately $36,466,000 are known to have been derived from sales through a Bordier account at Brown Brothers, and approximately $13,286,700 are known to have been derived from sales through a Dominick account at Brown Brothers.

83. On July 27, 2001, Brown Brothers transferred $44,669,000 from a Bordier account to Fleming Isle of Man Limited ("Fleming Bank") for deposit to an account in the name of relief defendant Olympus Capital Investments. This account and one other

23

in the name of relief defendant Oracle Capital were opened at Fleming bank to receive these and other proceeds of Poyiadjis's AremisSoft stock sales.

84. On July 26, 2001 Dominick transferred $37,984,539.99 to the Olympus Capital Investments account at Fleming bank. These funds also are proceeds of sales of AremisSoft stock by defendant Poyiadjis.

85. On July 26, 2001, another Swiss Bank, UBS AG (Zurich), transferred $35,117,300.00 to the Oracle Capital, Inc. account at Fleming bank. These funds also are proceeds of sales of AremisSoft stock by defendant Poyiadjis.

86. On July 26, 2001, another Swiss Bank, Hentsch Henchoz Et Cie (Lausanne), transferred $37,412,603.91 to the Oracle Capital, Inc. account at Fleming bank. These funds also are proceeds of sales of AremisSoft stock by defendant Poyiadjis.

87. On July 26, 2001, another bank in the Isle of Man, Isle of Man Bank, transferred $20,047,884.27 to the Oracle Capital account at Fleming bank. These funds had previously been transferred to Isle of Man bank from Dominick in Switzerland on July 9, 2001 ($10,009,218.75) and from Hentsch Henchoz Et Cie on July 9, 2001 ($10,008,593.75). These funds also are proceeds of sales of AremisSoft stock by defendant Poyiadjis.

88. Poyiadjis transferred these proceeds of his fraudulent sales of AremisSoft stock in an attempt to hide them and put them beyond the reach of the plaintiffs in the class action suits that had been filed against him and others in the United States.

**D.     Kyprianou's AremisSoft Stock Holdings**

89. According to AremisSoft's 1999 Form 10-K signed by Kyprianou on March 30, 2000, Kyprianou beneficially owned 7,637,379 AremisSoft shares as of

24

March 14, 2000. These shares were held by LK Global (Holdings) NV, a Netherlands corporation. They included 3,732,293 shares held by Info-Quest, S.A., with which LK Global and Kyprianou were parties to a voting agreement that expired by its terms on October 8, 2000. Thus, apart from the Info-Quest shares, the total number of AremisSoft shares held by Kyprianou through LK Global (Holdings) as of March 14, 2000 was 3,905,086.

90.    According to a Form 5 Kyprianou signed on February 13, 2001, LK Global (Holdings) gifted 3,187,790 AremisSoft shares to Aremis Holdings, Ltd., and 300,000 shares to AremisSoft Technology Ventures, Ltd. on July 8, 2000. These two entities are British Virgin Islands corporations of which Kyprianou is the sole director and officer. Their principal business is managing Kyprianou's investments. A Schedule 13D signed by Kyprianou on November 17, 2000 stated that Kyprianou transferred these shares for no consideration "for tax planning purposes and to effect a 'reincorporation' from the Netherlands to the British Virgin Islands." As of December 31, 2000, LK Global (Holdings) held zero shares, according to the Form 5. Subtracting the 3,487,790 shares gifted on July 8, 2000 from the 3,905,086 shares held by LK Global Holdings as of March 14, 2000 leaves a remainder of 417,296 shares. No forms have been found disclosing the disposition of the remaining 416,666 shares.

91. The Form 5 discloses that on November 6, 2000 Aremis Holdings "gifted" 1.6 million shares in two blocks of 800,000 shares each. The donees of the AremisSoft shares that had been nominally owned by Aremis Holdings are not identified in any public filing.

92. The Form 5 also states that on November 17, 2000 Kyprianou gifted a total 1,075,000 stock options to Sincock Holdings Corporation ("Sincock"), an entity in which Kyprianou has a beneficial interest, and that he "gifted" Sincock an additional 375,000 options on November 22, 2000. The Form 5 also discloses that between November 17 and November 22, 2000, Sincock "gifted" away all 1,450,000 options, for "tax and estate planning purposes." The donee of the options that had been nominally owned by Sincock is not identified in any public filing.

93. According to AremisSoft's 2000 Form 10-K, signed by Kyprianou on March 21, 2001, all of the 1.6 million gifted shares and 1,316,666 of the shares issued upon the exercise of the 1,450,000 options, had been sold by the donees as of March 8, 2001, for a total of 2,916,666 AremisSoft shares sold.

94. Based on these filings with the Commission, between March 2000 and March 2001, during which time there was no public disclosure of the material misstatements about the value of the Bulgarian contract, the revenue purportedly realized from that and other contracts or the overstatement of acquisition prices in the Emerging Market Group, the Kyprianou or entities to whom Kyprianou "gifted" stock and options sold 5,833,332 shares of AremisSoft for cash. The Commission has identified sales of 2,916,666 shares sold by entities under Kyprianou's control and believes an accounting will disclose additional sales.

E.    Kyprianou's Sale of Stock

1. Shares Held by Inlay Group and Lomond Finance

95. Transfer records show that on November 7, 2000 Aremis Holdings transferred 800,000 shares each to Lomond Finance, Inc. and Inlay Group, Inc.

The transaction was effected through AremisSoft counsel. This corresponds with Kyprianou's public disclosure of the gifts by Aremis Holdings the day before of two blocks of 800,000 shares each.

96. On November 10, 2000 Inlay Group sold 400,000 shares through Brown Brothers and on November 17, 2000 Inlay Group sold its remaining 400,000 shares, also through Brown Brothers. On November 27, 2000 Lomond Finance, Inc. sold its 800,000 shares. The proceeds of these sales were deposited in the Brown Brothers account of Bordier, the same account used to sell Poyiadjis's stock. No filings were made disclosing the sales of these shares.

97. Plaintiff does not yet have records showing the proceeds from the sale of these 1.6 million shares, but based on the proceeds realized from the sale of the 400,000 share block nominally owned by Onyx at approximately $35 per share, plaintiff estimates that sales proceeds totaled approximately $56 million.

98. On November 13, Poyiadjis assisted in the transfer of the Inlay stock by providing a handwritten letter informing the transfer agent that it was acceptable to follow instructions from his associate for the transfer of the 400,000 shares.

**2.    Shares Held by Sincock**

99. At least a portion of the shares issued upon the exercise of Sincock's options were sold in a similar manner. On December 15, 2000 AremisSoft's counsel wrote to its transfer agent stating that "options have been exercised by Quantum Group Management, Ltd., as assignee for Sincock Holdings Corp." Quantum Group is a British Virgin Islands corporation. The letter explains that the options are in two blocks of 266,666 and 300,000, advises the transfer agent to expect transfer instructions from

Poyiadjis's associate, and states that confirmation of the instructions can be obtained from Poyiadjis himself. Poyiadjis had written a letter to AremisSoft's counsel on December 7, 2000, consenting to the assignment of 1,075,000 options held by Sincock to Quantum Group. In his letter, Poyiadjis gave an address for Quantum Group in Switzerland, in care of his associate.

100.    On or about December 18, 2000, 566,666 shares were delivered to Brown Brothers for the same Bordier account used in the Prime Growth/Drax Trading and Inlay Group transactions. The Commission does not yet have records showing the proceeds from the sale of these 566,666 shares, but based on the proceeds realized from the sale of the 400,000 share block nominally owned by Onyx at approximately $35 per share, plaintiff estimates that sales proceeds totaled approximately $19.8 million.

101.    Although AremisSoft's 2000 Form 10-K states that 1,316,666 shares issued upon the exercise of gifted options were sold, the Commission does not yet have stock sale records for the shares other than the 566,666 shares discussed above, leaving a remainder 750,000 shares.   Based on the proceeds realized from the sale of the 400,000 share block nominally owned by Onyx at approximately $35 per share, plaintiff estimates that sales proceeds from these 750,000 shares totaled approximately $25,250,000.

102.    Poyiadjis and Kyprianou each owed a fiduciary duty to AremisSoft and its shareholders. They breached that duty by selling AremisSoft securities while in possession of material non-public information that the company had materially misstated the value of the Bulgarian contract and materially overstated the revenues realized from that contract.

103.    By virtue of the conduct alleged in paragraphs 24 to 102, Poyiadjis and Kyprianou engaged in the sale of AremisSoft securities in interstate commerce or by use of the mails and in so doing employed a device, scheme or artifice to defraud, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon the purchaser of AremisSoft securities.

104.    By virtue of the conduct alleged in paragraphs 24 to 102, defendants Poyiadjis and Kyprianou violated Sec. 17(a) of the Securities Act, Sec. 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### FOURTH CLAIM
#### [Failure to Report Sales of Securities]

**Poyiadjis and Kyprianou Violated Sec. 16(a) of the Exchange Act and Rules 16a-2and 16a-3 Thereunder**

105.    Section 16(a) of the Exchange Act, implemented by Rules 16a-2 and 16a-3, requires officers and directors of public companies, as well as those who beneficially own, directly or indirectly, more than 10 percent of any class of company security, to file periodic reports disclosing any change of beneficial ownership of those securities.

106.    As officers and directors during the relevant period described herein, Poyiadjis and Kyprianou were required to file such periodic reports. Either no reports or false reports were filed for the transactions described in paragraphs 64-102. By virtue of this conduct, Poyiadjis and Kyprianou violated Sec. 16(a) of the Exchange Act and Rules 16a-2 and 16a-3 thereunder.

29

## FIFTH CLAIM
### [Relief Defendants]

107.    Relief defendants Olympus Capital Investment, Inc., and Oracle Capital,
Inc., each were recipients, without consideration, of proceeds of sales of AremisSoft stock in
connection with the fraud described above. Each of these defendants profited from the
receipt or sale of some or all of those shares by obtaining illegal proceeds under
circumstances in which it is not just, equitable or conscionable for them to retain the illegal
proceeds. Consequently, each of these defendants has been named as a relief defendant for
the amount of stock proceeds by which each has been unjustly enriched as a result of the
fraudulent scheme.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Make findings of fact and conclusions of law that the defendants violated the
provisions of the federal securities laws as alleged above.

### II.

Enter Orders

A.    Restraining and enjoining AremisSoft, Poyiadjis and Kyprianou from
violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule
10b-5 thereunder;

C.    Restraining and enjoining AremisSoft, Poyiadjis and Kyprianou from
violating Secs. 13(a) of the Securities Act and Rules 12b-20, 13a-1 and 13a-13
thereunder.

D.     Restraining and enjoining Poyiadjis and Kyprianou from violating Sec. 16(a) of the Exchange Act and Rules 16a-2 and 16a-3 thereunder.

### III.

Enter an order requiring defendants and relief defendants, and each of them, to pay for a sworn accounting to determine the full amount of the monies received as a result of their conduct as alleged herein, said accounting to be performed by persons or entities not unacceptable to the Commission;

### IV.

Enter an Order directing defendants Poyiadjis and Kyprianou and relief defendants to disgorge their profits from the insider trading alleged herein, plus prejudgment interest on all amounts.

### V.

Enter an Order imposing civil penalties on each defendant for their unlawful acts pursuant to Sections 21 (d)(3)(B)(iii) and 21A(a)(2) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)(B)(iii) and 78u-1(a)(2)].

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all

...d decrees that may be entered

additional relief within the jurisdic...

Grant such other and additional reli...

Local Counsel:
Robert Blackburn
354 Upper Mountain Ave.
Upper Montclair, N.J. 07043
(Temporary address)
800-624-4468 (pager)
As of mid-October:
U.S. Securities & Exchange
Commission
Woolworth Building
233 Broadway
N.Y., N.Y.
blackburnr@sec.gov

(Trial Counsel – JK 5830)
...lsworth (LE 8924)
...l R. Berger
Richard C. Sauer
Robert J. Keyes
Richard M. Rosenfeld

Attorneys for Plaintiff

U.S. Securities and Exchange Commission
Mail Stop 9-11
450 Fifth Street, N.W.
Washington, D.C. 20549-0911
(202) 942-4797 (Kidney)
(202) 942-9581 (Kidney Fax)
kidneyj@sec.gov

Date: Oct. 4, 2001