# EXHIBIT 4 PART 1

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA,

     -v.-

(#1) LYCOURGOS K. KYPRIANOU,
(#2) ROYS S. POYIADJIS, and
(#3) M.C. MATHEWS,

     Defendants.

------------------------------------X



DOC # 3

INDICTMENT

S1 01 Cr. 1177 (LTS)



U.S. DISTRICT COURT
FILED
JUN 2 4 2002
S. D. OF N.Y.

## COUNT ONE

(Conspiracy To Commit Securities Fraud,
Mail Fraud, and Wire Fraud)

The Grand Jury charges:

### The Relevant Entities And Individuals

1.    At all times relevant to this Indictment,
AremisSoft Corporation ("AremisSoft" or the "Company") was a
Delaware corporation with offices in various locations around the
world, including in the United Kingdom, India, Cyprus, and the
United States.   AremisSoft purported to be engaged in the
business of developing, marketing, implementing and supporting
enterprise-wide software applications for organizations in the
manufacturing, hospitality, healthcare, and construction
industries.   From on or about April 22, 1999 through on or about
July 30, 2001, AremisSoft's common stock was publicly-traded on
the National Association of Securities Dealers Automatic
Quotation National Market System (the "NASDAQ"), an electronic

securities market administered by the National Association of Securities Dealers.

2.    At all times relevant to this Indictment, LYCOURGOS K. KYPRIANOU, the defendant, was the founder, a director, and a senior executive officer of AremisSoft. From in or about October 1997 through in or about July 2001, KYPRIANOU was Chairman and either Chief Executive Officer or Co-Chief Executive Officer of AremisSoft. KYPRIANOU, a citizen and resident of Cyprus, worked principally from AremisSoft's office in Nicosia, Cyprus.

3.    At all times relevant to this Indictment, ROYS S. POYIADJIS, the defendant, was a director and a senior executive officer of AremisSoft. From in or about October 1998 through in or about September 1999, POYIADJIS was Chief Financial Officer of AremisSoft. From in or about June 1998 through in or about January 2001, POYIADJIS was President of AremisSoft. From in or about May 2000 through in or about October 2001, POYIADJIS was either Chief Executive Officer or Co-Chief Executive Officer of AremisSoft. POYIADJIS, a citizen of the United Kingdom, worked principally from AremisSoft's offices in the United Kingdom and in New York, New York.

4.    At all times relevant to this Indictment, M.C. MATHEWS, the defendant, was a director and an executive officer of AremisSoft. MATHEWS was employed by AremisSoft, or its

subsidiary or predecessor entities, from in or about 1990 through in or about July 2001. From in or about February 2001 through in or about July 2001, MATHEWS was President of AremisSoft (E.E.M.E.A.) Limited, a wholly-owned subsidiary of AremisSoft organized under the laws of Cyprus, through which AremisSoft conducted many of its business operations in emerging markets, including in India, Eastern Europe, and the Middle East. MATHEWS, a citizen of India, worked principally from AremisSoft's offices in Bangalore and New Delhi, India.

### The Scheme To Defraud

5.    From in or about 1999 through in or about 2001, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, and others known and unknown, participated in a massive scheme to defraud AremisSoft's shareholders by misrepresenting the Company's true financial and business condition. In public filings with the United States Securities and Exchange Commission (the "SEC"), in press releases issued by AremisSoft, in statements made to securities industry analysts, and in other statements disseminated to members of the investing public, the defendants and their co-conspirators portrayed AremisSoft as a highly-successful, global software company, the business, revenues, and profits of which were experiencing rapid growth. In truth, and in fact, as the defendants well knew, AremisSoft was nothing of the sort. Among other things,

AremisSoft (a) improperly recognized at least approximately $90 million in fictitious revenues and associated income; and (b) announced three purported multi-million dollar acquisitions of other software companies that were sham transactions designed to enhance its false appearance as a thriving and expanding concern, and to hide the fabrication of its revenue.

6.    As a result of the scheme to misrepresent AremisSoft's true business and financial condition perpetrated by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, and their co-conspirators, the price of AremisSoft's common stock was inflated artificially. Over the course of the scheme, AremisSoft's aggregate market capitalization grew from less than $100 million to nearly $1 billion. While the market price of AremisSoft's common stock was artificially inflated, KYPRIANOU, POYIADJIS, and MATHEWS, sold millions of AremisSoft shares -- including through secret transactions that were never reported to the SEC or to members of the investing public -- yielding hundreds of millions of dollars in unlawful proceeds. When the truth about AremisSoft's business and financial condition was revealed, the price of AremisSoft's shares plummeted, leaving victim investors with losses totaling hundreds of millions of dollars.

## AremisSoft's Required Public Disclosures

7.    On or about April 22, 1999, AremisSoft completed an initial public offering of its common stock, selling approximately 3.3 million shares at a price of $5.00 per share. That same day, AremisSoft's common stock began to be publicly traded on the NASDAQ.

8.    To sell securities to members of the public and maintain public trading of its securities in the United States, AremisSoft was required to comply with provisions of the federal securities laws and regulations that are designed to ensure that a company's financial and business information is accurately recorded and disclosed to members of the investing public.  Among other things, these laws and regulations required AremisSoft (a) prior to the sale of its shares to the public, to file with the SEC a registration statement that described the Company's business and included financial statements audited by an independent accountant; (b) to file with the SEC quarterly and annual reports that disclosed its financial condition and the results of its business operations; (c) to report non-recurring material events affecting the Company's business and financial condition; and (d) to make and keep books, records, and accounts that accurately and fairly reflected the Company's business transactions.

9.    In addition to filing public reports of its financial and business condition, the federal securities laws and regulations required AremisSoft and its executive officers to make timely and accurate public reports regarding the ownership and dispositions of AremisSoft securities by such executive officers.  Among other things, AremisSoft was required to include in its annual reports filed with the SEC a statement of the ownership of its securities by its executive officers.  In addition, as executive officers of AremisSoft, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, were required to file with the SEC timely reports of any changes in their ownership of Company securities, and to file annual reports summarizing any such ownership changes.  These public reporting requirements reflect the judgment of Congress and of the SEC that timely disclosure of information about the ownership of company securities by a company's executive officers is information material to investors in the company's securities.

10.    Pursuant to its obligations under the federal securities laws and regulations, from in or about April 1999 through in or about July 2001, AremisSoft filed with the SEC various reports in which it detailed, among other things, the results of its business operations, its financial condition and performance, and the ownership and disposition of its securities by certain of its executive officers.  AremisSoft and its

6

executive officers made additional disclosures about these areas in various other statements disseminated to members of the investing public, including in Company press releases and in statements made to securities industry analysts. As set forth below, AremisSoft's representations to members of the investing public were riddled with misrepresentations as part of a concerted and purposeful effort by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, to mislead the investing public into believing the Company was a vibrant and growing concern.

### The Fraudulent Acquisition Scheme

11.  Throughout the time that AremisSoft's shares were publicly traded, AremisSoft and LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, represented to the SEC and to members of the investing public that its past rate of growth, and its prospects for future growth, were based in substantial part upon its ability to acquire other software companies and to integrate efficiently the operations of the companies it acquired.  For example, in the Registration Statement and Prospectus for AremisSoft's initial public offering, which were signed on behalf of the Company by KYPRIANOU and POYIADJIS, filed with the SEC, and disseminated to potential investors, AremisSoft stated:

> In the past five years, the Company has
> experienced rapid growth, both internally and

through acquisitions, with revenues increasing from $6.4 million in 1994 to $52.6 million in 1998. During this period, the Company successfully acquired and integrated the operations of eleven businesses, which were principally operating in the United Kingdom. In each acquisition, the Company sought to reduce expenses, rejuvenate the existing products of the acquired business and transition the customers to products that utilize the Aremis Architecture.

A significant aspect of the Company's growth strategy has been the acquisition of complementary businesses in order to achieve market presence and increase its customer base within the Targeted Markets. The Company's strategy is to rejuvenate the products of acquired businesses utilizing the Aremis Architecture and gradually transition the customers of acquired businesses to such products. The Company expects that it will continue to rely on acquisitions as a significant part of its growth strategy.

12.   In an effort to present the false appearance that AremisSoft was successfully implementing its announced strategy of growth by acquisition, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, caused AremisSoft to announce its purported acquisitions of three software companies (a) the December 17, 1999 acquisition of E-nnovations.com ("E-nnovations") for approximately $14.5 million; (b) the December 5, 1999 acquisition of E-ChaRM Private Limited ("E-Charm") for approximately $10.9 million; and (c) the December 29, 2000 acquisition of Denon International Limited ("Denon") for approximately $7.34 million. Although AremisSoft described the

acquired companies as significant, established, multi-million dollar software concerns, in truth and in fact, as KYPRIANOU, POYIADJIS, and MATHEWS well knew, the companies had few assets and little business, and were worth insubstantial sums of money.

The Fraudulent Acquisition Of E-nnovations

13.    On or about March 4, 1999, M.C. MATHEWS, the defendant, caused an advertisement to be placed in the Economic Times, an Indian business periodical.  Although AremisSoft had not yet completed its initial public offering, the advertisement stated that an unidentified United States-based company "listed in NASDAQ" was looking to "invest in companies developing tools, applications, and services for Internet & e-commerce applications."  The advertisement instructed interested parties to provide information to R. K. Dhawan & Co., AremisSoft's accountants in New Delhi, India.

14.    Following the publication of the Economic Times advertisement, M.C. MATHEWS, the defendant, met in India with representatives of various Indian software companies, including Athene Softech Private Limited ("Athene");  Baron Hexa Private Limited ("Baron"); Bay Internet Services Private Limited ("Bay"); Cascade Information Technologies Private Limited ("Cascade"); and TopSys Solutions Private Limited ("Topsys").  Representatives of each of the companies advised MATHEWS that each company was a

small software or computer technology company with a minimal number of employees and limited revenues.

15.  From in or about March 1999 through in or about October 1999, M.C. MATHEWS, the defendant, negotiated for AremisSoft to purchase the companies for consideration consisting principally of the following cash payments:

| Company | Cash Purchase Price |
|---------|---------------------|
| Athene | $132,558 |
| Baron | $ 22,221 |
| Bay | $ 59,349 |
| Cascade | $ 46,512 |
| Topsys | $ 41,070 |
| Total | $301,709 |

MATHEWS advised LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, of the prices of each proposed acquisitions, and KYPRIANOU and POYIADJIS authorized the proposed payments.

16.  In an effort to falsely portray the magnitude and significance of the acquisitions of Athene, Baron, Bay, Cascade, and Topsys, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, agreed to misrepresent the separate acquisitions of the five companies as a single acquisition, to misrepresent the business and revenues of the combined entity, and to misrepresent the price paid by AremisSoft in connection with the acquisitions.  KYPRIANOU, POYIADJIS, and MATHEWS agreed to create and execute false documents purportedly reflecting that

(a) E-nnovations had acquired each of Athene, Baron, Bay, Cascade, and Topsys during the period from in or about September 1998 through in or about January 1999; (b) in or about March 1999, E-nnovations had been acquired by Spahn & Partner Finanz Consult GmbH ("Spahn"), an Austrian corporation; and (c) AremisSoft had agreed to acquire E-nnovations from Spahn for approximately $14.5 million.

17. On or about October 4 and 5, 1999, the AremisSoft Board of Directors convened to consider and vote on the proposed acquisition of E-nnovations. LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, presented the proposed acquisition to the AremisSoft Board of Directors. In both written materials presented to the Board of Directors and in oral statements made at the Board meeting, KYPRIANOU, POYIADJIS, and MATHEWS made a variety of false representations about E-nnovations and the proposed acquisition, including by (a) falsely representing that Athene, Baron, Bay, Cascade, and Topsys were not separate companies, but rather divisions of E-nnovations; (b) falsely describing the history, business, revenues, and value of E-nnovations; (c) falsely representing that E-nnovations was expected to earn income of more than $3.4 million on revenues of more than $14 million during the year 2000; and (d) falsely stating that AremisSoft had negotiated to acquire E-nnovations from Spahn for approximately $14,939,000.

On or about October 5, 1999, based on the false representations
made by KYPRIANOU, POYIADJIS, and MATHEWS, AremisSoft's Board of
Directors voted to approve the proposed acquisition of
E-nnovations.

18.    In or about December 1999, M.C. MATHEWS, the
defendant, caused AremisSoft to agree to purchase Athene, Baron,
Bay, Cascade, and Topsys by promising to make cash payments
totaling approximately $301,709, and promising to cause
AremisSoft to grant the owners of Athene, Baron, Bay, Cascade,
and Topsys a total of approximately 45,000 AremisSoft options.

19.    On or about December 16, 1999, AremisSoft issued a
press release announcing its purported acquisition of
E-nnovations (the "E-nnovations Press Release").  Among other
things, the E-nnovations Press Release stated the following:

a.    E-nnovations was "a supplier of advanced
technology software and services," with 120 employees, 450
customers, 1999 revenues of $3 million, and 1999 profits of
$400,000;

b.    E-nnovations and AremisSoft had "been
partnering for the past two years on modernizing efforts on the
core AremisSoft enterprise applications," and that
E-nnovations' "technological capabilities have already been
utilized in several large projects executed by AremisSoft in
emerging markets";

c.    AremisSoft had acquired all of the outstanding shares of E-nnovations for $14.5 million cash; and

d.    quoted LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, regarding the purported value to AremisSoft of the acquisition.

20.    On or about December 17, 1999, a Share Purchase Agreement was entered into among AremisSoft, E-nnovations, and Spahn, relating to the purported purchase by AremisSoft of E-nnovations.  The Share Purchase Agreement was executed on behalf of AremisSoft by LYCOURGOS K. KYPRIANOU, the defendant, and on behalf of E-nnovations by an AremisSoft accounting staffer acting at the direction of M.C. MATHEWS, the defendant.  The Share Purchase Agreement falsely represented the purchase price for E-nnovations to be approximately $14,539,000.

21.    On or about December 30, 1999, AremisSoft filed with the SEC a Current Report on Form 8-K regarding the Company's purported acquisition of E-nnovations (the "E-nnovations 8-K"). The E-nnovations 8-K was signed on behalf of the Company by LYCOURGOS K. KYPRIANOU, the defendant, and stated, in part:

> On December 29, 1999, pursuant to a Share Purchase Agreement ("Agreement') dated December 17, 1999, AremisSoft Corporation ("AremisSoft"), through its wholly owned subsidiary AremisSoft (E.E.M.E.A.), a Cyprus corporation, acquired all of the outstanding capital stock of e-nnovations.com, an India corporation ("e-nnovations").  As a result of the acquisition, e-nnovations has become a wholly-owned subsidiary of AremisSoft.

13

Under the terms of the Agreement, AremisSoft
acquired all of the outstanding shares of
e-nnovations for approximately $14.5 million
in an all cash transaction. AremisSoft
funded the acquisition utilizing working
capital.

As a supplier of internet, workflow and other
advanced technology software, applications
and services, e-nnovations has assisted
AremisSoft during the past two years in the
modernization of certain enterprise
applications. Through this acquisition,
AremisSoft intends to combine e-nnovations
technology and application skills with
AremisSoft's enterprise applications to help
enable AremisSoft to offer a broader array of
products and services, including
internet-based applications. The principal
offices of e-nnovations are located in
Banglador, India.

The purported Share Purchase Agreement was attached as an exhibit

to the E-nnovations 8-K.

    22. On or about March 30, 2000, AremisSoft filed with

the SEC its 1999 Annual Report on Form 10-K (the "1999 Annual

Report"). The 1999 Annual Report, which was signed on behalf of

AremisSoft by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C.

MATHEWS, the defendants, stated, in part:

In December 1999, we acquired
e-nnovations.com, an Internet software
solutions provider located in Bangalore,
India. We believe this acquisition is a key
strategic milestone in our development
because it enables us to address the rapidly
expanding market opportunities brought about
by the Internet. For over two years, we have
partnered with e-nnovations.com and have
utilized their technological capabilities in
several large projects. This acquisition
enables us to continue to leverage the

> diverse technological capabilities of
> e-nnovations.com to address our customers'
> current and future e-business needs.
>
> We believe the e-nnovations.com acquisition
> will also assist us to develop an application
> service provider, or ASP, delivery method to
> best suit the evolving requirements of our
> expanding customer base.

The 1999 Annual Report stated that E-nnovations had earned
approximately $3.1 million in revenues during 1999, and included
purported audited balance sheets and income statements for
E-nnovations for the years 1997 through 1999.

23.    The statements regarding the E-nnovations
transaction contained in the E-nnovations 8-K, the E-nnovations
Press Release, and in the 1999 Annual Report were false and
misleading when made because, as, LYCOURGOS K. KYPRIANOU, ROYS S.
POYIADJIS, and M.C. MATHEWS, the defendants, well knew, among
other things (a) E-nnovations did not have the assets, business,
revenues, or income described; (b) E-nnovations had neither
assisted AremisSoft nor partnered with AremisSoft during the
previous two years; and (c) AremisSoft had not paid $14.5 million
in cash for E-nnovations.

## The Fraudulent Acquisition Of E-Charm

24.    In or about February 2000, in New Delhi, India,
M.C. MATHEWS, the defendant, met with a representative of
Medisoft Solutions ("Medisoft"), an India-based software company,
to discuss AremisSoft's possible acquisition of Medisoft.  The

Medisoft representative (the "Medisoft Representative") advised
MATHEWS, among other things, that (a) Medisoft was engaged in the
business of developing software for use by medical professionals;
(b) Medisoft had approximately six employees; (c) Medisoft had
two or three previous sales of its products; (d) Medisoft had
incurred approximately $200,000 in debts; and (e) Medisoft had
never earned any profits.

     25.    In or about September 2000, in Trivandrum, India,
M.C. MATHEWS, the defendant, met with a representative of Nortech
Infonet Private Limited ("Nortech"), an India-based software
company, to discuss AremisSoft's possible acquisition of Nortech.
The Nortech representative (the "Nortech Representative") advised
MATHEWS, among other things, that (a) Nortech was engaged in the
business of computer systems integration; and (b) Nortech had
approximately $500,000 in annual revenues.

     26.    In or about early October 2000, in Bangalore,
India, ROYS S. POYIADJIS and M.C. MATHEWS, the defendants, met
separately with the Medisoft Representative and the Nortech
Representative to discuss AremisSoft acquiring Medisoft and
Nortech.  During the meetings, the Medisoft Representative and
the Nortech Representative provided MATHEWS and POYIADJIS with
detailed information about Medisoft and Nortech, including
information regarding the history, nature, size, customers,
revenues, and profits of the companies.

27. In an effort to falsely portray the magnitude and significance of AremisSoft's purchases of Medisoft and Nortech, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, agreed to misrepresent the separate acquisitions of Medisoft and Nortech as a single acquisition, to misrepresent the business and revenues of the combined entity, and to misrepresent the price paid by AremisSoft in connection with the acquisitions. KYPRIANOU, POYIADJIS, and MATHEWS agreed to create and execute false documents purportedly reflecting (a) E-Charm's acquisition of Medisoft and Nortech; and (b) AremisSoft's subsequent acquisition of E-Charm from Still & Life GmbH ("Still & Life"), an Austrian corporation, for approximately $10.9 million. KYPRIANOU, POYIADJIS, and MATHEWS also agreed to create false financial statements for E-Charm, purporting to reflect that E-Charm had revenues of more than $1.3 million during the year 1999, and was expected to earn revenues of more than $3.4 million during the year 2000.

28. On or about November 17, 2000, the AremisSoft Board of Directors convened to consider and vote on the proposed acquisition of E-Charm. ROYS S. POYIADJIS and M.C. MATHEWS, the defendants, presented the proposed acquisition to the AremisSoft Board of Directors. In both written materials presented to the Board of Directors and in oral statements made at the Board meeting, POYIADJIS and MATHEWS made a variety of false

representations about E-Charm and the proposed acquisition, including by (a) falsely describing the history, business, revenues, and value of E-Charm, including by false representing that E-Charm was an established software company with more than 200 customers, 1999 revenues of more than $1.3 million, and expected 2000 revenues of more than $3.4 million; and (b) falsely stating that AremisSoft had negotiated to acquire E-Charm from Still & Life for approximately $10.9 million.  On or about November 17, 2000, based on the false representations made by POYIADJIS and MATHEWS, AremisSoft's Board of Directors voted to approve the proposed acquisition of E-Charm.

29.   In or about November 2000, M.C. MATHEWS, the defendant, caused AremisSoft to enter into an agreement to purchase Medisoft for consideration consisting principally of approximately $21,000 in cash, the assumption of approximately $200,000 in debt, and the grant of approximately 10,000 AremisSoft options.  In connection with completing the transaction, MATHEWS directed Medisoft to merge with, and adopt the name of, Rahul Computer Management Services Private Limited ("Rahul"), a pre-existing shell corporation.  In or about mid-November 2000, Rahul entered into a written Share Purchase Agreement with E-Charm, whereby Rahul agreed to be acquired by E-Charm for the consideration previously agreed to by MATHEWS on behalf of AremisSoft.  MATHEWS falsely represented to the

18

Medisoft Representative that E-Charm was a division of
AremisSoft, and directed an AremisSoft employee to sign the Share
Purchase Agreement on behalf of E-Charm.

    30.  In or about November 2000, M.C. MATHEWS, the
defendant, caused AremisSoft to enter into an agreement to
purchase Nortech for consideration consisting principally of
approximately $120,000 in cash and the grant of approximately
35,000 AremisSoft options.  A Share Purchase Agreement between
Nortech and E-Charm was executed in or about January 2001 and
signed on behalf of E-Charm by an AremisSoft employee acting at
MATHEWS' direction.

    31.  On or about November 29, 2000, M.C. MATHEWS, the
defendant, requested that LYCOURGOS K. KYPRIANOU and ROYS S.
POYIADJIS, the defendants, authorize payments totaling
approximately $310,000 and the grant of 45,000 AremisSoft
options, which MATHEWS represented to be the full cost of
acquiring MediSoft and Nortech, as well as payment of associated
acquisition costs and fees.

    32.  In or about December 2000, a Share Purchase
Agreement was entered into among AremisSoft, E-Charm, and Still &
Life, relating to the purported sale of E-Charm by Still & Life
to AremisSoft.  The Share Purchase Agreement was executed on
behalf of AremisSoft by M.C. MATHEWS, the defendant, and on
behalf of E-Charm by the Nortech Representative, acting at the
instruction of MATHEWS.  The Share Purchase Agreement falsely

represented the purchase price for E-Charm to be approximately $10.9 million.

33.  On or about December 6, 2000, AremisSoft issued a press release announcing its purported acquisition of E-Charm (the "E-Charm Press Release").  Among other things, the E-Charm Press Release:

a.    stated that E-Charm was "a supplier of web enabled customer relationship management and hospital management systems" that had conducted business since 1994, had 127 professional employees, and 200 customers, 2000 revenues of $3.4 million, and 2000 profits of $575,000;

b.    stated that AremisSoft had acquired all of the outstanding shares of E-Charm from Still & Life for $10.9 million cash; and

c.    quoted LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants, regarding the purported value to AremisSoft of the acquisition.

34.  On or about December 19, 2000, AremisSoft filed with the SEC a Current Report on Form 8-K regarding the Company's purchase of E-Charm (the "E-Charm 8-K").  The E-Charm 8-K was signed on behalf of the Company by ROYS S. POYIADJIS, the defendant, and stated, in part:

> On December 5, 2000, pursuant to a Share
> Purchase Agreement ("Agreement') dated
> November 28, 2000, AremisSoft Corporation
> ("AremisSoft"), through its wholly owned
> subsidiary AremisSoft (E.E.M.E.A.), a Cyprus

20

corporation, acquired all of the outstanding
capital stock of e-Charm Pvt Ltd, an India
corporation ("e-Charm"). As a result of the
acquisition, e-Charm has become a
wholly-owned subsidiary of AremisSoft.

Under the terms of the Agreement, AremisSoft
acquired all of the outstanding shares of
e-Charm for approximately $10.9 million in an
all cash transaction. AremisSoft funded the
acquisition utilizing working capital. A copy
of the Agreement is included herein as
Exhibit 10.28 and is incorporated by
reference into this Item 5. The foregoing
description is qualified in its entirety by
reference to the exhibit.

The consideration paid by AremisSoft for the
outstanding capital stock of e-Charm pursuant
to the Agreement was determined through
negotiations that took into account various
factors concerning the business of e-Charm
including, among other things, the market
value of comparable companies.

e-Charm is a supplier of web based Customer
Relationship Management and Hospital
Management Systems software, applications and
services. Through this acquisition,
AremisSoft intends to combine e-Charm
technology and application skills with
AremisSoft's enterprise applications to help
enable AremisSoft to offer a broader array of
products and services. The principal offices
of e-Charm are located in India.

35. On or about March 26, 2001, AremisSoft filed with

the SEC its 2000 Annual Report on Form 10-K (the "2000 Annual

Report"). The 2000 Annual Report, which was signed on behalf of

the Company by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and

M.C. MATHEWS, the defendants, stated, in part:

In December 2000, we acquired e-Charm India Pvt Ltd., a supplier of a web-based Customer Relationship Management system, or CRM, and a Hospital Management System, or HMS, for the healthcare market, for $10.9 million in cash consideration. Through this acquisition, we expanded our enterprise-wide web-enabled e-business offering and as a result, now participate in the market for integrated enterprise application -- CRM solutions. As a result of this acquisition, we gained approximately 200 customers who are primarily located in Southern India, including many corporate CRM customers and hospitals. We also acquired the services of additional software developers and e-Charm's complete India-based sales and marketing staff.

36.    The statements regarding E-Charm contained in the E-Charm Press Release, the E-Charm 8-K, and the 2000 Annual Report were false and misleading when made because, as, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, well knew, among other things (a) AremisSoft had not paid $10.9 million in cash for E-Charm; and (b) E-Charm did not have the assets, business, revenues, or income described.

## The Fraudulent Acquisition Of Denon

37.    At various times during the period from in or about April 2000 through in or about September 2000, M.C. MATHEWS, the defendant, spoke with a representative of Vision Group L.L.C. ("Vision"), a computer software company based in Dubai, United Arab Emirates, concerning the possible acquisition of Vision by AremisSoft. The Vision representative (the "Vision Representative") provided MATHEWS with detailed information about Vision's business, products, and past financial performance,

including by providing MATHEWS with (a) details regarding
Vision's proprietary software product, "Factor EMS"; and (b)
Vision's financial statements for the preceding three years.

38.  In or about September 2000, in Dubai, United Arab
Emirates, ROYS S. POYIADJIS and M.C. MATHEWS, the defendants, met
with the Vision Representative to discuss the acquisition of
Vision by AremisSoft.  The Vision Representative provided
POYIADJIS and MATHEWS with detailed information about Vision's
business, products, and past financial performance.

39.  In or about October 2000, in Nicosia, Cyprus,
LYCOURGOS K. KYPRIANOU and M.C. MATHEWS, the defendants, met with
the Vision Representative to discuss the acquisition of Vision by
AremisSoft.  The Vision Representative provided KYPRIANOU and
MATHEWS with detailed information about Vision's business,
products, past financial performance, and future financial
projections.

40.  In or about December 2000, ROYS S. POYIADJIS, the
defendant, distributed to the AremisSoft Board of Directors a
written presentation concerning the proposed acquisition by
AremisSoft of Denon International Ltd. ("Denon").  The written
presentation described the purported history, business, products,
customers, and revenues of Denon, and represented that AremisSoft
had negotiated to purchase Denon for $7.34 million.  The written
presentation was false and misleading because, in truth and in
fact, as LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C.

23

MATHEWS, the defendants, well knew, among other things (a) Denon was a shell corporation with little or no business or assets; (b) the written presentation concerning Denon copied almost verbatim from written information that had been provided by the Vision Representative regarding Vision and its product, Factor EMS; and (c) AremisSoft had reached no agreement to acquire Denon or Vision for $7.34 million.

41. On or about December 27, 2000, the AremisSoft Board of Directors convened to consider and vote on the proposed acquisition of Denon. ROYS S. POYIADJIS, the defendant, presented the proposed acquisition to the AremisSoft Board of Directors. In the above-described written presentation and in oral statements made at the Board meeting, POYIADJIS made a variety of false representations about Denon and the proposed acquisition, such as (a) falsely describing the history, business, revenues, and value of Denon, including by falsely representing that Denon was an established software company with 87 employees, an established base of significant customers, 2000 revenues of more than $3.2 million, and 2000 income of more than $600,000; and (b) falsely stating that AremisSoft had negotiated to acquire Denon for approximately $7.34 million. On or about December 27, 2000, based on the false representations made by POYIADJIS, AremisSoft's Board of Directors voted to approve the proposed acquisition of Denon.

24

42. In a document dated as of December 28, 2000, a Share Purchase Agreement was entered into among AremisSoft and Denon, relating to the purported acquisition of Denon by AremisSoft. The Share Purchase Agreement was executed on behalf of AremisSoft by M.C. MATHEWS, the defendant. The Share Purchase Agreement stated that AremisSoft had acquired Denon for $7.34 million by payment of the following amounts to the purported shareholders of Denon: $7,337,553 to "Michael Swovoda," and $2,447 to the Vision Representative. As of the date of the Share Purchase Agreement, however, the Vision Representative was not an owner of Denon, and the Vision Representative had not agreed to participate in the transaction described in the Share Purchase Agreement.

43. On or about January 10, 2001, AremisSoft filed with the SEC a Current Report on Form 8-K which disclosed the Company's purported acquisition of Denon (the "Denon 8-K"). The Denon 8-K was signed on behalf of the Company by ROYS S. POYIADJIS, the defendant, and stated, in part:

> On December 29, 2000, AremisSoft Corporation acquired all of the outstanding shares of Denon International Limited for approximately $7.34 million. Denon International is a Dubai, U.A.E., based company organized in the British Virgin Islands with operations in Romania, Turkey, Greece, Northern Cyprus, Ukraine, Oman, Qatar, Bahrain, Kuwait, Kingdom of Saudi Arabia, Jordan and India.
>
> Denon International develops, markets, implements and supports a fully integrated ERP system with an Arabic User Interface

25

directed at the ERP market in the Middle
East.  The amount of consideration was
determined through negotiations that took
into account various factors concerning the
business of Denon International including,
among other things, the barriers to entry
into the Middle Eastern ERP market and the
market value of comparable companies.

44.  On or about January 11, 2001, AremisSoft issued a
press release announcing its purported acquisition of Denon (the
"Denon Press Release").  Among other things, the Denon Press
Release:

a.    stated that Denon was "a supplier of
enterprise application software primarily focused on the business
requirements of the Middle East," had "developed an extensive
suite of Oracle based applications," had 87 employees, 40
customers, 2000 revenues of $5.0 million, and 2000 profits of
$625,000;

b.    stated that AremisSoft had acquired all of
the outstanding shares of Denon for $7.3 million cash; and

c.    quoted LYCOURGOS K. KYPRIANOU and ROYS S.
POYIADJIS, the defendants, regarding the purported value to
AremisSoft of the acquisition.

45.  On or about January 29, 2001, M.C. MATHEWS, the
defendant, and the Vision Representative executed a written
agreement whereby AremisSoft obtained the option to purchase
Vision for $250,000.  Thereafter, at MATHEWS' direction, MATHEWS

and the Vision Representative executed an identically-worded agreement between Denon and Vision.

46.    The 2000 Annual Report, which was filed with the SEC on or about March 26, 2001, and which was signed on behalf of AremisSoft by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, described the Denon acquisition, stating, in part:

> In December 2000, we also acquired Denon
> International Ltd., a supplier of enterprise
> application software for the retail, trading,
> distribution, and construction management
> markets, primarily in the Middle East. We
> acquired Denon International for $7.34
> million in an all cash transaction.  This
> acquisition expanded our geographic market
> presence and local product knowledge in
> markets such as the Middle East.  The
> acquisition also added over 40 customers,
> primarily located in the Middle East as well
> as Romania, Turkey, Greece, and the Ukraine.
> Denon International has a total of 87
> employees, including 55 developers in Dubai
> and India.

The purported Denon Share Purchase Agreement was included as an exhibit to the 2000 Annual Report.

47.    The statements regarding the acquisition of Denon contained in the Denon 8-K, the Denon Press Release, and the 2000 Annual Report were false and misleading when made because, as LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, well knew, among other things (a) AremisSoft had not agreed to acquire Denon or Vision for $7.34 million; and (b)

Denon was a shell corporation with little or no assets or
business.

48.   The statements of LYCOURGOS K. KYPRIANOU, ROYS S.
POYIADJIS, and M.C. MATHEWS, the defendants, concerning
AremisSoft's purported acquisitions of E-nnovations, E-Charm, and
Denon presented a materially false and misleading picture of
AremisSoft's true financial and business condition, thereby
operating as a fraud and deceit upon investors in AremisSoft
common stock.

### The Fictitious Revenue Scheme

49.   Throughout the time that AremisSoft's shares were
publicly traded, AremisSoft and LYCOURGOS K. KYPRIANOU, ROYS S.
POYIADJIS, and M.C. MATHEWS, the defendants, represented to
members of the investing public that AremisSoft's business,
revenues, and profits were experiencing rapid growth.   For
example, in the Registration Statement and Prospectus for
AremisSoft's initial public offering, which were signed on behalf
of the Company by KYPRIANOU and POYIADJIS, filed with the SEC,
and disseminated to potential investors and purchasers of
AremisSoft stock, AremisSoft stated:

> In the past five years, the Company has
> experienced rapid growth, both internally and
> through acquisitions, with revenues
> increasing from $6.4 million in 1994 to $52.6
> million in 1998.

50.   Following its initial public offering, AremisSoft
reported revenues and income that increased in almost every

quarter.  In (a) Quarterly Reports on Form 10-Q, which were signed by LYCOURGOS K. KYPRIANOU and ROYS S. POYIADJIS, the defendants; (b) the 1999 Annual Report, which was signed by KYPRIANOU, POYIADJIS, and M.C. MATHEWS, the defendants; and (c) the 2000 Annual Report, which was signed by KYPRIANOU, POYIADJIS, and MATHEWS, AremisSoft reported its revenue and income as follows:

| Quarter (Source) | Date Filed | Revenue | Net Income |
|---|---|---|---|
| 1999 Q-1 (10-Q) | May 13, 1999 | $13.1 million | $0.8 million |
| 1999 Q-2 (10-Q) | July 28, 1999 | $16.7 million | $2.5 million |
| 1999 Q-3 (10-Q) | Oct. 21, 1999 | $20.3 million | $3.2 million |
| 1999 Q-5 (10-K) | Mar. 30, 2000 | $23.2 million | $6.7 million |
| 2000 Q-1 (10-Q) | May 12, 2000 | $21.5 million | $2.5 million |
| 2000 Q-2 (10-Q) | Aug. 14, 2000 | $27.0 million | $4.4 million |
| 2000 Q-3 (10-Q) | Nov. 14, 2000 | $31.7 million | $8.8 million |
| 2000 Q-4 (10-K) | Mar. 26, 2001 | $43.4 million | $17.0 million |
| 2001 Q-1 (10-Q) | May 15, 2001 | $39.2 million | $4.5 million |

51.  In AremisSoft's quarterly and annual reports, the Company represented that its growth in revenue and income was based in substantial part upon the expansion of sales to customers located in emerging markets.  For example:

a.  In the 1999 Annual Report, which was signed on behalf of AremisSoft by LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, AremisSoft stated, "During 1999, we continued to expand our revenues in Europe,

29

primarily through large contracts in emerging markets in the manufacturing and healthcare industries." The 1999 Annual Report identified the geographic location of AremisSoft's customers as follows:

| United Kingdom | 35% |
|---|---|
| Other Portions Of Europe | 44% |
| United States | 3% |
| Asia | 5% |
| Rest of World | 13% |

b.    In the 2000 Annual Report, which was signed on behalf of AremisSoft by KYPRIANOU, POYIADJIS, and MATHEWS, AremisSoft stated, "During 2000, we continued to expand our revenues in Europe, primarily through large contracts in emerging markets in the manufacturing and healthcare industries." The 2000 Annual Report identified the geographic location of AremisSoft's customers as follows:

| Europe | 65% |
|---|---|
| North America (United States) | 3% |
| Asia | 14% |
| Rest of World | 18% |

52.    In AremisSoft's press releases relating to its financial performance, LYCOURGOS K. KYPRIANOU, ROYS S. POYIADJIS, and M.C. MATHEWS, the defendants, touted the significance of

30

revenues derived from the Company's sales to customers located in emerging markets. For example:

a.   In AremisSoft's October 25, 2000 press release announcing the results of the third quarter of its 2000 fiscal year (the "October 25, 2000 Press Release"):

i.   POYIADJIS stated, "We achieved our seventh consecutive record quarter of financial performance as a public company. Our solid track record is a result of effective execution of our growth strategies. Specifically, we continue to have great success in under-penetrated emerging markets, which have a substantial need for modern enterprise automation systems"; and

ii.   KYPRIANOU stated, "AremisSoft continues to successfully develop business in emerging markets. e-nnovations.com has been instrumental in securing business in India as well as assisting existing customers with a number of Internet and other technology enhancement projects. The Company continues to expand in Eastern Europe with major projects in Bulgaria, Czech Republic and elsewhere."

b.   In AremisSoft's February 21, 2001 press release announcing the results of the fourth quarter of its 2000 fiscal year, KYPRIANOU stated, "The fourth quarter marked success in a number of new geography endeavors. AremisSoft continues to expand in Eastern Europe, the Middle East and the Far East with key projects in Bulgaria (healthcare), Czech Republic

31

(manufacturing), Croatia (manufacturing), Romania (healthcare),

Ukraine (manufacturing), Kazakhstan (manufacturing), United Arab

Emirates (retail), Kuwait (retail), Jordan (healthcare), Oman

(retail), Malaysia (healthcare), and Philippines (healthcare)."

   c. In AremisSoft's April 25, 2001 press release

announcing the results of the first quarter of its 2001 fiscal

year, the defendants made the following statements, among others:

   i. KYPRIANOU stated, "We continue to see

tremendous opportunities in emerging markets as many enterprises

in these countries are modernizing their infrastructure.  * * *

AremisSoft has unparalleled opportunities for growth due to the

unique requirements of many emerging markets and our business

expertise in serving such customers, developed over a period of

over 20 years";

   ii. POYIADJIS stated, "AremisSoft now has

demonstrated nine consecutive quarters of excellent financial

performance.  Our strong results demonstrate that our business

remains solid and has not been negatively affected by current

market conditions  -  conditions that are proving to be

challenging for many technology companies who heavily

participated in the technology hyper cycle of the past few years

in the US and Western Europe.  We have not experienced a slow

down in business activity in the emerging markets where we

participated and our US and UK based businesses achieved plan"; 

and