# EXHIBIT 6

**FILE COPY**

**GREENBERG TRAURIG, LLP**
Hal M. Hirsch (HH 0417)
Ronald D. Lefton (RL 2666)
Daniel J. Buzzetta (DB 7816)
200 Park Avenue
New York, New York  10166
Phone:   (212) 801-9200
Fax:       (212) 801-6400

**06  CV     4335**

*Attorneys for Joseph P. LaSala and Fred S. Zeidman,*
*as Co-Trustees of the AremisSoft Corporation Liquidating Trust, Plaintiffs*

RECEIVED
JUN 0 8 2006
U.S.D.C. S.. N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH P. LASALA and<br>FRED S. ZEIDMAN, as CO-TRUSTEES of<br>the AREMISSOFT CORPORATION<br>LIQUIDATING TRUST,<br><br>                            Plaintiffs,<br><br>v.<br><br>LLOYDS TSB BANK, PLC,<br><br>                            Defendant. | Civil Action No.<br>06-CV-____<br><br><br>Plaintiffs Demand<br><u>A Jury Trial</u> |

## <u>COMPLAINT</u>

Joseph P. LaSala and Fred S. Zeidman, as Co-Trustees (the "Co-Trustees" or "Plaintiffs")

of the AremisSoft Corporation Liquidating Trust (the "AremisSoft Trust"), bring this action as

successor to the debtor AremisSoft Corporation ("AremisSoft" or the "Company") and on behalf

of the beneficiaries of the AremisSoft Trust against Lloyds TSB Bank, PLC ("Lloyds" or

"Defendant") to recover damages caused by the wrongful conduct of Lloyds in connection with a

massive international fraud perpetrated on AremisSoft and its shareholders. The Plaintiffs assert

claims against Lloyds for aiding and abetting breaches of fiduciary duty, aiding and abetting

fraud, fraud, negligent misrepresentation, and violating Swiss banking laws which prohibit money laundering.

## I.     THE PARTIES

### A.     The AremisSoft Corporation Liquidating Trust

1.     AremisSoft was incorporated in the State of Delaware in the United States. As a result of the fraud perpetrated on AremisSoft described below, a series of class action lawsuits were filed against the Company, its officers -- Lycourgos Kyprianou and Roys Poyiadjis -- and others in the United States District Court for the District of New Jersey ("New Jersey Federal Court"). AremisSoft thereafter filed for protection from its creditors under Chapter 11 of the U.S. Bankruptcy Code ("Bankruptcy Code"). See Bankruptcy Code 11 U.S.C. § 101, *et. seq.*

2.     The AremisSoft Trust is a Delaware trust formed pursuant to three Orders entered by the Honorable Joel A. Pisano of the New Jersey Federal Court as follows:  (i) July 1, 2002 Order confirming the First Amended Joint Plan of Reorganization (the "Confirmation Order") of AremisSoft; (ii) August 1, 2002 Order approving a Class Action Settlement with AremisSoft; and (iii) August 16, 2002 Order entered *nunc pro tunc* to August 1, 2002, correcting the Order and Final Judgment previously entered August 1, 2002, in respect of the bankruptcy case captioned In re AremisSoft Corp., Case No. 02-32621 (D.N.J.).

3.     Joseph P. LaSala, with an address at McElroy, Deutsch, Mulvany & Carpenter, LLP, 1300 Mount Kimble Road, Morristown, New Jersey, is an individual who has been appointed by the New Jersey Federal Court as Co-Trustee of the AremisSoft Trust, responsible to act for the Trust.

2

4.      Fred S. Zeidman, with an address at 2104 Shilton Road, Houston, Texas, is an individual who has been appointed by the New Jersey Federal Court as Co-Trustee of the AremisSoft Trust, responsible to act for the Trust.

5.      Under the terms of the Plan of Reorganization (the "Plan") as approved by the Confirmation Order, any and all claims arising out of the purchase of AremisSoft securities on the open market or otherwise from April 22, 1999 through and including July 27, 2001, and any and all of AremisSoft's claims, were assigned to, and for the benefit of, the AremisSoft Trust. As successor to AremisSoft and assignee of claims from AremisSoft shareholders, and pursuant to the Liquidating Trust Agreement ("LTA"), the AremisSoft Trust is the proper successor to all corporate claims and all claims of its shareholders.  Through the Co-Trustees, the AremisSoft Trust serves as the vehicle for the prosecution of all such claims, including claims arising from the fraud committed on AremisSoft and its shareholders by the Company's former executives, including Lycourgos Kyprianou ("Kyprianou"), as well as those persons and entities, such as the Defendant herein, who, together with Kyprianou, Roys Poyiadjis ("Poyiadjis") and others, also committed a fraud against the Company.

6.      The purpose of the AremisSoft Trust is to identify and maximize the recovery and distribution of assets for the benefit of the aggrieved shareholders, who are AremisSoft Trust beneficiaries, including SoftBrands, Inc., as the reorganized debtor.  The AremisSoft Trust continues to identify, locate, recover and distribute assets for the benefit of the AremisSoft Trust beneficiaries and uses whatever means within its authority to fulfill this obligation.

7.      Under the terms of the Plan and the LTA, the AremisSoft Trust engages in a multitude of activities beyond litigation to achieve its goals.  The AremisSoft Trust functions include, among other things, (i) holding and preserving the value of the trust assets for

3

distribution; (ii) litigating trust claims; (iii) investigating the wrongful acts committed on AremisSoft and searching worldwide for additional proceeds of the AremisSoft fraud; (iv) making distribution of trust recoveries, including, under Delaware law, the disgorgement of insider trading proceeds to the Company; (v) distributing the common stock of SoftBrands, Inc.; (vi) taking further actions for the post-confirmation debtor with respect to the proceed assets; and (vii) ensuring compliance with the provisions of the Plan.    Additionally, the AremisSoft Trust continues to monitor the affairs of that company; also, the Co-Trustees have sought and obtained favorable tax rulings for the AremisSoft Trust beneficiaries.

8.    The AremisSoft Trust is a liquidating trust and functions as a traditional bankruptcy trustee.  The Confirmation Order specifically provides that the Trustees shall have the duties and powers of a bankruptcy trustee in pursuing overseas recoveries.  To this end, the AremisSoft Trust has cooperated with United States government authorities, not merely for the purpose of litigation, but for the purpose of coordinating and working with government authorities in criminal and other investigative endeavors.  In addition, the AremisSoft Trust has communicated and continues to engage in significant communication with various foreign government and police authorities in an effort to work with and assist them in their investigations in pursuit of documents, testimony, and other information which has resulted, and will continue to result, in the recovery of assets for the benefit of the AremisSoft Trust beneficiaries.

9.    Based on the foregoing among other things, and because the AremisSoft Trust was not established solely for the purpose of participating in this litigation, it is to be treated as "one person" pursuant to the Securities Litigation Uniform Standards Act of 1998.  Accordingly, the investor claims asserted here are not preempted.

4

**B.**     <u>Lloyds TSB Bank, PLC</u>

10.     Lloyds is a wholly owned bank subsidiary of Lloyds TSB Group, PLC, both of which have principal places of business at 25 Gresham Street, London, Greater London EC2V 7HN, United Kingdom. Through its extensive number of branches throughout the world, Lloyds offers a variety of consumer, business, corporate and private banking services.

11.     According to its website, Lloyds has extensive worldwide coverage with thirty (30) main branches including, but not limited to, branches in Geneva, Switzerland and New York, New York. The corporate banking arm of Lloyds operates out of, among other locations, the branch located at 1251 Avenue of the Americas, 39th Floor, New York, New York, 10020 with the phone number (212) 930-5000. The international private banking arm of Lloyds operates out of, among other locations, a branch located in Geneva, Switzerland with an address of Place Bel-Air 1, P.O. Box 5145, CH-1211 and a phone number (+41) (22) 307-3333. Lloyds also has an international banking branch at One Biscayne Tower, Suite 3200, 2 South Biscayne Boulevard, Miami, Florida.

12.     Lloyds advertises on its website that its corporate office in New York offers a wide range of financial services to U.S. corporate and financial institution customers. According to the *September 2005 Federal Reserve Board Structure and Share Data for US Offices of Foreign Banks* report, the New York branch of Lloyds has domestic assets of over $8 billion.

13.     The State of New York Banking Department website lists Lloyds as a "Supervised Institution, Foreign Branch." Lloyds is licensed under Article 5, section 200 of the New York Banking Law, which requires that a license be obtained by a foreign banking corporation in order to establish and maintain a branch in New York.

## II.    JURISDICTION

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because no defendant is a citizen of the same state as any plaintiff and the amount in controversy is well in excess of $75,000.

15.    This Court has personal jurisdiction over Defendant pursuant to the New York Banking Law, §§ 200, 200-b(2)(e), the Federal Reserve Act of 1913, 12 U.S.C. § 632 and the New York long arm statute, N.Y.C.P.L.R. §302(a)(1).

## III.    FACTUAL BACKGROUND

### A.    Overview of the Kyprianou Fraud and Breaches of Fiduciary Duty, the Bankruptcy of AremisSoft and the Government Investigations

16.    Lycourgos Kyprianou was the founder and largest individual shareholder of AremisSoft and served as the Chairman of the Board of Directors since October of 1997, Chief Executive Officer from October 1997 to May 2000, and co-CEO with Roys Poyiadjis from February 2001 to July 31, 2001.    From May 2000, Kyprianou also was AremisSoft's Chief Technology Officer.    At all relevant times he controlled the affairs of AremisSoft's subsidiaries, including LK Global Information Systems and the Company's Eastern Europe, Middle East and Africa division (AremisSoft EE.ME.A.).

17.    Through the first half of 2001, AremisSoft appeared – from the Company's public statements and financial reporting – to be a leading international enterprise software company which enjoyed lucrative international contracts with substantial annual revenues.    The Company also appeared to be growing rapidly through a series of acquisitions of substantial and successful foreign software companies.

18.    This picture, however, was almost entirely a fiction.    In reality, from April 22, 1999 through July 27, 2001, Kyprianou, in conspiracy with Poyiadjis and others, engaged in a

6

fraudulent scheme to artificially inflate the price of AremisSoft's publicly traded stock. More specifically, Kyprianou, Poyiadjis and others blatantly misrepresented the value and profitability of AremisSoft by, *inter alia*, causing AremisSoft to (a) report revenue that was almost entirely fictitious, and (b) announce publicly that the Company had acquired software companies with substantial revenues for prices totaling tens of millions of dollars when, in reality, the acquired companies were small, with minimal revenues, and AremisSoft paid to those companies only a small fraction of the announced acquisition prices. The fraud was conducted, almost entirely, through the purported operations of AremisSoft's EE.ME.A. and LK Global subsidiaries.

19.    The effect of the numerous and misleading statements and other fraud was that the perceived value and profitability of AremisSoft was far higher than the actual value and profitability, with the result that the AremisSoft shares being traded on the open market were artificially inflated in price. In further breach of his fiduciary duty to the Company and its shareholders, Kyprianou, in conspiracy with Poyiadjis, took advantage of the ensuing inflated stock price by illegally engaging in insider trading. Kyprianou thereby reaped huge profits at the expense of the Company and its shareholders, who are the beneficiaries of the AremisSoft Trust, by selling his AremisSoft shares at inflated prices. By using nominee companies to hold and sell AremisSoft stock, Kyprianou misled the investing public into thinking that the sales were genuine arm's length sales by other investors and at the same time concealed his illegal conduct. Kyprianou then, with the participation of Lloyds, laundered more than $44 million in furtherance of the fraudulent scheme.

20.    By mid-May 2001, there were widespread media reports concerning the inflated revenues reported by Kyprianou and Poyiadjis and other fraudulent activity. By way of example only, on May 17, 2001, The New York Times published an article reporting that documents

indicated that the true value of a contract AremisSoft purportedly entered into with the National Health Insurance Fund ("NHIF") of Bulgaria was less than $4 million, instead of the $37.5 million claimed by the Company in public reporting. In addition, the article raised concerns regarding the so-called "blind trusts" Kyprianou and Poyiadjis had used to sell more than 10 million shares of AremisSoft stock in 2000. On May 21, 2001, an article entitled "The Plot Thickens: Bulgaria Disputes AremisSoft's Claims" appeared on "thestreet.com." The article reported that Bulgarian officials and the World Bank had confirmed that the NHIF contract was valued at no more than $3.94 million.

21.    Moreover, at least one class action lawsuit was filed against AremisSoft and its directors by May 24, 2001.

22.    Other allegations in the public press and in the class action lawsuits during the spring and summer of 2001 included:

- Kyprianou, AremisSoft's Co-CEO, was the Chairman and primary stockholder in GlobalSoft, an AremisSoft subsidiary spun off from AremisSoft in 1999, and with which AremisSoft was negotiating an option to repurchase control;

- Investigations of Kyprianou were ongoing by the Cyprus SEC related to hyping of GlobalSoft stock;

- AremisSoft had been writing off the whole purchase of acquisitions to help manage earnings and maintain some semblance of profitability;

- AremisSoft misled investors regarding the number of software developers it employed in India;

- AremisSoft incorrectly stated UK revenue for the first three quarters of 1999 as part of its geographic supplemental information disclosures in the 10Qs;

- AremisSoft was trying to confuse investors by using the phrases 'software sales' and 'application software licenses' without differentiating them;

- Insyst Electronics, a Bulgarian company, from which AremisSoft allegedly had entered previously into a $9.2 million contract, was in fact a strategic partner and supplier of hardware;

- Assen Koinov, President of Insyst Electronics, who also was identified as the future CEO of AremisSoft Bulgaria, had been indicted by a US federal grand jury for smuggling computer equipment into Bulgaria in 1984 while employed by a Bulgarian state enterprise;

- AremisSoft's Executive Vice President, Paul Bloom, had refused to discuss with the author of a news report Assen Koinov's current role with AremisSoft;

- Kyprianou and Poyiadjis used so-called blind trusts to sell more than 10 million shares of stock in 2000 and were claiming they had done so for tax and estate planning services;

- Poyiadjis had transferred 1.6 million shares and 2.9 million stock options into a trust for the benefit of his family; and Kyprianou had transferred 3.2 million shares and 2.9 million options into a trust, collectively selling their shares and exercising nearly all their options;

- More than 22 million shares, equal to half of the AremisSoft shares outstanding, had changed hands in two days, with the price per share falling 11 percent;

- AremisSoft investors were scrambling to get the facts about AremisSoft, which was maintaining that the value of its contract with the Bulgarian NHIF was $37.5 million; and

- The Bulgarian NHIF's own press release clearly stated that it had paid out only $1.7 million, and not the $7.1 million that AremisSoft claimed it had received for the first phase of work.

23. On July 30, 2001, trading of AremisSoft on the NASDAQ was halted due to, *inter alia*, the failure of the Company to file its Form 10-Q for the second quarter ending on June 30, 2001. During this period, the press coverage of events with respect to the fraud accusations, class action lawsuits and AremisSoft's delisting was widespread and notorious throughout the world and known to Lloyds.

9

24.    AremisSoft's second quarter 2001 earnings were scheduled to be released on or about July 30, 2001. However, on July 31, 2001, AremisSoft publicly announced that it was delaying the release of its results indefinitely and that Kyprianou had resigned. The National Association of Securities Dealers, Inc. ("NASD") and the United States Securities Exchange Commission (the "SEC") immediately commenced investigations of Kyprianou and Poyiadjis.

25.    On or about October 4, 2001, the SEC sued Kyprianou and Poyiadjis in a civil injunction action, alleging that they each secretly sold over 2.1 million shares of their AremisSoft stock in late 2000 in violation of several provisions of the United States securities laws. On October 19, 2001, the Honorable Charles S. Haight, Jr., United States District Judge for the Southern District of New York, issued a preliminary injunction against Roys Poyiadjis and Lycourgos Kyprianou, among others. The SEC successfully froze $175 million of Poyiadjis' proceeds that had been hidden in bank accounts in the Isle of Man.

26.    On December 19, 2001, the United States Attorney for the Southern District of New York obtained an indictment against Poyiadjis.

27.    On March 15, 2002, AremisSoft filed for bankruptcy protection pursuant to Chapter 11 of the Bankruptcy Code.

28.    On March 22, 2002, the U.S. Attorney's Office filed a civil complaint *in rem* in the U.S. District Court for the Southern District of New York (the "New York Federal Court") seeking civil forfeiture of the funds in the Isle of Man banks, and on June 3, 2002 the court entered a default judgment ordering forfeiture of the funds to the United States.

29.    On June 24, 2002, a superseding indictment was returned against Kyprianou, Poyiadjis and M.C. Mathews ("Mathews"), the top AremisSoft executive in India, on counts of conspiracy to commit securities fraud, mail fraud and wire fraud, substantive counts of securities

fraud (both on the market and insider trading), conspiracy to commit money laundering, and substantive counts of money laundering.

**B.    Damages to the Plaintiffs and Relevant Proceedings by the AremisSoft Trust**

30.    By the time the fraud was uncovered in 2001, AremisSoft shareholders, who comprise the more than 6000 beneficiaries of the AremisSoft Trust and whose interests, along with the Company's interests, are represented thereby, had sustained losses of approximately $500 million.

31.    As part of its ongoing efforts to recover these amounts, the AremisSoft Trust commenced and prosecuted a Chancery Action in the Isle of Man against Kyprianou, Poyiadjis, the trustees of trusts in the Isle of Man established by Roys Poyiadjis to hold his proceeds from sales of AremisSoft stock, namely Roger Andre Meyer ("Meyer"), John Trevor Roche Baines ("Baines"), and Peter Grut ("Grut") (collectively, the "Isle of Man Trustees"), and certain affiliated individuals and entities for damages arising from the fraud.  In addition, in connection with the indictment of Kyprianou and Poyiadjis, the United States government initiated an asset forfeiture action relating to assets located and frozen in the Isle of Man.

32.    After more than two years of litigation in the Isle of Man, the United States government, the Plaintiffs and Poyiadjis (and individuals and entities affiliated with him) (collectively, the "Settling Defendants") entered into settlements whereby certain disputes were compromised and resolved.

33.    As part of the settlement agreement with the AremisSoft Trust, the Plaintiffs received certain critical and relevant information pertaining to Defendant's participation in the laundering of the proceeds of Kyprianou's fraudulent and criminal conduct, including (1) a schedule of accounting, received in or around April 25, 2005 ("Trustees Schedule"), of

AremisSoft stock purportedly owned by or for the benefit of Kyprianou and Poyiadjis and sold by Meyer; (2) documents related to said accounting; and (3) interviews in May 2005 of Poyiadjis' trustees (collectively referred to as "Trustees Accounting").

34.    The Trustees Accounting demonstrated that Kyprianou had gifted AremisSoft stocks and options to Quantum Group Management and Inlay Group Management – Swiss-based nominee entities operated by Meyer. Kyprianou's options subsequently were exercised, and the stock was sold by Meyer. Thereafter, at Kyprianou's direction, the proceeds of these sales in large part were transferred into "house" accounts - accounts created by a bank for internal use - at Lloyds in order to hide Kyprianou's identity as recipient and beneficiary.

35.    Kyprianou defaulted in appearance in the Isle of Man proceeding and was not party to the settlement described above. The AremisSoft Trust therefore, in July 2005, initiated a separate proceeding against Kyprianou and a number of his nominees in Cyprus.

36.    In addition, in October 2005 the AremisSoft Trust initiated proceedings in the High Court of Justice, Queen's Bench Division of the Commercial Court of the United Kingdom (Case No. 2005 Folio Nos. 885, 886, 933) to freeze assets belonging to Kyprianou and his wife and to obtain from third parties relevant documents and information (the "UK Proceedings"). The ancillary orders provide for freezing of Kyprianou's assets and the disclosure of information concerning such assets so that the proceeds of Kyprianou's fraud may be traced. As a result of the UK Proceedings, the AremisSoft Trust has received hundreds of pages of bank account statements, communications and other memoranda and documents from individuals, corporate bodies and banking institutions associated with Kyprianou (the "UK Documents"). Also, as part of the UK Proceedings, the AremisSoft Trust on May 22-23, 2006, cross-examined Michael

Miragliotta, a former personal assistant to Kyprianou, regarding, *inter alia*, Kyprianou's accounts at Lloyds.

37.     The UK Documents and Proceedings reveal the money laundering and fraudulent activities of Kyprianou and various other individuals and entities, including Lloyds.  Documents obtained from HSBC (UK) include wire transfer statements reflecting the transfer of funds between Kyprianou's personal bank accounts at HSBC (UK) and Lloyds.  Further, information obtained through the UK Documents and Proceedings identify Kyprianou as saying that he maintains accounts at Lloyds, where he deposited proceeds from AremisSoft stock sales; that the general manager of the Lloyds' branch in Geneva is related to his family; and that Kyprianou subsequently opened bank accounts relating to his yacht, M/Y Noni, at Lloyds' branch in Geneva.

38.     It was only after conducting a review of the Trustees Accounting and the UK Documents, which detail the voluminous transfers of money, that the Plaintiffs discovered the true nature of Lloyds' wrongdoing.  The Plaintiffs continue to learn new information which supports their claims against Defendant.  Based on the Plaintiffs' investigation conducted to date, the Plaintiffs in their representative capacity as Co-Trustees of the AremisSoft Trust, acted with all reasonable speed to commence this action on behalf of the AremisSoft Trust.

39.     On February 17, 2006, Lloyds executed a Declaration of Renunciation To The Statute of Limitations, waiving any applicable statute of limitations defense and thus providing that the AremisSoft Trust may, through December 31, 2007, bring any claim against the Defendant that had not been time-barred as of February 17, 2006.

## IV.    LLOYDS' OBLIGATIONS UNDER SWISS LAW

40.    Switzerland has numerous laws and regulations aimed at combating money laundering, including the Federal Law on Combating Money Laundering in the Financial Sector in effect since April 1, 1998 ("Money Laundering Law"), the Swiss banks' Code of Conduct with Regard to the Exercise of Due Diligence in force since 1977 (the "Due Diligence Law"), the Swiss Federal Banking Commission's Guidelines ("Banking Guidelines"), and provisions of the Swiss Criminal Code.  Lloyds is required to comply with each of these laws.

41.    The Money Laundering Law applies to all financial intermediaries, including banks and asset managers, and is based on the Due Diligence Law and Banking Guidelines that impose obligations on banks to properly identify their customers and to exercise due diligence if faced with circumstances suggesting money laundering.

42.    Among the core principles of the Due Diligence Law is to "know your customer." It is not sufficient for banks and other financial intermediaries merely to request an individual's passport or driver's license or a corporation's records in order to verify the identity of the customer opening the account.  The banks must also conduct due diligence as to whether the assets to be deposited in the account belong to the contracting party or some third party.  In circumstances where it appears that the contracting party is not the beneficial owner of the assets, the banks must take steps to clarify the identity of the beneficial owner or refrain from opening an account.

43.    The Banking Guidelines, which assist with the interpretation of the Swiss Criminal Code, impose certain obligations on banks that are triggered when a customer's transactions bear certain characteristics that suggest that he or she is engaging in money laundering.  As set forth in the Banking Guidelines, these include transactions:

14

- where the economic justification is not discernible or which may not make any economic sense.

- where assets are withdrawn shortly after being deposited and there is no plausible reason for such an immediate withdrawal.

- which lead to substantial activity without any apparent reason.

- which are incompatible with the knowledge and experience of the bank concerning the customer and the stated purpose of the relationship.

- where the client's reason for selecting the particular bank to carry out its transaction is unclear.

44.    In these and other unusual circumstances that indicate that a customer may be engaging in money laundering, the bank is required to investigate and exercise the proper amount of diligence to determine whether there exists any economic justification for the suspicious transactions. In certain situations, the bank may be required to freeze the account without notifying the customer and/or report the activity to the criminal authorities.

45.    The Swiss Criminal Code also contains provisions prohibiting financial intermediaries from assisting money laundering.  Article 305bis of the Criminal Code prohibits a bank from committing an act designed to obstruct the identification or confiscation of assets it knows, or must assume based on the circumstances, to be derived from criminal activity.

46.    In addition, it is a violation of Article 305ter of the Criminal Code for a bank to accept, preserve, invest or assist to transfer assets and to neglect to determine the identity of the beneficial owner of the assets with the necessary diligence according to the circumstances.

47.    Lloyds was bound by the obligations set forth by these laws and failed to meet its obligations, thereby participating in and enabling Kyprianou to perpetrate his fraud and launder the proceeds through its accounts.

15

V.    LLOYDS' KNOWLEDGE OF, AND PARTICIPATION IN, KYPRIANOU'S
      MONEY LAUNDERING AND BREACHES OF HIS FIDUCIARY DUTIES

48.    As a result of materially false statements regarding the financial condition of

AremisSoft during 1999, 2000 and the beginning of 2001, the stock price of AremisSoft was

artificially inflated.  Kyprianou, knowing that the information he disclosed was false, took

advantage of the inflated stock price and used alter ego companies to sell a substantial number of

AremisSoft shares and options at artificially inflated prices to unsuspecting and innocent public

investors and then retained control of the profits.

49.    Kyprianou opened his account at Lloyds through Evangelos Embedoklis

("Embedoklis"), his wife's cousin, who at the time was the Deputy General Manager and Chief

of Private Banking of Lloyds.  Lloyds assigned Jane Moore ("Moore"), Manager at the Geneva

branch of Lloyds ("Lloyds Geneva"), to be Kyprianou's account manager.  At least one account,

(No. 1980410-110) ("Lloyds-Kyprianou"), was established for the benefit of Kyprianou.  Upon

information and belief, Lloyds operated other accounts out of the Lloyds Geneva branch for the

benefit of Kyprianou, including but not limited to Accounts Nos. 189812, 190047, 1984203-212

and/or 1984203-210.

50.    To conceal the origins of the transfers and the beneficial owner of the accounts,

Kyprianou and Lloyds agreed that money transferred into the Lloyds-Kyprianou account would

be transferred without reference to the remitter's name, but directed to Jane Moore. In another

attempt to frustrate any effort to trace the ill-gotten funds, money was often transferred into the

Lloyds-Kyprianou account with reference to "house account" numbers 04043323 or even 9999,

as opposed to the specific account number.

51.    At the time that Kyprianou opened the Lloyds-Kyprianou account, Lloyds knew,

and pursuant to the laws of Switzerland was required to know, that Kyprianou was the Chairman

16

and a corporate insider of AremisSoft, a United States publicly traded company, and that the purpose of the Lloyds-Kyprianou account was to deposit the proceeds of his sale of AremisSoft securities.

52.    In addition, and pursuant to minimum due diligence required of large transactions, Moore knew, and was required to know with regard to each transfer, the amount of money being transferred, the source of the funds and the value date. Moore provided the routing instructions for each transaction and received an electronic report (i.e. SWIFT report) of the transfer.

53.    By reason of its obligation to "know your customer," Lloyds knew or was required to know that Kyprianou held stock of AremisSoft and received options to acquire additional shares of AremisSoft as part of his compensation. Lloyds also knew that in November 2000, Kyprianou publicly reported that he gifted 1,600,000 AremisSoft shares to two unnamed donees for "overall tax and estate planning" purposes and claimed that he had "no voting, beneficial or pecuniary interest" in the donees.

54.    Shortly after these gifts were made, and over the course of two weeks in December 2000, more than $36 million was transferred into the Lloyds-Kyprianou account in four tranches from two different accounts at Bordier et Cie ("Bordier") and Dominick Company AG ("Dominick"), each account in the name of Inlay Group Management ("Inlay").

- $6,007,350.00 was transferred on December 13, 2000 from the Bordier-Inlay account.

- $6,007,350.00 was transferred on December 14, 2000 from the Dominick-Inlay account.

- $12,575,000.00 was transferred on December 21, 2000 from the Bordier-Inlay account.

- $11,425,000.00 was transferred on December 21, 2000 from the Dominick-Inlay account.

17

55.    Further, on January 3, 2001 and February 9, 2001, Lloyds received from an account at Bordier in the name of Quantum Group Management ("Quantum") transfers of $7,500,000 and $781,536 respectively, for deposit into the Lloyds-Kyprianou account.   These were proceeds from the sale of stock after the exercise of AremisSoft options that Kyprianou gifted through Sincock – a Kyprianou alter-ego entity – to Quantum.

56.    These transfers bore indicia of money laundering.  Lloyds knew that Kyprianou publicly reported that he had gifted in late 2000 all of his stock options and 1.6 million shares of AremisSoft securities to two entities in which he claimed "he had no voting, beneficial or pecuniary interest."  This burst of activity in a short period of time originated from a total of three different accounts at two different banks and involved large amounts of money at a time when Kyprianou had purportedly gifted large amounts of shares and options.

57.    These large transfers, from accounts for which Kyprianou was neither listed as the record nor beneficial owner, were inherently suspicious and required an enhanced level of diligence and inquiry.  Lloyds failed this obligation.

58.    Lloyds, consistent with its duties and obligations under Swiss law, should have recognized these characteristics, questioned its client about the economic justification of such transactions and procured additional information regarding the transactions which resulted in the massive proceeds deposited into the bank.  Moreover, in circumstances where there is a question as to whether the customer is the beneficial owner of the assets, Lloyds was required to take affirmative steps to clarify the identity of the beneficial owner.  Had Lloyds done this, it would have learned that Kyprianou was neither a record nor a beneficial owner of any account at Bordier or Dominick, including the three accounts from which the $44 million was transferred.

18

59.    Even after learning that Kyprianou had used conspirators to sell millions of shares in 2000, Lloyds failed to take appropriate measures to ensure that its accounts were not being used by Kyprianou for money laundering or other criminal purposes. Lloyds' failure to do so provided opportunities for Kyprianou to secrete the proceeds of his criminal and fraudulent conduct and frustrate the AremisSoft Trust's attempts to trace and recover its damages.

60.    Lloyds not only made it possible, and in many instances easy, for Kyprianou to launder the proceeds of his criminal and fraudulent conduct through Lloyds' accounts, but Lloyds misrepresented material information that it knew would be relied on by AremisSoft and its auditors in reporting the Company's financial condition and thereby perpetuated Kyprianou's fraud and crimes against the Company.

61.    In March 2001, in response to an audit inquiry regarding cash in AremisSoft's bank accounts, Lloyds sent a letter to Pavlos Meletiou ("Meletiou"), a co-conspirator of Kyprianou, who purported to act as AremisSoft EE.ME.A's auditor, which stated that "since 29th December 2000" Lloyds was holding $9,980,000.00 "blocked in favour of AremisSoft (EE.ME.A) Ltd." ("Confirmation Letter"). That amount was approximately 30% of the total cash that AremisSoft reported in its audited consolidated financial statements for the fiscal year ended December 31, 2000. The Confirmation Letter was signed by Moore and Sylvie Orsatti ("Orsatti"), the Assistant Manager at Lloyds, both of whom knew or should have known that the information contained in the letter was for the purpose of confirming entries in AremisSoft's ledgers in connection with the annual audit of its financial statements as required of public companies. Indeed, AremisSoft's financial report filed with the SEC on the Form 10-K dated March 26, 2001 ("2000 10-K") included false sales booked by AremisSoft EE.ME.A and false cash accounts, thereby giving the appearance of revenue and cash that did not exist.

19

62.    Lloyds' conduct with respect to the Confirmation Letter constituted acts of fraud, dishonesty and furtherance of Kyprianou's criminal activities.  Upon information and belief, Lloyds did not hold the $9.98 million since December 29, 2000 blocked in favor of AremisSoft and therefore the Confirmation Letter was materially false and constitutes a false written statement.  Upon information and belief, Lloyds intentionally provided the materially false Confirmation Letter knowing that it would have a material impact on the market value of AremisSoft.

63.    The Lloyds Confirmation Letter was false and misleading because (a) upon information and belief, Lloyds did not hold the $9.98 million since December 29, 2000 blocked in favor of AremisSoft and (b) Lloyds affirmed that there were monies blocked in favor of AremisSoft EE.ME.A but omitted to disclose that (i) neither AremisSoft EE.ME.A nor any other AremisSoft entity had an account at Lloyds either at December 29, 2000, or at the date of the confirm; and (ii) the supposedly blocked funds, if ever blocked at all, were in an account in the name, or for the benefit, of Kyprianou.

64.    Additionally, Moore, Orsatti and/or Embedoklis knew or should have known that AremisSoft EE.ME.A did not have any account at Lloyds at the time the letter was written. Rather, the monies were held in the Lloyds-Kyprianou account.  There was no apparent reason that said amount either should be blocked or transferred to AremisSoft EE.ME.A.  Indeed, no AremisSoft EE.ME.A account was opened until June 11, 2001.

65.    Moreover, had AremisSoft EE.ME.A been a customer of Lloyds at the time the Confirmation Letter was written, Moore, Orsatti and/or Embedoklis knew or should have known that, without apparent economic or business purpose, it violated Swiss law to hold funds of one banking customer in an account beneficially owned by another customer .

20

66.    The issuance by Lloyds of the misleading Confirmation Letter, which upon information and belief, falsely stated that monies were blocked and had been since December 29, 2000, and which falsely suggested that AremisSoft had an account at Lloyds when it did not, enabled AremisSoft to include false and misleading material information in AremisSoft's publicly filed financial statements and further delayed for months discovery of the massive AremisSoft fraud.  Further, this false and misleading information was relied on by the Company and by the auditors of AremisSoft in auditing the financial statements for the Company and in preparing their opinion thereon.

67.    The Company, other than the co-conspirators themselves, did not know that the subsequently published audit opinion was thereby tainted.  Investors continued to buy millions of shares of AremisSoft stock not knowing that its financial results and financial statements were false and misleading.

68.    Amidst the flurry of media reports beginning in May 2001 which discussed allegations of Kyprianou's involvement in the AremisSoft fraud and Kyprianou's numerous false and misleading statements, false written statements and forgeries involved in AremisSoft's purported revenues, Lloyds nonetheless continued to conduct business with Kyprianou in violation of its duties under Swiss law.

69.    Upon information and belief, in June 2001, Kyprianou instructed Lloyds to open an account in the name of AremisSoft EE.ME.A, Account Number 190551-110 ("Lloyds-EE.ME.A").  Lloyds did this even though (a) AremisSoft EE.ME.A, had no offices, personnel, nor business operations in Switzerland and its reason for selecting Lloyds was unclear—another indicia of money laundering, and (b) there were widespread public allegations that Kyprianou had engaged in fraudulent conduct.

21

70.    Then, on June 8, 2001, Lloyds transferred over $10 million (the $9.9 million purportedly "blocked in favour of AremisSoft (EE.ME.A) Ltd" plus interest) from the Kyprianou account, to the newly opened Lloyds-EE.ME.A account for no apparent economic or business purpose.  Lloyds further participated in money laundering and assisted Kyprianou's theft of AremisSoft's assets by then transferring said funds to an AremisSoft account controlled by Kyprianou at the Bank of Cyprus in Nicosia, Cyprus.

71.    Even after the disclosure of fraud in the reporting of the revenues generated by the NHIF Contract, Lloyds permitted the transfer of $200,000 from the Lloyds-EE.ME.A account to an AremisSoft EE.ME.A account at Bulbank, Sofia, Bulgaria on June 29, 2001.

72.    Upon information and belief, despite knowing or having information which would cause one to know that Kyprianou was engaged in theft of assets from AremisSoft and money laundering activities, Lloyds actively aided and abetted Kyprianou's activities by enabling Kyprianou to use Lloyds accounts to effectuate such thefts and otherwise launder the proceeds of his criminal conduct.

73.    Under Swiss law, Kyprianou's conduct and dealing with Lloyds indicated that the accounts were being used to conceal the proceeds of criminal activity and money laundering and, thereby, triggered an obligation on the part of Lloyds to determine the economic justification for the transactions and freezing the account and/or reporting the suspicious activity to the criminal authorities—neither of which Lloyds did.

74.    News of the AremisSoft fraud and Kyprianou's involvement was widespread. The UK branch of HSBC, with whom Mr. and Mrs. Kyprianou maintained bank accounts, discussed internally their concerns regarding various transactions within the Kyprianous' accounts and the government investigation in the United States. For example:

- In an e-mail exchange dated August 1 and 2, 2001, James Hogan of HSBC wrote to Keith Simpson of HSBC: "...trading in AremisSoft stock (AREM) was suspended by Nasdaq yesterday morning and . . . it is facing an SEC probe. . . . Dr. Kyprianou has stepped down as Chairman and Co-CEO. . . . On Friday we were asked to transfer USD300,000 to the sole account of Mrs. Kyprianou from the joint account. In itself **a rare transaction for them to undertake.** Following yesterday's events **I believe this is suspicious enough for us to report them to compliance.**" (emphasis added).

- James Hogan further wrote: **"We are also asked today to pay USD50,000 to a numbered account with Lloyds TSB, Geneva where a 'cousin' of LKK is General/Branch Manager. ... I am led to understand that clients maintain a significant balance ... with them following AREM sales last year.** These share sales are also part of several class action lawsuits filed over the last 2 months against several key individuals within the company." (emphasis added).

- HSBC appeared to be concerned that Kyprianou might be using his wife to launder money. Keith Simpson of HSBC wrote to Norman Fashek: "...if we were asked to open an account for the client now I suspect we would be steering clear of someone with this much involvement in AremisSoft, past or present. The current situation may blow over **but if LKK is moving assets to his wife as a result of this then he clearly sees a problem."** (emphasis added)

- In an internal HSBC memo dated August 22, 2001, Keith Simpson wrote to Norman Fashek: "We have spoken about LKK and agreed that we are looking to exit this relationship. As a first step you plan to speak with the client to tell him the current situation and to explain the bank's position in light of recent events."

75.    While HSBC was concerned with Kyprianou's banking activities and the reports of suspected fraud, Lloyds continued to assist Kyprianou in completing various transactions, during and after the fraudulent sale of AremisSoft shares, which were intended to conceal and launder the proceeds of Kyprianou's fraud, including but not limited to the following transactions.

76.    Lloyds Geneva received the following transfers from Mr. and Mrs. Kyprianou's Joint HSBC account (225151) ("Joint HSBC Account") and credited the amounts to an account

identified with the number 189812.    In both cases, the transfer documents referenced Lloyds employee, and Kyprianou account manager, Jane Moore:

- June 22, 2001        $400,000
- August 1, 2001       $50,000

77.    Payments were also made from Lloyds Geneva to the Joint HSBC Account including $815,000 and $88,757.17 on the 1st and 13th of June 2001 respectively.  On September 20, 2001, after the NASDAQ delisted AremisSoft, Lloyds permitted the transfer of $41,168.95 pursuant to instructions of "One of Our Customers," a designation often used by Kyprianou and Lloyds when trying to conceal the origins of Kyprianou's transfers, to Mrs. Kyprianou's account (309602-060).  The amount of £27,930.09 was then transferred to another of Mrs. Kyprianou's accounts (309602-750) on or about September 24, 2001.

78.    On October 10, 2001, after the SEC had filed a civil injunction action against Kyprianou, Lloyds Geneva received a transfer of £25,000 from Kyprianou's Bank of Cyprus account (309604-750) and credited the amount to an account identified with the number 190047 presumably for the benefit of an entity named CEI (i.e. Cassiere Enterprises, Inc., the holding company for a yacht (M/Y Noni)), known to be beneficially owned by or on behalf of Kyprianou).  This transfer also referenced Jane Moore.

79.    Likewise, between November 2001 and August 2002, Lloyds Geneva received the following transfers totaling over £726,000 from Kyprianou's Bank of Cyprus account (309607-060) and credited the amounts to an account in the name of UG Business with account number either 19842032-12 and/or 19842032-10.

- November 27, 2001,  £270,000.00,   acct. #1984203-212
- January 8, 2002,      £28,000.00,   acct. #1984203-212
- April 10, 2002,       £126,000.00,  acct. #1984203-212
- April 19, 2002,       £50,000.00,   acct. #1984203-210
- April 24, 2002,       £34,744.13,   acct. #1984203-212

24

- May 14, 2002,         £16,200.00,     acct. #1984203-212
- May 30, 2002,         £11,195.35,     acct. #1984203-212
- July 3, 2002,         £125,000.00,    acct. #1984203-212
- July 16, 2002,        £40,000.00,     acct. #1984203-212
- August 28, 2002,      £25,000.00,     acct. #1984203-212

80.     At least three of these transfers occurred after Kyprianou had been indicted on counts of money laundering, among others.   According to documents in the Plaintiffs' possession, all but the transfers on April 24, 2002 and May 30, 2002 reference Jane Moore.  In addition, the transfer documents for the April 19, 2002, May 14, 2002 and July 12, 2002 transfers reference Account Number 04043323, the same number used as a reference on the transfers identified in paragraphs 54 and 55 above.

81.     Mike Miragliotta, the Kyprianous' personal representative responsible for banking activities and other administrative activities in the United Kingdom, maintained an account at Lloyds in the name of Velvet Underground, with an account number almost identical to that of the UG Business account, 1984203, but for the suffix.  Between April 2001 and December 2002 Kyprianou transferred £58,000 in 17 tranches from his Bank of Cyprus and HSBC accounts to Velvet Underground for Miragliotta's salary.  All but two transfers reference Jane Moore.

82.     Lloyds further facilitated Kyprianou's fraud by honoring unusual requests such as receiving payments which did not reference the remitter's name or the appropriate account number.  Instead, Lloyds would permit Kyprianou to remit payments to his Lloyds-Kyprianou account by referring to Jane Moore or transfer money out of the Lloyds-Kyprianou account by referencing "by order of one of our clients."  Lloyds never referred to the Lloyds-Kyprianou account number, # 1980410-110.  They often used "house account" numbers  04043323 or 9999.

25

VI.    **STATEMENT OF CLAIMS**

**COUNT I**
**(Aiding and Abetting Breach of Fiduciary Duty)**

83.    The Plaintiffs repeat and reallege and incorporate by reference herein the entirety of the allegations contained in the foregoing paragraphs.

84.    Lloyds knew, and pursuant to the laws of Switzerland was required to know, that Kyprianou was the Chairman of the Board of Directors and a corporate insider of AremisSoft, a United States publicly traded company, and that in those capacities Kyprianou owed fiduciary duties to both AremisSoft and its shareholders. These duties include the duties to exercise due care, good faith, and loyalty which mandate that the best interest of the corporation and its shareholders takes precedence over any interest possessed by Kyprianou and not shared by the shareholders generally.

85.    Under Delaware law, by having engaged in insider trading and fraud, Kyprianou breached the fiduciary duties he owed to the shareholders and the Company, all beneficiaries of the AremisSoft Trust. Moreover, under Delaware law, Kyprianou is liable to the Company, now the AremisSoft Trust, to disgorge the entirety of his insider trading profits.

86.    Lloyds aided and abetted Kyprianou's breaches of fiduciary duty by knowingly participating in Kyprianou's scheme to conceal his fraud by engaging in covert activities to frustrate the tracing of Kyprianou's illegal proceeds. For example, Lloyds allowed transfers that did not refer to Kyprianou's name or account number, and accepted and delivered funds without a remitter's name being shown. Lloyds further aided and abetted Kyprianou's breaches of fiduciary duty by knowingly permitting tens of millions of dollars to be funneled through the bank's accounts when Lloyds knew that the funds were purportedly beneficially owned by

someone other than Kyprianou, and Lloyds knew, or in the proper exercise of its duties should have known, that such proceeds were the result of insider trading of AremisSoft stock.

87.     Lloyds further aided and abetted Kyprianou's breach of fiduciary duty by creating the Confirmation Letter which misrepresented the cash accounts of the Company and which it knew would be relied on by the Company and its auditors in opining on the financial statements of AremisSoft.

88.     As a foreseeable consequence of Lloyds aiding and abetting the insiders' breach of fiduciary duty, AremisSoft and its investors, both as represented by Plaintiffs, suffered substantial harm and damage proximately caused by Lloyds' wrongful conduct.

## COUNT II
### (Aiding and Abetting Fraud)

89.     The Plaintiffs repeat and reallege and incorporate by reference herein the entirety of the allegations contained in the foregoing paragraphs.

90.     Kyprianou and his co-conspirators, Poyiadjis and others, blatantly misrepresented the value and profitability of AremisSoft by, *inter alia*, causing AremisSoft to (a) report revenue that was almost entirely false, and (b) announce publicly that the Company had acquired software companies with substantial revenues for prices totaling tens of millions of dollars when, in reality, the acquired companies were small, with minimal revenues, and AremisSoft paid only a small fraction of the announced acquisition prices.

91.     The effect of the misrepresentations was that the perceived value and profitability of AremisSoft was far higher than the actual value and profitability, with the result that the AremisSoft shares being traded on the open market were artificially inflated in price. Kyprianou took advantage of the ensuing inflated stock price by, through his co-conspirators, illegally

engaging in insider trading at inflated prices, thereby reaping huge profits at the expense of the beneficiaries of the AremisSoft Trust.

92.    Lloyds aided and abetted Kyprianou's fraud by knowingly aiding Kyprianou to use accounts at Lloyds to launder over $44 million worth of illegal insider trading proceeds and creating the Confirmation Letter.

93.    As a foreseeable consequence of Lloyds aiding and abetting the insiders' fraud, AremisSoft and its investors, both as represented by Plaintiffs, have suffered substantial harm and damage proximately caused by Lloyds' wrongful conduct.

## COUNT III
### (Fraud)

94.    The Plaintiffs repeat and reallege and incorporate by reference herein the entirety of the allegations contained in the foregoing paragraphs.

95.    In response to an inquiry by an AremisSoft auditor, Lloyds knowingly created a false and misleading Confirmation Letter by falsely affirming that there was approximately $9.9 million blocked in favor of AremisSoft EE.ME.A as of December 29, 2000 and further, omitting to disclose that (i) neither AremisSoft EE.ME.A nor any other AremisSoft entity had an account at Lloyds either at December 29, 2000, or at the date of the confirm; and (ii) the supposedly blocked funds were in an account in the name, or for the benefit, of Kyprianou.

96.    Lloyds knew that its false and misleading confirm would be relied on by the auditors of AremisSoft in auditing the financial statements for the Company and in preparing their opinion thereon which would be publicly disclosed.

97.    Lloyds' false and misleading Confirmation Letter caused the Company's public filing to include false financial statements that misrepresented the Company's cash position.

Moreover, the provision of the false and misleading confirm both delayed discovery of the fraud, resulting in further investor losses, and deepened the Company's own insolvency.

98.   Lloyds affirmatively misrepresented material information in a document it knew would be relied upon in the audit opinion on the financial statements disclosed to the investing public.

99.   As a direct and foreseeable consequence of Lloyds' material misrepresentations, AremisSoft and its investors, both as represented by Plaintiffs, have suffered substantial harm and damage caused by Lloyds' fraudulent conduct.

## COUNT IV
### (Negligent Misrepresentation)

100.   The Plaintiffs repeat and reallege and incorporate by reference herein the entirety of the allegations contained in the foregoing paragraphs.

101.   At the time Lloyds responded to the Company's auditor's inquiry, Lloyds undertook a duty to AremisSoft and its shareholders to respond truthfully and accurately.  In issuing the Confirmation Letter, Lloyds negligently and carelessly made statements that, by reason of material omissions as set forth above, were false and misleading.

102.   Lloyds' false and misleading Confirmation Letter caused the Company's public filing to include false financial statements that misrepresented the Company's cash position. Moreover, the provision of the false and misleading confirm both delayed discovery of the fraud, resulting in further investor losses, and deepened the Company's own insolvency.

103.   As a direct and foreseeable consequence of Lloyds' false and misleading representations, AremisSoft and its investors, both as represented by Plaintiffs, have suffered substantial harm and damage caused by Lloyds' negligent conduct.

<u>COUNT V</u>
**(Violations of Articles 41 and 55 of the Swiss Code of Obligations)**

104.    The Plaintiffs repeat and reallege and incorporate by reference herein the entirety of the allegations contained in the foregoing paragraphs.

105.    It is a violation of Article 305ter of the Swiss Federal Code of Criminal Law to professionally accept, hold on deposit, or assist in investing or transferring assets and to neglect to determine the identity of the beneficial owner of the assets with the necessary diligence required by the circumstances.    Violations of Article 305ter are punishable by fines and/or imprisonment.

106.    It is a violation of 305bis of the Swiss Federal Code of Criminal Law for anyone to take action designed to frustrate the discovery of the origin, the tracing or recovery of funds that he or she knows or must assume represent the proceeds of criminal conduct.    The offender will also be punished if the principal offense was committed abroad in a jurisdiction where it is also punishable by law.    Violations of Article 305bis are punishable by fines and/or imprisonment.

107.    Under Article 5 of the Money Laundering Act, a financial intermediary must engage in further verification of the identity of the customer or beneficial owner of funds if doubts arise as to the identity of the customer or beneficial owner subsequent to the commencement of the business relationship.    In circumstances where a customer is engaging in unusual transactions or there is reason to suspect that assets in the account are proceeds of criminal conduct, Article 6 of the Money Laundering Act requires a financial intermediary to investigate the economic background and the purpose of the transactions.    Under Article 9 of the Act, a financial intermediary must, "without delay," notify the Reporting Office for Money

30

Laundering if it knows or presumes that assets in an account are related to a violation of Article 305bis of the Criminal Code or are the proceeds of a crime. Article 10 requires the financial intermediary to immediately freeze all assets related to the reporting until receipt of a decision by the prosecuting authority, up to a maximum of five working days from the date of notification of the Reporting Office.

108.    In the present case, and in satisfaction of the elements set forth in Article 305bis of the Criminal Code, the acts committed by Kyprianou and Poyiadjis in the United States with respect to AremisSoft may, *inter alia*, be qualified under Swiss law, as offenses to Articles 146, 158 and 251 of the Swiss Code of Criminal Law.

109.    Under Article 41 of the Swiss Code of Obligations, anyone who causes harm to another, whether willfully or negligently, shall be liable for damages. Under Article 55 of the Swiss Civil Code, the willingness of a company is expressed through the members of its executive body, and the company is bound by their legal acts as well as any other acts. According to Article 55 of the Swiss Code of Obligations (Liabilities for Employees), the principal shall be liable for damages caused by his employees or other auxiliary persons in the course of their employment or business, unless he proves that he has taken all precautions appropriate under the circumstances in order to prevent damage of that kind, or that the damage would have occurred in spite of the application of such precautions. Civil damages may be awarded under Article 41 of the Swiss Code of Obligations for violations of Articles 305ter and 305bis of the Swiss Federal Code of Criminal Law, as well as for violations of the Money Laundering Act. Indeed Article 41 of the Swiss Code of Obligations together with Article 55 of the Swiss Civil Code create the liability of the company for the acts of their executive body. In

31

addition, Article 55 of the Swiss Code of Obligations creates the liability of the company for the acts of employees that are technically not competent to represent the company.

110.    Kyprianou's rapid transfers of funds through his account at Lloyds bore all the classic hallmarks of concealing the proceeds of criminal activity or theft of assets by money laundering, especially in light of the numerous public allegations of fraud against Kyprianou made in and after May 2001. As set forth above, beginning in May 2001 there were numerous widely disseminated media reports discussing allegations of Kyprianou's involvement in the AremisSoft fraud and that Kyprianou had made numerous false and misleading oral and written statements. In addition to the allegations contained in public documents, Lloyds was aware of at least the following: 1) transfers were made into the Lloyds-Kyprianou account in a manner to conceal the origins of the transfers and the beneficial owner of the account; 2) a significant portion of the assets in the Lloyds-Kyprianou account, with a value in the millions of dollars, were transferred from accounts at other Swiss banks where Kyprianou did not have accounts at a time when Kyprianou purportedly had gifted millions of shares and options to individuals in which he claimed no beneficial or pecuniary interest; 3) for no discernible business purpose, the funds were being transferred into and out of various accounts at Lloyds and other banks maintained in a variety of jurisdictions; and 4) Lloyds was holding funds for the benefit of one customer in an account of another customer.

111.    Authorized representatives and/or employees of Lloyds failed to exercise the degree of diligence required by the circumstances to verify the identity of the beneficial owner of the assets deposited in the accounts at the bank and to ascertain the origin of the funds in the accounts. After learning that Kyprianou used conspirators to sell more than 10 million shares of stock in 2000 – and even after the publication of widespread media reports beginning in May

2001 concerning fraud at AremisSoft – authorized representatives and/or employees of Lloyds took no action to determine the source of the funds in the accounts maintained by Kyprianou, to notify the Reporting Office for Money Laundering, to freeze the funds in the accounts, or to otherwise prevent Kyprianou's money laundering.

112.    Further, Lloyds' false and misleading Confirmation Letter caused the Company's public filing to include false financial statements that misrepresented the Company's cash position. The provision of the false and misleading confirm both delayed discovery of the fraud, resulting in further investor losses, and deepened the Company's own insolvency.

113.    By reason of Lloyds' willful and/or negligent and/or reckless conduct, Lloyds, by their authorized representatives and/or employees, violated both Articles 305ter and 305bis of the Swiss Federal Code of Criminal Law, as well as provisions of the Money Laundering Act, including, without limitation, Articles 5, 6, 9, and 10.

114.    As a foreseeable consequence, AremisSoft and its investors, both as represented by Plaintiffs, have suffered substantial harm and damage proximately caused by the unlawful, willful, negligent and/or reckless conduct of Lloyds authorized representatives and/or employees, for which Lloyds is liable.

VII.   **RELIEF REQUESTED**

**WHEREFORE,** the Plaintiffs respectfully request:

1.    that judgment be entered for Plaintiffs on each count of this complaint in an amount to be determined at trial but not less than $150 million;

2.    that the Court order the relief sought by the Plaintiffs in each Count, together with interest, costs, and attorneys' fees;

3.    that the Court award such further relief as it may deem just and appropriate.

Dated: June 8, 2006              GREENBERG TRAURIG, LLP

                         By: _____
                              Hal M. Hirsch (HH 0417)
                              Ronald D. Lefton (RL 2666)
                              Daniel J. Buzzetta (DB 7816)
                              200 Park Avenue
                              New York, New York 10166
                              (212) 801-9200

                              *Attorneys for Plaintiffs Joseph P. LaSala and*
                              *Fred S. Zeidman, as Co-Trustees of the*
                              *AremisSoft Corporation Liquidating Trust*

34

## JURY DEMAND

DEMAND IS HEREBY MADE FOR A TRIAL BY JURY ON ALL ISSUES PROPERLY TRIABLE TO A JURY.

Dated: June 8, 2006

GREENBERG TRAURIG, LLP

By: _____

Hal M. Hirsch (HH 0417)
Ronald D. Lefton (RL 2666)
Daniel J. Buzzetta (DB 7816)
200 Park Avenue
New York, New York 10166
(212) 801-9200

*Attorneys for Plaintiffs Joseph P. LaSala and
Fred S. Zeidman, as Co-Trustees of the
AremisSoft Corporation Liquidating Trust*

35