UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

UNITED STATES OF AMERICA,                          :
                                                   :
                                Plaintiff,         :
                                                   :
                    v.                             :
                                                   :        No. 07 Civ. 9235 (CSH)
                                                   :
                                                   :
                                                   :
LLOYDS TSB BANK PLC,                               :
                                                   :
                                Defendant.         :

------------------------------------------------------------------ X

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANT LLOYDS TSB BANK PLC'S
## <u>MOTION TO DISMISS THE COMPLAINT</u>

LOVELLS LLP
Marc J. Gottridge (MG 1616)
Andrew M. Behrman (AB 5949)
Lisa J. Fried (LF 6968)
590 Madison Avenue
New York, New York 10022
(212) 909-0600
marc.gottridge@lovells.com
*Attorneys for Defendant Lloyds TSB Bank plc*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ............................................................................ 1

PROCEDURAL BACKGROUND......................................................................... 3

ALLEGATIONS OF THE COMPLAINT............................................................... 6

    Allegations Concerning Kyprianou's Underlying Conduct............................ 6

    Allegations Against Lloyds TSB .................................................................. 7

    The Government's Claims Under the MLCA.................................................. 9

ARGUMENT ....................................................................................................... 9

I.    THE GOVERNMENT'S CLAIMS FALL FAR OUTSIDE THE LIMITED
    EXTRATERRITORIAL JURISDICTION GRANTED BY THE MLCA
    AND MUST BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(1) ....... 9

    A.   Sections 1956 and 1957 Have Limited Extraterritorial
       Reach, As Congress Expressly Set Forth in the MLCA ............................. 9

    B.   Section 1956 By Its Terms Does Not Reach
       Lloyds TSB's Exclusively Swiss Conduct ............................................. 10

    C.   Section 1957 By Its Terms Does Not Reach
       Lloyds TSB's Exclusively Swiss Conduct ............................................. 14

    D.   Congress Is Presumed Not to Have Legislated Extraterritorially
       Except to the Limited Extent Expressly Set Forth in the MLCA ............. 15

    E.   The Legislative History of the MLCA and the Assurances of the
       U.S. Government to the Government of Switzerland Confirm that
       the Statute Does Not Reach the Exclusively Swiss Conduct
       Alleged in the Complaint...................................................................... 18

II.   APPLYING THE MLCA EXTRATERRITORIALLY TO THE
    ACTIVITIES OF LLOYDS TSB IN SWITZERLAND WOULD
    BE UNREASONABLE ...................................................................... 19

III.  EVEN IF THE MLCA COULD BE APPLIED EXTRATERRITORIALLY
    TO LLOYDS TSB'S EXCLUSIVELY SWISS CONDUCT, THIS COURT
    SHOULD DISMISS THE ACTION ON THE BASIS OF INTERNATIONAL
    COMITY.......................................................................................... 23

    A.   Switzerland Has a Stronger Interest in the Issues
       Raised By this Action Than Does the U.S................................................ 24

    B.   This Action Offends Swiss Sovereignty.................................................. 25

IV.  BECAUSE THE EXERCISE OF PERSONAL JURISDICTION
    OVER LLOYDS TSB IN THIS ACTION WOULD BE
    UNREASONABLE, DUE PROCESS REQUIRES DISMISSAL ....................... 26

A.   Litigating this Action Would Impose
     a Heavy Burden on Lloyds TSB .................................................. 27

B.   The Forum has no Significant Interests
     in Adjudicating this Action ........................................................ 28

C.   The Interests of the Plaintiff in Obtaining
     Relief in this Forum are Minimal .............................................. 28

D.   Adjudication of this Action Would Result
     in an Inefficient Administration of Justice ............................... 29

E.   Adjudication of this Action Would Hinder,
     Not Further, Relevant Policies ................................................... 29

V.   THE COMPLAINT IS TIME-BARRED AS TO PRE-SEPTEMBER 7, 2002
     TRANSACTIONS AND FAILS TO STATE A CLAIM AS TO
     POST-SEPTEMBER 7, 2002 TRANSACTIONS ............................... 30

A.   The Government's Claims Based on
     Pre-September 7, 2002 Transactions Are Time-Barred ............. 30

B.   The Government's Claims Based on
     October 2002 Transactions Fail to State a Claim ..................... 31

VI.  THE GOVERNMENT HAS FAILED TO PLEAD THE REQUISITE
     ELEMENTS TO SUPPORT COUNT III OF THE COMPLAINT,
     AND IT SHOULD BE DISMISSED PURSUANT TO
     FED. R. CIV. P. 12(b)(6) ............................................................... 34

CONCLUSION ................................................................................................ 35

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Asahi Metal Indus. Co. v. Superior Court,*
    480 U.S. 102 (1987) ................................................................................................ 27, 28, 29

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ................................................................................................. 32

*Banque Worms v. BankAmerica Int'l,*
    77 N.Y.2d 362 (1991) ........................................................................................................ 12

*Bell Atlantic Corp. v. Twombly,*
    127 S. Ct. 1955 (2007) ...................................................................................................... 32

*Benz v. Compañia Naveira Hildago, S.A.,*
    353 U.S. 138 (1957) .......................................................................................................... 16

*Bigio v. Coca-Cola Co.,*
    239 F.3d 440 (2d Cir. 2001) ......................................................................................... 24, 25

*Blusal Meats, Inc. v. United States,*
    638 F. Supp. 824 (S.D.N.Y. 1986) ............................................................................... 30, 31

*Calgarth Invs. Ltd. v. Bank Saderat Iran,*
    No. 95 Civ. 5332 (MBM), 1996 WL 204470 (S.D.N.Y. Apr. 26, 1996) .............................. 22

*Carnero v. Boston Scientific Corp.,*
    433 F.3d 1 (1st Cir. 2006) .................................................................................................. 17

*Casio Computer Ltd. v. Sayo,*
    No. 98 Civ. 3772 (WK), 2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000) ................................ 33

*Connecticut Nat'l Bank v. Germain,*
    503 U.S. 249, 253-54 (1992) ............................................................................................. 14

*Doron Precision Sys., Inc. v. FAAC, Inc.,*
    423 F. Supp. 2d 173 (S.D.N.Y. 2006) ................................................................................ 34

*EEOC v. Arabian American Oil Co.,*
    499 U.S. 244 (1991) .................................................................................................... 15, 17

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London,*
    147 F.3d 118 (2d Cir. 1998) ......................................................................................... 19, 21

*F. Hoffman-LaRoche Ltd. v. Empagran S.A,*
    542 U.S. 155 (2004) .................................................................................................... 16, 21

*Finanz AG Zurich v. Banco Economico S.A.,*
    192 F.3d 240 (2d Cir. 1999) .............................................................................................. 24

*Foley Bros. v. Filardo,*
    336 U.S. 281 (1949) .................................................................................................... 15, 16

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,*
    284 F.3d 1114 (9th Cir. 2002) ........................................................................................... 26

*Hilton v. Guyot*,
  159 U.S. 113 (1895).................................................................................. 24

*In re American Exp. Co. Shareholder Litig.*,
  39 F.3d 395 (2d Cir. 1994) ..................................................................... 34

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ...................................................................... 32

*International Housing Ltd. v. Rafidain Bank Iraq*,
  893 F.2d 8 (2d Cir. 1989) ........................................................................ 13

*International Shoe Co. v. Washington*,
  326 U.S. 310 (1945)............................................................................. 3, 27

*Jones v. Coughlin*,
  665 F. Supp. 1040 (S.D.N.Y. 1987) ........................................................ 31

*Jota v. Texaco Inc.*,
  157 F.3d 153 (2d Cir. 1998) .................................................................... 25

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A.*,
  412 F.3d 418 (2d Cir. 2005) .................................................................... 23

*Lan Assocs. XVIII v. Bank of Nova Scotia*,
  No. 96 Civ. 1022 (JFK), 1997 WL 458753 (S.D.N.Y. Aug. 11, 1997)............... 12, 22

*LaSala v. Bank of Cyprus Public Co. Ltd.*,
  510 F. Supp. 2d 246 (S.D.N.Y. 2007) ....................................................... 4

*LaSala v. Bank of Cyprus Public Co. Ltd.*,
  No. 06-CV-6673 (CSH) (S.D.N.Y., filed Sept. 1, 2006)................................ 4

*LaSala v. Bordier et Cie*,
  452 F. Supp. 2d 575 (D.N.J. 2006),
  *app. pending*, No. 06-4323 (3d Cir., filed Oct. 4, 2006) ............................. 4

*LaSala v. Bordier et Cie*,
  No. 05-CV-4520 (JAP) (D.N.J., filed Sept. 15, 2005)................................... 4

*LaSala v. Lloyds TSB Bank plc*,
  514 F. Supp. 2d 447 (S.D.N.Y. 2007) ................................................ passim

*LaSala v. Lloyds TSB Bank plc*,
  No. 06-CV-4335 (CSH) (S.D.N.Y., filed June 8, 2006)................................. 2

*LaSala v. UBS, AG*,
  510 F. Supp. 2d 213 (S.D.N.Y. 2007) ....................................................... 4

*LaSala v. UBS, AG*,
  No. 06-CV-1736 (CSH) (S.D.N.Y., filed March 3, 2006)............................... 4

*Maxwell Commc'n Corp. v. Societe Generale*,
  93 F.3d 1036 (2d Cir. 1996) ............................................................... 23, 24

*McCulloch v. Sociedad Nacional de Marineros de Honduras*,
  372 U.S. 10 (1963)................................................................................... 15

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996) .......................................................... 26, 27, 29

NYCLIB01/NYLJF/129930.1

*Nat'l Group for Commc'ns. and Computers Ltd. v. Lucent Techs., Inc.*,
420 F. Supp. 2d 253 (S.D.N.Y. 2006) .................................................................. 34

*Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris*,
No. 03 Civ. 1681 (LAP), 2004 WL 2199547 (S.D.N.Y. Sept. 29, 2004) ................................ 13

*Oriental Imports and Exports, Inc. v. Maduro & Curiel's Bank, N.V.*,
701 F.2d 889 (11th Cir. 1983) .................................................................. 12, 13

*Romero v. Int'l Terminal Operating Co.*,
358 U.S. 354 (1959) .................................................................. 23

*SEC v. AremisSoft Corp., et al.*,
No. 01 Civ. 8903 (CSH) (S.D.N.Y., filed Oct. 4, 2001) .................................................................. 6

*Semi Conductor Materials, Inc. v. Citibank Int'l PLC*,
969 F. Supp. 243 (S.D.N.Y. 1997) .................................................................. 13

*Singleton v. City of New York*,
632 F.2d 185 (2d Cir. 1980) .................................................................. 31

*Skiriotes v. Florida*,
313 U.S. 69 (1941) .................................................................. 10

*Smith v. United States*,
507 U.S. 197 (1993) .................................................................. 16, 17

*Societe Nationale Industrielle Aerospatiale v. U.S. District Court*,
482 U.S. 522 (1987) .................................................................. 23

*Stoneridge Investment Partners, LLC v. Scientific Atlanta, Inc.*,
No. 06-43, ___ S. Ct. ___, 2008 WL 123801 (U.S. Jan. 15, 2008) .................................................................. 17

*Sussman v. Bank of Israel*,
801 F. Supp. 1068 (S.D.N.Y. 1992) .................................................................. 13

*United States v. Bank of Cyprus*,
No. 07 Civ. 9234 (CSH) (S.D.N.Y., filed Oct. 15, 2007) .................................................................. 6

*United States v. Black*,
469 F. Supp. 2d 513 (N.D. Ill. 2006) .................................................................. 15

*United States v. Gatlin*,
216 F.3d 207 (2d Cir. 2000) .................................................................. 16, 17

*United States v. Giffen*,
326 F. Supp. 2d 497 (S.D.N.Y. 2004) .................................................................. 24, 25

*United States v. Javino*,
960 F.3d 1137 (2d Cir.1992) .................................................................. 20, 23

*United States v. Kramer*,
73 F.3d 1067 (11th Cir. 1996) .................................................................. 34

*United States v. Kyprianou*,
No. 01 Cr. 1177 (LTS) (S.D.N.Y., filed June 24, 2002) .................................................................. 6

*United States v. Project on Gov't Oversight*,
484 F. Supp. 2d 56 (D.D.C. 2007) .................................................................. 30

*United States v. Stein*,
   Crim. A. No. 93-375, 1994 WL 285020 (E.D. La. June 23, 1994) .......................................... 14

*United States v. Stephenson*,
   183 F.3d 110 (2d Cir. 1999) ................................................................................................... 33

*United States v. Swiss American Bank, Ltd.*,
   274 F.3d 610 (1st Cir. 2001) .................................................................................................. 13

*United States v. Village of Island Park, Inc.*,
   791 F. Supp. 354 (E.D.N.Y. 1992) ......................................................................................... 30

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   401 U.S. 321 (1971) ................................................................................................................ 31

## Domestic Statutes and Court Rules

Federal Rules of Civil Procedure, Rule 12(b)(1) ........................................................................... 9

Federal Rules of Civil Procedure, Rule 12(b)(6) ......................................................................... 34

Title 18, United States Code, Section 1956 ......................................................................... passim

Title 18, United States Code, Section 1957 ......................................................................... passim

Title 18, United States Code, Section 2243 ................................................................................ 16

Title 18, United States Code, Section 3077 ................................................................................ 14

Title 28, United States Code, Section 2462 ................................................................................ 30

Title 42, United States Code, Section 1983 ................................................................................ 31

Title 42, United States Code, Section 1985 ................................................................................ 31

## Swiss Statutes

Swiss Criminal Code, Article 305[bis] ........................................................................................... 7

Swiss Criminal Code, Article 305[ter] ............................................................................................ 7

## Other Authorities

Michael Gruson, *The U.S. Jurisdiction Over Transfers of U.S. Dollars*
   *Between Foreigners and Over Ownership of U.S. Dollar Accounts in Foreign Banks*,
   2004 Colum. Bus. L. Rev. 721, 725-27 .................................................................................. 12

Edmund Kwaw, *The Evolving Law on the Eurobank –*
   *Customer Relationship and the Common Law:  The Need for Clarity*,
   32 Syracuse J. Int'l L.R. Com. 87, 91 (2004) ....................................................................... 11

Letter from Deputy Assistant Attorney General James I.K. Knapp to Mr. David de Purye,
   Chargé d'Affaires of Switzerland, dated Sept. 12, 1986,
   132 Cong. Rec. S17348-01, 1986 WL 789550 (Oct. 18, 1986) ............................................ 18

Restatement (Third) of Foreign Relations Law of the United States § 402 (1987) ..................... 10

Restatement (Third) of Foreign Relations Law of the United States § 403 (1987) .......... 19, 20, 21

## PRELIMINARY STATEMENT

In this unprecedented action, the United States government asserts that the Geneva branch of defendant Lloyds TSB Bank plc, a British bank ("Lloyds TSB" or "the Bank"), violated the Money Laundering Control Act of 1986 as amended, 18 U.S.C. § 1956 *et seq*. (the "MLCA"), by engaging in transactions exclusively in Switzerland, with non-U.S. entities and individuals, in accounts held by non-U.S. citizens. None of the transactions at issue involved money going to or coming from this country; rather, the transactions involved transfers of funds either entirely within Switzerland or between Switzerland and other European countries.

There are only two possible connections between the U.S. and the subject matter of this action. *First*, the government alleges that the funds deposited at Lloyds TSB are ultimately traceable to a securities fraud perpetrated on a U.S. company's shareholders by two Cypriot nationals, Lycourgos Kyprianou ("Kyprianou") and Roys Poyiadjis ("Poyiadjis"); Kyprianou was the beneficial owner of accounts at Lloyds TSB in Geneva. However, it is not, and cannot be, alleged that the funds deposited at Lloyds TSB in Geneva came from the U.S. To the contrary, the government affirmatively pleads that these funds came to Lloyds TSB from other banks in Switzerland. *Second*, some of the interbank transactions in U.S. dollars necessarily and routinely cleared through correspondent banking accounts in the U.S. As demonstrated below, these tenuous connections are insufficient as a matter of law to justify the extraterritorial assertion of MLCA claims against the Bank. Although the statute provides for a certain degree of extraterritorial jurisdiction, it does not stretch nearly that far.

The government's action is unusual not merely for trying to take the MLCA well beyond where Congress provided for it to go, and where any court has allowed it to be applied. Equally remarkable is the government's decision to commence this action shortly after this Court had

already held, in dismissing a case arising from the same allegations of fact at issue here,[1] that the law of Switzerland, not that of the U.S., supplies the standards against which the relevant conduct of the Geneva branch of Lloyds TSB must be measured. Indeed, in its Complaint – before switching gears to allege breaches of the *MLCA's* requirements – the government acknowledges that Lloyds TSB's conduct is governed by Swiss law. (*See* Complaint [Gottridge Decl. Ex. 1] ¶¶ 32-36).[2] What this Court said on August 15, 2007, in dismissing the action commenced against Lloyds TSB by the Liquidating Trustees of AremisSoft Corporation (the "Trustees"), is equally true of the case at bar:

> Whatever interest the United States has, it pales in comparison with that of Switzerland. Switzerland possesses a strong interest in regulating the conduct of banks within its borders. There is no question that this dispute centers around events occurring there. The Bank accounts were opened in Switzerland, and the transfers alleged to have been improperly permitted by the Bank were authorized by personnel there. This is at its heart a dispute involving what Swiss banking representatives did and what they knew when they did these things. The knowledge plaintiffs allege on the part of the Bank, both concerning its legal obligations and concerning the fraudulent nature of Kyprianou's transfers, exists only in the minds of Bank representatives in Switzerland.

*LaSala v. Lloyds TSB Bank plc*, 514 F. Supp. 2d 447, 462-463 (S.D.N.Y. 2007) (citations omitted).

Nevertheless, on the basis of an agreement between the government and the Trustees, the government filed this action in October 2007, asserting that the Swiss transactions at the Bank in Geneva violated the laws of the *United States*. As demonstrated in Point I of this memorandum, this remarkable assertion of jurisdiction to proscribe the purely non-U.S. conduct of bankers in Switzerland, solely with respect to accounts and transactions not touching the U.S.: transgresses the express limitations on extraterritorial jurisdiction set forth in the MLCA itself; contravenes

---

[1] *LaSala v. Lloyds TSB Bank plc*, No. 06-CV-4335 (CSH) (S.D.N.Y., filed June 8, 2006) (the "Trustees' Action").

[2] Citations to "Gottridge Decl." refer to the declaration of Marc J. Gottridge, dated January 24, 2008, submitted in support of the instant motion. Citations to "Cassani Decl." refer to the declaration of Ursula Cassani, dated January 24, 2008, also submitted in support of this motion.

2

the MLCA's unambiguous legislative history and express assurances given to Switzerland by the U.S. Department of Justice at the time the MLCA was enacted; and violates principles governing when (and how far) a statute may be read as proscribing extraterritorial conduct. For these fundamental reasons, the government's Complaint must be dismissed for lack of subject matter jurisdiction.

But even if the MLCA could otherwise be applied extraterritorially to the entirely non-U.S. conduct of the Bank, the Complaint should still be dismissed in its entirety because such application would be unreasonable (*see* Point II) and because it would violate principles of international comity (*see* Point III). Moreover, the exercise of personal jurisdiction over Lloyds TSB in this action would be unreasonable and violate the Bank's due process rights because asserting jurisdiction here based solely on conduct entirely outside of the U.S. offends "traditional notions of fair play and substantial justice," *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted) (*see* Point IV). In addition, all five counts of the Complaint are time-barred to the extent that they are based on transactions that occurred before September 7, 2002 – *i.e.*, 75 of the 80 transactions alleged in the Complaint, accounting for all but $393,400.90 of the approximately $130 million claimed by the government – and, as to the five remaining transactions, the Complaint's conclusory allegations have failed to plead the basic elements required by the MLCA. (*See* Point V). Finally, because the Complaint nowhere alleges, other than in purely conclusory fashion, that Lloyds TSB transported any funds to or from the United States, Count III, based on 18 U.S.C. § 1956(a)(2), must be dismissed. (*See* Point VI, below).

## PROCEDURAL BACKGROUND

The subject matter of this action will be familiar to the Court from the Trustees' Action. As the government has acknowledged to this Court, this action "arise[s] out of the same facts" as

the Trustees' Action.[3]  In that case, the Trustees pleaded that Lloyds TSB assisted Kyprianou in

laundering funds allegedly traceable to the proceeds of his insider trading of falsely inflated

AremisSoft shares.   The Trustees claimed that the Bank therefore violated Swiss money

laundering laws and committed various torts.  The Trustees, relying on similar allegations, also

sued four other non-U.S. banks – UBS, AG ("UBS") and the Bank of Cyprus Public Company,

Ltd. ("Bank of Cyprus") in this Court, and Dominick and Company ("Dominick") and Bordier et

Cie ("Bordier") in the District of New Jersey.[4]

On July 25, 2006, Lloyds TSB moved to dismiss the Trustees' Action on various

grounds.  On August 15, 2007, the Court granted Lloyds TSB's motion on the basis of *forum non*

*conveniens*.   The Court held, *inter alia*, that because Switzerland constituted an adequate

alternative forum, and because Switzerland's interest in the Trustees' Action far outweighed that

of the U.S., the action must be dismissed.  *LaSala*, 514 F. Supp. 2d at 467.  Also on August 15,

2007, this Court dismissed the Trustees' parallel actions against UBS and the Bank of Cyprus,

essentially on the same grounds.  *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 234 (S.D.N.Y. 2007);

*LaSala v. Bank of Cyprus Public Co. Ltd.*, 510 F. Supp. 2d 246, 267 (S.D.N.Y. 2007).[5]

On August 28, 2007 – eight business days after this Court entered judgment dismissing

the Trustees' Action – the United States Attorney's Office for this District (the "USAO") advised

the Court and counsel for Lloyds TSB that it planned to file a civil penalty complaint against

---

[3] Gottridge Decl. Ex. 5 (Aug. 28, 2007 letter of Assistant United States Attorney Rua M. Kelly to the Court).

[4] *See LaSala v. UBS, AG*, No. 06-CV-1736 (CSH) (S.D.N.Y., filed March 3, 2006); *LaSala v. Bank of Cyprus Public Co. Ltd.*, No. 06-CV-6673 (CSH) (S.D.N.Y., filed Sept. 1, 2006); *LaSala v. Bordier et Cie*, No. 05-CV-4520 (JAP) (D.N.J., filed Sept. 15, 2005).

[5] In *LaSala v. Bordier et Cie*, 452 F. Supp. 2d 575 (D.N.J. 2006), *app. pending*, No. 06-4323 (3d Cir., filed Oct. 4, 2006), United States District Judge Joel A. Pisano dismissed the Trustees' action against Dominick and Bordier, holding that the Securities Litigation Uniform Standards Act pre-empted each of the Trustees' claims.   Oral argument on the Trustees' appeal was heard on December 13, 2007, and the matter is *sub judice* before the United States Court of Appeals for the Third Circuit.

NYCLIB01/NYLJF/129930.1

Lloyds TSB based on the same allegations as in the Trustees' just-dismissed complaint (Gottridge Decl. ¶ 7 and Ex. 5).[6]

The government, through the USAO and the Securities and Exchange Commission (the "SEC"), had actively pursued a plethora of civil and criminal proceedings relating to AremisSoft, its former principals and their assets, both in this Court and abroad, since April 2001 – five years before the Trustees filed their Complaint. (Gottridge Decl. ¶¶ 5-6 and Exs. 2-4). Yet never, until after this Court dismissed the Trustees' Action, did any arm of the government suggest any interest in that action or in pursuing claims against Lloyds TSB. The government's filing of this action is apparently rooted in a September 14, 2004 Coordination Agreement to which the USAO and the Trustees are parties (Gottridge Decl. Ex. 2). In that agreement, the Trustees and the USAO represented that they had "concluded that a coordinated effort to locate and repatriate assets" would "further the ends of justice and maximize the recovery of assets for the benefit of the victims of the AremisSoft fraud." (*Id.* at 11). The Coordination Agreement requires the government to pay any recovery obtained from third parties (minus only the government's out-of-pocket costs) directly to the Trustees. (*Id.* at 21-22, §§ 5.1, 5.2). It also expressly contemplates litigating in foreign jurisdictions, specifically including Switzerland. (*Id.* at 19, § 4.1).

Relying solely on the theory that the government's August 28, 2007 threat to commence a civil penalty action (*see* Gottridge Decl. Ex. 5) was a "new circumstance," the Trustees on August 29, 2007 filed a motion for reconsideration of this Court's dismissal of the Trustees' Action. That motion has been fully briefed and is pending.

On October 15, 2007, the government filed the Complaint, commencing this action.[7]

---

[6] On August 31, 2007, Lloyds TSB and the government entered into an agreement tolling the claims the government might assert against Lloyds TSB as of September 7, 2007. On September 27, 2007, Lloyds TSB and the government extended that agreement. (Gottridge Decl. Ex. 7).

## ALLEGATIONS OF THE COMPLAINT

The Complaint in this action closely tracks the Trustees' now-dismissed complaint. Indeed, significant portions of the Complaint appear to have been copied nearly verbatim from the Trustees' pleading. (Gottridge Decl. Ex. 6). The two complaints contain markedly similar descriptions of:

- the underlying AremisSoft fraud and the various related actions (*Compare* Trustees' Complaint [Gottridge Decl. Ex. 6] ¶¶ 20, 23, 25, 26, 27, 28 *with* Complaint [Gottridge Decl. Ex. 1] ¶¶ 10, 12, 13, 14, 20, 21);

- Kyprianou's alleged initial contact with the Bank and Bank employees' alleged knowledge of Kyprianou (*Compare* Trustees' Complaint [Gottridge Decl. Ex. 6] ¶¶ 49, 50, 51, 52, 56 *with* Complaint [Gottridge Decl. Ex. 1] ¶¶ 29, 30, 44-46);

- the governing Swiss anti-money laundering legislation (*Compare* Trustees' Complaint [Gottridge Decl. Ex. 6] ¶¶ 40-46 *with* Complaint [Gottridge Decl. Ex. 1] ¶¶ 32-36);

- the alleged "Confirmation Letter" (*Compare* Trustees' Complaint [Gottridge Decl. Ex. 6] ¶¶ 61, 63, 64, 66, 67 *with* Complaint [Gottridge Decl. Ex. 1] ¶¶ 47, 49, 50, 51, 52); and

- Lloyds TSB's allegedly continuing banking relationship with Kyprianou (*Compare* Trustees' Complaint [Gottridge Decl. Ex. 6] ¶¶ 68, 69, 81, 82 *with* Complaint [Gottridge Decl. Ex. 1] ¶¶ 53, 54, 60, 61).

### Allegations Concerning Kyprianou's Underlying Conduct

The government alleges that Kyprianou, AremisSoft's founder and former Chairman of its Board of Directors, together with Poyiadjis and others, engaged in a "pump and dump" securities fraud and then laundered the proceeds of his violations of U.S. securities laws.[8] In particular, the Complaint asserts that Kyprianou artificially inflated the value of AremisSoft's stock, used nominee companies to hold and sell his holdings in AremisSoft to unsuspecting

---

[7] The government filed a similar complaint against Bank of Cyprus, also on October 15, 2007. *United States v. Bank of Cyprus*, No. 07 Civ. 9234 (CSH) (S.D.N.Y., filed Oct. 15, 2007). The government has not brought actions against UBS, Bordier or Dominick.

[8] These allegations echo assertions made by the government in, *inter alia*, the indictment of Kyprianou, *United States v. Kyprianou*, No. 01 Cr. 1177 (LTS) (S.D.N.Y., filed June 24, 2002) (Gottridge Decl. Ex. 4), and the SEC's civil complaint against Kyprianou and others, *SEC v. AremisSoft Corp., et al.*, No. 01 Civ. 8903 (CSH) (S.D.N.Y., filed Oct. 4, 2001) (Gottridge Decl. Ex. 3).

purchasers who sustained losses when the stock's value later collapsed, and laundered the proceeds through various banks. (Complaint [Gottridge Decl. Ex. 1] ¶¶ 1, 6-15).

### Allegations Against Lloyds TSB

The government alleges that, in or about June 2000, Kyprianou opened an account at Lloyds TSB in Geneva, which assigned Jane Moore-Piacentini[9] at its Geneva branch to manage Kyprianou's accounts. (*Id.* ¶ 29). Lloyds TSB is alleged to have maintained several accounts at its Geneva branch for Kyprianou's benefit. (*Id.* ¶ 30). The government alleges that Kyrprianou laundered hundreds of millions of dollars through accounts at Lloyds TSB and other banks. (*Id.* ¶ 31). In processing transactions for Kyprianou's benefit, the government contends, Lloyds TSB:

> disregarded its obligations under the Swiss Federal Law on Combating Money Laundering in the Financial Sector…, the Swiss banks' Code of Conduct with Regard to the Exercise of Due Diligence…, the Swiss Federal Banking Commission's Guidelines…, and provisions of the Swiss Criminal Code.

(*Id.* ¶ 32). The government devotes nearly two pages of the Complaint to discussing these Swiss statutes and various of their provisions, including Articles 305[bis] and 305[ter] of the Swiss Criminal Code. (*Id.* ¶¶ 33-36). The Complaint details the "know-your-customer," suspicious activity reporting and due diligence obligations that these statutes impose upon Swiss financial institutions, including Lloyds TSB's Geneva branch. (*Id.*). The Trustees in their complaint, dismissed by this Court on August 15, 2007, had sought relief against the Bank under precisely the same statutes. *See LaSala*, 514 F. Supp. 2d at 453; Trustees' Complaint [Gottridge Decl. Ex. 6] ¶¶ 40-46.

---

[9] The Complaint refers to her as Jane Moore, but her full surname is Moore-Piacentini. *See LaSala*, 514 F. Supp. 2d at 452.

NYCLIB01/NYLJF/129930.1

Paragraph 38 of the government's Complaint contains a chart setting forth the 80 transactions, in various currencies,[10] on which this action is based. The earliest of these – a transfer from Swiss bank Bordier to Lloyds TSB – is alleged to have occurred on December 13, 2000. (Complaint [Gottridge Decl. Ex. 1] ¶ 38). The latest allegedly occurred on October 17, 2002. (*Id.*). Approximately $43.5 million is alleged to have flowed into Lloyds TSB in Geneva to fund Kyprianou's principal account; these funds came not from the U.S., but from other banks in Switzerland. (*Id.*, Entries from December 13, 2000 through January 5, 2001).

Of the 80 challenged transactions: (i) 30 were either between two accounts within Lloyds TSB's Geneva branch itself (or even between two sub-accounts within a single account at the Geneva branch) or between accounts at Lloyds TSB's Geneva branch and another bank in Switzerland (*i.e.*, Bordier, Dominick, UBS Zurich) (*Id.*, Entries 1-3, 5-8, 10, 12-17, 19, 20, 24, 25, 28, 34, 44, 46, 49, 53, 56, 63, 67, 70, 74 and 80); and (ii) the remaining 50 occurred between accounts at Lloyds TSB's Geneva branch and accounts at other banks in Europe (*see id.*, remaining entries). *None* of the 80 transactions at issue is alleged to have been from or to any bank or other entity in the U.S.

In an apparent effort to suggest some connection to the U.S., the government pleads, in general terms, that many of the transactions were routed through Lloyds TSB's correspondent bank in New York. (*See id.* ¶¶ 4, 18, 42, 43).

Only five of the 80 listed transactions postdated September 7, 2002 – the date five years before the statute of limitations was tolled pursuant to the parties' tolling agreement. Each of those five involved an account in the name of Cassiere Enterprises. (Complaint [Gottridge Decl.

---

[10] In addition to U.S. dollars, paragraph 38 of the Complaint sets forth transactions in British pounds and Euros.

Ex. 1] ¶ 38). The government alleges that this account held money to pay for expenditures for Kyprianou's private yacht. (*Id.* n.11).[11]

### The Government's Claims Under the MLCA

Despite the Complaint's lengthy discussion of the various Swiss laws Lloyds TSB is alleged to have violated (*see id.* ¶¶ 32-36), the actual claims asserted by the government are for violations of the MLCA. Specifically, the Government pleads, in five counts, that Lloyds TSB violated 18 U.S.C. §§ 1956(a)(1)(A), (a)(1)(B), (a)(2)(A), (a)(2)(B), (b), (h) and 1957. The gist of the government's claims – like that of the now-dismissed Trustees' Action – is that Lloyds TSB's Geneva branch, together with Kyprianou, allegedly laundered the proceeds Kyprianou obtained from his insider trading and market manipulation.

Under the MLCA, the government seeks a civil penalty "for the value of the funds involved in the financial transactions in violation" of 18 U.S.C. §§ 1956 and 1957, which the government sets at "at least $130 million." (Complaint [Gottridge Decl. Ex. 1], Prayer for Relief, p. 33, ¶ B).

## ARGUMENT

I. **THE GOVERNMENT'S CLAIMS FALL FAR OUTSIDE THE LIMITED EXTRATERRITORIAL JURISDICTION GRANTED BY THE MLCA AND MUST BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(1)**

A. **Sections 1956 and 1957 Have Limited Extraterritorial Reach, As Congress Expressly Set Forth in the MLCA**

In enacting the MLCA, Congress expressly delimited the statute's extraterritorial reach:

> There is extraterritorial jurisdiction over the conduct prohibited by
> [Section 1956] if –

---

[11] In addition to processing transactions at the request of its customer, Lloyds TSB is accused in the Complaint of performing certain other actions – all in Switzerland, and none even touching the U.S. (*See, e.g.,* Complaint [Gottridge Decl. Ex. 1] ¶¶ 44-63). For example, the government alleges that Lloyds TSB's Geneva branch provided to a man "who purported to act as AremisSoft EE.ME.A's (an AremisSoft subsidiary based in Cyprus) auditor" a "Confirmation Letter," which the government alleges falsely stated that Lloyds TSB "had been holding $9,980,000 blocked in favour of AremisSoft (EE.ME.A) Ltd." (*Id.* at ¶ 47). The Complaint nowhere alleges that that letter either originated from, or was sent to, any person or entity in the U.S. Nor could it. The "Confirmation Letter" was faxed from Switzerland to Cyprus.

> (1)    the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and
>
> (2)    the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

18 U.S.C. § 1956(f).[12]

Section 1957 provides for limited extraterritorial jurisdiction, albeit in different terms. That section prohibits the conduct specified therein "in any of the circumstances set forth in subsection (d)." 18 U.S.C. § 1957(a). Section 1957(d) in turn spells out two "circumstances":

> (1)    that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States; or
>
> (2)    that the offense under this section takes place outside the United States and such special jurisdiction, but the defendant is a United States person (as defined in section 3077 of this title, but excluding the class described in paragraph (2)(D) of such section).

18 U.S.C. § 1957(d).

## B.    Section 1956 By Its Terms Does Not Reach Lloyds TSB's Exclusively Swiss Conduct

As to the first of the two alternatives in Section 1956(f)(1), it is beyond dispute that Lloyds TSB is not a "United States citizen."[13] Accordingly, to invoke Section 1956(f)'s limited grant of extraterritorial jurisdiction the government must plead, and **ultimately prove**, that the Bank's "conduct occur[red] in part in the United States."  18 U.S.C.  § 1956(f)(1).  A party

---

[12] This provision relates to jurisdiction over the subject matter of the action (*i.e.*, "over the conduct prohibited by" Section 1956, 18 U.S.C. § 1956(f)), rather than personal jurisdiction.  The due process impediments to asserting personal jurisdiction over Lloyds TSB in this action are discussed at pp. 26-29, *intra*.

[13] Congress may, of course, proscribe the conduct of its own citizens "in foreign countries when the rights of other nations or their nationals are not infringed." *Skiriotes v. Florida*, 313 U.S. 69, 73 (1941).  This is consistent with the "nationality principle" of prescriptive jurisdiction recognized in international law.  *See* Restatement (Third) of Foreign Relations Law of the United States § 402 (2) (1987) and Comments a and e.  However, when the nationality principle is applied to entities, "the nationality of a corporation or comparable jurisdictional entity is that of the state under whose law it is organized."  *Id.*, Comment e.  It is beyond question that Lloyds TSB is incorporated in the United Kingdom.  Accordingly, the nationality principle cannot justify the assertion of U.S. jurisdiction to proscribe the Bank's conduct in Switzerland.

"conducts" a transaction either by "initiating" it (*e.g.*, withdrawing funds from an account) or by "concluding" it (*e.g.*, depositing those funds into another account). 18 U.S.C. § 1956(c)(2). But in each of the 80 transactions that are the subject of the government's Complaint, neither the initiation nor the conclusion took place in the U.S. The Complaint in fact alleges that Lloyds TSB's Geneva branch violated the MLCA exclusively by initiating and/or concluding transactions *in Switzerland*. (*See* Complaint [Gottridge Decl. Ex. 1] ¶¶ 29-38).

The only U.S. conduct alleged in the Complaint is not by Lloyds TSB, but rather that of (a) Kyprianou and others involved in the underlying securities law violations which allegedly generated criminal proceeds that were later laundered through a variety of banks in Switzerland, Cyprus and elsewhere, and (b) correspondent banks in New York. Such conduct by *other* persons or entities does not constitute the requisite "conduct" of Lloyds TSB "occurring in part in the United States." 18 U.S.C. § 1956(f)(1). Nor does it represent the initiation or conclusion of a transaction at issue in this action by any person.

In particular, the circumstance that some of the transactions listed in the Complaint (presumably, those interbank transactions denominated in U.S. dollars)[14] "necessarily" (Complaint [Gottridge Decl. Ex. 1] ¶ 43) resulted in incidental clearing transactions by correspondent banks in the U.S. – is patently insufficient. The incidental conduct of correspondent banks in the U.S. does not constitute conduct *of Lloyds TSB* in the U.S., as Section 1956(f)(1) requires.[15]

"Correspondent banking refers to the system of 'reciprocal bank accounts between participating institutions' created to facilitate receipts and payment in foreign currency." Edmund Kwaw, *The Evolving Law on the Eurobank – Customer Relationship and the Common*

---

[14] *See* Complaint ¶ 38, Entries 1-8, 10, 12-17, 19, 20, 22-30, 32-34, 41, 43-46, 49, 53-57, 59, 60, 63, 69, 76-80.

[15] The transactions in non-U.S. currencies, *i.e.*, euros and pounds sterling, did not even have this incidental contact with the U.S. (Complaint ¶ 38, Entries 9, 11, 18, 21, 31, 35-40, 42, 47, 48, 50-52, 58, 61, 62, 64-68, 70-75).

11

*Law: The Need for Clarity*, 32 Syracuse J. Int'l L. & Com. 87, 91 (2004) (citation omitted). *See also Oriental Imports and Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 891 (11th Cir. 1983) ("correspondent accounts facilitate the transfer of funds incidental to the conduct of international trade between citizens of different countries"); Michael Gruson, *The U.S. Jurisdiction Over Transfers of U.S. Dollars Between Foreigners and Over Ownership of U.S. Dollar Accounts in Foreign Banks*, 2004 Colum. Bus. L. Rev. 721, 725-27 (transfers of U.S. dollars between two non-U.S. banks most frequently clear through those banks' correspondent banks in the U.S.). Such transfers are "generally made over the two principal wire payment systems: the Federal Reserve Wire Transfer Network (Fedwire) and the CHIPS." *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370, 570 N.E.2d 189, 194 (1991) (footnote omitted).[16] CHIPS processes over 95% of all U.S. dollar cross-border payments, transferring more than $2 trillion each day. http://www.chips.org/about/pages/033738.php (last visited January 25, 2008).

In view of the practical necessity for virtually all interbank transactions in U.S. dollars – even those between two foreign banks – to pass through correspondent banks in the U.S., and the enormous volume of such transactions, that bare connection cannot be a sufficient basis for subject matter jurisdiction. Asserting jurisdiction on that basis would prove too much – it would subject trillions of wholly foreign transactions to the jurisdiction of the U.S. merely by virtue of a quirk of the international banking system. *See Lan Assocs. XVIII v. Bank of Nova Scotia*, No. 96 Civ. 1022 (JFK), 1997 WL 458753, at *6 (S.D.N.Y. Aug. 11, 1997) (dismissing action on *forum non conveniens* grounds because New York "ha[d] virtually no link to th[e] action"; if wire transfers of funds in New York were "to be deemed significant, this Court, located in one of the

---

[16] "CHIPS is owned and operated by the New York Clearing House Association and the Federal Reserve Bank owns and operates Fedwire, the largest American wire transfer network." *Banque Worms*, 77 N.Y.2d at 370 n.2, 570 N.E.2d at 194 n.2.

world's largest and busiest financial centers, would be burdened with countless international financial disputes having no real, substantive link to New York").

The Second Circuit Court of Appeals has held that a U.S. dollar payment from one foreign bank to another that passed through a U.S. correspondent bank was "not a sufficiently 'direct effect in the United States' to support [subject matter] jurisdiction" under the commercial activity exception of the Foreign Sovereign Immunities Act. *International Housing Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 12 (2d Cir. 1989). Many other decisions, in various contexts, likewise make clear the inconsequential nature of correspondent bank accounts to an analysis of this jurisdiction's interest. *See, e.g., United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 619-20 (1st Cir. 2001) (defendant was not subject to personal jurisdiction, notwithstanding, *inter alia*, its "correspondent banking relationships and accounts with four New York banks"); *Oriental Imports*, 701 F.2d at 891-92 (maintenance of correspondent bank account insufficient to confer personal jurisdiction over foreign bank); *LaSala*, 514 F. Supp. 2d at 462 (dismissing the Trustees' Action on *forum non conveniens* grounds because, *inter alia*, "the argument that dollar transfers through banks in the United States creates a strong public interest in favor of the United States has been rejected by courts in this Circuit"); *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris*, No. 03 Civ. 1681 (LAP), 2004 WL 2199547, at *8 (S.D.N.Y. Sept. 29, 2004) (maintenance of "correspondent banking relationships with at least six New York banks and . . . an account with the Bank of New York in New York City" were insufficient to confer personal jurisdiction over defendant); *Semi Conductor Materials, Inc. v. Citibank Int'l PLC*, 969 F. Supp. 243, 246 (S.D.N.Y. 1997) (finding no general jurisdiction over an English bank despite maintenance of four bank accounts in New York); *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1074 (S.D.N.Y. 1992) (Haight, J.) (dismissing action on grounds of *forum non conveniens*, in part, because foreign bank's use of New York branch to "route . . . loan proceeds . . . cannot be regarded, in the overall scheme of things, as other than peripheral").

13

In short, this action involves no U.S. conduct by Lloyds TSB. Because "section 1956 was not intended [to], nor does it, apply to actions of a non-United States citizen taken wholly outside the United States," *United States v. Stein*, Crim. A. No. 93-375, 1994 WL 285020, at *5 (E.D. La. June 23, 1994), this Court has no subject matter jurisdiction over the government's claims under Section 1956 (Counts I through III).

### C.  Section 1957 By Its Terms Does Not Reach Lloyds TSB's Exclusively Swiss Conduct

Section 1957 also fails to reach the purely non-U.S. conduct of Lloyds TSB pleaded in the Complaint. That provision simply does not provide for jurisdiction over non-U.S. conduct by a non-U.S. person. Section 1957, jurisdiction only exists if (i) "the offense under [that] section t[ook] place in the United States or in the special maritime and territorial jurisdiction of the United States," 18 U.S.C. § 1957(d)(1), or (ii) "the defendant is a United States person (as defined in Section 3077 of this title, but excluding [U.S. government employees or contractors])." 18 U.S.C. § 1957(d)(2). Lloyds TSB does not fall within any definition of "United States person" as set forth in 18 U.S.C. § 3077. As a United Kingdom-incorporated bank, Lloyds TSB is neither a "national of the United States," a permanent resident alien, a "person within the United States," an entity "composed principally of nationals or permanent resident aliens of the United States," or a corporation organized under the United States. 18 U.S.C. §§ 3077(2)(A)-(C), (E), (F).

Nor is any monetary transaction in which Lloyds TSB engaged alleged to have taken place "in the United States or in the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1957(d)(1). To the contrary, all such transfers are alleged to have been made either within Switzerland or between Switzerland and another European country. Under the plain language of the statute, such transactions did not take place within the U.S. or its special maritime or territorial jurisdiction. *See Connecticut Nat'l Bank v. Germain*, 503 U.S.

249, 253-54 (1992) ("courts must presume that a legislature says in a statute what it means and means in a statute what it says there …. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete'") (citations omitted). *Cf. United States v. Black*, 469 F. Supp. 2d 513, 538 (N.D. Ill. 2006) (transfer of funds from a bank in Canada to one in Chicago was a monetary transaction in the United States, because the "transaction was completed when the transfer was completed in Chicago").

### D.  Congress Is Presumed Not to Have Legislated Extraterritorially Except to the Limited Extent Expressly Set Forth in the MLCA

If there were any ambiguity as to the extraterritorial reach of the MLCA, which there is not, this Court should strictly limit the statute's scope, consistent with the guidance provided by the Supreme Court and the Court of Appeals for the Second Circuit as to the extraterritorial application of prescriptive federal statutes.

The extent to which Congress has proscribed conduct outside of the territory of the U.S. is, in the first instance, a matter of statutory construction based on Congress' intent in enacting a particular statute. Congress is presumed not to have legislated extraterritorially except to the extent it has explicitly so provided. *See EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248 (1991) ("*Aramco*"). As the Supreme Court explained in *Aramco*:

> It is a longstanding principle of American law "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Foley Bros. v. Filardo,* 336 U.S. 281, 285 (1949). This "canon of construction … is a valid approach whereby unexpressed Congressional intent may be ascertained." *Ibid*. It serves to protect against unintended clashes between our laws and those of other nations which could result in international discord. *See McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20-22 (1963).
>
> In applying this rule of construction, we look to see whether "language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." *Foley Bros., supra*, 336 U.S., at 285. *We assume that Congress legislates against the backdrop of the*

> *presumption against extraterritoriality.* Therefore, unless there is
> "the affirmative intention of the Congress clearly expressed," *Benz
> v. Compañia Naveira Hildago, S.A.*, 353 U.S. 138, 147 (1957), we
> must presume it "is primarily concerned with domestic
> conditions." *Foley Bros., supra*, 336 U.S., at 285.

*Id.* (affirming dismissal of EEOC's action alleging discrimination by a U.S. employer against a

U.S. citizen in Saudi Arabia on the ground that Title VII did not apply extraterritorially)

(emphasis added); *see also F. Hoffman-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 169

(2004) (dismissing antitrust claims, arising out of foreign transactions, for lack of subject matter

jurisdiction; "if America's antitrust policies could not win their own way in the international

marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in

an act of legal imperialism, through legislative fiat"); *Smith v. United States*, 507 U.S. 197, 203-

204 (1993) (affirming dismissal of a Federal Tort Claims Act claim against the U.S. government

for the wrongful death of a federal employee in Antarctica because "the presumption against

extraterritorial application of United States statutes requires that any lingering doubt regarding

the reach of the FTCA be resolved against its encompassing torts committed in Antarctica").

The presumption against extraterritorial application of a prescriptive statute has even

greater force where, as here, the statute explicitly provides for *some* degree of extraterritorial

effect but does not clearly extend such effect to the situation at hand.  Thus, in *United States v.

Gatlin*, 216 F.3d 207 (2d Cir. 2000), the Court of Appeals reversed the conviction of an

American civilian, pursuant to 18 U.S.C. § 2243(a), for engaging in sexual acts with a minor at a

U.S. military institution in Germany.  Section 2243(a) prohibited such conduct "in the special

maritime and territorial jurisdiction of the United States."  The question for the court was

whether "18 U.S.C. § 7, which is incorporated by reference into § 2243(a) ... and which defines

the 'special maritime and territorial jurisdiction of the United States' to include '[a]ny lands

reserved or acquired for the use of the United States, and under the exclusive or concurrent

jurisdiction thereof,' applie[d] extraterritorially," so as to encompass a U.S. military base

overseas. *Id.* at 210. The court in *Gatlin* held, *inter alia*, that "accepting the Government's argument would potentially frustrate one of the central purposes of the presumption against extraterritoriality – namely, the prevention of the 'unintended clashes between our laws and those of other nations which could result in international discord.'" *Id.* at 216 (quoting *Aramco*, 499 U.S. at 248). Judge Cabranes explained:

> That Congress may have reconciled itself to the possibility of such clashes in some circumstances does not mean that it did so in all circumstances. . . . If anything, the presumption against extraterritoriality, "far from being overcome here, is doubly fortified by the language of this statute," *Smith*, 507 U.S. at 204 (internal quotation marks omitted), since [other] subsections [of the same section] confirm that Congress knows how to legislate extraterritorially when it so desires.

*Gatlin*, 216 F.3d at 216.

It likewise cannot be presumed that Congress, by clearly and expressly providing in 18 U.S.C. §§ 1956(f) and 1957(a) and (d) (quoted at pp. 9-10, *supra*) for a certain limited degree of extraterritorial application for the MLCA, intended the statute to have still broader (but unexpressed) extraterritorial reach. Because those provisions "confirm that Congress knows how to legislate extraterritorially when it so desires," *Gatlin*, 216 F.31 at 216, the converse in fact is true. *See also Carnero v. Boston Scientific Corp.*, 433 F.3d 1, 10 (1st Cir. 2006) ("That Congress provided for extraterritorial reach as to Section 1107 [of the Sarbanes-Oxley Act] but did not do so as to Section 806 . . . conveys the implication that Congress did not mean Section 806 to have extraterritorial effect"). *Cf. Stoneridge Investment Partners, LLC v. Scientific Atlanta, Inc.*, No. 06-43, ___ S. Ct. ___, 2008 WL 123801, at *9 (U.S. Jan. 15, 2008) (affirming dismissal of private securities fraud action where defendants did not make any misrepresentation to the public, because there is no implied private right of action under Section 10(b) of the Securities Exchange Act 1934 against alleged aidors and abettors; "we give weight to Congress'

amendment to the Act restoring aiding and abetting liability in certain cases but not others. The amendment, in our view, supports the conclusion that there is no liability.").

### E. The Legislative History of the MLCA and the Assurances of the U.S. Government to the Government of Switzerland Confirm that the Statute Does Not Reach the Exclusively Swiss Conduct Alleged in the Complaint

The presumption against extraterritorial application of the MLCA, beyond the limited extent clearly authorized by Congress, is reinforced by the statute's legislative history. Neither Section 1956 nor Section 1957 was meant to apply to the extraterritorial conduct of foreign bankers executing foreign transactions. The Senate Report recommending passage of the bill that eventually became the MLCA is unequivocal on this point: "It is not the Committee's intention to impose a duty on foreign citizens operating wholly outside of the United States to become aware of U.S. laws." S. Rep. No. 99-433, at 14 (1986).

The government's attempt to nevertheless apply Sections 1956 and 1957 to purely Swiss conduct of Lloyds TSB contradicts not only Congress' explicit intent, but also express assurances contemporaneously provided by the U.S. Department of Justice to the Swiss government. Upon the enactment of the MLCA in 1986, the U.S. government assured Switzerland that "extraterritorial jurisdiction with respect to non-United States persons – for example, Swiss banks and their employees – would exist only if part of the money laundering transaction occurred in the United States." Letter from Deputy Assistant Attorney General James I.K. Knapp to Mr. David de Purye, Chargé d'Affaires of Switzerland, dated Sept. 12, 1986, 132 Cong. Rec. S17348-01, 1986 WL 789550 (Oct. 18, 1986).[17] In instituting this action, the government has gone back on its word and on the original understanding of the legislative purpose of the MLCA.

*    *    *

---

[17] When that letter was officially added to the Congressional Record, Sen. Thurmond, then Chair of the Senate Judiciary Committee, stated that the policy expressed in the letter was "compatible with congressional intent." 132 Cong. Rec. S17348-01.

Not surprisingly, no reported decisions have applied either Sections 1956 or 1957 against a foreign bank or other entity, either civilly or criminally, for actions occurring entirely outside the U.S. The express language of the MLCA, the presumption against the extraterritorial effects of a statute, the statute's legislative history, and the assurances given by the U.S. government to Switzerland in 1986 all compel the conclusion that the Court lacks subject matter jurisdiction over this action.

## II.     APPLYING THE MLCA EXTRATERRITORIALLY TO THE ACTIVITIES OF LLOYDS TSB IN SWITZERLAND WOULD BE UNREASONABLE

Even if the MLCA could be applied extraterritorially to the Bank's Swiss conduct, this Court should still dismiss this action because such an application of the statute would be unreasonable. "[A] state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections to another state when the exercise of such jurisdiction is *unreasonable*." Restatement (Third) of Foreign Relations Law of the United States § 403 (1) (1987) ("Restatement (Third)") (emphasis added). *See also Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 131 (2d Cir. 1998) ("Congress may not be presumed to have prescribed rules governing activity with strong connections to another country, if the exercise of such jurisdiction would be unreasonable in the light of established principles of U.S. and international law.").

The "reasonableness" of the exercise of jurisdiction is determined by evaluating:

a)      the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial direct, or foreseeable effect upon or in the territory;

b)      the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

c)      the character of the activity to be regulated, the importance of the regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which desirability of such regulation is generally accepted;

d)      the existence of justified expectations that might be protected or hurt by the regulation;

e)      the importance of the regulation to the international political, legal, or economic system;

f)      the extent to which the regulation is consistent with the traditions of the international system;

g)      the extent to which another state may have an interest in regulating the activity; and

h)      the likelihood of conflict with regulation by another state.

Restatement (Third) § 403(2).

In *United States v. Javino*, 960 F.3d 1137 (2d Cir. 1992), the Court of Appeals reversed a criminal conviction under the National Firearms Act for possession of an incendiary bomb because the government presented no evidence that the device in question was made in the United States as required by the Act. The court held that the statute was not intended to have extraterritorial application, *id.* at 1142, and further stated that "[e]ven had Congress intended all foreign manufacturers of firearms to comply with the requirements set out in the [relevant provision], there is substantial question as to whether it could lawfully have done so," because legislation prohibiting extraterritorial conduct is impermissible "when the exercise of [such] jurisdiction is unreasonable." *Id.* at 1143 (quoting Restatement (Third) § 403(1)).

Exercising jurisdiction over Lloyds TSB's Swiss conduct in this case would be equally "unreasonable." The reasonableness analysis focuses largely on the interests of other countries and the extent to which the exercise of jurisdiction would interfere or conflict with those interests. *See* Restatement (Third) §§ 403(2)(c)-(h). This Court has already recognized that Switzerland possesses a strong interest in regulating the conduct underlying this action, *i.e.*, "the conduct of banks within its borders." *LaSala*, 514 F. Supp. 2d at 465. It also observed that:

20

- "There is no question that this dispute centers around events occurring" in Switzerland; and

- "In this case, . . . the contacts between Switzerland and the underlying events are strong, while the contacts with the United States are minimal."

*Id.* The strength of the Swiss interest in this Swiss banking matter weighs against the reasonableness of exercising subject matter jurisdiction in this action. *See Europe & Overseas Commodity Traders, S.A.*, 147 F.3d at 129 (without any significant factor weighing in favor of jurisdiction, "the exercise of prescriptive jurisdiction by Congress would be unreasonable . . . and is particularly so when the transaction is clearly subject to the regulatory jurisdiction of another country with a clear and strong interest in redressing any wrong").

The exercise of jurisdiction by this Court would also unreasonably risk a conflict with Swiss law. Restatement (Third) § 403(2)(h). The alleged market manipulation and insider trading that are the predicate offenses underlying the purported MLCA claims against Lloyds TSB do not constitute predicate acts for purposes of Swiss money-laundering legislation and therefore could not give rise to any liability under Swiss law. (Cassani Decl. ¶¶ 9-20). This represents a conscious decision of the Swiss legislature, which has declined to make such crimes pedicate offenses. (*Id.* ¶ 17). Moreover, under Swiss law, even if Lloyds TSB suspected or knew that the funds were the proceeds of such acts, it could not disclose them absent an order of a Swiss court. (*Id.* ¶ 16). The U.S. government in this action seeks to punish Lloyds TSB for purely Swiss conduct that was lawful in Switzerland.

The U.S. may desire that Switzerland adopt money-laundering laws that are identical to its own. "But if America's [money-laundering] policies could not win their own way in the international marketplace for such ideas," imposing them on conduct in other countries would be "an act of legal imperialism." *Empagran*, 542 U.S. at 167, 169 (U.S. antitrust laws did not apply to conduct occurring abroad; different nations have adopted different antitrust laws).

21

To hale Lloyds TSB into a U.S. court to defend against allegations that its conduct in Switzerland violated U.S. money-laundering laws would defeat Lloyds TSB's reasonable expectation that it would be regulated by Swiss law and Swiss authorities. *See LaSala*, 514 F. Supp. 2d at 462-63. Applying the MLCA to Lloyds TSB's actions here would not only require its Swiss bankers to have been aware of U.S. laws – contrary to the legislative history (*see* p. 18, *supra*) – but would in fact punish them for not following U.S. laws as to transactions that they had no reason to believe were connected to the U.S. It would also belie the assurances that the U.S. government gave to the Swiss government at the time the MLCA was enacted. *See* p. 18, *supra*.

In contrast to these factors stands the far more modest interest of the United States. The U.S. may have some interest "in ensuring that United States dollars are not laundered abroad to the detriment of United States shareholders and a United States company." *LaSala*, 514 F. Supp. 2d at 466. But this Court already held this interest to be weaker than Switzerland's interest in "policing its financial systems." *Id.* at 466-67. "[T]he argument that dollar transfers through banks in the United States creates a strong public interest in favor of the United States has been rejected by courts in this Circuit." *Id.* at 462 (citing *Lan Assocs. XVIII*, 1997 WL 458753, at *6; *Calgarth Invs. Ltd. v. Bank Saderat Iran*, No. 95 Civ. 5332 (MBM), 1996 WL 204470, at *6 (S.D.N.Y. Apr. 26, 1996)). *See also LaSala*, 514 F. Supp. 2d at 462 ("Whatever interest the United States has, it pales in comparison with that of Switzerland."). That the government, as opposed to the Trustees, is now the plaintiff does not alter this analysis. The Coordination Agreement between the U.S. and the Trustees makes plain that the government essentially is seeking the same relief in the case at bar as the Trustees sought in the Trustees' Action. Any recovery the U.S. obtains against Lloyds TSB in this action would be paid to the Trustees for the benefit of the Trust beneficiaries. *See* Gottridge Decl. Ex. 2 at 21-22, §§ 5.1, 5.2. The government's participation in this action therefore does not increase the minimal U.S. interest.

The Court of Appeals in *Javino*, construing the National Firearms Act, held that "[i]n light of the substantial interests that other countries have in regulating the manufacture of firearms within their own borders, and the attenuated impact that a foreign-made firearm is likely to have within this country," application of the relevant statute "would likely be ruled unreasonable." 960 F.3d at 1143. The same is true here. Switzerland's interest in regulating the conduct of financial institutions within its borders is paramount. That factor, coupled with the serious potential of a conflict between U.S. and Swiss laws, makes the exercise of jurisdiction in this action unreasonable.

## III. EVEN IF THE MLCA COULD BE APPLIED EXTRATERRITORIALLY TO LLOYDS TSB'S EXCLUSIVELY SWISS CONDUCT, THIS COURT SHOULD DISMISS THE ACTION ON THE BASIS OF INTERNATIONAL COMITY

The doctrine of international comity furnishes yet another compelling reason why this action should be dismissed. *See Maxwell Commc'n Corp. v. Societe Generale*, 93 F.3d 1036, 1047 (2d Cir. 1996) (observing that "international comity is a separate notion from the 'presumption against extraterritoriality'").[18] "Comity," as relevant here, is "the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states." *Societe Nationale Industrielle Aerospatiale v. U.S. District Court*, 482 U.S. 522, 544 n.27 (1987). The doctrine contemplates "maintaining amicable working relationships between nations." *JP Morgan Chase **Bank** v. Altos Hornos de Mexico, S.A.*, 412 F.3d 418, 423 (2d Cir. 2005). As explained by the Supreme Court:

> "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is a recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and

---

[18] In *Maxwell*, the court cited *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 383 (1959), in which comity was applied to preclude the application of the Jones Act to conduct that was otherwise clearly subject to the statute because it occurred in waters of the United States.

> convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895).

The Court of Appeals for the Second Circuit has considered several factors when determining questions of abstention on the basis of international comity – the strength of the interest of the foreign government in question, the strength of the U.S. government's interest, and the likelihood that applying U.S. law to acts occurring or having consequences outside this country might impinge upon another nation's sovereignty. *See, e.g., Bigio v. Coca-Cola Co.*, 239 F.3d 440, 454 (2d Cir. 2001) (focusing on lawsuit's "connection" to Egypt and the United States); *Maxwell*, 93 F.3d at 1048 ("Comity is a doctrine that takes into account the interests of the United States, the interests of the foreign state, and those mutual interests the family of nations have in just and efficiently functioning rules of international law"; deferring to the greater interest of the United Kingdom in applying its insolvency laws to English transaction) (citation omitted); *United States v. Giffen*, 326 F. Supp. 2d 497, 507 (S.D.N.Y. 2004) (criticizing the government's apparent effort to "engraft" American law on foreign jurisprudence). Each of these factors militates strongly in favor of abstention.[19]

## A.    Switzerland Has a Stronger Interest in the Issues Raised By this Action Than Does the U.S.

As this Court held in dismissing the Trustees' Action, Switzerland's interest in the subject matter of this action is paramount. Because the Trustees' Action and this action spring from precisely the same facts, the interest-balancing in which this Court engaged as part of its *forum non conveniens* analysis in the former action applies with equal force here.

---

[19] The Court's discretion in determining this issue is broad. Appellate courts reviewing dismissals on the basis of international comity in contexts such as this one apply an "abuse of discretion" standard of review. *See Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999) (district court did not exceed its allowable discretion by deferring to ongoing liquidation proceeding in Brazil).

Comity analyses typically focus on many of the same factors this Court considered in its decision dismissing the Trustees' Action. The fact that the events giving rise to this case are alleged to have taken place in Switzerland, for example, is strong evidence of that nation's interest in the action for purposes of a comity analysis. *See Bigio*, 239 F.3d at 454. Federal courts likewise are mindful of foreign nations' rights to regulate activities occurring within their borders. *See, e.g., Giffen*, 326 F. Supp. 2d at 507 (dismissing, on international comity grounds, portions of an indictment alleging that an American corporate executive's alleged bribery of Kazakhstan officials violated a right to honest services held by citizens of Kazakhstan; "the Government's suggestion that American legal standards [concerning honesty in public service] be exported to Kazakhstan [was] simply a bridge too far").

Here, the Complaint itself confirms that "whatever interest the United States has, it pales in comparison with that of Switzerland." *LaSala*, 514 F. Supp. 2d at 462.[20]

## B.    This Action Offends Swiss Sovereignty

Comity principles also caution against applying U.S. standards to behavior more appropriately judged according to other nations' standards, to avoid inappropriately encroaching on other nations' sovereignty. In *Giffen*, 326 F. Supp. 2d at 507-08, Judge Pauley dismissed on comity grounds portions of the indictment that alleged a scheme to deprive the citizens of Kazakhstan of the honest services of their government officials. Although the government in essence "urge[d] that American notions of honesty in public service developed over two centuries be engrafted on Kazakh jurisprudence," the court in *Giffen* declined to do so, noting that "[a]n argument in favor of the export of United States law represents not only a form of legal

---

[20] The fact that the government essentially is acting at the Trustees' behest also eliminates the need to consider anew the adequacy of Switzerland as an "alternative forum" for this action. *See Jota v. Texaco Inc.*, 157 F.3d 153, 160 (2d Cir. 1998). The Court's previous finding that Switzerland was an adequate alternative forum (*LaSala*, 514 F. Supp. 2d at 456) applies here as well, because the government seeks to obtain for the benefit of the Trust relief that this Court previously held the Trustees should themselves seek in a Swiss court.

imperialism but also embodies the essence of sanctimonious chauvinism." *Id.* (citations omitted).

The Complaint in this action should likewise be dismissed because it inappropriately asks the Court to apply U.S. standards to characterize and penalize as "money laundering" the behavior of Swiss bankers that was permitted by Swiss law. The government improperly seeks to impose on Swiss banks legal obligations that have been rejected by their own government, and to require Swiss banks to report activity that Swiss law forbids them from reporting. (*See* p. 21, *supra*).

## IV.   BECAUSE THE EXERCISE OF PERSONAL JURISDICTION OVER LLOYDS TSB IN THIS ACTION WOULD BE UNREASONABLE, DUE PROCESS REQUIRES DISMISSAL

Even if the MLCA did reach Lloyds TSB's Swiss conduct and even if international comity grounds did not counsel dismissal, the exercise of personal jurisdiction over Lloyds TSB would nonetheless violate due process. Personal jurisdiction may only be exercised if it is consistent with the constitutional requirement of due process. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). "The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Id.* These requirements apply whatever the basis for federal subject matter jurisdiction. *See, e.g., id.* (applying test in diversity case); *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002) (federal question jurisdiction).

That Lloyds TSB maintains a branch in New York may provide "minimum contacts" with this forum.[21] But that is not the end of the inquiry. Even where "a plaintiff has demonstrated the requisite minimum contacts between the defendant and the forum state, a court

---

[21] The government does not allege that Lloyds TSB's New York branch had any connection to the alleged money laundering at issue in this action.

is required to continue to the 'reasonableness' stage of the inquiry and apply the five-factor test of *Asahi* to assess whether the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Metropolitan Life*, 84 F.3d at 567 (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113-14 (1987)).  The five relevant factors are: (1) the burden on the defendant; (2) the interests of the forum State; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Asahi*, 480 U.S. at 113 (citation omitted).  Collectively, these factors weigh in favor of a determination that the exercise of jurisdiction over Lloyds TSB in this action, based on its conduct wholly outside of the U.S., is unreasonable and offends "traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316.

A.    **Litigating this Action Would Impose a Heavy Burden on Lloyds TSB**

All of the actions carried out by Lloyds TSB that form the basis for the government's allegations of money laundering occurred in Switzerland.  As this Court has already recognized, "the vast majority of relevant evidence appears to be located in Switzerland, where the Bank accounts were opened and administered." *LaSala*, 514 F. Supp. 2d at 458.  All current Lloyds TSB employees with knowledge of the relevant facts work in the Geneva branch.  And two of the key non-party individuals identified in the complaint reside in Switzerland.  Former Lloyds TSB employee Jane Moore-Piacentini was the relationship manager dealing with Kyprianou's accounts at Lloyds TSB in Geneva; the government alleges she had full knowledge of the nature of Kyprianou's funds and was directly involved in the allegedly wrongful transactions. (Complaint [Gottridge Decl. Ex. 1] ¶¶ 29, 42, 45, 47, 50).  The government also alleges that Roger Meyer, Poyiadjis's financial manager, directed the very transactions as to which Moore-Piacentini and Lloyds TSB are accused of violating the money laundering laws. (*Id.* ¶¶ 42, 45). Both Ms. Moore-Piacentini and Mr. Meyer reside in Switzerland. *See LaSala*, 514 F. Supp. 2d at

459-60. A number of officers and employees of Bordier and Dominick and other Swiss banks involved in the relevant financial transactions would likely also be important non-party witnesses. *See id.* at 460. No such witnesses, by contrast, are located in this jurisdiction. *See id.*

Defending itself in the United States would severely disadvantage Lloyds TSB because, unlike in an action in Switzerland, it could not compel Moore, Meyer or other Swiss non-party witnesses to come to New York to testify. The only way that these witnesses' testimony could be obtained for use in a U.S. proceeding would be through the Hague Convention on Taking Evidence Abroad. This Court has already observed that "obtaining evidence by means of letters rogatory pursuant to the Hague Convention is a poor substitute for live trial testimony." *Id.* "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114.

### B.     The Forum has no Significant Interests in Adjudicating this Action

As demonstrated above (at pp. 22-23), the government can point to no strong interest of this forum in adjudicating this dispute.

### C.     The Interests of the Plaintiff in Obtaining Relief in this Forum are Minimal

In the Trustees' Action, the plaintiffs "point[ed] to the interest of the United States in safeguarding transactions involving U.S. currency and in 'ensuring that foreign banks are not havens for criminals who steal and launder U.S. currency' [and] the interest of the United States in adjudicating matters affecting its residents." *LaSala*, 514 F. Supp. 2d at 462 (citation omitted). In dismissing that action, this Court rejected the Trustees' argument. As explained above, the government's status as plaintiff in the current action does not alter that conclusion. *See* pp. 22-23, *supra.*

**D.    Adjudication of this Action Would Result
in an Inefficient Administration of Justice**

In dismissing the Trustees' Action, this Court remitted the Trustees to their remedies against Lloyds TSB in Switzerland. Adjudicating this action in the U.S. while a parallel proceeding by the Trustees is pursued in Geneva would be an inefficient use of judicial resources and would create the risk of inconsistent judgments.

In addition, "[i]n evaluating this factor, courts generally consider where witnesses and evidence are likely to be located." *Metropolitan Life*, 84 F.3d at 574 (citations omitted). Because the documentary evidence regarding Lloyds TSB's actions and the most relevant witnesses are located in Switzerland, and in light of the need to translate the testimony of certain Swiss witnesses (*see LaSala*, 514 F. Supp. 2d at 461), this factor strongly weighs against exercising jurisdiction in the U.S.

**E.    Adjudication of this Action Would Hinder, Not Further, Relevant Policies**

The final factor requires a court to "take into consideration the interests of the 'several States,' in addition to the forum State, in the efficient judicial resolution of the dispute and the advancement of substantive policies." *Asahi*, 480 U.S. at 115. As in *Asahi*, this case calls for this Court "to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by [this] court." *Id.* (emphasis in original). This Court has already weighed this balance and held that "[w]hatever interest the United States has, it pales in comparison with that of Switzerland. Switzerland possesses a strong interest in regulating the conduct of banks within its borders." *LaSala*, 514 F. Supp. 2d at 462.

\*        \*        \*

In sum, analysis of the *Asahi* factors demonstrates that this Court's exercise of personal jurisdiction over Lloyds TSB in the instant action would be unreasonable, and the action should be dismissed for lack of personal jurisdiction.

V. **THE COMPLAINT IS TIME-BARRED AS TO PRE-SEPTEMBER 7, 2002 TRANSACTIONS AND FAILS TO STATE A CLAIM AS TO POST-SEPTEMBER 7, 2002 TRANSACTIONS**

    A. **The Government's Claims Based on Pre-September 7, 2002 Transactions Are Time-Barred**

In each of the five counts of the Complaint, the government seeks a civil monetary penalty from Lloyds TSB pursuant to 18 U.S.C. § 1956(b). (Complaint ¶ 2). Because the MLCA does not contain a specific statute of limitations, the applicable limitations period is furnished by 28 U.S.C. § 2462, which provides that "[e]xcept as otherwise provided by Act of Congress" any action for a civil penalty must be brought within "five years from the date when the claim first accrued." *See United States v. Project on Gov't Oversight*, 484 F. Supp. 2d 56, 62-63 (D.D.C. 2007) (recognizing a "consistent line of cases in which courts ... have applied § 2462's five-year limitations period to statutes that prescribe a 'civil penalty' and that do not have a more specific statute of limitations"); *United States v. Village of Island Park, Inc.*, 791 F. Supp. 354, 367-68 (E.D.N.Y. 1992) (applying 28 U.S.C. § 2462 to claim seeking a civil penalty under Fair Housing Act).

Seventy-five of the 80 transactions executed by Lloyds TSB's Geneva branch, on which the Complaint is based, occurred before September 7, 2002. (Complaint [Gottridge Decl. Ex. 1] ¶ 38). Those transactions – involving all but $393,400.90 of the approximately $130 million claimed by the government – precede by more than five years the agreed tolling date for the government's "substantive" claims. (*See* Gottridge Decl. Ex. 7). Accordingly, the government's claims based on those individual acts of alleged money laundering (Counts I through IV) are time barred. *Cf. Blusal Meats, Inc. v. United States*, 638 F. Supp. 824, 828 (S.D.N.Y. 1986) (government counterclaimed against plaintiff for violations of the False Claims Act; as the statute of limitations "begins to run on the date the claim is made or, if the claim is paid, on the

date of payment," the "counterclaim is dismissed with respect to those claims" arising at a time outside the limitations period).

Count V, for conspiracy, is also time-barred as to pre-September 7, 2002 transactions. In a civil conspiracy case, a claim accrues for statute of limitations purposes each time a defendant commits an act causing damages, and "as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (antitrust conspiracy). "The principle is well settled in this circuit that the occurrence of an act in furtherance of a civil conspiracy within the limitations period does not render every related but otherwise time barred conspiratorial act actionable." *Blusal*, 638 F. Supp. at 830 (granting in part motion to dismiss government's conspiracy claims under the False Claims Act) (citations omitted). Thus, for example, in *Jones v. Coughlin*, 665 F. Supp. 1040 (S.D.N.Y. 1987), Judge Sweet dismissed plaintiff's civil rights conspiracy claims under 42 U.S.C. § 1985 to the extent they arose out of acts outside the relevant limitations period, even though other acts occurred within the period, reasoning that "a civil plaintiff will only recover those damages 'caused by' the overt acts of the conspiracy that occurred within the period of the statute of limitations." *Id.* at 1044 (footnote omitted). *See also Singleton v. City of New York*, 632 F.2d 185 (2d Cir. 1980) (affirming the dismissal of complaint under 42 U.S.C. § 1983).

Accordingly, the entire Complaint must be dismissed on limitations grounds as to all pre-September 7, 2002 transactions.

**B.    The Government's Claims Based on October 2002 Transactions Fail to State a Claim**[22]

In an apparent effort to avoid the time bar, the government has pleaded five transactions, involving less than $400,000 in all, in October 2002 (Complaint [Gottridge Decl. Ex. 1] ¶ 38,

---

[22] The Bank does not concede that the Complaint states any claim under the MLCA with respect to the 75 pre-September 7, 2002 transactions. However, because claims arising out of those transactions are plainly time-barred, there is no need to address their merits separately on this motion.

Entries 76-80). While these five transactions are not barred by the statute of limitations, the government's claims based on them nevertheless must be dismissed for failure to state a claim upon which relief may be granted.

A plaintiff must "provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1972 (2007)). Here, the government has failed to allege facts sufficient to "nudge [the government's] claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (citation omitted).

The government has failed to allege that the five October 2002 transactions involved proceeds derived from specified unlawful activity, that the Bank had knowledge that the funds were so derived, or that the Bank acted with the intent to disguise the source of the funds or to further promote the underlying fraud. Specifically:

- The Complaint does not make any factual allegations satisfying the threshold requirement that the October 2002 transactions involved the proceeds of specified unlawful activity. The Complaint alleges only that, from October 16, 2002 through October 17, 2002, Kyprianou made five transfers into or out of his Lloyds TSB "Cassiere Enterprises Inc." account ending in 7-110 (the "Cassiere Account") in the approximate total amount of $393,400.90. Complaint ¶ 38, Entries 76-80. It fails to allege that the source of the funds in the Cassiere Account was specified unlawful activity.

- The Complaint likewise fails to sufficiently allege that the Bank had knowledge that the funds in the Cassiere Account derived from unlawful activity.

- The Complaint also nowhere plausibly alleges that the October 2002 transactions were designed to "*conceal or disguise* the nature, location, source, ownership or

control of the proceeds of unlawful specified activity," as required under 18 U.S.C. §§ 1956(a)(1)(B) and (a)(2)(B) (emphasis added).  The Second Circuit has held that "the money laundering statute does not criminalize the mere spending of proceeds of specified unlawful activity" and that, "absent proof of intent to conceal, an ordinary purchase made with ill-gotten gains does not violate the money laundering statute." *United States v. Stephenson*, 183 F.3d 110, 120-21 (2d Cir. 1999).  The Complaint fails this test.  It alleges that those funds used in the October 2002 transactions were in an account in the name of a holding company for Kyprianou's personal yacht and had been earmarked for expenditures related to that yacht.  Complaint ¶ 38 n. 11. Such allegations belie any argument that there was any effort to disassociate Kyprianou from those funds or otherwise "conceal or disguise the nature, location, source, ownership or control of the proceeds of unlawful specified activity."  The Complaint's conclusory allegation that these transactions were designed to "conceal[] the origin of the funds for the yacht" (Complaint ¶ 59) is insufficient to state a money laundering claim.  *Casio Computer Ltd. v. Sayo*, No. 98 Civ. 3772 (WK), 2000 WL 1877516, at *16 (S.D.N.Y. Oct. 13, 2000) (dismissing money laundering claim).

- Finally, Sections 1956(a)(1)(A) and (a)(2)(A) prohibit transactions designed "to promote the carrying on of specified unlawful activity."  But the AremisSoft fraud had been exposed and terminated by 2001 or early 2002 (*see* Gottridge Decl. ¶¶ 6(a)-(1)), so the October 2002 transactions could not plausibly have been conducted to "promote the carrying on" of that fraud.

These defects doom not only Counts I through IV, but also the conspiracy claim in Count V.[23] Because the five post-September 7, 2002 do not sufficiently state a substantive claim for money laundering under the MLCA, they also cannot support a conspiracy claim under that statute. *Cf. Nat'l Group for Commc'ns. and Computers Ltd. v. Lucent Techs., Inc.*, 420 F. Supp. 2d 253, 273 (S.D.N.Y. 2006) (granting Rule 12(b)(6) motion to dismiss RICO conspiracy claim because substantive RICO claim was deficient).

## VI.    THE GOVERNMENT HAS FAILED TO PLEAD THE REQUISITE ELEMENTS TO SUPPORT COUNT III OF THE COMPLAINT, AND IT SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(b)(6)

Count III alleges that Lloyds TSB violated both subsections of 18 U.S.C. §§ 1956(a)(2), which prohibits the transporting of funds "from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States."[24]

The government's complaint lacks any factual allegations – as distinct from conclusory statements unsupported by such allegations (*see* Complaint [Gottridge Decl. Ex. 1] ¶ 80), which are not entitled to any deference on this motion[25] – that Lloyds TSB transported any funds from or to the U.S. All of the transactions that Lloyds TSB allegedly executed were between non-U.S. accounts. The government's claims based on 18 U.S.C. §§ 1956(a)(2) therefore fail. *See United States v. Kramer*, 73 F.3d 1067, 1072-73 (11th Cir. 1996) (reversing 18 U.S.C. § 1956(a)(2)

---

[23] This Court need not accept as true the government's conclusory allegation, unsupported by any facts, that the alleged money laundering conspiracy continued "through in or about January 2004" (Complaint [Gottridge Decl. Ex. 1] ¶ 85). *Doron Precision Sys., Inc. v. FAAC, Inc.,* 423 F. Supp. 2d 173, 179 (S.D.N.Y. 2006).

[24] Section 1956(a)(2)(A) prohibits the defendant from so acting "with the intent to promote the carrying on of specified unlawful activity," while the *mens rea* for Section 1956 (a)(2)(B)(i) is that the defendant knew the funds were proceeds of unlawful activity and that the transfer was designed to conceal or disguise the nature, location, source, ownership or control of those funds. The government alleges both theories in a single count (III).

[25] On a Rule 12(b)(6) motion, "the Court need not accept as true conclusory allegations and legal conclusions masquerading as facts." *Doron*, 423 F. Supp. 2d at 179; *see also In re American Exp. Co. Shareholder Litig.*, 39 F.3d 395, 400 n.3 (2d Cir. 1994).

NYCLIB01/NYLJF/129930.1

conviction because the defendant was only involved in one transaction that occurred "totally outside" the United States).

**CONCLUSION**

For the foregoing reasons, Lloyds TSB's motion to dismiss the Complaint, in its entirety and with prejudice, should be granted.

Dated: New York, New York
     January 25, 2008

                                    Respectfully submitted,

                                      LOVELLS LLP

                                      By: _____
                                          Marc J. Gottridge (MG 1616)
                                          Andrew M. Behrman (AB 5949)
                                          Lisa J. Fried (LF 6968)
                                      590 Madison Avenue
                                        New York, New York 10022
                                        (212) 909-0600
                                        marc.gottridge@lovells.com
                                        *Attorneys for Defendant Lloyds TSB Bank plc*