**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

　　　　　　　　　Plaintiff,

　　v.

LLOYDS TSB BANK PLC,

　　　　　　　　　Defendant.

07 Civ. 9235 (CSH)

---

MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO
DISMISS COMPLAINT FILED BY DEFENDANT LLOYDS TSB BANK PLC

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................4

ARGUMENT........................................................................................................................9

I.      THIS COURT HAS SUBJECT MATTER JURISDICTION
        OVER THIS ACTION.................................................................................................9

        A.      The Government Has Subject Matter Jurisdiction Under 28 U.S.C. § 1345. ...........9

        B.      The Government Has Subject Matter Jurisdiction Under the MLCA,
                Where the Conduct Occurred "In Part" in the United States Analysis.....................10

        C.      Where the United States is the Plaintiff, Exercising Jurisdiction is
                Neither Unreasonable Nor Inconsistent with Principles of International Comity. ....14

II.     THIS COURT HAS PERSONAL JURISDICTION OVER LLOYDS. ................................17

        A.      Standard of Review..................................................................................................17

        B.      Lloyds Consented to the Jurisdiction of this Court. ..................................................18

        C.      Section 1956(b) Confers Jurisdiction Over Foreign Persons.....................................20

        D.      Lloyds Has a Presence in This Forum, Transacted Business in New York,
                And Purposefully Availed Itself of This Forum. .......................................................21

                1.      Personal Jurisdiction Under N.Y. C.P.L.R. § 301. ........................................21

                2.      Personal Jurisdiction Under the N.Y. Long-Arm Statute. .............................22

III.    THE GOVERNMENT'S CLAIMS ARE NOT TIME-BARRED.........................................25

        A.      Standard of Review..................................................................................................25

        B.      Application of Section 3282 as Statute of Limitations. .............................................25

        C.      Application of Section 2462 as Statute of Limitations. .............................................28

IV.     THE GOVERNMENT DOES NOT FAIL TO STATE A CLAIM
        UNDER FED. R. CIV. P. 12(B)(6) AS TO THE
        OCTOBER 2002 TRANSACTIONS OR COUNT III OF THE COMPLAINT...................31

A. The Government Sufficiently States a Claim
With Respect to the October 2002 Transactions.........................................................31

B. The Government Pled the Requisite Elements to Support Count III. ........................33

CONCLUSION..................................................................................................................................34

## TABLE OF AUTHORITIES

ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007)............................................25, 31

Bano v. Union Carbide Corp., 361 F.3d 696 (2d Cir. 2004) ..............................................................27

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779 (2d Cir. 1999)................22, 23

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007)....................................................................25, 31

Bensusan Rest. Corp. v. King, 937 F. Supp. 295, 298 (S.D.N.Y. 1996), aff'd, 126 F.3d 25 (2d
Cir. 1997)...............................................................................................................................................17

Berger v. United States, 295 U.S. 78 (1935) ...................................................................................3

Blusal Meats, Inc. v. United States, 638 F. Supp. 824 (S.D.N.Y. 1986), aff'd on other grounds,
817 F.2d 1007 (2d. Cir. 1987)..............................................................................................................27

Burger King v. Rudzewicz, 471 U.S. 462 (1985)...............................................................................passim

Cutco Industries, Inc. v. Naughton, 806 F.2d 361 (2d Cir. 1986) .....................................................21-22

Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp.2d 736 (S.D.N.Y. 2004) ............................23-24

DiStefano v. Carozzi N.Am., Inc., 286 F.3d 81 (2d Cir. 2001)..........................................................17

Ghartey v. St. John's Queens Hosp., 869 F.2d 160 (2d Cir. 1989)....................................................25

Harris v. City of New York, 186 F.3d 243 (2d Cir. 1999)...................................................................25

Hoffman v. Blaski, 363 U.S. 335, 343 (1960) ...................................................................................19

Ford v. United States, 273 U.S. 593, 624 (1927) ..............................................................................12

Frasier v. Gen. Elec. Co., 930 F.2d 1004 (2d Cir. 1991)...................................................................25

In re Sumitomo Copper Litigation, 120 F.Supp.2d 328 (S.D.N.Y. 2000)..........................................23

Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 465 U.S. 694 (1982) ...............18

Jones v. Coughlin, 665 F. Supp. 1040 (S.D.N.Y. 1987).....................................................................27

Koninklijke Philips Electronics v. Digital Works, Inc., 358 F. Supp.2d 328 (S.D.N.Y. 2005) .......17, 19

LaBounty v. Adler, 933 F.2d 121 (2d Cir. 1991) ...............................................................................25

LaSala v. Lloyds TSB Bank plc, 510 F. Supp.2d 246 (S.D.N.Y. 2007)..............................................1

LaSala v. Bordier et Cie, 452 F. Supp. 2d 575 (D. N.J. 2006) ............................................................1

LaSala v. Bordier et Cie, No. 06-4323, 2008 WL 638266 (3rd Cir. Mar 11, 2008).........................1

Mastec Latin America v. Inepar S/A Industrias E Construcoes, No. 03 Civ. 9892, 2004 WL
1574732 (S.D.N.Y. July 13, 2004) ....................................................................................................19

M/S Bremen v. Zapata Off-shore Co., 407 U.S. 1, 15 (1972) ............................................................15

OCC v. Spitzer, 396 F. Supp.2d 383, 389 (S.D.N.Y. 2005)..................................................................9

Overseas Media, Inc. v. Skvortsov, 407 F. Supp.2d 563 (S.D.N.Y. 2006) ........................................22

PDK Labs, Inc. v. Friedlander, 103 F.3d 1105 (2d Cir. 1997) ...........................................................21

Phillips v. Audio Active Ltd., 494 F.3d 378 (2d Cir. 2007) ................................................................15

Porina v. Marward Shipping Co., No. 06-5397, 2008 WL 850301 (2d Cir. April 1, 2008)..............17

Securities and Exchange Commission v. Alexander, 2007 WL 28161195 (E.D.N.Y. Sept. 26,
2007) ...................................................................................................................................................29

Securities and Exchange Commission v. Jones, No. 05 Civ. 7044(RCC), 2006 WL 1084276
(S.D.N.Y. April 25, 2006)...................................................................................................................29

Securities and Exchange Commission v. Power, 525 F. Supp.2d 415 (S.D.N.Y. 2007) .................29

Simon v. Philip Morris, Inc., 86 F. Supp.2d 95 (E.D.N.Y. 2000) ..................................................23-24

Singleton v. City of New York, 632 F.2d 185 (2d. Cir. 1980)..............................................................27

State of New York v. Henrickson Bros., Inc., 840 F.2d 1065 (2d Cir. 1988) ...................................29

United States v. Bodmer, 342 F. Supp.2d 176 (S.D.N.Y. 2004) ....................................................11-12

United States v. Brasco, 516 F.2d 816 (2d Cir. 1976).........................................................................25

U.S. v. Collins, 503 F.3d 616 (7th Cir. 2007).......................................................................................9

United States v. Dinero Express, Inc., 313 F.3d 803 (2d Cir. 2002) ..................................................33

United States v. Giffen, 326 F. Supp.2d 497 (S.D.N.Y. 2004) ..........................................................16

United States v. Inco Bank & Trust Corp., 845 F.2d 919 (11th Cir. 1988)........................................12

United States v. LaSpina, 299 F.3d 165 (2d Cir. 2002).......................................................25

United States v. Moloney, 287 F.3d 236 (2d Cir. 2002)....................................................28

United States v. Piervinanzi, 23 F.3d 670 (2d Cir. 1994)..................................................33

United States v. Sadighi, 199 F.3d 1334 (9th Cir. 1999)...................................................13

United States v. Stein, No. 93-375, 1994 WL 285020 (E.D. La. June 23, 1994).................13

United States v. Tarkoff, 242 F.3d 991, 995 (11th Cir. 2001)............................................12

Valdez ex rel. Donely v. United States, 518 F.3d 173 (2d Cir. 2008)................................30

Webpro Inc. v. Petrou, 02 Civ. 3465, 2002 WL 31132889 (S.D.N.Y. Sept. 25, 2002) ....................19

Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88 (2d Cir.2000).......................................22

Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321 (1971)................................27

STATE LAW

Bryant v. Finnish National Airline, 15 N.Y.2d 426 (1965) ...............................................21

Landoil ResourcesCorp. v. Alexander & Alexander Services, Inc., 77 N.Y.2d 28, 563 N.Y.S.2d 739 (1990)...........................................................................................................21

Tauza v Susquehanna Coal Co., 220 N.Y. 259 (1917).......................................................21

FEDERAL RULES

Fed. R. Civ. P. 8(a)(2)........................................................................................................34

Fed. R. Civ. P. 12(b)(1).......................................................................................................9

Fed. R. Civ. P. 12(b)(2).....................................................................................................17

Fed. R. Civ. P. 12(b)(6)...............................................................................................passim

FEDERAL STATUTES

18 U.S.C. § 1956..........................................................................................................passim

18 U.S.C. § 2462..........................................................................................................passim

18 U.S.C. § 3282 ...................................................................................................25, 28

28 U.S.C. § 1345 ..........................................................................................................9

STATE STATUTES

N.Y. C.P.L.R. § 301 ...............................................................................................21-22

N.Y. C.P.L.R. § 302 ...............................................................................................22-23

CONGRESSIONAL REPORTS

S. Rep. 99-433 (Sept. 3, 1986) ..............................................................................11, 13

## **INTRODUCTION**

On October 16, 2007, the Government filed the instant Complaint against Lloyds TSB Bank plc ("Lloyds"), seeking a civil monetary penalty of at least $130,000,000, alleging that Lloyds conspired with the principals of AremisSoft to launder the proceeds of a massive securities fraud. This Court, of course, is extremely familiar with the facts of the AremisSoft fraud, having presided over civil actions by the SEC and by trustees for the AremisSoft Liquidating Trust against banks allegedly complicit in the fraud, including Lloyds. See LaSala v. Lloyds TSB Bank plc, 510 F. Supp.2d 246, 279 (S.D.N.Y. 2007) (dismissing the Trustees' action against Lloyds in connection with its conduct in the AremisSoft securities fraud on *forum non conveniens* grounds).[1]

In moving to dismiss the Government's Complaint, Lloyds simply ignores inconvenient facts on the face of the Complaint, entirely misstates the law regarding subject matter and personal jurisdiction, and inexplicably fails to disclose to the Court that it executed a Consent to Jurisdiction in favor of the United States that expressly waives any personal jurisdiction defense in this matter and any objection to the United States District Court as a proper forum.

First, Lloyds devotes nearly 11 pages to arguing that the Government's claims fall outside the limited grant of extraterritorial jurisdiction of the Money Laundering Control Act ("MLCA"), because the bank's conduct did not occur "in whole or in part in the United States," as required for jurisdiction. However, Lloyds neglects to mention that the Government is not attempting to apply its laws to conduct that occurred solely outside the United States. Rather, the

---

[1] In its Memorandum at 4, n. 5, Lloyds notes that the Trustees' action against two other Swiss banks was dismissed by the United States District Court for the District of New Jersey pursuant to the Securities Litigation Uniform Standards Act. LaSala v. Bordier et Cie, 452 F. Supp.2d 575 (D. N.J. 2006). On March 11, 2008, the United States Court of Appeals for the Third Circuit vacated that decision in its entirety and remanded the case to the District Court for further proceedings. LaSala v. Bordier et Cie, No. 06-4323, 2008 WL 638266 (3rd Cir. Mar 11, 2008). The defendants petitioned for rehearing and for *en banc* review, which was denied on April 9, 2008.

1

Government's Complaint clearly alleges that the actions of Lloyds' co-conspirators (Kyprianou and Poyiadjis) occurred in the United States, laying out the facts surrounding a massive securities fraud perpetrated against a United States company whose shares were traded on the NASDAQ and whose investors were largely United States citizens.

Indeed, the monies that Lloyds laundered were Kyprianou's proceeds of illegal insider trading in the United States. The stock sales were executed here and the investors paid their cash here and it was this money, in United States currency, which Lloyds then helped launder. Yet nowhere in Lloyds' memorandum of law does Lloyds acknowledge the connection between its conduct and the conduct of its co-conspirators that brings Lloyds' conduct within the MLCA. In essence, Lloyds disingenuously ignores the allegation of the Government that it is a co-conspirator with the principals of AremisSoft, and asserts that only conduct by Lloyds itself[2] should be considered in the jurisdictional analysis.

Second, Lloyds suggests that even if the Government could proceed against Lloyds, this Court should abstain from exercising jurisdiction because the extraterritorial application of U.S. laws is simply "unreasonable" and is inconsistent with international comity – yet cites to no caselaw supporting abstention where the Government – as opposed to a private party – is the plaintiff in the action. Lloyds simply ignores its Consent to Jurisdiction which makes this Court the appropriate forum for adjudication of the Government's claims. Beyond ignoring its Consent to Jurisdiction, the core facts of the Complaint, and the applicable law, Lloyds treats the Government's action as if it was a mere offshoot of the Trustees' action, and ultimately asks this

---

[2] Moreover, as this Court knows, Lloyds' conduct was far from benign. As the Complaint makes plain, Lloyds intentionally misrepresented material information in connection with an AremisSoft audit, by providing a back-dated "confirmation letter" that falsely stated that millions of dollars were "blocked" in favor of AremisSoft. In fact, no such monies were blocked, and Lloyds well knew that American investors would rely on this false information. Complaint ¶¶ 47-52.

2

Court to engage in a *forum non conveniens* analysis. Lloyds' assertion – i.e., that another forum could have a greater interest than the United States in the enforcement of its own criminal and civil laws – is patently absurd. As this Court well knows, *forum non conveniens* analysis is wholly inapplicable when the United States brings an action for penalties under its criminal laws, since no other forum could ever have a superior interest to this country in enforcing its own laws. As Justice Sutherland stated in 1935, "the United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty[.]" Berger v. United States, 295 U.S. 78, 88 (1935). Accordingly, and with all due respect to the Trust which brought the previous action against Lloyds, the Government does not represent individual investors, but the United States of America itself. While the American investors' interest in the AremisSoft fraud, standing alone, may be "modest" compared to the interest of Swiss regulators, the Government brings this action on behalf of the citizenry as a whole – not just to recover monies for a limited class of investors, but on behalf of the public at large.

In bringing this action, the Government is not seeking to engraft its laws on those of other sovereign nations like Switzerland or Cyprus. Rather, the Government is appropriately enforcing the MLCA and acting to hold international banks accountable for laundering American investors' money overseas. To permit banks like Lloyds or Bank of Cyprus to avoid federal prosecution for money laundering, where they actively conspired with their customers in the United States, is simply to ignore the technological realities of modern banking, and to ignore the clear directive of Congress in amending the MLCA to permit civil actions for money laundering.

Third, Lloyds goes to great lengths to argue that it is not subject to personal jurisdiction. Lloyds fails to advise this Court that, in obtaining a license from the Federal Reserve, the bank has already consented to jurisdiction in matters involving violations of United States laws. See

Exhibit A to the Declaration of Rua M. Kelly ("Kelly Decl.")(Lloyds' Consent to Jurisdiction).

Moreover, Lloyds curiously omits any reference to the plain language of Title 18, United States

Code, Section 1956(b), which expressly confers jurisdiction over foreign persons for violations

of the MLCA. Finally, even if Lloyds had not waived its personal jurisdiction defense and

personal jurisdiction was not conferred by federal law, personal jurisdiction over Lloyds exists

because of the presence of Lloyds' branch office in New York and because personal jurisdiction

is conferred under the New York Long-Arm statute.

Finally, in arguing that the Government fails to state a claim for money laundering

against Lloyds, Lloyds parses the factual assertions set forth in the Complaint to a degree wholly

inconsistent with the mandate of Federal Rule of Civil Procedure 12(b)(6). Further, where the

Court cannot determine on the face of the Complaint that the action is time-barred, dismissal

under Fed. R. Civ. P. 12(b)(6) is wholly inappropriate. Where all reasonable inferences are to be

drawn in favor of the plaintiff, the Government has amply met its burden.

## STATEMENT OF FACTS

As set forth in greater detail in the Complaint, Lloyds acted in concert with Lycourgos

Kyprianou ("Kyprianou") to launder proceeds of Kyprianou's criminal conduct at AremisSoft

Corporation ("AremisSoft" or the "Company"). Kyprianou, the founder and former Chairman of

the Board of AremisSoft, a company whose shares traded on the NASDAQ National Market

from April 1999 until July 2001, engaged in an insider trading scheme in which he and his co-

conspirators inflated the price of AremisSoft's publicly traded stock by falsely misrepresenting

the Company's growth and earnings. Kyprianou used nominee companies to own and sell

AremisSoft stock and, with the assistance and participation of Lloyds, laundered the proceeds of

4

his illegal activity having an aggregate value of at least approximately $130,000,000 through accounts he controlled at Lloyds. Complaint ¶ 1.

AremisSoft was purportedly a leading computer software technology company incorporated in the State of Delaware in 1998 with a principal place of business in New Jersey. From in or about 1998 through July 2001, Kyprianou and co-conspirator Roys Poyiadjis ("Poyiadjis") caused AremisSoft to issue false and misleading public statements and regulatory filings claiming that AremisSoft was experiencing rapid growth, with annual revenues exceeding $100,000,000. Complaint ¶¶ 6, 19. The effect of these fraudulent misrepresentations was that the value of AremisSoft's shares traded on the NASDAQ were artificially inflated. Privy to this knowledge, Kyprianou, Poyiadjis and others secretly and illegally sold their AremisSoft shares at these inflated prices. Complaint ¶ 8. When news reports surfaced in May 2001 that Kyprianou and Poyiadjis had fraudulently misrepresented the value and profitability of AremisSoft, the price of AremisSoft shares plummeted, with investor losses totaling approximately $500,000,000, plus interest. Complaint ¶ 11. Trading in AremisSoft securities was halted in July 2001 and the stock was delisted in August 2001. Complaint ¶ 12. Poyiadjis and Kyprianou were indicted in the Southern District of New York in 2001 and 2002, respectively, for their roles in the AremisSoft fraud. Complaint ¶ 13.

To conceal the proceeds of his illicit activity, Kyprianou utilized numerous accounts at Lloyds to launder the proceeds of his illegal insider trading. Kyprianou opened his accounts at Lloyds through Evangelos Embedoklis, his wife's cousin who at that time was Deputy General Manager and Chief of Private Banking of Lloyds. Lloyds assigned Jane Moore ("Moore"), the branch manager at Lloyds in Geneva, to manage Kyprianou's accounts. Complaint ¶ 29. Lloyds

allowed Kyprianou to mask his ownership of his accounts by using sham names such as "CEI", "UG Business", and "Lady Moura." Complaint ¶¶ 43, 59.

Kyprianou used these accounts to funnel proceeds of his illegal insider trading of AremisSoft stock sold in the open market to U.S. investors. In December 2000, more than $36,000,000 was transferred into Kyprianou's Lady Moura account at Lloyds in four tranches, and an additional amount exceeding $7,500,000 was transferred in 2 transactions in early 2001. Complaint ¶ 43. The majority of this initial $44 million laundered through Lloyds were in U.S. dollar denominated transactions that were necessarily routed through Bankers Trust, Lloyds correspondent bank in New York. Complaint ¶ 43.

At the time Kyprianou opened his Lloyds accounts, Lloyds knew he was the Chairman and corporate insider of AremisSoft. Lloyds also was aware that the purpose of the Lady Moura account was to deposit proceeds of his sale of AremisSoft securities. Complaint ¶ 44. Indeed, the transfer instructions for wiring the stock sale proceeds to the Lady Moura account were provided to Kyprianou by Moore. The stock was sold on instructions from Poyiadjis in New York, and the proceeds were transferred to Lloyds, on instructions from Poyiadjis in New York to Roger Meyer in Switzerland. Complaint ¶ 42. At the instructions of Poyiadjis, Meyer sold Kyprianou's stock through brokerage accounts in New York and deposited the proceeds in the Lady Moura account. These transfers were wired through correspondent banks in New York. Id. In addition, Meyer specifically told Jane Moore that the funds being transferred into Kyprianou's Lloyds accounts were proceeds of his AremisSoft share sales. Complaint ¶ 45.

Lloyds further allowed Kyprianou to continue the money laundering scheme by routing and churning the funds through Lloyds accounts including CEI and UG Business, so as to conceal the identity of Kyprianou's fraud. Complaint ¶ 43. Indeed, Kyprianou funded both the

6

CEI and UG Business accounts with the proceeds of the AremisSoft fraud. Complaint ¶ 59. At least 70 transactions took place from December 2000 through October 2002 in and through these Lloyds accounts with a value of more than $130,000,000. Complaint ¶¶ 37-38.

Another method Lloyds used to conceal the origins of certain transfers and the beneficial owner of the Kyprianou accounts was by allowing transfers of money without reference to the remitter's name or account number. Instead, Lloyds permitted Kyprianou to remit payments to his Lloyds accounts by simply referencing "Jane Moore", or using "house account numbers" rather than referencing the individual accounts he controlled. Complaint ¶ 61. Similarly, Lloyds permitted Kyprianou to transfer money out of his account by stating on the transfer document "by order of one of our clients." Id.

Lloyds not only allowed Kyprianou to launder the proceeds of his criminal and fraudulent conduct through Lloyds accounts, Lloyds also misrepresented material information that it knew would be relied on by AremisSoft and its auditors in reporting the Company's financial condition to U.S. investors and regulators. Complaint ¶ 47. On March 29, 2001, in response to an audit inquiry regarding cash in AremisSoft's bank accounts, Lloyds knowingly created a false and misleading letter ("Confirmation Letter") stating that "since 29th December 2000" Lloyds has been holding $9,980,000 "blocked in favor of AremisSoft (EE.ME.A) Ltd." The Confirmation Letter, signed by Jane Moore and her assistant, Sylvia Orsatti, was simply false. Complaint ¶ 47. In reality, Moore and Orsatti knew no funds were blocked in favor of AremisSoft even on March 29, 2001 – the date of the letter – and certainly not on December 29, 2000. Id. Indeed neither AremisSoft EE.ME.A nor any other AremisSoft entity had an account at Lloyds either at December 29, 2000, or at the date of the Confirmation Letter. It was not until June 2001 that the AremisSoft EE.ME.A account was opened at Lloyds and approximately $10,000,000 was

transferred to this account from Kyprianou's Lady Moura account.  Complaint ¶ 48.  Lloyds'

false Confirmation Letter enabled AremisSoft to include false and misleading material

information in its publicly filed financial statements, and was relied on by the Company and its

auditors in auditing the financial statements for the Company and in preparing their opinion

thereon.  Complaint ¶ 51.

### Lloyds' Consent to Jurisdiction

Lloyds, through its subsidiary Lloyds TSB Offshore Limited, maintains an office at 1251

Avenue of the Americas in New York.  Lloyds filed an application to establish a representative

office in the United States with the Board of Governors of the Federal Reserve System (the

"Board") on March 18, 2005.  As part of that application, Lloyds TSB Offshore Corporate

Services and Lloyds TSB Group plc signed a Consent to Jurisdiction ("Consent") on February

14, 2005 and February 23, 2005, respectively.  The Consent explicitly states that it:

> consents to the jurisdiction of the federal courts of the United
> States and all United States governmental agencies, departments
> and divisions for the purposes of any and all claims made by,
> proceedings initiated by, or obligations to, the United States, the
> Board, and any other United States governmental agency,
> department or division, in any matter arising under U.S. Banking
> Law.

"U.S. Banking Law" includes "all federal criminal laws of which violation(s) arise(s) from the

applicability of any provision of a U.S. Banking Law."  It also includes all federal criminal laws

"under any other provisions of Title 18 of the United States Code applicable to the ownership,

control, operations or activities of a bank...[or] to the operations or activities of a foreign

bank..."

Based on the Consent and assurances to provide information to determine and enforce

compliance with applicable Federal law, the Board approved Lloyds' application on November

1, 2005. See Exhibit B to the Kelly Decl. In its Order Approving Establishment of a Representative Office, the Board stated that the proposed office "has established controls and procedures for the proposed representative office to ensure compliance with U.S. law." Additionally, the Board stated that the application was "specifically conditioned on compliance by [Lloyds] with the conditions imposed in this order and the commitments made to the Board in connection with this application."

## ARGUMENT

I.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS ACTION.

### A.   The Court Has Subject Matter Jurisdiction Under 28 U.S.C. § 1345.

Federal district courts have original subject matter jurisdiction over all civil actions commenced by the United States, "[e]xcept as otherwise provided by Act of Congress," pursuant to Title 28, United States Code, Section 1345. Therefore, the district court's jurisdiction cannot reasonably be questioned, because subject matter jurisdiction is automatically vested in district courts over civil actions in which the United States is the plaintiff. 28 U.S.C. § 1345. See, e.g., U.S. v. Collins, 503 F.3d 616, 617 (7th Cir. 2007) ("Though courts have not explicitly stated the source of this jurisdiction, we note that it is secured by 28 U.S.C. § 1345, which provides to the federal district courts 'original jurisdiction of all civil actions, suits or proceedings commenced by the United States.'"); OCC v. Spitzer, 396 F. Supp.2d 383, 389 (S.D.N.Y. 2005) ("this Court also has jurisdiction pursuant to 28 U.S.C. § 1345, which provides federal jurisdiction over all actions commenced by an agency of the United States.").   Accordingly, to decide the Defendant's motion pursuant to Federal Rule of Civil Procedure 12(b)(1), this Court need only consider whether the Money Laundering Control Act of 1986, 18 U.S.C. § 1956 et seq., is an Act of Congress limiting subject matter jurisdiction over Lloyds conduct outside of the United States.

9

B. The Government Has Subject Matter Jurisdiction Under the MLCA,
   Where the Conduct Occurred "In Part" in the United States Analysis.

Title 18, United States Code, Section 1956(f), explicitly provides for jurisdiction over Lloyds' conduct in this case, because the underlying conduct occurred "in part in the United States." 18 U.S.C. § 1956(f). In fashioning its lengthy argument on the limits of extraterritorial jurisdiction, Defendant simply ignores the most crucial facts set forth in the Complaint – namely, that in furtherance of a massive fraudulent scheme perpetrated on a United States company and involving insider trading on a United States market, Lloyds participated in laundering the fruits of that illegal insider trading. Complaint ¶ 1. In fact, AremisSoft co-conspirators directed the transfer of millions of dollars of the fraud proceeds to be deposited in Kyprianou's Lloyds accounts via faxes originating in the United States. Complaint ¶ 42. In other words, Lloyds failed to address in its Memorandum that in fact the Complaint alleges that Lloyds conspired with others, not that it acted alone. Accordingly, Lloyds ignores not only that the fraudulent actions of its co-conspirators took place within U.S. borders, but that communications in furtherance of these fraudulent actions originated in the United States. Under any analysis, these acts explicitly permit subject matter jurisdiction under 18 U.S.C. 1956(f) of the MLCA.

The MLCA's legislative history makes plain that Congress – far from seeking to proscribe jurisdiction – explicitly sought to hold foreign banks[3] responsible for the kind of conduct in which Lloyds engaged with AremisSoft's principals. The Senate, in particular, contemplated two examples regarding transactions occurring "in part" in the United States as defined by 1956(f): (1) "[A] person transfers by wire the proceeds of a drug transaction from a

---

[3] Of course, Lloyds can hardly be described as a "foreign" bank. Lloyds TSB is registered as a domestic business corporation with the New York Department of State, with an executive office in New York, New York. Lloyds TSB offers customers both inside and outside of the United States a "wide variety of International banking, for both private customers and corporations." See http://www.lloydstsb.com/international.asp.

10

bank in the United States to a bank in a foreign country," and, (2) "*[A] person telephones instructions from the United States to one foreign bank to transfer such proceeds to another foreign bank.*" S. Rep. 99-433 at 14. (*emphasis added*). Here, for example, the Complaint clearly sets forth the facts surrounding the instructions for transferring the proceeds of Kyprianou's insider trading to Lloyds. Specifically, Poyiadjis, via a fax from his home in New York, directed his financial manager Roger Meyer to sell the stock and options of Kyprianou, which were traded through Brown Brothers & Harriman in New York, and further directed that the sale proceeds be transferred to Kyprianou's accounts at Lloyds. Complaint ¶ 42. Thus, the facsimile transmission from the United States alleged in the Complaint can and does create jurisdiction over Lloyds, as this act was, plainly, an overt act by a co-conspirator that constitutes conduct that took place "in part" in the United States.

For example, in United States v. Bodmer, a court in this district held that it had extraterritorial jurisdiction over financial transactions involving money laundered in furtherance of a scheme in violation of the Foreign Corrupt Practices Act ("FCPA"), even though each transaction occurred outside of the United States. 342 F. Supp.2d 176, 190-91 (S.D.N.Y. 2004). The plot alleged in Bodmer involved a complicated consortium of off-shore shell companies and a massive scheme of bribery to illegally effectuate the privatization of the Azerbaijan State Oil Company. Id. at 178-79. The defendant, a Swiss national operating through his Swiss law firm, then opened Swiss bank accounts to launder money in furtherance of the scheme. Id. He proceeded to wire funds through banks in Switzerland, the Netherlands, and the United Arab Emirates, and arranged for U.S. currency to be flown to Azerbaijan via private jets and charters. Id. The sole nexus to the U.S. was a Delaware company with a principal place of business in New York involved in purchasing the privatization vouchers. Id.

11

The court in Bodmer exercised extraterritorial jurisdiction for violations of 18 U.S.C. § 1956 over the financial transactions executed wholly outside the U.S. that were the proceeds of a scheme involving a U.S. company. Id. at 191. In doing so, the court explicitly held that to allow a foreign money launderer to be immune from prosecution for laundering the proceeds of the specified unlawful activity outside the United States would be tantamount to stating that such "launderers would be beyond the reach of the Department of Justice even if part of the conduct occurred in the United States. This would contravene Congress's clearly articulated intention to include foreigners within the scope of the money laundering statute. See 18 U.S.C. § 1956(f)." Id.

Like the defendant in Bodmer, Lloyds should not be immune from prosecution or for civil penalties for laundering money in furtherance of a conspiracy to commit fraud that occurred in the U.S. because its involvement occurred after the money was stolen from the U.S. and purposefully concealed at Swiss banks such as Lloyds. See also United States v. Tarkoff, 242 F.3d 991, 995 (11th Cir. 2001) (holding that a defendant may be convicted for conspiracy to violate and violating the money laundering statute where the two monetary transactions at issue occurred wholly outside the United States).

Lloyds does not argue that an overt act of a co-conspirator could not create jurisdiction in this case, nor could it. Jurisdiction over all of a predominantly foreign scheme can be established on the basis of overt acts in the United States. Ford v. United States, 273 U.S. 593, 624 (1927) ("The overt acts charged in the conspiracy . . . were acts within the jurisdiction of the United States, and the conspiracy charged . . . had for its object crime in the United States, and was carried on partly in and partly out of this country, and so was within its jurisdiction under the principles above settled."); United States v. Inco Bank & Trust Corp., 845 F.2d 919, 920 & n.4

12

(11th Cir. 1988) ("[A] conspiracy occurring partly within the United States is prosecutable without resort to any theory of extraterritorial jurisdiction.").

Moreover, while Congress "did not intend to impose a duty on foreign citizens operating wholly outside the United States to become aware of U.S. laws," it absolutely intended "extraterritorial jurisdiction over the offense to situations in which the interests of the United States are involved." S. Rep. 99-433 at 14. Lloyds spends pages of its Memorandum claiming the conduct occurred wholly outside the U.S. by focusing on each financial transaction with a microscope, conveniently ignoring the entirety of the conduct alleged in the Complaint, which states unequivocally that Lloyds, through its accounts, knowingly laundered the proceeds of a securities fraud committed in the United States.

> Section 1956 was enacted to combat 'one of the greatest challenges facing law enforcement today.' S. Rep. 99-433, at 3-4. In light of the modern methods of transporting funds between countries, Congress authorized extraterritorial jurisdiction for violations of the nation's money laundering statute. It is clear that in so doing Congress intended section 1956 to apply to money laundering activities in which the United States has a substantial interest.

United States v. Stein, No. 93-375, 1994 WL 285020, at *5 (E.D. La. June 23, 1994). Indeed, Lloyds participated in the conspiracy by engaging in continuous transactions with full knowledge that they were designed to conceal or disguise the nature, location, source, ownership or control of the proceeds of the fraud. Complaint ¶¶ 59-63; United States v. Sadighi, 199 F.3d 1334, at *3 (9th Cir. 1999) ("The government has the power to prosecute every member of a conspiracy that takes place in United States territory, even those conspirators who never entered the United States."). The MLCA was specifically enacted to deter such activities. S. Rep. 99-433.

Therefore, to state that Lloyds' conduct falls outside the extraterritorial jurisdiction of the United States is patently wrong.[4]

Further, Lloyds argues that the Government cannot base a claim of extraterritorial jurisdiction on correspondent bank accounts maintained by foreign banks within the United States. While the Defendant devotes several pages of its Memorandum to the reasons why correspondent bank accounts are not a sufficient predicate for subject matter jurisdiction, Defendant ignores the fact that Lloyds' conduct is literally the paradigmatic conduct considered by Congress in enacting the MLCA in the first place. Far from attempting to limit jurisdiction under the facts and circumstances, Congress sought to combat money laundering by foreign banks by creating jurisdiction over just this type of conduct. The statute expressly provides for jurisdiction over a foreign person, here Lloyds, that maintains an account, as Lloyds does at its correspondent banks. See 18 U.S.C. § 1956(b)(2)(A), (C).[5]

In sum, where the United States itself has brought this action, alleging that substantial conduct occurred in the United States, and involved United States-based perpetrators and United States victims, the District Court plainly has subject matter jurisdiction.

C. Where the United States is the Plaintiff, Exercising Jurisdiction is Neither Unreasonable Nor Inconsistent with Principles of International Comity.

Nonetheless, Lloyds argues that the Court should decline to exercise jurisdiction under the "reasonableness analysis" of the Restatement (Third) of Foreign Relations Law of the United States (1987), for reasons of international comity. In making this argument, Lloyds once more

---

[4] Similarly, Section 1957 of the MLCA clearly permits jurisdiction – notwithstanding the defendant's contention that Lloyds' actions took place in Switzerland – because the acts of the co-conspirators were committed in the United States. See 18 U.S.C. 1957 (authorizing jurisdiction where "the offense . . .takes place in the United States.")

[5] Lloyds contends that jurisdiction cannot be based solely on maintaining correspondent bank accounts in the United States. However, the MLCA plainly provides for jurisdiction over foreign banks that maintain a correspondent account in the United States. See 18 U.S.C. §1956(b)(2)(A), (C), as amended by USA PATRIOT Act of 2001, P.L. 107-56 (Oct. 26, 2001).

14

ignores its Consent to Jurisdiction through which it expressly agreed to have claims by the United States involving U.S. banking law adjudicated in this forum. Lloyds consented to "the jurisdiction of the federal courts of the United States" to determine the claims of the United States under the MLCA. Having agreed to the selection of this forum, Lloyds cannot be heard to complain that it finds itself before this forum for its money laundering activities in violation of United States law.[6] M/S Bremen v. Zapata Off-shore Co., 407 U.S. 1, 15 (1972) (forum selection clauses are enforceable); Phillips v. Audio Active Ltd., 494 F.3d 378 (2d Cir. 2007) (same).

Even if Lloyds did not consent to this forum, its argument for this Court to decline jurisdiction fails. Lloyds describes the United States' interest in this case as "modest." D. Br. at 22. Such an argument essentially relegates the United States' interest to that of any civil litigant. In fact, as Congress made explicit in enacting the MLCA, the United States has a powerful interest in combating money laundering schemes to ensure the integrity of its financial markets. The United States has an extremely strong – not "modest" – interest in protecting its citizens from being defrauded by companies like AremisSoft, and having their monies transferred off-shore and laundered by international banks. The investing public lost hundreds of millions of dollars when Kyprianou and others secretly sold millions of AremisSoft shares and laundered the proceeds through international financial institutions, including Lloyds. It is the Government's duty to protect shareholders from having their money stolen – and it is also our obligation to recover those monies, whether they be located in the United States or overseas.

---

[6] Lloyds also cites to its expert Ursula Cassani for support that the illegal actions creating the predicate offenses to the alleged violations of the MLCA do not give rise to liability under Swiss law. D. Br. at 21. As the Government is not bringing a claim under Swiss law, it is unnecessary to respond to Ms. Cassani's analysis.

The cases cited by Defendant for the proposition that this Court should abstain from exercising jurisdiction on the basis of international comity are wholly inapposite. For example, Defendant cites to United States v. Giffen, 326 F. Supp.2d 497 (S.D.N.Y. 2004) for the proposition that American legal standards should not be applied to the citizens of foreign nations. However, the facts of Giffen are radically different from those in the instant case. In Giffen, the Government charged an American citizen, James H. Giffen, for making illegal payments to government officials in Kazakhstan and thus depriving *the citizens of Kazakhstan* of honest services, in violation of 18 U.S.C. § 1346. Giffen, at 504. The Court, in examining the legislative history, found that "Congress did not intend that the intangible right to honest services encompass bribery of foreign officials in foreign countries." Id. at 506. By contrast, the MLCA, as amended in 2001, reflects Congress' clear intention to hold foreign banks accountable for money laundering, by adding a civil provision allowing prosecutors to seek civil penalties for violating the MLCA. Moreover, the victims of the AremisSoft fraud – and by default, the victims of laundering of the criminal proceeds – are American investors. Where the harm in this case befell U.S. citizens, and the legislative history reflects a direct mandate from Congress to prosecute foreign banks for money laundering, the analysis is far different than in Giffen.

Quite simply, there is no principled basis on which to abstain from exercising such jurisdiction for reasons of international comity, where Congress placed its imprimatur on precisely this type of civil action, charging foreign banks with laundering the proceeds of a crime. Defendant's argument to the contrary should thus be summarily rejected.

II.    THIS COURT HAS PERSONAL JURISDICTION OVER LLOYDS.

    A.    Standard of Review.

    When a district court chooses to rely on the pleadings and affidavits and chooses not to conduct a full-blown evidentiary hearing on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing that the court has personal jurisdiction over the defendant. Porina v. Marward Shipping Co., No. 06-5397, 2008 WL 850301, at *2 (2d Cir. April 1, 2008). As with any motion to dismiss, the court is to "construe the pleadings and affidavits in the light most favorable to [the plaintiff], resolving all doubts in his favor." DiStefano v. Carozzi N.Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001) (internal citations omitted). Moreover, courts may consider matters outside the pleadings without converting the motion to one for summary judgment. See Bensusan Rest. Corp. v. King, 937 F. Supp. 295, 298 (S.D.N.Y. 1996), aff'd, 126 F.3d 25 (2d Cir. 1997).

    Lloyds' defense of lack of personal jurisdiction is meritless for three independent and definitive reasons: first, because Lloyds consented to the jurisdiction of the courts of the United States when the bank applied to the Board of Governors of the Federal Reserve for a license to transact business in the United States, and that contractual consent is binding; second, because the MLCA explicitly provides for jurisdiction over foreign persons in Section 1956(b) of Title 18, United States Code; and third, because their contacts with New York are sufficient to give this Court personal jurisdiction over them. See Koninklijke Philips Electronics v. Digital Works, Inc., 358 F. Supp.2d 328, 333 n.5 (S.D.N.Y. 2005) (where court has jurisdiction over defendant on the basis of defendant's consent, no need to analyze whether court has jurisdiction under long-arm statute (citing cases)). See also Burger King v. Rudzewicz, 471 U.S. 462, 473 n.14 (1985) (holding that the "personal jurisdiction requirement is a waivable right" and where

"forum-selection provisions have been obtained through freely negotiated agreements and are not unreasonable and unjust, their enforcement does not offend due process"); <u>Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee</u>, 465 U.S. 694, 703-05 (1982) (setting forth discussion of difference in constitutional underpinnings for personal, as opposed to subject matter, jurisdiction and stating that, because personal jurisdiction is an individual right, it can be waived, and parties can consent to personal jurisdiction).

      B.      <u>Lloyds Consented to the Jurisdiction of this Court.</u>

Although Lloyds moves for dismissal based on lack of personal jurisdiction, Lloyds fails to disclose to the Court that Lloyds irrevocably and unconditionally consented to the jurisdiction of this Court. <u>See</u> Exhibit A, attached to Kelly Decl. (February 23, 2005, Letter from Lloyds TSB Group PLC, to Board of Governors of the Federal Reserve System, regarding "Assurance of Availability of Information, Consent to Jurisdiction, and Designation of an Agent for Service of Process"). As noted above, Lloyds consented to

> the jurisdiction of the federal courts of the United States and all United States governmental agencies, departments and divisions for the purposes of any and all claims made by, proceedings initiated by, or obligations to, the United States, the Board, and any other United States governmental agency, department or division, in any matter arising under U.S. Banking Law.

<u>See id.</u> Moreover, the Lloyds Consent to Jurisdiction applies to any and all claims by the United States arising under "all federal criminal laws of which violation(s) arise(s) from the applicability of any provision of a U.S. Banking Law." It also includes all federal criminal laws "under any other provisions of Title 18 of the United States Code applicable to the ownership, control, operations or activities of a bank...[or] to the operations or activities of a foreign bank..." The MLCA is well within this broad definition.

Lloyds' express consent to the jurisdiction of this Court is valid and binding. As the Supreme Court has explained,

> [B]ecause the personal jurisdiction requirement is a waivable right, there are a 'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.' For example, particularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction. Where such forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process.

Burger King, 471 U.S. at 473 n. 14 (citations omitted). Following this reasoning, courts in this district have consistently enforced contractual clauses consenting to jurisdiction, particularly if signed by sophisticated commercial parties such as Lloyds. See Koninklijke, 358 F. Supp.2d at 332-33 (upholding consent to jurisdiction); Webpro Inc. v. Petrou, 02 Civ. 3465, 2002 WL 31132889, at *3 (S.D.N.Y. Sept. 25, 2002) ("Challenges to personal jurisdiction may be waived by either express or implied consent" and such consent controls absent a "strong showing that it should be set aside"); cf. Hoffman v. Blaski, 363 U.S. 335, 343 (1960) (acknowledging that venue, like personal jurisdiction, may be waived).

In Koninklijke, 358 F. Supp.2d at 330, the defendant had agreed to "irrevocably waive[] any objection to the jurisdiction, process and venue." The court declared that in the face of such submission to jurisdiction, there was a "strong presumption favoring enforcement" of such a clause, and defendant had to make a "strong showing" to overcome that presumption. Id. at 332. This presumption is especially powerful in the commercial context, in which a commercial party can contractually consent to a forum for dispute resolution and thereby waive its personal jurisdiction defense. Mastec Latin America v. Inepar S/A Industrias E Construcoes, No. 03 Civ. 9892, 2004 WL 1574732, at *3 (S.D.N.Y. July 13, 2004). Such consent should be enforced unless it would be "unreasonable and unjust." Burger King, 471 U.S. at 473 n.14.

Lloyds cannot meet the Burger King test to show that enforcement of its Consent to Jurisdiction would be unreasonable and unjust. Lloyds is a highly sophisticated commercial party, with approximately $6.6 billion of after-tax profit in 2007, which engaged in sophisticated financial transactions in this case alone totaling at least $130,000,000. Having waived its personal jurisdiction defense and agreed to selection of this forum, Lloyds cannot argue that this Court lacks jurisdiction.

C.      Section 1956(b) Confers Jurisdiction Over Foreign Persons.

Even without Lloyds' Consent to Jurisdiction, this Court has personal jurisdiction over Lloyds pursuant to 18 U.S.C. § 1956(b). Defendant simply fails to address the applicability of section 1956(b) to the question of personal jurisdiction. Under the plain language of the MLCA, the district courts have jurisdiction over any foreign person ("including any financial institutional authorized under the laws of a foreign country") if:

> (A) the foreign person commits an offense under subsection (a) involving a financial transaction that occurs in whole or in part in the United States;
> (B) the foreign person converts, to his or her own use, property in which the United States has an ownership interest by virtue of the entry of an order of forfeiture by a court of the United States; or
> (C) the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.

Title 18, United States Code, Section 1956(b) (*emphasis added*). Accordingly, Lloyds is subject to personal jurisdiction under the MLCA under 1956(b)(2)(A), where the financial transaction occurred "in whole or in part" in the United States. As discussed in detail above, Lloyds committed an offense where financial transactions occurred at least in part in the United States. Moreover, Lloyds is subject to personal jurisdiction pursuant to 1956(b)(2)(C) simply by virtue of maintaining a bank account at a financial institution in the United States. Lloyds maintained a correspondent bank account at Bankers Trust in New York through which Lloyds routed U.S.

dollar transactions in support of Kyprianou's fraud and money laundering.  Complaint ¶¶ 4, 18, 43.  Thus, Lloyds is properly the subject of this action.

      D.      Lloyds Has a Presence in This Forum, Transacted Business in New York, And Purposefully Availed Itself of This Forum.

Two independent bases for personal jurisdiction over Lloyds also exist under New York law.  Lloyds' branch office in New York creates a presence in the state such that personal jurisdiction exists regardless of whether the claim arises out of the transaction of business in New York.  Personal jurisdiction is also present under New York's long-arm statute, based on Lloyds' contacts with New York.  Regardless of whether subject matter jurisdiction is based on diversity of citizenship or federal question jurisdiction, the Court may look to the New York law to determine whether personal jurisdiction exists.  See PDK Labs, Inc. v. Friedlander, 103 F.3d 1105 (2d Cir. 1997) (federal question); Cutco Industries, Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986) (diversity).

      1.      Personal Jurisdiction Under N.Y. C.P.L.R. § 301.

"A foreign corporation is amenable to suit in New York courts under [N.Y. C.P.L.R. § 301] if it has engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction is warranted."  Landoil ResourcesCorp. v. Alexander & Alexander Services, Inc., 77 N.Y.2d 28, 33, 563 N.Y.S.2d 739 (1990) (citations omitted).  The Court "must be able to say from the facts that the corporation is 'present' in the State 'not occasionally or casually, but with a fair measure of permanence and continuity."  Id. at 33-34 (citations omitted).  In applying this test, the presence of an office of the defendant in New York has been an important factor in determining that the foreign corporation is present in the state for purposes of personal jurisdiction.  Bryant v. Finnish National Airline, 15 N.Y.2d 426, 432 (1965) (office and bank account maintained in NY); Tauza v Susquehanna Coal Co., 220

N.Y. 259, 256-66 (1917) (branch office maintained in NY). The classic indicia of to show presence in New York for purposes of N.Y. C.P.L.R. § 301 "include: 1) the existence of an office in New York; 2) the solicitation of business in New York; 3) the existence of bank accounts or other property in New York; and 4) the presence of employees in New York." Overseas Media, Inc. v. Skvortsov, 407 F. Supp.2d 563, 567-68 (S.D.N.Y. 2006); see also Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir.2000). "[A] defendant who is found to be doing business in New York in a permanent and continuous manner may be sued in New York on causes of action wholly unrelated to acts done in New York." Overseas Media, 407 F. Supp.2d at 567-68.

It is undisputed that Lloyds operates and maintains a branch office in the State of New York, solicits business in New York, has bank accounts or other property in New York, and has employees present in New York. It therefore has such a presence in the state under N.Y. C.P.L.R. § 301 that the courts of New York may exercise personal jurisdiction over Lloyds. It matters not whether the cause of action before the court arises from the transaction of business in the state of New York by Lloyds' branch office. The Court has personal jurisdiction under N.Y. C.P.L.R. § 301 over Lloyds on the Government's money laundering claims.

2.     Personal Jurisdiction Under the N.Y. Long-Arm Statute.

New York courts have jurisdiction over an out-of-state defendant if it "transacts business" in New York and the relevant cause of action "arises from" that business activity. See N.Y. C.P.L.R. § 302(a)(1); Cutco, 806 F.2d at 365. In order to meet the "transacting business" prong of Section 302(a)(1), the party "need not be physically present in the state at the time of service." Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 787 (2d Cir. 1999). Rather, jurisdiction under Section 302(a)(1) extends "to any non-resident who has

22

purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." Id. (internal marks omitted). The exercise of personal jurisdiction in a New York court is also proper over a non-domiciliary defendant who "in person or through an agent... commits a tortious act within the state." See N.Y. C.P.L.R. § 302(a)(2); Simon v. Philip Morris, Inc., 86 F. Supp.2d 95, 119 (E.D.N.Y. 2000). It is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under N.Y. C.P.L.R. §§ 302(a)(1) and (2). Id.; see also Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp.2d 736, 759 (S.D.N.Y. 2004); In re Sumitomo Copper Litigation, 120 F.Supp.2d 328, 338 (S.D.N.Y. 2000). The court may exercise personal jurisdiction over a foreign defendant based on the acts of its co-conspirators if plaintiffs have alleged facts sufficient (1) to establish a prima facie case of conspiracy, (2) to warrant the inference that the foreign defendant was a member of that conspiracy, (3) to demonstrate that a co-conspirator committed a tort or transacted business within New York within the meaning of CPLR § 302(a)(1) or (a)(2), and (4) to justify the finding of an agency relationship between the co-conspirator acting in New York and the foreign defendant. Id.

Here, as a threshold matter, Lloyds is registered as a domestic business corporation with the New York Department of State, and has an office on the Avenue of the Americas in New York, New York. Further, the funds laundered were the proceeds of specified unlawful activity – fraud – that occurred in the United States. Indeed, the fraud was committed on a United States company using a United States exchange and affecting over 6,000 United States citizens. Complaint ¶¶ 6-12. Lloyds then laundered U.S. dollars through a U.S. correspondent bank in New York. ¶¶ 18, 43. In furtherance of this fraud, it falsely confirmed cash in an AremisSoft

23

subsidiary account knowing that such confirmation would be used by AremisSoft's auditors for purposes of its public reporting requirements in the U.S.  Complaint at ¶¶ 18, 43, 47-52.

Moreover, the Complaint clearly (1) states a claim for conspiracy under 18 U.S.C. § 1956(h)(Complaint ¶¶ 84-90); (2) alleges Lloyds' involvement in that conspiracy (Complaint ¶¶ 38, 42, 46-49, etc.); (3) alleges contacts with the State of New York by the co-conspirators Kyprianou and Poyiadjis – such as the fax transmitted by Poyiadjis from his home in New York to Meyer in Switzerland instructing Meyer to sell Kyprianou's stock and options, which were traded through accounts at Brown Brothers & Harriman in New York, and transfer the proceeds of Kyprianou's stock to his accounts at Lloyds (Complaint ¶¶ 6-14, 38-43, etc.); and (4) alleges that Lloyds and its co-conspirators, Kyprianou and Poyiadjis, maintained an agency relationship by pleading that the transfer instructions were provided by Lloyds employee Moore and executed by Poyiadjis in New York via his instructions to Meyer (Complaint ¶¶ 42-58, 59-63, etc.). Daventree, 349 F. Supp.2d at 759.  Accordingly, the exercise of personal jurisdiction over Lloyds is proper based on the acts of its co-conspirators in New York because the causes of action for violations of the money laundering statutes unquestionably arose from Kyprianou's and Poyiadjis' activity in New York.

These contacts also more than satisfy constitutional Due Process requirements because Lloyds "purposefully availed itself of the privilege of conducting activities" in New York such that it "should reasonably anticipate being haled into Court there." Burger King Corp., 471 U.S. at 474-75; Simon, 86 F. Supp.2d at 126 (finding the exercise of personal jurisdiction based on co-conspirator's contacts with New York also sufficient to satisfy Due Process).

III.     THE GOVERNMENT'S CLAIMS ARE NOT TIME-BARRED.

A.     Standard of Review.

Under Rule 12(b)(6), a plaintiff must provide the grounds on which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007); ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). In ruling on a motion to dismiss under Rule 12(b)(6), the court is required to accept all the alleged facts as true and to draw all reasonable inferences in favor of the plaintiff. See LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991); Frasier v. Gen. Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991). A Rule 12(b)(6) motion based on the alleged affirmative defense of the statute of limitations cannot be granted unless the action is clearly time-barred on the face of the Complaint. Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999); Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 163 (2d Cir. 1989).

B.     Section 3282 Provides the Applicable Statute of Limitations.

Criminal money laundering and conspiracy to commit money laundering are subject to the five year statute of limitations set out in 18 U.S.C. § 3282. United States v. LaSpina, 299 F.3d 165, 173 (2d Cir. 2002).[7] With regard to Count V of the Complaint (alleging conspiracy), it is black letter law that the Government may bring an action alleging a money laundering conspiracy so long as at least one overt act in furtherance of the conspiracy occurred within the applicable five-year statute of limitation period.[8] See, e.g., United States v. Brasco, 516 F.2d

_____

[7] Section 3282 provides: "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." Although there are no reported cases addressing the statute of limitations governing civil money laundering actions, the United States respectfully submits that Section 3282 is the applicable statute for criminal and civil actions brought under the MLCA, to ensure consistency in the application and enforcement of the money laundering laws.

[8] Defendant contends that the applicable statute of limitations is Title 28, United States Code, Section 2462, the "catch-all" provision for civil actions. Under 28 U.S.C. § 2462, a claim may be brought no later than five years

816 (2d Cir. 1976) . Here, there are numerous overt acts that occurred within the applicable five-year period. While the Complaint does not and need not articulate the Government's theory as to how each and every transaction constituted money laundering, the post-September 7, 2002 transactions bear clear indicia of money laundering, wherein the Government explicitly described the nexus between the specific transactions and Kyprianou's scheme to hide the proceeds of the AremisSoft fraud. For example, the Government's Complaint described Lloyds' practice of permitting Kyprianou to engage in transactions "without reference to the remitter's name or appropriate account number." Complaint ¶ 61. Consistent with this practice, on October 17, 2002, Lloyds allowed the transfer of $76,969.00 to Cassiere Enterprises from an individual or entity described only as "One of Our Clients." See Complaint ¶ 19. (noting that Lloyds permitted Kyprianou to transfer money out of his account by simply stating on the transfer document "by order of one of our clients.") Similarly, the Government's Complaint noted that numerous transactions were conducted by Kyprianou's personal assistant, Michael Miragliotta, with an account under the pseudonym "Velvet Underground." See Complaint ¶ 60. The Velvet Underground transactions, which are listed on the Government's chart at pp. 13-18, occurred between April 2001 and December 2002. Id. As the Government described in the Complaint, the name "Velvet Underground" was selected to ensure that the account owner's identity could not be discerned by an outside observer. To wit:

> The name Velvet Underground was used for Miragliotta's account because he and Kyprianou wanted to keep it confidential to conceal his salary. Lloyds provided a list of names from which Miragliotta chose the name Velvet Underground. Lloyds not only knew that Miragliotta and Kyprianou wished to conceal the identity of the beneficial owner of the Velvet Underground account, as it did with Kyprianou, Lloyds assisted by providing the account alias.

---

from the date when the claim first accrued. While the Government disagrees that 28 U.S.C. § 2462 is the applicable statute, the parties' disagreement is of no moment. As discussed below, this action was brought within the five-year limitation period of section 2462.

26

<u>Id</u>. Indeed, Lloyds permitted the use of sham account names for all of Kyprianou's accounts such as "Lady Moura," "UG Business" and "CEI" or "Cassiere". Complaint ¶¶ 38, 59.

Nonetheless, Defendant contends that Count V is time-barred as to pre-September 7, 2002 transactions. Lloyds essentially argues that this Court should ignore the conspiracy count and consider only the individual transactions as isolated and unrelated events. There is no precedent for doing so and moreover, the cases cited for this proposition are wholly inapposite.[9] Here, had the Government proceeded criminally, which option remains available, the "last overt act" rule would apply in determining when the statute of limitations started to run. It is inconceivable that a more stringent rule should apply simply because the Government, in the exercise of prosecutorial discretion, determined instead to bring a civil enforcement action.

Defendant essentially attempts to carve out the post-September 7, 2002 transactions from the larger conspiracy to launder the proceeds of the AremisSoft fraud, in arguing that the Government fails to state a claim as to those particular transactions. As the Government has set forth above, the nature of the transactions was exactly the same after September 7, 2002 as it was before – Kyprianou laundered the proceeds of the AremisSoft fraud by engaging in (often rapid) transactions between pseudonymous or anonymous accounts that concealed the identities of those sending and receiving money. Defendant complains that the Government does not adequately explicate the nexus between the AremisSoft fraud and certain of the transactions alleged to constitute money laundering; however, the post-September 2007 transactions are

---

[9]  The cases cited by Lloyds – which primarily involve issues of damages calculation – are not persuasive authority on a motion to dismiss the Government's enforcement action for monetary penalties for failure to state a claim. <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 338 (1971) (private antitrust action focusing on damages analysis); <u>Singleton v. City of New York</u>, 632 F.2d 185 (2d. Cir. 1980) (private civil rights case involving damages for civil conspiracy); <u>Jones v. Coughlin</u>, 665 F. Supp. 1040 (S.D.N.Y. 1987) (same); <u>Blusal Meats, Inc. v. United States</u>, 638 F. Supp. 824, 828 (S.D.N.Y. 1986) (civil conspiracy under False Claims Act where Government had to show it suffered damages), <u>aff'd on other grounds</u>, 817 F.2d 1007 (2d. Cir. 1987).

27

virtually identical to the vast majority of transactions that occurred in earlier years, and are consistent with Kyprianou's method of laundering his ill-gotten gains.

As to Counts I through IV of the Government's Complaint, the substantive money laundering counts are not time-barred. The Second Circuit's rule is clear: "[A] single money laundering count can encompass multiple acts provided that each act is part of a unified scheme." United States v. Moloney, 287 F.3d 236, 241 (2d Cir. 2002) (permitting Government to aggregate series of financial transactions over several years into single count indictment charging money laundering). Accordingly, the Government's decision to aggregate all of the financial transactions by Lloyds relative to AremisSoft was proper under the MLCA. The Defendant cannot prevail by simply asserting that many of those transactions took place more than five years before the date of the Tolling Agreement. The Government submits that because money laundering is a continuing offense, any pre-September 7, 2002 conduct is properly encompassed in the substantive counts, as well as the conspiracy count.

C.     Application of Section 2462 as Statute of Limitations.

Even if the Court were to decline to apply section 3282 to these civil money laundering claims, and instead apply the civil penalty and fine limitations period under 28 U.S.C. § 2462, the result would be the same – all of the Government's claims would survive this challenge under Rule 12(b)(6).[10]

In making its argument that the Government's claims are barred by Section 2462, Lloyds makes a fundamental error of law. Lloyds simply goes back in time five years from the date that the parties entered into a tolling agreement and states that pre-September 7, 2002 money

---

[10] Section 2462 provides: "Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon."

laundering transactions are barred by the applicable statute of limitations. Lloyds thereby

ignores a crucial part of the analysis under Section 2462. Under that statute of limitations, the

period does not start to run until "the date when the claim first accrued." Without any analysis of

when the money laundering claim first accrued, Lloyds' commencement of the limitations period

on the dates of the money laundering violations cannot be sustained.

Numerous authorities in this District have concluded that when the cause of action

accrues for a civil fine or penalty under Section 2462 is subject to doctrines that allow the date of

accrual of the cause of action to be later than when the underlying conduct occurred. For

example, in Securities and Exchange Commission v. Jones, No. 05 Civ. 7044(RCC), 2006 WL

1084276 (S.D.N.Y. April 25, 2006), the court noted that the fraudulent concealment doctrine

applies to Section 2462. To establish the concealment element, a plaintiff can allege either that

the defendant took affirmative steps to prevent discovery of the fraud or that the wrong itself was

self-concealing. Id. (citing State of New York v. Henrickson Bros., Inc., 840 F.2d 1065 (2d Cir.

1988) (bid-rigging conspiracy was found to be a self-concealing wrong.)). So, too, in Securities

and Exchange Commission v. Alexander, 2007 WL 28161195 (E.D.N.Y. Sept. 26, 2007), Judge

Garaufis surveyed early Supreme Court precedent on the discovery rule and fraudulent

concealment doctrines, concluding there are significant reasons for finding that a discovery rule

governs the accrual of the limitations period in section 2462. Id. at *15; see also Securities and

Exchange Commission v. Power, 525 F. Supp.2d 415, 424-25 (S.D.N.Y. 2007) (fraudulent

concealment doctrine operates to toll the statute if the plaintiff alleges: (1) that the defendants

concealed the cause of action; (2) that the plaintiff did not discover the cause of action until some

point within five years of commencing the action; and (3) that the plaintiff's continuing ignorance was not attributable to lack of diligence on its part).[11]

Here, on the Rule 12(b)(6) motion, the Court need only look to the money laundering allegations in the Government's Complaint to see that Lloyds' offenses were inherently self-concealing. Indeed, the very purpose of the money laundering engaged in by Lloyds was to secrete funds unlawfully obtained and to confound anyone seeking to discover and unravel the trail of the fraud's proceeds by all of the methods detailed in the Government's Complaint. Complaint ¶¶ 43, 46, 61-65. Consequently, the money laundering allegations here are within the protection of the discovery rule and equitable tolling doctrine that the statute of limitations would not commence to run until such time as the plaintiff knew, or should have known in the exercise of reasonable diligence, that he had a claim.[12] Reviewing the allegations of the Government's Complaint under this established test for Section 2462, no part of the Government's claims are subject to dismissal as time-barred. Nothing in the Government's Complaint indicates that, by September 7, 2002, the Government knew or should have known that any of the self-concealing money laundering transactions alleged in the Complaint had occurred. Hence, there is no basis on which the Court can conclusively determine that the Government's claim for civil penalties first accrued before September 7, 2002.

_____

[11] The Second Circuit recently made it clear that, although the doctrines of equitable tolling and fraudulent concealment are often used interchangeably, there is no requirement that the defendant have actively engaged in misconduct for equitable tolling to apply to a limitations period. Valdez ex rel. Donely v. United States, 518 F.3d 173, 182-83 (2d Cir. 2008). The wrong itself, such as the fraud committed by a defendant, can be self-concealing, not requiring any additional misconduct by the defendant to confound the plaintiff in his effort to discover that he has a claim.

[12] The Government made a supplemental request to the Swiss Central Authority pursuant to the relevant Mutual Legal Assistance Treaty ("MLAT") in force between Switzerland and the United States on October 4, 2002, which included a request for documents from Lloyds relevant to the AremisSoft fraud. The Swiss Central Authority replied to the MLAT by producing documents on October 26, 2004, which included the account documents for some of Kyprianou's accounts at Lloyds. At no time earlier than October 2004 could the Government reasonably have comprehended Lloyds' complicity in the AremisSoft fraud. Therefore, at no time earlier than October 2004, could the Government's money laundering claims have first accrued under 28 U.S.C. § 2462.

On this Rule 12(b)(6) motion, the Complaint is clearly not barred on its face. Once it is time for the facts of the case to be explored, there will undoubtedly be factual issues on purposeful fraudulent concealment by Lloyds. When the Swiss Central Authority responded to the Mutual Legal Assistance Treaty request on October 26, 2004, not all of Kyprianou's accounts at Lloyds were disclosed. Such failure to candidly disclose all Kyprianou accounts at Lloyds obstructed the Government from discovering the money laundering activities at an earlier point in time.

IV.    THE GOVERNMENT DOES NOT FAIL TO STATE A CLAIM
       UNDER FED. R. CIV. P. 12(b)(6) AS TO THE
       OCTOBER 2002 TRANSACTIONS OR COUNT III OF THE COMPLAINT.

The Government states valid claims with respect to the five transactions in October 2002 as well as to Count III of the Complaint. A plaintiff must assert "factual allegations sufficient to raise a right to relief above the speculative level." Bell Atlantic, 127 S. Ct. at 1965; ATSI Commc'ns, 493 F.3d at 98. The allegations as set forth in the Complaint state a claim for which relief may be granted.

A.    The Government Sufficiently States a Claim
      With Respect to the October 2002 Transactions.

Defendant argues that the Government failed to allege (1) that the five October 2002 transactions involved proceeds derived from specified unlawful activity, (2) that Lloyds had knowledge that the funds were so derived, or (3) that the Bank acted with the intent to disguise the source of the funds or to further promote the underlying fraud. As an initial matter, Lloyds is once again attempting to deflect the focus from the overall conspiracy to commit money laundering in furtherance of the AremisSoft fraud by shining a spotlight on each separate transaction. Notwithstanding this distorted perspective of the facts as pled, the Government has more than adequately stated a claim with respect to the October 2002 transactions.

31

The October 2002 transactions involved proceeds derived from specified unlawful activity because they were set forth as part of an overall chart listing 80 transactions all of which were alleged as bearing the classic hallmarks of money laundering and were linked to the original $44,000,000 of insider trading proceeds deposited at Lloyds from accounts at Bordier et Cie and Dominick Company AG. Complaint ¶ 38. Defendant points to the five October 2002 transactions as representing transfers into or out of Kyprianou's Lloyds TSB "Cassiere Enterprises, Inc." account in the approximate total of $393,400.90 claiming that the Government fails to allege that the source of these funds was specified unlawful activity. D. Br. at 32. On the contrary, a simple analysis of the chart as pled shows portions of the insider trading proceeds being transferred into the Cassiere account via other Kyprianou beneficially owned accounts at Lloyds (such as Quayside Finance), at HSBC, or at Bank of Cyprus. Complaint ¶ 38, Chart at No. 19, 20, 22, 27, 28, 40, 41, etc. The funds in the Cassiere account through and including the transactions in October 2002 are indisputably proceeds of the AremisSoft insider trading fraud.

As to the connection between the October 2002 transactions and the underlying fraud, the real irony is that any difficulty in setting it forth was caused by Lloyds' and Kyprianou's success at designing transactions to "conceal or disguise the nature, location, source, ownership or control of the proceeds of the specified unlawful activity." 18 U.S.C. § 1956. In fact, as alleged in the Complaint, Lloyds' knowledge and participation in laundering the proceeds of this fraud applies as much to the October 2002 transactions as any of the other 75 transactions. Lloyds' upper-level managers had full knowledge that the funds being transferred to Kyprianou's Lloyds accounts were proceeds of his AremisSoft share sales and those funds were permitted to be funneled through various Kyprianou accounts including the Cassiere account and the transactions in October 2002. Complaint ¶¶ 38, 45.

32

Defendant makes a final attempt at misdirection by arguing the *non sequitur* that because the AremisSoft fraud was exposed in 2001, the transactions in 2002 could not plausibly have been conducted to promote the carrying on of that fraud as required by Sections 1956(a)(1)(A) and (a)(2)(A). Indeed, it is Lloyds' willingness to continue permitting and assisting with transactions after the fraud went public that further supports the Government's allegations that Lloyds was fully aware of its participation in laundering Kyprianou's fraudulent proceeds in furtherance of the AremisSoft fraud. It is specious to claim, and Defendant cites no law to support, that once a specified unlawful activity is exposed to the public that such activity cannot continue to be promoted. Indeed, the purpose of laundering the money through Lloyds was to promote the unlawful activity as much as to conceal or disguise the nature of its origin. 18 U.S.C. §§ 1956 (a)(1)(A)-(B) and (a)(2)(A)-(B).

## B. The Government Pled the Requisite Elements to Support Count III.

Finally, Defendant argues that the Government's Complaint lacks "any factual allegations . . . that Lloyds TSB transported any funds from or to the U.S." to support Count III of the Complaint Title 18, U.S.C., Section 1965(a)(1)(2). D.Br. at 34. However, the statute proscribes not only the transport of funds, but also the "transmission" or "transfer" of funds. Title 18, U.S.C., Section 1965(a)(1)(2); see also United States v. Dinero Express, Inc., 313 F.3d 803, 807 (2d Cir. 2002) (holding that "a course of conduct that begins with a sum of money located in one country and ends with a related sum of money located in another may constitute a 'transfer' for purposes of Section 1956(a)(2)"); United States v. Piervinanzi, 23 F.3d 670, 678 & n. 6 (2d Cir. 1994) (holding that "transportation" includes wire transfers of funds). By definition, the monies stolen from U.S. investors could not have been laundered in foreign banks without having been transferred overseas, thus placing the conduct squarely within Section

33

1956(a)(1)(2). Accordingly, the Government has sufficiently alleged a violation of this portion

of the statute in Count III, and the defendant's motion to dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(6) should be summarily rejected.

In sum, the Government's Complaint amply provides what is required of the plaintiff

under the Federal Rules of Civil Procedure: "a short and plain statement of the claim showing

that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

## CONCLUSION

For these reasons, the Government respectfully requests that this Court DENY the

Defendant's Motion to Dismiss.

Dated:       New York, New York
             April 23, 2008

                        MICHAEL J. GARCIA
                        United States Attorney for the
                        Southern District of New York
                        Attorney for the United States of America

                   By: _____
                        RUA M. KELLY (MA-643351)
                        Assistant United States Attorney
                        One Saint Andrew's Plaza
                        New York, New York 10007
                        Telephone:  (212) 637-2471
                        Facsimile:  (212) 637-0421

34