# Exhibit 1

MONFRINI CRETTOL & ASSOCIÉS
Avocats au Barreau de Genève
3, PLACE DU MOLARD - 1204 GENÈVE

ENRICO MONFRINI
GILLES CRETTOL
JAMES BOUZAGLO
ISABELLE TERRIER-HAGMANN
YVES KLEIN
DIDIER OLIVER PRÉTÔT

Monsieur Valentin ROSCHACHER
Procureur Général de la Confédération
Ministère public fédéral
Taubenstrasse 16
3003 Berne

Genève, le 7 juillet 2004

**Plainte pénale contre Lykourgos KYPRIANOU, Roys POYIADJIS, Mannithottathil Cherian "M.C." MATHEWS, Roger André MEYER, Peter Nils GRUT, John Trevor BAINES & al. en relation avec AremisSoft Corp.**

Monsieur le Procureur Général,

M. Joseph P. LASALA, co-trustee, avec M. Fred S. ZEIDMAN, du AremisSoft Liquidating Trust (les "Trustees"), m'a donné procuration (Pièce n°1), notamment au nom des 6'028 demandeurs de l'action collective (*class action*) No. 01 CV 2486 (JAP) devant le Tribunal du District de New Jersey et au nom de la masse en faillite AremisSoft, qu'ils ont pouvoir de représenter (Pièce n°2, para. 4.3 (v), p. 11 et Pièce n°3, p. 2), aux fins de déposer plainte pénale avec élection de domicile en l'Etude.

Les 6'028 demandeurs à l'action collective précitée sont des personnes et sociétés qui, entre le 22 avril 1999 et le 27 juillet 2001, ont acheté des actions d'AremisSoft Corp. ("AremisSoft"), une société du Delaware cotée sur le NASDAQ qui prétendait être un fournisseur important de services informatiques sur les marchés émergents, mais qui n'était en réalité qu'un **décor de carton-pâte** destiné à tromper le public. Les tromperies astucieuses commises par les administrateurs d'AremisSoft et leurs complices ont directement causé à ces investisseurs un **préjudice d'au moins USD 565 millions** (plus de CHF 700 millions au cours de ce jour) (Pièce n°4).

AremisSoft était en effet une **société factice**, dont les activités, actifs ou revenus réels ne représentaient qu'une **proportion infime** de ceux allégués par son administration.

En conséquence de la tromperie du marché, AremisSoft a atteint au début de 2001 une valeur capitalisée de plus de **USD 1 milliard**. Quand AremisSoft a déposé son bilan le 15 mars 2002, cette valeur n'était plus que de **USD 26 millions**.

TÉLÉPHONE (+4122) 310 22 66 - TÉLÉFAX (+4122) 310 24 86 - mail@mcswisslaw.com

Les principaux administrateurs et actionnaires d'AremisSoft étaient deux hommes d'affaires chypriotes, Lykourgos KYPRIANOU ("KYPRIANOU") et Roys POYIADJIS ("POYIADJIS"), ainsi qu'un ingénieur indien, Mannithottathil Cherian "M.C." MATHEWS ("MATHEWS"). Ceux-ci ont mis en place une **organisation criminelle** ("l'Organisation Criminelle" ou "l'Organisation"), dont les activités ont principalement eu lieu aux Etats Unis, à Chypre, en Inde, en Grèce, au Royaume Uni, en Suisse, en Autriche, à Monaco et à l'Ile de Man.

Le **but de l'Organisation** était de constituer des sociétés largement factices, de les faire entrer en bourse, de faire enfler artificiellement le cours de leurs actions par des déclarations mensongères afin de vendre celles-ci *via* des sociétés écran, de piller les actifs sociaux et de blanchir le produit de ces crimes.

KYPRIANOU, POYIADJIS et MATHEWS sont désormais **fugitifs** de la justice américaine, où ils ont été formellement mis en accusation d'escroquerie, de blanchiment d'argent et de participation à une organisation criminelle (*conspiracy*).

Ils font en outre l'objet de **procédures civiles** aux Etats-Unis et à l'Ile de Man, initiées par les autorités américaines, notamment par la *Securities and Exchange Commission* ("SEC") et par les victimes de leurs agissements.

Une enquête pénale est en cours **à Chypre** concernant une société chypriote **LK Globalsoft.com** ayant été utilisée de la même manière criminelle par l'Organisation.

Le cas AremisSoft a été décrit comme **une des plus grandes escroqueries boursières de ce type** ("*pump and dump scheme*") dans l'histoire de la SEC. Approximativement **USD 230 millions** ont d'ores et déjà été bloqués à l'Ile de Man à la requête des autorités américaines. Le rapatriement de ces fonds en vue de confiscation représenterait le cas le plus **important de l'histoire des Etats-Unis.**

**La Suisse** était le centre de gravité du système mis en place pour recevoir le produit des crimes et les blanchir. Ainsi, des actions d'AremisSoft ont été vendues pour au moins **USD 350 millions** à partir de comptes ouverts auprès de banques suisses par des sociétés *offshore* dont les ayants droit économiques réels étaient les administrateurs d'AremisSoft membres de l'Organisation.

**Roger André MEYER** ("MEYER"), un citoyen suisse résidant à Genève, administrateur et actionnaire d'**Edifica SA**, à Préverenges, Vaud, est le membre de l'Organisation qui a ouvert et opéré lesdits comptes.

En juillet 2001, avec l'aide de **Peter Nils GRUT** ("GRUT") et de **John Trevor** BAINES ("BAINES"), MEYER a transféré les fonds hors de Suisse vers l'Ile de Man et Chypre afin d'empêcher leur blocage par les autorités suisses.

Les Trustees du AremisSoft Liquidating Trust, la masse en faillite d'AremisSoft et les 6'028 demandeurs à l'action collective précitée déposent par la présente une **plainte pénale**, avec **constitution de partie civile**, contre KYPRIANOU, POYIADJIS, MATHEWS, MEYER, GRUT, BAINES et d'autres membres de l'Organisation Criminelle dont la liste figure aux paragraphes 36 à 50 ci-dessous, ainsi que toute autre personne à déterminer, pour **escroquerie** (art. 146 CP), **faux renseignements sur des entreprises commerciales** (art. 152 CP), **gestion déloyale aggravée** (art. 158 CP), **exploitation de la connaissance de faits confidentiels** concernant une société étrangère (art. 161 al. 5 CP), **faux dans les titres** (art. 251 CP), participation et soutien à une **organisation criminelle** (art. 260$^{ter}$ CP), **blanchiment d'argent** aggravé (art. 305$^{bis}$ al. 2 CP) et violation de la **Loi fédérale sur le blanchiment d'argent**.

Au cours des dernières semaines, les Trustees du AremisSoft Liquidating Trust ont obtenu l'accès à des preuves essentielles au dépôt de la présente plainte pénale, un fait dont les membres de l'Organisation Criminelle ont connaissance. Il existe dès lors un **risque concret** que les preuves se trouvant en Suisse soient **détruites** et que les avoirs déposés en Suisses soient **transférés hors d'atteinte** des autorités de poursuite pénale.

Mes clients demandent dès lors que les **mesures** dont la liste figure au paragraphe 138 ci-dessous soient adoptées de toute **urgence**.

## TABLE DES MATIERES

I. EXPOSE DES FAITS PRINCIPAUX .......... 4
II. PROCEDURES EN COURS .......... 8
III. PIECES ANNEXEES .......... 10
IV. INDIVIDUS ET SOCIETES IMPLIQUES .......... 12
A. Principaux organes d'AremisSoft .......... 12
B. Les blanchisseurs professionnels .......... 14
C. Sociétés utilisées .......... 18
V. EXEMPLES DE TROMPERIE ASTUCIEUSE DES INVESTISSEURS .......... 24
A. Acquisition frauduleuse de filiales .......... 24
1. Acquisition de e-nnovations.com Pvt. Ltd .......... 25
2. Acquisition de E-ChaRM Pvt. Ltd .......... 25
3. Acquisition de Denon International Ltd .......... 26
4. Acquisition (annulée) de LK GlobalSoft.com .......... 26
B. Déclarations trompeuses concernant les contrats .......... 29
C. Tromperie sur les rapports annuels .......... 29
VI. ENCAISSEMENT ET BLANCHIMENT PAR MEYER .......... 30
A. Première étape: encaissement du produit de l'escroquerie .......... 30
B. Deuxième étape: blanchiment du produit de l'escroquerie .......... 34
VII. QUALIFICATION ET COMPETENCE .......... 34
VIII. CAPACITE D'ETRE PLAIGNANT ET PARTIE CIVILE .......... 40
IX. MESURES URGENTES REQUISES .......... 40

## I. EXPOSE DES FAITS PRINCIPAUX

1. **AremisSoft Corp.** est le résultat de la fusion par absorption, le 10 octobre 1997, de la société néerlandaise contrôlée par KYPRIANOU, **LK Global Information System BV**, avec **Juno Acquisitions Inc.**, une société constituée au Nevada le 16 novembre 1992 mais qui, bien que cotée sur le NASDAQ, n'avait jusqu'alors eu aucune activité opérationnelle. Le 7 novembre 1997, la raison sociale de Juno Acquisition Inc. a été changée en AremisSoft Corp. Le 1er juin 1998, AremisSoft a déplacé son siège social du Nevada vers l'Etat du Delaware.

2. Le 26 septembre 1997, KYPRIANOU est devenu le directeur général (*Chief Executive Officer*) de Juno Acquisitions Inc. Selon les documents déposés auprès de la SEC[1] immédiatement après la fusion, KYPRIANOU contrôlait 66,6% d'AremisSoft, soit 9'915'425 actions via sa holding **LK Global Holdings NV**, Antilles Néerlandaises[2]. En réalité il est vraisemblable qu'à cette époque KYPRIANOU contrôlait, directement ou indirectement, la totalité du capital d'AremisSoft.

3. En mai 1998, POYIADJIS a été nommé Vice-président du Conseil d'administration et directeur financier (*Chief Financial Officer*) d'AremisSoft, dont il a déclaré détenir 1 million d'actions (5,8%) via la société **Raleigh Nominees Ltd.**

4. Dans le premier rapport annuel déposé auprès de la SEC le 1er juillet 1998[3] sous la signature de KYPRIANOU, AremisSoft indique être le successeur économique de **LK Global Information System (Cyprus) Ltd** fondée à Chypre en 1978. Il y est prétendu qu'AremisSoft est une **société multinationale** ayant 520 employés à travers le monde, active dans le développement et la vente de logiciels à des entreprises de taille moyenne dans l'industrie, l'hôtellerie, la santé et la construction, présente dans 12 pays et disposant de filiales et bureaux au Royaume Uni, aux Etats Unis, en Irlande, en Inde, à Chypre, au Mexique et en Argentine (p. 36).

5. Le chiffre d'affaires 1997, provenant de licences de logiciels (40%), de contrats de maintenance et de services (45%) et de ventes de matériel (15 %) aurait été de **USD 42,4 millions**, en hausse de 23% par rapport à l'année précédente (p. 36).

---

[1] Voir pièce n°10.

[2] LK Global Holdings NV, dont KYPRIANOU disait être l'actionnaire unique, détenait 100% de LK Global Information System BV avant sa fusion avec Juno Acquisition Inc. Après la fusion, LK Global Information System BV est devenue la filiale de Juno Acquisition Inc. (AremisSoft).

[3] Voir pièce n°11.

6. Principalement grâce à des acquisitions, AremisSoft (ou ses prédécesseurs) aurait crû rapidement pendant les cinq années précédentes, le chiffre d'affaires en 1993 n'étant que de USD 2,67 millions (p. 24).

7. Comme on le verra (voir paragraphes 91 ss. ci-dessous), cette présentation était **essentiellement mensongère**. En particulier, ni le chiffre d'affaires, ni l'existence de 520 employés n'ont pu être vérifiés par la SEC, le FBI ou l'administration qui a succédé à KYPRIANOU, POYIADJIS et MATHEWS.

8. En avril 1999, KYPRIANOU, POYIADJIS et MATHEWS, qui étaient alors les principaux organes d'AremisSoft, et vraisemblablement ses réels actionnaires, ont donné les instructions de déposer auprès de la SEC un **prospectus[4] très largement mensonger**, en vue d'annoncer l'entrée en bourse d'AremisSoft. Le chiffre d'affaires 1998 était prétendument de USD 52,6 millions, en progression de 24 % par rapport à 1997. Comme dans le rapport annuel 1997, la société prétendait avoir 520 employés à travers le monde.

9. Selon ledit prospectus, avant l'entrée en bourse, 10'000'051 actions ordinaires d'AremisSoft avaient été émises et étaient détenues par 113 différents actionnaires, dont KYPRIANOU, via LK Global Holdings NV (4'693'630 actions, soit 46,9%) et POYIADJIS, via Temco Ltd (584'190 actions, soit 5,8%). En réalité, il est vraisemblable que l'Organisation Criminelle contrôlait la quasi-totalité du capital (voir paragraphes 98 ss. ci-dessous).

10. Le 22 avril 1999, AremisSoft a fait son Offre Publique Initiale ("IPO") sur le NASDAQ. Celle-ci portait sur la vente de 3,3 millions d'actions ordinaire d'AremisSoft et s'est achevée le 27 avril 1999. Sur la base du prospectus et des communiqués de presse mensongers, le public a acheté ces actions à USD 5,00 l'unité, permettant à AremisSoft de lever près de **USD 12,1 millions** nets.

11. Par la suite, KYPRIANOU, POYIADJIS et MATHEWS ont continué à fournir **des informations mensongères** sur les activités d'AremisSoft et sa situation financière, notamment en relation avec des acquisitions fictives de filiales dans des pays émergents et la signature de contrats dont la valeur réelle ne représentait qu'une petite fraction de la valeur alléguée (voir paragraphes 88 ss. ci-dessous).

12. Ainsi, selon le rapport annuel 2000 (voir pièce n°7, annexe 1), le chiffre d'affaires s'était élevé à USD 123,6 millions, en hausse de 68% par rapport à 1999. Or,

[4] Voir pièce n°12.

comme on le verra, **trois quarts** du revenu allégué en 2000 **n'ont pas pu être vérifiés** (voir paragraphes 91 ss. ci-dessous).

13. Les autorités américaines ont déterminé qu'après l'entrée en bourse, KYPRIANOU, POYIADJIS et MATHEWS ont profité du prix exagéré des actions d'AremisSoft, qu'ils avaient eux-mêmes provoqué, pour vendre, à travers des comptes de sociétés *offshore* ouverts auprès de banques suisses plus de **10 millions** d'actions au public pour un prix de près de **USD 350 millions** (voir paragraphes 101 ss. ci-dessous).

14. Ces chiffres sont probablement en deçà de la réalité, puisqu'au moment de la fuite de ses administrateurs, la société avait émis **un total de 39'192'422 actions**[5], dont trois quarts après l'entrée en bourse du 22 avril 1999, sous divers prétextes (voir pièce n°8, annexe 8).

15. Selon les documents déposés auprès de la SEC, AremisSoft a émis plus de 11 millions d'options[6], dont plus de 7 millions ont été ouvertement attribuées à KYPRIANOU et POYIADJIS ou à des sociétés qu'ils admettaient contrôler (**Sincock Holdings Corp.** et **Prime Growth Inc.** respectivement)[7]. Il est avéré[8] qu'ils contrôlaient, via l'Organisation Criminelle, une partie substantielle des autres options, vraisemblablement la quasi-totalité.

16. On notera que le prix de l'exercice de ces options était en général payé après que les actions eurent été livrées et vendues au public, de telle sorte que l'exercice de ces **options** était en réalité **financé par les victimes** de l'escroquerie.

17. Sur la base de l'examen du compte d'AremisSoft auprès de Commerce Bank, New Jersey, le produit de la vente d'actions et de l'exercice des options totalise au moins **USD 98'793'000.-**[9]. Ces fonds ont été subséquemment **pillés**, en partie par des acquisitions frauduleuses de sociétés mises en place et contrôlées par les administrateurs d'AremisSoft et acquises à des prix sans mesure avec leur valeur réelle (voir paragraphes 58 ss. ci-dessous).

18. MEYER et sa société Edifica SA, ainsi que ses complices locaux, ont organisé en Suisse **l'encaissement** et le **blanchiment** du produit de ces crimes, en y ouvrant

---

[5] Le 18 décembre 2000, AremisSoft a procédé à une distribution gratuite d'une action pour chaque action (*two-for one stock split*).
[6] 2'977'600 options selon le plan 1998, 6'001'100 options selon le plan 2000, 774'950 options hors plan 2000 et 1'777'900 options selon le plan 2001 (voir pièce n°8, annexe 7).
[7] Voir pièces n°13, p. 6 et n°7, annexe 1, p. 166.
[8] Voir paragraphe 104 ci-dessous.
[9] Voir pièce n°8, p. 5.

des comptes bancaires, en constituant des sociétés *offshore* ou des trusts destinés à en être les titulaires, en désignant mensongèrement des hommes de paille comme ayants droit économiques de ces comptes, et en déplaçant des fonds entre ces comptes. MEYER était également impliqué dans les crimes commis par l'Organisation, notamment en étant signataire pour des sociétés *offshore* vendant des actifs fictifs ou exagérés afin à la fois de tromper le public sur la marche des affaires d'AremisSoft et de piller les actifs de la société (voir paragraphe 46 ci-dessous).

19. La **vérité** a commencé à être dévoilée à la suite d'un article paru le 17 mai 2001 en première page de la section affaires du New York Times, mentionnant qu'un contrat avec les autorités de Bulgarie, que les administrateurs d'AremisSoft avaient présenté comme ayant une valeur de USD 37,5 millions, était en réalité évalué par les autorités bulgares et la Banque Mondiale à moins de USD 4 millions (voir pièce n°7, annexe n°67). AremisSoft a agi judiciairement contre les périodiques (TheStreet.Com) et les analystes financiers (Apex Capital llc, Wells Fargo et Rocker Partner) qui avaient révélé ces faits, puis a retiré sa demande.

20. Le 17 mai 2001, la cotation des actions d'AremisSoft a été suspendue pour la journée. Le 23 mai 2001, une **enquête** a été formellement ouverte par la SEC.

21. Les employés d'AremisSoft aux Etats-Unis ont alors soudainement **perdu contact** avec plusieurs de leurs bureaux à l'étranger et la plupart des documents se trouvant dans lesdits bureaux d'AremisSoft ont été détruits[10].

22. Le 30 août 2001, AremisSoft, qui était incapable de déposer son 2ème rapport trimestriel, a cessé d'être cotée sur le NASDAQ.

23. Au cours de l'enquête interne initiée par la nouvelle administration d'AremisSoft, ainsi que de celles opérées par la SEC et le FBI, la plupart des actifs, activités et revenus allégués par AremisSoft se sont avérés être **inexistants**[11] (voir paragraphes 91 ss. ci-dessous).

---

[10] Quand des réviseurs de Deloitte & Touche, qui avaient été engagés par la nouvelle administration d'AremisSoft après le 31 juillet 2001, ont tenté de récupérer les documents comptables de la société, ils ont découvert que les bureaux d'AremisSoft à Chypre et en Inde avaient été nettoyés. En fait, les seuls documents comptables qui ont pu être obtenus ont été trouvés déchirés dans une pile d'ordures devant les bureaux d'AremisSoft en Inde (voir pièce n°7, para. 43).

[11] A l'exception peut-être des filiales du groupe Eltrax acquises le 19 décembre 2000 pour USD 10 millions comptants et des participations dans Fourth Shift Corp. acquises le 30 avril 2001 pour plus de USD 40 millions comptants. Il existe toutefois des soupçons que le prix payé pour ces actifs ait été trop élevé.

24. **Une procédure pénale** a été initiée par le Procureur US pour le District Sud de New York contre KYPRIANOU, POYIADJIS et MATHEWS[12] qui, dans l'intervalle avaient déplacé leurs avoirs hors de Suisse et sont depuis lors devenus des fugitifs.

25. AremisSoft a **déposé son bilan** le 15 mars 2002.

26. A leur plus haut, le 12 décembre 2000, les actions d'AremisSoft s'échangeaient pour près de USD 48,75 par action. Après que la réelle nature des affaires et des conditions financières d'AremisSoft eût été révélée, le prix des actions s'est **effondré** à moins de USD 0,67 par action.

27. On a vu que la valeur capitalisée d'AremisSoft, qui avait atteint **USD 1 milliard** au début de 2001, n'était plus que de **USD 26 millions** le 15 mars 2002, jour du dépôt de bilan.

28. Au-delà des chiffres, les **tragédies personnelles** des petits investisseurs qui avaient fait confiance à la direction d'AremisSoft et avaient placé une part substantielle de leurs épargnes dans des actions qui sont devenues virtuellement sans valeur, doivent rester à l'esprit de toutes les autorités concernées par la poursuite pénale des membres de l'Organisation Criminelle et la recherche de leurs avoirs.

29. Il est essentiel qu'une **enquête pénale de grande envergure** soit initiée, y compris au moyen d'une **alerte bancaire générale**, afin de faire la lumière sur des crimes qui ont gravement violé l'ordre public suisse et d'identifier, bloquer et confisquer leur produit se trouvant en Suisse. A cet égard, la destination d'au moins **USD 175 millions** des fonds blanchis en Suisse n'a pas pu être déterminée. Il est vraisemblable que ceux-ci sont à nouveau en Suisse, sous le contrôle de membres de l'Organisation qui ont pu se croire à l'abri de poursuites pénales.

## II. PROCEDURES EN COURS

30. A ce jour, les procédures suivantes sont en cours:

**A. Procédure pénale** n°1:01-cr-01177-LTS-ALL devant le Tribunal des Etats-Unis pour le District Sud de New York pour violation de la Loi sur les bourses (*Securities Exchange Act of 1934*). Dans le contexte de cette procédure, initiée le

[12] Au début seulement contre POYIADJIS (voir paragraphe 30 C. ci-dessous).

19 décembre 2001 par le Procureur des Etats-Unis pour le District Sud de New York ("Procureur US"), seul POYIADJIS a en premier lieu été **accusé du chef d'escroquerie boursière**. Le 11 février 2002, la Cour a rendu, à l'appui de la procédure pénale **une ordonnance de blocage et de rapatriement** contre POYIADJIS concernant ses avoirs identifiés à l'Ile de Man. Le 24 juin 2002, **14 chefs d'accusation** remplaçant ceux du 19 décembre 2001 ont été prononcés contre POYIADJIS, KYPRIANOU et MATHEWS, notamment d'**escroquerie boursière**, de **délit d'initié**, de **blanchiment d'argent** et de **participation à une organisation criminelle** (*conspiracy*) (Pièce n°5)[13]. POYIADJIS, KYPRIANOU et MATHEWS, qui ont refusé de se présenter devant les autorités américaines, sont considérés comme des fugitifs et des mandats d'arrêt internationaux ont été décernés à leur encontre.

**B. Procédure civile** 1:01-CV-08903-CSH SEC vs. AremisSoft Corp. & al. devant le Tribunal des Etats-Unis pour le District Sud de New York. Cette procédure a été initiée le 4 octobre 2001 par la SEC pour violation du droit fédéral sur les valeurs mobilières. Dans ce cadre, AremisSoft, KYPRIANOU et POYIADJIS ont, le 19 octobre 2001, reçu **l'interdiction** de commettre de nouvelles infractions et reçu l'ordre de **rapatrier** tous les produits de la vente frauduleuse des actions AremisSoft.

**C. Des procédures civiles collectives** (*class actions*) ont été commencées en mai 2001 par des actionnaires victimes de l'escroquerie boursière (Pièce n°6 pour un exemple). Selon une ordonnance du 27 août 2001, le Juge du Tribunal des Etats-Unis pour le District du New Jersey, Joel A. PISANO, a ordonné la jonction des différentes *class actions* sous la référence *In re AremisSoft Corporation Securities Litigation No 01CV2486 (JAP).*

**D. Procédure de faillite** 02-32621-RG re AremisSoft Corporation devant la Chambre des Faillites du Tribunal des Etats-Unis pour le District du New Jersey. Le 15 mars 2002, AremisSoft a déposé une demande de protection selon le Chapitre 11 du Code de la faillite (*US Bankruptcy Code*). Un accord judiciaire entériné par le juge de la faillite est intervenu entre les parties, y compris les demandeurs à la *class action*, la SEC et d'autres créanciers, qui, entre autres, institue un trust de liquidation –**AremisSoft Liquidating Trust** – et charge les trustees dudit trust ("les Trustees") de **recouvrer tous avoirs où qu'ils se trouvent dans le monde afin d'indemniser les victimes de l'escroquerie** AremisSoft. En

[13] Je vous renvoie respectueusement en particulier aux paragraphes 5 et 6 des chefs d'accusation, qui résument de manière adéquate l'ensemble du contenu de ce document.

octobre 2002, les Trustees ont initié une procédure civile devant la Haute Cour de Justice de l'Ile de Man, Division de Chancellerie (*Chancery Division*), contre POYIADJIS, KYPRIANOU & al. et ont obtenu une **ordonnance de blocage de tous avoirs se trouvant à l'Ile de Man jusqu'à une valeur de USD 447 millions.**

**E. Procédures de confiscation** commencées par le Procureur US aux Etats-Unis et à l'Ile de Man. Les autorités américaines ont déterminé que POYIADJIS et d'autres membres de l'Organisation Criminelle, au moins en partie afin d'éviter la saisie de ces fonds en Suisse, avaient, en juillet 2001, déplacé USD 175 millions qui étaient le produit de la vente des actions d'AremisSoft vers quatre comptes bancaires à l'Ile de Man. A la demande du Procureur US, le 2 octobre 2001, le Procureur général de l'Ile de Man a obtenu de la Haute Cour de Justice de l'Ile de Man, Division du droit commun (*Common Law Division*), une **ordonnance de blocage** interdisant le déplacement de tous avoirs dans l'Ile de Man dont POYIADJIS et/ou KYPRIANOU seraient les ayants droit économiques. En outre, USD 5 millions liés aux ventes frauduleuses d'actions ont été bloqués à Guernesey sur un compte ouvert au nom de **Alcon Opportunity Fund, Inc.** Le 31 juillet 2002, Thomas P. GRIESA, Juge au Tribunal des Etats-Unis pour le District Sud de New York, a rendu un jugement par défaut, devenu définitif, confisquant les avoirs contenus dans les quatre comptes précités de l'Ile de Man. A ce jour, USD 230 millions sont bloqués à l'Ile de Man. Le **22 avril 2004,** les Trustees ont été admis comme parties à la procédure se déroulant devant la Haute Cour de Justice de l'Ile de Man, Division du droit commun. Ils ont commencé à recevoir copie des documents déposés par les autres parties dans la procédure, mais ont l'interdiction, selon le droit de l'Ile de Man, de les utiliser dans d'autres procédures sans autorisation préalable.

**F. Procédures d'entraide :** des procédures d'entraide en matière pénale et civile ont été initiées par le Département de la justice des Etats-Unis à la demande du Procureur US auprès de diverses juridictions, notamment la Suisse, Chypre et l'Ile de Man.

## III. <u>PIECES ANNEXEES</u>

31. Les documents relatifs aux agissements de l'Organisation Criminelle représentent plusieurs centaines de classeurs fédéraux.

32. Dans un premier temps, les plaignants ont décidé de ne déposer que les documents essentiels à la compréhension et à la preuve des méthodes de ladite Organisation, dont tous n'ont pas encore été traduits en français.

33. Dans un deuxième temps, les plaignants et le soussigné verseront à la procédure, spontanément ou sur demande, d'autres documents pertinents afin d'assister les autorités suisses de poursuite pénale dans leur enquête.

34. Les pièces produites à l'appui de la présente plainte pénale sont dès lors les suivantes (voir également bordereau joint en annexe):

- Pièces n°1 à 4: documents relatifs aux pouvoirs de l'avocat soussigné et à l'identité des plaignants.

- Pièce n°5: acte d'accusation du 24 juin 2002 contre POYIADJIS, KYPRIANOU et MATHEWS.

- Pièce n°6: demande collective du 24 mai 2001 (01-CV-2486).

- Pièce n°7: traduction et copie du troisième de la déclaration sous serment (*affidavit*) daté du 28 août 2003 de l'Agente Spéciale du FBI Courtney B. WILSON devant la Haute Cour de l'Ile of Man, ainsi que les annexes à celui-ci que les plaignants sont autorisés à utiliser.

- Pièces n°8 et 9: documents fournis par la SEC au mois de juin 2004: document intitulé Comptabilité d'AremisSoft Corporation (*Accounting of AremisSoft Corporation*) déposé par AremisSoft auprès du Tribunal des Etats-Unis pour le District Sud de New York le 17 octobre 2001 et ses annexes (Pièce n°8); Journal Principal des Opérations (*Master Transaction Journal*) établi par l'agent de transfert d'AremisSoft, Olde Monmouth Stock Transfer Co. Inc. (Pièce n°9).

- Pièces n°10 à 13: documents déposés auprès de la SEC par AremisSoft[14] : Déclaration générale d'acquisition de propriété SC 13D déposée auprès de la SEC le 31 octobre 1997 (Pièce n°10); Rapport annuel 1997 10-K405 déposé auprès de la SEC le 1er juillet 1998 (Pièce n°11); Prospectus d'entrée en bourse déposé auprès de la SEC le 23 avril 1999 (Pièce n°12); Déclaration générale d'acquisition de propriété SC 13D déposée auprès de la SEC le 21 novembre 2000 (Pièce n°13).

---

[14] Ces rapports sont publics et peuvent être consultés sur le site de la SEC : www.sec.gov.

- Pièce n°14: correspondance entre BARTEL et Edifica SA
- Pièce n°15 à 16: articles de presse (Pièce n°15) et analyses financières (Pièce n°16).
- Pièces n°17 à 24: documents relatifs aux personnes et sociétés visées par la présente plainte pénale.

## IV. INDIVIDUS ET SOCIETES IMPLIQUES

35. La présente section décrit et énumère les personnes participant à l'Organisation Criminelle ou lui ayant apporté leur soutien, contre qui la présente plainte pénale est dirigée, ainsi que les sociétés qu'ils ont utilisées pour commettre leurs crimes.

### A. Principaux organes d'AremisSoft

36. KYPRIANOU, POYIADJIS et MATHEWS se sont associés afin de donner une apparence de respectabilité, de profitabilité et de croissance à AremisSoft, alors que cette société n'était en réalité qu'un **décor de carton-pâte** destiné à tromper le public et à commettre une escroquerie boursière, dont ils ont profité à hauteur de plusieurs centaines de millions de dollars.

37. En outre, KYPRIANOU, POYIADJIS et MATHEWS étaient également au centre des acquisitions de sociétés factices et d'autres transactions frauduleuses destinées à **piller les liquidités** d'AremisSoft, qui provenaient principalement des quelque **USD 100 millions** du produit des émissions d'actions et d'exercice des options sur actions.

38. Pour le détail du comportement de KYPRIANOU, POYIADJIS et MATHEWS, je vous renvoie respectueusement à l'acte d'accusation du 24 juin 2002 (voir pièce n°5).

39. **Lycourgos K. KYPRIANOU,** né en 1945 ou 1946, de Chypre, résidant au 123 Strovolos Avenue, Strovolos, Chypre. Titulaire d'un doctorat en informatique, il aurait mis en place les sociétés LK Global System (qui sont ensuite devenues les sociétés AremisSoft) depuis 1978[15]. Il a fonctionné comme Président du Conseil

[15] Pièce n°12, <PAGE> 54.

d'administration et Directeur général (*Chief Executive Officer*) jusqu'au 31 juillet 2001, lorsqu'il a précipitamment démissionné[16].

40. **Roys Spyros POYIADJIS**, né le 14 août 1965, de Chypre et du Royaume Uni (Pièce n°17), résidant à Long Beach Group, Kantaras Street, Enalos Villas, Chypre. Banquier d'affaires de profession, il s'est associé avec KYPRIANOU dès 1997 au moins, alors qu'il était alors associé dans **Alpha Capital Ltd**[17] (après un bref passage auprès de la banque new-yorkaise Lehman Brothers). De mai 1998 au 26 septembre 2001, il a assumé les fonctions de Vice-président du Conseil d'administration et de directeur financier (*Chief Financial Officer*), ainsi que de Vice-directeur général (*Co-Chief Executive Officer*) d'AremisSoft. Il a précipitamment démissionné de ses fonctions le 26 septembre 2001, citant des "raisons personnelles"[18].

41. **Mannithottathil Cherian "M.C." MATHEWS**, né le 4 avril 1964, d'Inde (Pièce n°18), résidant B-1, 1st Floor, Charter House, 36(3) Lavelle Road, 56001 Bangalore, Inde. Programmeur informatique, il était présenté comme le Directeur des projets de groupe, puis administrateur délégué pour l'ingénierie logicielle de LK Global Software Engineering (India) Private Ltd[19], entre 1992 et 1999[20]. Il est devenu membre du Conseil d'administration d'AremisSoft après l'entrée en bourse du 22 avril 1999[21]. Il a démissionné de ses fonctions le 31 juillet 2001, citant des motifs personnels et de santé.

42. **Scott E. BARTEL**, né le 7 avril 1957, des Etats-Unis, résidant 3396 Beatty Drive El Dorado Hills California, Etats-Unis d'Amérique. Associé de l'Etude d'avocats californienne Bartel, Eng, Linn, & Schroeder, ses services ont été retenus en août 1997 par LK Global Information Systems BV, prédécesseur néerlandais d'AremisSoft. BARTEL a préparé les acquisitions frauduleuses d'AremisSoft, les documents déposés auprès de la SEC, fait des présentations au Conseil d'administration, préparé différents rapports et autres communications diffusées par AremisSoft. Il n'a pas seulement agi comme avocat de la société, mais en était un organe *de facto*. Il détenait en outre des fonds pour la société, ayant mis à disposition le compte de son Etude pour y recevoir le produit de ventes d'actions d'AremisSoft. Il a également organisé l'exercice des options sur actions de

[16] Pièce n°7, annexe 6, p. 4.
[17] Pièce n°12, <PAGE> 54.
[18] Pièce n°7, annexe 6, p. 5.
[19] Cette société est ensuite devenue AremisSoft India Pvt. Ltd.
[20] Pièce n°12, <PAGE> 54.
[21] Pièce n°12, <PAGE> 54.

KYPRIANOU, POYIADJIS et MATHEWS à travers des entités *offshore* disposant de comptes bancaires en Suisse, en donnant les instructions nécessaires à l'agent de transfert d'AremisSoft, Olde Monmouth Stock Transfer Co. Inc., sur les instructions de POYIADJIS. Il agissait également comme conseiller privé pour KYPRIANOU, POYIADJIS et MATHEWS, étant par exemple le *protector* d'Atlas Trust et de Trident Trust pour POYIADJIS. Une transaction judiciaire a été conclue entre lui et les Trustees le 11 décembre 2003. Il est toutefois soupçonné de détenir des avoirs en Suisse pour son compte ou celui de KYPRIANOU, POYIADJIS et MATHEWS.

43. **Paul BLOOM**, des Etats-Unis. De décembre 1998 à mai 2000, il était l'analyste d'AremisSoft pour le compte de Roth Capital Partners, Inc. En mai 2000, BLOOM a été engagé par AremisSoft afin de superviser ses acquisitions aux Etats-Unis, avec le rang de Vice Président. En février 2001, AremisSoft a annoncé qu'elle acquérait Fourth Shift Corp., une compagnie peu active suivie par BLOOM lorsqu'il était analyste auprès de Roth Capital Partners. BLOOM est soupçonné d'avoir détenu des actions dans Fourth Shift Corp., une société stagnante qu'AremisSoft a acquis pour plus de USD 40 millions comptant (voir pièce n°16, p. 2). Indépendamment de ce qui précède, les analyses favorables de BLOOM ont permis, alors qu'il se trouvait auprès de Roth Capital, de soutenir artificiellement la valeur des actions d'AremisSoft. En tant qu'organe d'AremisSoft, BLOOM a insisté pour maintenir contre l'évidence la réalité des acquisitions frauduleuses et des contrats dont la valeur était exagérée.

44. D'autres organes d'AremisSoft, contre lesquels des actions ont été initiées puis retirées à la suite d'une transaction, comprennent Michael A. TYMVIOS, Dann V. ANGELOFF, H. Tate HOLT, Stan J. PATEY, George/Georgios PAPADOPOULOS, John/Ioannis MAMALAS, Noel R. VOICE, George H. ELLIS et Theodore/Theodoros S. FESSAS, ainsi que l'organe de révision du groupe AremisSoft, PKF (auparavant Pannel Kerr Forster), ne sont *a priori* pas visés par la présente plainte pénale.

### B.    Les blanchisseurs professionnels

45. Un groupe de personnes, principalement suisses, de l'Ile de Man, de Chypre et d'Autriche, ont été des instruments utilisés hors des Etats-Unis par KYPRIANOU, POYIADJIS et MATHEWS pour commettre leurs crimes, en encaisser le produit et le blanchir.

46. Le membre clé de l'Organisation Criminelle dans ce contexte est **Roger André MEYER**, un citoyen suisse né le 28 avril 1962, résidant 27, Square Clair-Matin, 1213 Petit-Lancy (Pièce n°19). De novembre 1997 à novembre 1999, il a travaillé comme employé d'**Atlas Management SA**, à Genève. En 2000, il est devenu complètement indépendant dans sa propre société financière, **Edifica SA**, Préverenges, en association avec **Bernard TAVEL** (voir pièce n°21). MEYER a utilisé ses contacts dans le monde bancaire pour ouvrir des comptes pour l'Organisation auprès de banques suisses (Bordier & Cie, Genève; Dominick Company AG, Zurich; Hentsch Henchoz & Cie, Lausanne; UBS SA, Genève; ainsi que d'autres établissements non encore identifiés), principalement au nom de sociétés *offshore* qu'il a constituées lui-même pour les membres de l'Organisation[22]. Dans la formule A de plusieurs de ces comptes, il a désigné des hommes de paille tels que lui-même, Georgios KARADIMAS, Spyros POYIADJIS (le père de Roys POYIADJIS) et Richard ROBBINS comme faux ayants droit économiques. Avec BARTEL, BAINES et GRUT, il était à l'origine de l'idée de mettre en place les trusts Atlas Trust et Trident Trust comme instruments destinés à cacher la propriété de POYIADJIS sur les actions d'AremisSoft vendues au public à travers des banques suisses. Il a également participé à la mise en place d'au moins une des acquisitions frauduleuses de sociétés factices. Il a enfin aussi joué un rôle important dans les affaires courantes d'AremisSoft, étant par exemple la personne de contact concernant le compte en banque de la filiale d'AremisSoft en Suisse, AremisSoft Hospitality (Schweiz) GmbH auprès de Credit Suisse, Zurich (voir pièce n°8, annexe 2, pp. 1 et 2). Il était vraisemblablement également l'introducteur d'AremisSoft (E.E. M.E. A.) Ltd auprès de Lloyds Bank, Genève, (voir pièce n°8, annexe 2, p. 3).

47. **John Trevor Roche BAINES**, né le 19 décembre 1939, du Royaume Uni, résidant Africa House, Woodbourne Road, Douglas, Ile de Man. Ce financier très fortuné basé à l'Ile de Man est l'un des *trustees* d'Atlas Trust et de Trident Trust. Il a également servi comme administrateur de sociétés *offshore* et signataire de comptes en Suisse contrôlés par l'Organisation Criminelle. En juillet 2001, quand les membres de l'Organisation ont craint que les autorités suisses ne saisissent leurs avoirs, BAINES a organisé le transfert des fonds hors de Suisse vers deux comptes en banque de l'Ile de Man. A cette occasion, il a permis le transfert de plus de USD 45 millions par le compte de sa société Baines International Ltd auprès de l'Isle of Man Bank, Douglas.

[22] Pièce n°7, para. 48.

48. **Nils Peter GRUT**, né le 10 septembre 1938, de Suède, résidant 31, avenue Princesse Grace, MC 98000 Monaco. GRUT a agi à la fois en tant que trustee d'Atlas Trust et de Trident Trust et comme directeur des sociétés *offshore* et signataire des comptes bancaires contrôlés par l'Organisation Criminelle.

49. Les personnes suivantes ont en outre servi comme hommes de pailles et/ou signataires sur les comptes bancaires suisses au nom de sociétés *offshore* (voir paragraphe 51 ci-dessous), qui ont encaissé, puis blanchi le produit des crimes de l'Organisation:

- Wendy BAINES. Epouse de John Trevor Roche BAINES. Jouissait de la signature sur certains des comptes en Suisse de l'Organisation[23].

- Georgios KARADIMAS, de Grèce. Partenaire d'affaires de Roys POYIADJIS, il a accepté d'agir comme homme de paille, étant désigné comme faux ayant droit économique des comptes de Quantum Group Management, Ltd auprès de Bordier & Cie, Genève, et Dominick & Co AG, Zurich[24]. Il était également l'administrateur de Alcon Opportunity Fund Inc., dont un compte à Guernsey, contenant approximativement USD 5 millions de produit de vente d'actions d'AmerisSoft a été saisi. Il était également l'administrateur et/ou la personne de contact pour Fenwick Assets Ltd et Twenty First Fund Ltd, utilisés pour détenir et vendre des actions d'AremisSoft.

- Nonni KYPRIANOU, de et à Chypre. Epouse de KYPRIANOU, pour qui elle est soupçonnée de détenir des biens provenant de ses crimes.

- Marcos MARCOU, de et en Grèce. Il était notamment la personne de contact pour Fenwick Assets Ltd (Pièce n°20)[25].

- Donna POYIADJIS, des Etats-Unis, à Chypre. Epouse de Roys POYIADJIS, pour qui elle est soupçonnée de détenir des biens provenant des crimes de l'Organisation.

- Spyros Savva POYIADJIS, de et à Chypre. Père de Roys POYIADJIS, il a signé comme *settlor* la constitution de Trident Trust, (anti)datée du 29 décembre 2000.

[23] Voir pièce n°7, para. 48.
[24] Voir pièce n°7, para 80.
[25] Voir notes manuscrites sur l'envoi par BARTEL de la demande d'enregistrement "Piggyback" à Fenwick Assets Ltd.

- Micheline RAPIN, de Suisse, à Tannay. Fondée de procuration pour Edifica SA (voir pièce n°21).

- Richard Simon ROBBINS, de et en Grande Bretagne. A accepté d'agir comme homme de paille, étant désigné comme faux ayant droit économique du compte de Drax Trading Ltd auprès de Bordier & Cie, Genève[26]. Personne de contact pour First View Ltd[27].

- Bernard TAVEL, de Suisse, à Yverdon. Associé de MEYER et administrateur d'Edifica SA. Jouissait de la signature sur des comptes en Suisse[28]. A signé le contrat frauduleux de vente d'actions de LK Globalsoft.com à AremisSoft au nom de Global Capital Management Ltd[29].

50. Les personnes suivantes ont servi comme administrateurs, signataires ou personne de contact des sociétés qui ont signé des contrats frauduleux avec AremisSoft (voir paragraphes 63, 67, 73, 82 et 89 ci-dessous):

- Maria Aurora CARCIA-PAYR, de et en Autriche.

- Michael POEHN, de et en Autriche.

- Alexander PAYR (ou POYR), de et en Autriche.

- Sergei POTACHEV, de et en Autriche.

- Kurt SEDLMAYER (ou SEDELMAYER), de et en Autriche.

- Michael SWOBODA (ou SWOVODA), de et en Autriche.

- Rouman ANTONOV, de et en Bulgarie.

- Manfred UNGER, de et en Autriche.

- Johannes ZEHETHOFER (ou ZEHETHUFER), de et en Autriche.

---

[26] Voir pièce n°7, para 81.
[27] Voir pièce n°8, annexe 6 (lettre du 10 janvier 2001).
[28] Voir pièce n°7, para 48.
[29] Voir pièce n°7, annexe n°103. Voir paragraphe 82 ci-dessous.

## C. Sociétés utilisées

51. Les sociétés *offshore* suivantes ont été utilisées pour détenir des actions d'AremisSoft, et encaisser, puis blanchir les produits des crimes de l'Organisation (voir pièces n°7 et 9):

- Alcon Opportunity Fund Inc.[30], Iles Vierges Britanniques (Directeur: Georgios KARADIMAS)
- Alfa Capital Ltd. (Associé: POYIADJIS[31])
- Atlas Asset Management Ltd[32]
- Aremis Holdings Ltd[33], Iles Vierges Britanniques (Administrateur: KYPRIANOU)
- Aremis Technology Ventures Limited[34], Iles Vierges Britanniques (Administrateur: KYPRIANOU)
- Argossy Ltd[35]
- Atlas Trust[36], Ile de Man (Trustees: BAINES, GRUT et MEYER)
- Baines International Limited[37], Ile de Man (Administrateur: BAINES)
- Bayford Shipping Corporation[38]
- Cronos Capital[39]
- Denmore Investments Ltd[40][41], Iles Vierges Britanniques.
- Drax Trading Ltd[42], Iles Vierges Britanniques (Administrateur: BAINES)

---

[30] Voir pièce n°7, para. 80.
[31] Voir pièce n°7, annexe 10, p. 65.
[32] Voir pièce n°9, pp. 1 ss.
[33] Voir pièce n°7, annexe 6, p. 6.
[34] Voir pièce n°7, annexe 6, p. 6.
[35] Voir pièce n°7, para. 53, 85, 93
[36] Voir pièce n°7, para. 80.
[37] Voir pièce n°7, para. 86.
[38] Voir pièce n°9, pp. 20 ss.
[39] Voir pièce n°7, para. 90.
[40] Voir pièce n°9, pp. 14 ss.
[41] Voir pièce n°8, annexe 8, p. 5.
[42] Voir pièce n°9, pp. 1 ss et pièce n°7, para. 50, 61, 78, 80 and 81.

- Edifica SA, Préverenges (Administrateurs: MEYER, Président; Bernard TAVEL, Secrétaire) (Pièce n°21)
- Egmont International Associates Inc[43]
- Emerging Markets Capital Ltd[44], Isle de Man
- Emerson Capital Management Ltd[45]
- Fenwick Assets Ltd[46] (Personne de contact: Marcos MARCOU)
- First View Ltd[47], Ile de Man (Directeur: Richard ROBBINS)
- Groupe Nova S.A., Iles Vierges Britanniques
- Harglen Financial Ltd[48], Iles Vierges Britanniques (Administrateur: Manfred UNGER; représentant: Simon C. GROOM)
- Info-quest SA[49], Grèce.
- Inlay Group Ltd[50], Iles Vierges Britanniques
- Isola Investment Services Ltd[51]
- Jason S.A.M[52]., Monaco
- Libra Financière SA, Lausanne (Pièce n°22)
- L.K. Global Holdings N.V.[53], Antilles néerlandaises (Administrateur: KYPRIANOU)
- Lomond Finance Inc[54], Iles Vierges Britanniques

[43] Voir pièce n°7.
[44] Voir pièce n°7, para. 50. Voir aussi paragraphe 82 ci-dessous.
[45] Voir pièce n°9, pp. 36 ss.
[46] Voir pièce n°9, pp. 1 ss.
[47] Voir pièce n°8, annexe 6 et pièce n°9, p. 2.
[48] Voir pièce n°9, pp. 1 ss.
[49] Voir pièce n°9, pp. 1 ss.
[50] Voir pièce n°7, para. 50, et pièce 9, pp. 58 ss.
[51] Voir pièce n°9, pp. 15 ss.
[52] Voir pièce n°7, annexe 47
[53] Voir paragraphe 4 ci-dessus.
[54] Voir pièce n°9, pp. 58 ss.

- Olympus Capital Investments Inc.[55] Iles Vierges Britanniques (Administrateur: BAINES).
- Onyx Capital, Inc.[56], Iles Vierges Britanniques (Administrateur: Egmont International Associates Inc.)
- Oracle Capital Inc[57], Iles Vierges Britanniques (Administrateurs: MEYERGRUT et BAINES)
- Petrolcom SA[58]
- Prime Growth Inc.[59], Iles Vierges Britanniques (POYIADJIS)
- Quantum Group Management, Ltd[60], Panama
- Raleigh Nominees Ltd[61]
- Sincock Holdings Corporation[62], Iles Vierges Britanniques (directeur: Tasso PATSALIDES)
- Southwood Management Ltd[63], Chypre.
- Temco Ltd[64]
- Trident Trust[65], Ile de Man (Trustees: BAINES, GRUT et MEYER)
- Twenty First Fund Ltd[66] (Directeur: Georgios KARADIMAS)
- Valerian Communications Ltd[67]
- Valinor Management Ltd[68]

---

[55] Voir pièce n°7, annexe 50. Voir pièce n°9, pp. 87 ss.
[56] Voir pièce n°7, para. 50, 54, 55, 58, 59, 61, 62, 65, 67 - 69, 74 et 78.
[57] Voir pièce n°7, para. 50, 52, 53, 59, 61, 62, 68, 72, 73, 78, 82, 86 - 89 et 97.
[58] Voir pièce n°9, pp. 15 ss.
[59] Voir pièce n°7, annexe 1, p. 166.
[60] Voir pièce n°7, annexes 75 et 76.
[61] Voir pièce n°9, p. 47.
[62] Voir pièce n°7, annexe 1, p. 153 ss.
[63] Voir pièce 9, pp. 3 ss.
[64] Voir pièce n°12, <PAGE>. 60, et pièce 9, pp. 4 ss.
[65] Voir pièce n°7, para. 47, 53, 68, 73, 75, 85 and 93.
[66] Voir pièce 9, pp. 1 ss.
[67] Voir pièce 9, pp. 1 ss.
[68] Voir pièce 9, pp. 15 ss.

- Westminster International Securities Ltd, Iles Vierges Britanniques (Personne de contact: Maria Aurora CARCIA-PAYR)

52. Les sociétés *offshore* suivantes ont été utilisées pour vendre de manière frauduleuse des actifs surévalués à AremisSoft (voir paragraphes 58 ss. ci-dessous):

- Barrington Assets Management Ltd[69], Iles Vierges Britanniques; adresse de contact: Riemergasse 10/8 A - 1010 Vienne; administrateur: Kurt SEDLMAYER.

- Capital Growth Overseas Partners Inc.[70], Iles Vierges Britanniques ; adresse de contact: Le Coronado, 20, avenue de Fontvieille, MC - 98000 Monaco; persone de contact: Alexander PAYR.

- Global Capital Management Ltd, St Vincent et Grenadines; administrateur: Bernard TAVEL[71].

- Jupiter Venture Capital Ltd[72], St Vincent et Grenadines; adresse de contact: Africa House, Woodbourne Road, Douglas, Isle of Man; administrateur: BAINES.

- Momentum Equities Inc.[73], Iles Vierges Britanniques; adresse de contact: Philippines, 4F2 Parkville Condominium, Dao Corner, Guijo Street, San Antonio Village, Mukati City, Metro Manilla; administrateur: Johannes ZEHETHUFER.

- Morgan Capital Partners Ltd, Iles Vierges Britanniques; adresse de contact: Boschstrassse 55/18 A - 1190 Vienna; administrateur: Erich SPAHN.

- Palatine Asset Management Ltd (ou Palantine Asset Management Ltd), Iles Vierges Britanniques; adresse de contact: Philippines, 315 Hawaii Street, Green Park Village, Pasig City; administrateur: Sergei POTACHEV.

- Spahn & Partner Finanz Consult GmbH, Parkring 10/1/3/10, 1010 Vienne, Autriche. Administrateurs: Kurt SEDLMAYER; Erich SPAHN; Sergei POTACHEV.

---

[69] Voir pièce n°7, annexe 20.
[70] Voir pièce n°7, annexe 103.
[71] Associé de MEYER et administrateur d'Edifica SA
[72] Voir pièce n°7, annexe 105.
[73] Voir pièce n°7, annexe 105.

- Still & Life GmbH, Austria, Bauernmarkt 24/36, 1010 Vienne, Autriche; directeur général: Michael POEHN.

53. Les sociétés suivantes prétendaient mensongèrement être les représentants de vente d'AremisSoft ou ont signé des contrats frauduleux avec elle (voir paragraphes 92 ss. ci-dessous):

- Agra Prime Production Inc.[74], Philipines, 7th floor, ALAP 1 building Leviste Street Malaki City, Manila; Vice-Président Johannes ZEHETHUFER.
- Agroservice S.A.S.[75], Monaco, Le Coronado, 20, avenue de Fontvieille. 98000 Monaco.
- Con-Imp.[76]
- Gravitas [77]
- Insyst Electronic Ltd[78], Bulgarie, 9, Tintyava Street, PO Box 46, Sofia, Bulgarie (Directeur: Asen KOINOV)
- MC Invest GmbH[79], Austria, Parkring 10/1/3/10, 1010 Vienne, Autriche; administrateur: Kurt SEDLMAYER
- Orimix[80]
- Poche and Co GmbH[81], Bauernmarkt 24, 1010 Vienne, Autriche
- Zen Trade Ltd[82]; adresse de contact: Riemergasse 10/8, 1010 Vienne, Autriche; personne de contact: Kurt SEDLMAYER.

54. Les sociétés suivantes étaient les principales filiales d'AremisSoft[83]. Comme la plus grande partie des documents bancaires concernant les comptes détenus par ces sociétés ont disparu, il existe des soupçons que lesdits comptes ont été utilisés pour piller les actifs du groupe AremisSoft:

---

[74] Voir pièce n°7, annexe 7.
[75] Voir pièce n°7, annexe 7, 8.
[76] Voir pièce n°7, annexe 5.
[77] Voir pièce n°7, annexe 5.
[78] Voir paragraphe 89 ci-dessous.
[79] Voir pièce n°7, annexe 8.
[80] Voir pièce n°7, annexe 5.
[81] Voir pièce n°7, annexes 5 et 8.
[82] Voir pièce n°7, annexes 5 et 7.
[83] Voir pièce n°8 annexe 13; sans compter les filiales de Fourth Shift Corp., acquise le 30 avril 2001.

- AremisSoft Australia Pty Ltd, Australie
- AremisSoft (E.E. M.E. A) Ltd, Chypre
- AremisSoft (Oerseas) Ltd, Iles Vierges Britanniques
- AremisSoft GmbH, Allemagne
- AremisSoft Hospitality (Switzerland) GmbH, Baar, Zoug
- AremisSoft Hospitality (UK) Ltd, Londres
- AremisSoft Hospitality (US), Inc., succursale de Belgique, Bruxelles
- AremisSoft (HK) Corporation Ltd, Hong Kong
- AremisSoft (India) Pvt Ltd, Bangalore, Inde
- AremisSoft Norway A.S.,
- Impact Level (M) Sdn. Bhd, Malaisie
- Latin America One Ptc. Ltd, Singapour
- LK Global Information Systems BV, Pays-Bas
- LK Global Information Systems (US), Inc., Etats-Unis
- LK Global Manufacturing Systems de Argentina, Argentine
- LK Global Manufacturing Systems de Mexico, Mexique
- M.L.L.-Logistix Israel Ltd, Israel
- Sulcus Espana SL, Espagne
- Sulcus Hospitality Group BV, Pays-Bas
- Sulcus South Africa Pty. Ltd, Afrique du Sud

## V. EXEMPLES DE TROMPERIE ASTUCIEUSE DES INVESTISSEURS

55. Les enquêtes diligentées par la nouvelle direction d'AremisSoft, Davis Polk & Wardwell, l'Etude d'avocats américaine retenue par celle-ci, la SEC, le Procureur US et le FBI ont conclu que la plupart des activités mentionnées dans le prospectus de l'IPO, dans les rapports et documents déposés auprès de la SEC et dans les déclarations à la presse faites par KYPRIANOU, POYIADJIS, MATHEWS, BLOOM et BARTEL, étaient grossièrement mensongères (voir pièce n°7, para. 8 à 9 et pièce n°5, para. 5 - 6).

56. Ces déclarations mensongères étaient faites en vue de tromper le public afin de l'induire à acquérir des actions d'AremisSoft à des prix sans aucune mesure avec la valeur réelle de la société.

57. L'intention de POYIADJIS, KYPRIANOU et MATHEWS, en commettant ces escroqueries, était d'en profiter en vendant au public des actions qu'ils détenaient à travers des sociétés *offshore*, réalisant ainsi plusieurs centaines de millions de dollars de profit.

### A. Acquisition frauduleuse de filiales

58. KYPRIANOU, POYIADJIS et MATHEWS ont agi de manière astucieuse afin de donner au public l'impression qu'AremisSoft poursuivait une stratégie de croissance par acquisitions.

59. Entre décembre 1999 et janvier 2001, AremisSoft a annoncé l'acquisition de trois sociétés prétendument actives dans les marchés émergents, e-nnovations.com Pvt. Ltd, E-ChaRM India Pvt Ltd et Denon International Ltd, pour un montant total de **USD 32,74 millions,** valeur qui, après l'enquête interne, a été reconnue par la nouvelle direction d'AremisSoft comme n'ayant aucun fondement, le montant ayant été exagéré d'au moins **USD 32,1 millions** (voir pièce n°7, para. 22).

60. En outre, des contrats pour l'acquisition d'actions dans la société chypriote LK Global Soft Com. pour un total de plus de **USD 340 millions** furent signés en avril 2001 avec neuf sociétés *offshore* et précipitamment annulés en juin 2001.

61. Il existe également des soupçons que des crimes aient été commis en relation avec l'acquisition des filiales du groupe Eltrax (y compris la société suisse AremisSoft Hospitality (Switzerland) GmbH, Baar- ZG – Pièce n°23) pour USD 10 millions et

de la société américaine Fourth Shift Corporation, Minnesota, pour USD 43 millions.

1. Acquisition de e-nnovations.com Pvt. Ltd

62. La première acquisition qui a été rapportée après l'entrée en bourse a été celle de l'ensemble des actions de la société indienne e-nnovations.com Pvt. Ltd, une société de 120 employés prétendument active dans la fourniture de solutions logicielles, avec laquelle AremisSoft coopérait depuis deux ans, pour **USD 14,5 millions.**

63. Un contrat d'acquisition daté du 17 décembre 1999 avait été conclu entre AremisSoft et la société autrichienne **Spahn & Partner Finanz Consult GmbH.**

64. En réalité, au cours de 1999, e-nnovations.com Pvt. Ltd avait, par des **contrats antidatés,** acquis cinq petites sociétés informatiques indiennes pour un total d'à peu près **USD 300'000.-** à la suite de la publication le 4 mars 1999 d'une annonce dans l'Economic Times, un journal indien, indiquant qu'une société américaine cotée sur le NASDAQ souhaitait acquérir des participations dans des sociétés informatiques indiennes (voir pièce n°7, para. 23 - 30 et les annexes mentionnées; voir pièce n°5, para.13 - 23).

65. Ainsi, e-nnovations.com Pvt. Ltd était une coquille vide, mise en place pour l'occasion, selon toute vraisemblance fiduciairement détenue par Spahn & Partner Finanz Consult GmbH pour les principaux membres de l'Organisation Criminelle.

2. Acquisition de E-ChaRM Pvt. Ltd

66. De même, en décembre 2000, AremisSoft a annoncé qu'elle avait acquis toutes les actions de la société indienne E-ChaRM Pvt. Ltd pour **USD 10,9 millions.**

67. Un contrat avait été signé le 28 novembre 2000 entre AremisSoft (E.E. M.E. A.) Ltd, Chypre, et Still & Life GmbH, une société autrichienne prétendument active dans l'Internet, représentée par son directeur général, Michael POEHN.

68. En réalité, quelques semaines auparavant, trois sociétés indiennes, Nortech Systems, MediSoft Systems et Acenet Solutions avaient été acquises pour **USD 290'000.-** et constituaient les seuls actifs de E-CharRM Pvt. Ltd (voir pièce n°7, para. 31 - 33 et les annexes mentionnées; voir pièce n°5, para. 24 - 36).

69. E-ChaRM Pvt. Ltd était une société vide, constituée pour l'occasion. La raison sociale réelle de Still & Life GmbH, était "STILL a LIFE studio für Werbefotographie GmbH", un studio photographique de mode (Pièce n°24).

70. Selon toute vraisemblance, Michael POEHN détenait dès lors fiduciairement E-ChaRM Pvt. Ltd à travers cette société autrichienne, pour le compte des principaux membres de l'Organisation Criminelle.

3. Acquisition de Denon International Ltd

71. Le 22 décembre 2000, AremisSoft a annoncé l'acquisition de Denon International Ltd, prétendument une société Internet basée à Dubaï, pour **USD 7,34 millions**.

72. En réalité, à l'époque, Denon International Ltd n'avait pas le moindre actif. Le 31 janvier 2001, Denon International Ltd acquit les actions de Vision Group llc, une société basée à Dubaï, pour **USD 250'000.-**.

73. La personne de contact pour Denon International Ltd était Michael SWOVODA (en réalité Michael SWOBODA), et l'adresse de contact était Bauernmarkt 24, Vienne, la même que celle de Poche & Co GmbH et STILL a LIFE studio für Werbefotographie GmbH (voir pièce n°7, para. 34 - 39 et les annexes mentionnées; voir pièce n°5, para. 37 - 48).

74. Selon toute vraisemblance, Michael SWOBODA, détenait dès lors fiduciairement Denon International Ltd pour le compte des principaux membres de l'Organisation Criminelle.

4. Acquisition (annulée) de LK GlobalSoft.com

75. Dans un mémorandum daté du 4 octobre 1999 (voir pièce n°7, annexe 100), KYPRIANOU et POYIADJIS avaient recommandé au Conseil d'administration d'AremisSoft de vendre pour **USD 400'000.-** le 80 % des actions de sa filiale AremisSoft (Cyprus) Ltd, après que celle-ci eut cédé ses activités non chypriotes à une nouvelle filiale d'AremisSoft, AremisSoft (E.E. M.E. A.) Ltd., Chypre[84]

76. La raison prétendue était qu'AremisSoft devait se défaire des activités chypriotes, dont le chiffre d'affaires ne s'élevait qu'à USD 850'000.- et qui étaient déficitaires.

77. Les acquéreurs proposés pour AremisSoft (Cyprus) Ltd se déclaraient prêts à préparer une entrée en bourse à Chypre. Selon KYPRIANOU et POYIADJIS,

---

[84] E.E. M.E. A. signifiait Europe de l'Est, Moyen-Orient, Afrique (*Eastern Europe*, Middle-East, Africa).

cette vente pouvait dès lors potentiellement transformer une participation à 100% dans une société déficitaire en une participation minoritaire dans une société valorisée par sa cotation en bourse. AremisSoft (Cyprus) Ltd devait changer sa raison en LK GlobalSoft.com. KYPRIANOU en serait le Président du Conseil d'administration. Enfin, ils recommandaient que cette opération ne soit pas rapportée à la SEC.

78. La proposition fut acceptée par le Conseil d'administration d'AremisSoft et mise en œuvre par KYPRIANOU et POYIADJIS.

79. A peine une année plus tard, le 5 novembre 2000, KYPRIANOU et POYIADJIS adressèrent un nouveau mémorandum au Conseil d'administration d'AremisSoft en leur expliquant que depuis leur premier mémorandum, LK GlobalSoft.com avait eu tant de succès qu'elle était devenue un concurrent majeur d'AremisSoft. Ils recommandaient dès lors d'acquérir un intérêt majoritaire dans LK GlobalSoft.com.

80. Dans un communiqué de presse du 30 avril 2001 (voir pièce n°7, annexe 102), AremisSoft indiqua avoir conclu un accord avec certains investisseurs institutionnels, qui lui avaient vendu une option lui permettant d'augmenter sa participation dans LK GlobalSoft.com de 7,1 % à 25 %. Les accords devaient également permettre à AremisSoft d'augmenter sa participation à 59,5% en lui donnant l'option d'acheter des actions des mêmes investisseurs sur une période s'étendant jusqu'au mois de septembre 2002. Le coût total de l'acquisition serait de **USD 341,7 millions**.

81. Selon le communiqué, LK GlobalSoft.com avait plus de 5'000 clients et 600 employés et avait en 2000 un chiffre d'affaires de USD 68,6 millions.

82. Les "investisseurs institutionnels" ayant conclu des contrats avec AremisSoft étaient les suivants:

- Barrington Assets Management Ltd, représentée par Kurt SEDLMAYER, adresse de contact: Riemergasse 10/8, A - 1010 Vienne.

- Capital Growth Oversea Partners Inc., représentée par Alexander PAYR, adresse de contact: Le Coronado, 20, avenue de Fontvieille, MC - 98000 Monaco.

- Emerging Markets Capital Ltd., représentée par Roger MEYER, adresse de contact: Africa House, Woodbourne Road, PO Box 15, Douglas, Ile de Man.

- Global Capital Management Ltd., représentée par Bernard TAVEL, adresse de contact: P.O. Box 1693, Murray's Road.

- Jupiter Venture Capital Ltd, représentée par Trevor BAINES, adresse de contact: Africa House, Woodbourne Road, PO Box 15, Douglas, Ile de Man.

- Momentum Equities Inc., représentée par Johannes ZEHETHOFER, adresse de contact: Philippines, 4F2 Parkville Condominium, Dao Corner, Guijo Street, San Antonio Village, Mukati City, Metro Manilla, Philippines.

- Morgan Capital Partners Ltd, représentée par Erich SPAHN, adresse de contact: Boschstrassse 55/18, A - 1190 Vienne

- Palantine Asset Management Ltd, représentée par Sergei POTACHEV, adresse de contact: Wohnpark Roemersee No. 385, A – 7202 Bad Sauerbrunn

- Westminster International Securities Ltd, représentée par Maria Aurora CARCIA-PAYR, adresse de contact: 315 Hawaï Street, Green Park Village, Pasig City, Philippines.

83. Tout porte à croire que ces prétendus investisseurs institutionnels étaient en réalité des sociétés *offshore* contrôlées par KYPRIANOU et POYIADJIS à travers leurs complices usuels, coordonnés par MEYER.

84. Le 31 mai 2001, les options furent exercées pour un prix de USD 109'145'375.-, payés à raison de USD 25 millions comptant (via le compte de Me BARTEL, date valeur 5 juin 2001) et USD 84'145'375.- en obligations d'AremisSoft portant un intérêt de 4%.

85. Le 13 juin 2001, l'opération fut précipitamment annulée par des contrats de rescision et les USD 25 millions furent remboursés, valeur 14 juin 2001. Aucune explication convaincante ne fut donnée, ni sur la raison pour laquelle AremisSoft avait décidé d'annuler ces contrats, ni les motifs pour lesquels les "investisseurs institutionnels" l'auraient accepté.

86. Quand bien même cette opération a été annulée, elle a permis de soutenir le cours d'AremisSoft pendant six semaines, ce qui a notamment permis à l'Organisation Criminelle d'exercer une option pour 40'000 actions d'AremisSoft attribuée à MATHEWS et de vendre lesdites actions sur le marché aux alentours du 8 mai

2001 (voir pièce n°9, pp. 80 et 81 et paragraphe 110 ci-dessous), avec un important profit.

87. En outre, cette opération était sans doute également destinée à soutenir le cours de LK GlobalSoft.com. A cet égard, il existe de sérieux soupçons selon lesquels cette société aurait été utilisée par l'Organisation Criminelle de la même manière qu'AremisSoft pour tromper les investisseurs sur sa valeur et permettre à ses administrateurs et/ou actionnaires de vendre leurs actions au public à des prix surfaits. Une enquête a été initiée à Chypre à cet égard (voir pièce n°16, p. 3).

### B. Déclarations trompeuses concernant les contrats

88. KYPRIANOU, POYIADJIS et MATHEWS ont également trompé le public en exagérant grossièrement l'effet de la conclusion de contrats par AremisSoft.

89. Un des exemples les plus choquants est celui du contrat conclu avec le Fond National d'Assurance Maladie de Bulgarie ("NHIF") via la société bulgare **Insyst Electronic Ltd** et **Ruman ANTONOV**, qui, selon un communiqué de presse du 17 décembre 1999, valait **USD 37,5 millions.** Par la suite, le 17 mai 2001, la direction d'AremisSoft (Paul BLOOM), a affirmé que les paiements reçus à ce moment excédaient **USD 7 millions.**

90. En réalité, la valeur totale du contrat n'était que de **USD 3,9 millions** et avait seulement généré un revenu de **USD 1,7 millions** (voir pièce n°15).

### C. Tromperie sur les rapports annuels

91. Les tromperies astucieuses concernant la prétendue acquisition de sociétés importantes et la conclusion de contrats étaient les fondements nécessaires pour permettre l'exagération du chiffre d'affaires d'AremisSoft.

92. Après que KYPRIANOU, POYIADJIS et MATHEWS eurent précipitamment démissionné, le comptable d'AremisSoft, Peter FRANCIS, mandaté par la nouvelle administration, a découvert que pratiquement tout le chiffre d'affaires attribué dans les comptes 2000 à des clients localisés dans des marchés émergents était **entièrement fictif** (voir pièce n°7, para. 10 - 20 et annexe 5).

93. Ainsi, les revenus prétendus d'AremisSoft pour l'exercice 2000, soit USD 123'609'000.- selon le rapport annuel déposé auprès de la SEC le 26 mars 2001 (voir pièce n°7, annexe 1), étaient exagérés de **USD 90 millions, soit 73%.**

94. Il semblerait que KYPRIANOU, POYIADJIS et MATHEWS soient parvenus à tromper PKF, l'organe de révision d'AremisSoft, en affirmant que les revenus d'AremisSoft étaient encaissés par ses agents de vente étrangers, qui les dépensaient entièrement en frais d'acquisition du revenu.

## VI. ENCAISSEMENT ET BLANCHIMENT PAR MEYER

95. Ainsi que cela a déjà été mentionné, les fausses déclarations concernant les activités et les finances d'AremisSoft avaient un objectif, celui de tromper le public afin qu'il acquière des actions à des prix qui étaient entièrement artificiels.

96. Afin d'encaisser le produit de cette escroquerie, un système complexe de blanchiment a été mis en place par MEYER, en premier lieu en Suisse, puis à l'Ile de Man.

### A. Première étape: encaissement du produit de l'escroquerie

97. La **première étape** consistait à vendre les actions d'AremisSoft à travers des sociétés *offshore* qui n'apparaissaient pas être liées à KYPRIANOU, POYIADJIS et MATHEWS.

98. Avant l'entrée en bourse du 22 avril 1999, AremisSoft avait émis 10'000'051 actions, qui étaient détenues comme suit :

- KYPRIANOU: 4,693,630 actions (détenues par LK Global Holdings N.V.).
- POYIADJIS: 584,190 actions (détenues par Temco Ltd).
- Le reste était prétendument détenu par 111 autres actionnaires – afin de donner l'impression à la SEC et au public que les actions étaient réparties entre un grand nombre de personnes et de faciliter l'entrée en bourse. Il est vraisemblable qu'en réalité, la plupart de ces 111 autres actionnaires étaient contrôlés ou agissaient à titre fiduciaire pour KYPRIANOU, POYIADJIS et MATHEWS.

99. En outre, jusqu'au 20 avril 2001, KYPRIANOU et POYIADJIS se sont officiellement alloués plus de 7 **millions d'options**.

100. Enfin, en octobre 1999, 3,2 millions de nouvelles actions ont été émises et vendues à Info-quest SA pour USD 17,6 millions.

101. Entre le mois d'août 2000 et le mois de mai 2001, plus de **10 millions** d'actions d'AremisSoft ont été vendues à travers des comptes bancaires suisses par des membres de l'Organisation Criminelle, pour un montant approximatif de **USD 350 millions** (voir pièce n°7, para. 47 - 64).

102. Pour ce faire, MEYER a ouvert **au moins 15 comptes** auprès de Bordier & Cie, Genève, Dominick Company AG, Zurich, Hentsch Henchoz et Cie, Lausanne et UBS SA, Genève et Zurich, pour les sociétés des Iles Vierges Britanniques suivantes :

- Drax Trading Ltd: Bordier & Cie; Dominick Company AG
- Emerging Markets Capital Ltd: Bordier & Cie; Dominick Company AG
- Groupe Nova S.A. Dominick Company AG
- Inlay Group Corp.: Bordier & Cie; Dominick Company AG
- Olympus Capital Investment Inc: Bordier & Cie;
- Onyx Capital Inc.: Bordier & Cie; Dominick Company AG
- Oracle Capital Inc: Dominick Company AG; Hentsch Henchoz & Cie; UBS SA
- Quantum Group Management, Ltd: Bordier & Cie; Dominick Company AG

103. En outre, le Journal Principal des Transactions (*Master Transaction Journal* – voir pièce n°9) tenu par l'agent de transfert d'AremisSoft, Olde Monmouth Stock Transfer Co. Inc., montre que des certificats d'actions qui avaient été émis avant l'entrée en bourse (et qui étaient dès lors vraisemblablement pour une grande part détenus à titre fiduciaire pour KYPRIANOU, POYIADJIS et MATHEWS)[85] ont été transférés par d'autres banques suisses :

- 24 février 1999: 60'000 actions ont été émises en faveur de **Bank J. Vontobel & Co AG**, Zurich (certificat n°364)[86]
- 15 juillet 1999: certificat n°135 représentant 245'380 actions cédées par **CBG Compagnie Bancaire Genève**, Genève, à Drax Trading Ltd (140'206

[85] Les certificats émis avant le 31 décembre 1998 portent des numéros inférieurs à 322. Les certificats émis avant l'entrée en bourse du 22 avril 1999 portent des numéros inférieurs à 1'021 (voir pièce n°9, pp. 1 et 5).

[86] Voir pièce n°9, p. 1.

actions) et à la banque new-yorkaise Brown Brothers Harriman & Co (105'154 actions) en vue d'une vente en bourse qui a eu lieu le 21 juillet 1999[87].

- 26 juillet 1999: certificat n°133 représentant 245'380 actions, cédées par Swiss **Bank Corporation**, Zurich, à Brown Brothers Harriman & Co, New York, en vue d'une vente en bourse qui a eu lieu le 3 août 1999[88].

- 26 juillet 1999: certificat n°138 représentant 239'518 actions cédées par **Banque Edouard Constant**, Genève, à Drax Trading Ltd[89].

- 1er novembre 1999: certificat n°175 représentant 11'684 actions, échangé par **Union Bancaire Privée**, Genève, pour un nouveau certificat n°1'144, vendu en bourse le 14 septembre 2000[90].

- 10 décembre 1999: certificat n°187 représentant 23'368 actions cédées par **Union Bancaire Privée**, Genève, à l'agent de bourse Egger & Co, New York, pour une vente en bourse ayant eu lieu le 16 décembre 1999[91].

104. Le fait que plusieurs des certificats d'actions qui précèdent aient été cédés à Drax Trading Ltd indique clairement le caractère fiduciaire de leur détention.

105. L'exemple suivant décrit comment 3 millions d'actions d'AremisSoft ont été reçues sur le compte de Quantum Group Management Ltd auprès de Bordier & Cie, Genève, et comment les membres de l'Organisation mettaient leurs moyens en commun afin de réaliser le produit de leurs crimes.

106. Le compte de Quantum Group Management, Ltd, a été ouvert auprès de Bordier & Cie, Genève, par MEYER, qui a frauduleusement désigné Georgios KARADIMAS comme unique ayant droit économique du compte (voir pièce n°7, para. 80).

107. Entre le 11 novembre 2000 et le 1er mai 2001, un total de 3'101'320 actions d'AremisSoft a été livré sur le compte de Quantum Group Management, Ltd sur les instructions de MEYER, et vendu sur le marché boursier.

---

[87] Voir pièce n°9, p. 10.
[88] Voir pièce n°9, p. 10.
[89] Voir pièce n°9, p. 10.
[90] Voir pièce n°9, pp. 16 et 52.
[91] Voir pièce n°9, p. 20.

108. Les options avaient été prétendument allouées à Prime Growth, Inc. (POYIADJIS) et à Sincock Holding Corp., (KYPRIANOU), à MATHEWS et à des employés indiens d'AremisSoft.

109. POYIADJIS donnait des instructions à l'avocat Scott BARTEL, qui les transmettait à Olde Monmouth Stock Transfer Co. Inc., agent transfert d'AremisSoft, qui, à son tour, réémettait les certificats d'actions appropriés et les envoyait conformément aux instructions reçues de MEYER.

110. Selon les instructions de POYIADJIS, les options étaient cédées à Drax Trading Ltd, Emerging Capital Markets Ltd et Quantum Group Management Ltd, avec la directive d'attendre les instructions de MEYER, qui indiquait systématiquement le numéro de compte n°172'408 de Quantum Group Management Ltd auprès de Bordier & Cie (voir pièce n°7, para. 70 et 100 et annexes 65 et 68; voir pièce n°): ?

| Actions AremisSoft | Options émises en faveur de | Options cédées à | Fax de BARTEL daté du | Instructions de MEYER datées du |
|---|---|---|---|---|
| 400'000 | ? | ? | ? | 20.11.2000 |
| 133'333 | Prime Growth, Inc. | Drax Trading Ltd | 12.12.2000 | 12.12.2000 |
| 500'000 | Prime Growth, Inc. | Drax Trading Ltd | 12.12.2000 | 12.12.2000 |
| 566'666 | Sincock Holding Corp | Quantum Group Management Ltd | 15.12.2000 | 18.12.2000 |
| 11'322 | 17 employés indiens | Emerging Capital Markets Ltd | 11.01.2001 | 11.01.2001 |
| 300'000 | 15 employés indiens | Emerging Capital Markets Ltd | 15.01.2001 | 16.01.2001 |
| 750'000 | Sincock Holding Corp. | Quantum Group Management Ltd | 27.02.2001 | 27.02.2001 |
| 266'666 | Sincock Holding Corp. | Quantum Group Management Ltd | 23.04.2001 | 26.04.2001 |
| 133'333 | Prime Growth, Inc. | Drax Trading Ltd | 23.04.2001 | 26.04.2001 |
| 40'000 | M.C. MATHEWS | Emerging Capital Markets Ltd | 30.04.2001 | 01.05.2001 |
| 3'101'320 | TOTAL | | | |

111. Les membres de l'Organisation Criminelle ne faisaient dès lors pas de distinction entre les actions qui étaient supposées appartenir à KYPRIANOU, POYIADJIS ou MATHEWS, puisqu'elles étaient toutes reçues et vendues par MEYER à travers le compte de Quantum Group Management Ltd.

112. **Cette manière de mélanger le produit de l'escroquerie entre les membres de l'Organisation Criminelle est une nouvelle confirmation de son existence.**

113. Interrogés par l'équipe d'investigation mise en place par la nouvelle administration d'AremisSoft, les employés indiens d'AremisSoft qui étaient prétendument bénéficiaires d'options ont déclaré qu'ils n'en avaient reçu aucun bénéfice.

## B. Deuxième étape: blanchiment du produit de l'escroquerie

114. Après que les actions aient été vendues, MEYER transférait le produit de la vente du compte de Quantum Group Management Ltd vers d'autres comptes bancaires suisses et auprès de banques à Chypre et en Grèce, avant que les fonds ne reviennent en Suisse (voir pièce 7, para. 50 et 51).

115. En mai 2001, quand KYPRIANOU, POYIADJIS et MEYER ont appris que la SEC avait commencé une enquête, des démarches ont été entreprises pour déplacer les fonds hors de Suisse, notamment vers l'Ile de Man.

116. En juillet 2001, les comptes suisses ont été fermés et USD 175 millions ont été transférés vers quatre comptes au nom de Olympus Capital Investment Inc. et de Oracle Capital Inc., auprès de Fleming Isle of Man Ltd (maintenant Gerrard Private Bank (Isle of Man) Ltd), Douglas, et Isle of Man Bank Ltd, Douglas, où ils sont désormais bloqués à la demande de la justice américaine et des victimes de l'escroquerie.

117. Le reste des USD 350 millions blanchis en Suisse a vraisemblablement été transféré à l'étranger avant de revenir vers des banques suisses ou leurs filiales offshore. Il est vraisemblable que MEYER et TAVEL aient utilisé leurs contacts en Suisse pour ouvrir de tels comptes qui n'ont pas encore pu être identifiés.

118. En outre, on a vu que MEYER n'avait pas hésité à utiliser des hommes de paille pour être désignés comme ayants droit économiques dans la formule A.

119. La recherche de comptes qu'il pourrait avoir ouverts ou fait ouvrir devra dès lors être extrêmement large et minutieuse afin de pouvoir identifier et bloquer les fonds provenant de l'escroquerie AremisSoft.

## VII. QUALIFICATION ET COMPETENCE

120. Le code pénal suisse est applicable :

A. Aux crimes et délits commis en Suisse, y compris, le cas échéant, si l'enrichissement de l'auteur a eu lieu en Suisse, ou si le dommage causé à la victime a eu lieu en Suisse (art. 3 et 7 CP) (ATF 117 Ib 210 C. IIIb /CC et TI : CCRP 30.04.1982 prep. 1984 p. 415) ; ou

B. Aux crimes ou délits commis à l'étranger contre un Suisse, si l'auteur se trouve en Suisse et n'est pas extradé à l'étranger (art. 5 CP); ou

C. Aux crimes ou aux délit commis à l'étranger par un Suisse pouvant d'après le droit suisse donner lieu à extradition, si l'acte est aussi réprimé dans l'Etat où il a été commis et si l'auteur se trouve en Suisse (art. 6 CP).

121. Les faits décrits ci-dessus peuvent être qualifiés de la manière suivante selon le Code pénal suisse :

a. **Crime d'escroquerie (art. 146 CP)**: la manière astucieuse selon laquelle les membres de l'Organisation Criminelle ont induit en erreur le public et la personne morale AremisSoft, par des affirmations fallacieuses et la dissimulation de faits vrais, déterminant des personnes à acheter des actions d'AremisSoft qui n'avaient en réalité pratiquement aucune valeur, ce qui a été préjudiciable à leurs intérêts pécuniaires et a conduit AremisSoft à la faillite, est constitutive d'escroquerie (ATF 113Ib 170; ATF 122 II 422). Comme l'objectif principal et le résultat de cette escroquerie étaient de permettre aux membres de l'Organisation de vendre leurs actions d'AremisSoft à des prix surfaits, et que ces ventes ont eu lieu depuis des comptes ouverts auprès de banques suisses, les autorités helvétiques ont compétence pour en poursuivre les auteurs. En outre, dans la mesure où au moins quatre personnes domiciliées en Suisse ont été trompées de cette manière, la compétence helvétique découle également de cette circonstance.

b. **Délit de faux renseignements sur des entreprises commerciales (art. 152 CP)**: en faisant de fausses déclarations sur les activités d'AremisSoft, ses administrateurs, POYIADJIS, KYPRIANOU et MATHEWS savaient que celles-ci ne seraient pas seulement lues aux Etats-Unis, mais également dans d'autres pays. Les communications au public et les rapports déposés auprès de la SEC contenaient des renseignements faux et incomplets d'une importance considérable, susceptibles de déterminer les investisseurs à disposer de leur patrimoine de manière préjudiciable à leurs intérêts pécuniaires. Au moins quatre personnes domiciliées en Suisse ont été trompées par de tels renseignements, ont acheté des actions AremisSoft à des prix surfaits et ont de

ce fait subi un préjudice important. Les autorités helvétiques ont dès lors compétence pour poursuivre ce délit.

c. **Crime de gestion déloyale aggravée (art. 158 CP)** : POYIADJIS, KYPRIANOU et MATHEWS étaient tenus en vertu de leur mandat d'administrateurs et de directeurs d'AremisSoft, de gérer ses intérêts pécuniaires. En faisant acquérir à AremisSoft des sociétés factices pour des dizaines de millions de dollars, et en inventant en grande partie le chiffre d'affaires et les revenus de la société, POYIADJIS, KYPRIANOU et MATHEWS ont gravement violé leurs devoirs à l'égard d'AremisSoft et lui ont causé un préjudice si important que celle-ci a dû déposer son bilan. Ce comportement était destiné à enrichir POYIADJIS, KYPRIANOU et MATHEWS en leur permettant de vendre des actions à un prix surfait. Comme l'enrichissement a eu lieu en Suisse, les autorités helvétiques ont compétence pour la poursuite de ce crime.

d. **Délit d'exploitation de la connaissance de faits confidentiels concernant une société étrangère (art. 161 §5 CP)**: POYIADJIS, KYPRIANOU et MATHEWS, en qualité d'administrateurs, ainsi que les autres membres de l'Organisation Criminelle, savaient que la valeur réelle des actions d'AremisSoft était proche de zéro, puisque son chiffre d'affaires et la valeur des acquisitions de sociétés étaient grossièrement exagérés. Il était prévisible que la divulgation de telles informations confidentielles influence notablement le cours des actions cotées en bourse d'AremisSoft, ce qui a été le cas, puisque celui-ci a plongé aussitôt que ces informations ont commencé à circuler. Les membres de l'Organisation Criminelle ont tiré un avantage pécuniaire se chiffrant en centaines de millions de dollars en vendant au public leurs actions à un prix atteignant près de USD 49,00 par action, alors qu'en réalité ces actions n'avaient aucune valeur. Dans la mesure où ces actions ont été vendues depuis des comptes en Suisse, les autorités suisses de poursuite pénale ont compétence pour poursuivre ce délit.

e. **Crime de faux (intellectuel) dans les titres (art. 251 CP)**: le faux prospectus d'émission (ATF 120 IV 122 c. 4b), les comptes mensongers (ATF 126 IV 68 c. 2a), les contrats frauduleux portant sur des acquisitions fictives (ATF 96 IV 152 c. 2a), les formules A de déclaration de l'ayant droit économique mensongères (ATF du 30 novembre 1999, SJ 2000, p. 234), ainsi que les faux documents déposés auprès de la SEC sont des documents auxquels s'attache une garantie objective, notamment en raison de la qualité de ceux qui la

rédigent et sont dès lors des faux intellectuels. Ces titres ont été utilisés en Suisse, volontairement dans le cas des formules A (voir paragraphe 46 ci-dessus), et par dol éventuel dans le cas des autres documents, qui ont conduit les quatre victimes de l'escroquerie domiciliées en Suisse à acquérir les actions d'AremisSoft. En outre, dans la mesure où le dessein d'enrichissement s'est concrétisé en Suisse, les autorités helvétiques ont compétence pour la poursuite de ces crimes.

f. **Crime de participation à une organisation criminelle (art. 260$^{ter}$ CP)**: des crimes ont été commis par une **vingtaine d'individus**, qui se sont organisés et structurés secrètement en vue d'escroquer les investisseurs d'AremisSoft. Cette escroquerie n'est pas la seule à porter à l'actif de l'Organisation, puisque celle-ci est également impliquée dans l'escroquerie boursière relative à LK GlobalSoft.com, Chypre. Dans l'Organisation, les tâches étaient précisément distribuées de la manière suivante :

1) KYPRIANOU, POYIADJIS, MATHEWS, BLOOM et BARTEL constituaient la partie émergée de l'Organisation. Ils conduisaient AremisSoft à prendre des décisions relatives à l'acquisition d'actifs frauduleux, d'émission d'actions, d'émission d'options sur actions, de rachat d'actions. Ils préparaient en outre les déclarations à la presse et les documents mensongers déposés auprès de la SEC, afin de tromper le public.

2) BAINES, GRUT, MEYER, PAYR, POEHN, POTACHEV, SEDLMAYER, SPAHN, TAVEL et ZEHETHOFER mettaient en place, depuis la Suisse, l'Ile de Man, Monaco et l'Autriche, des sociétés *offshore* dont ils étaient les organes et/ou les signataires et concluaient des contrats frauduleux afin de donner l'impression au public que tant le chiffre d'affaires que la valeur des filiales d'AremisSoft étaient en augmentation constante et qu'AremisSoft était en contact avec de nombreuses sociétés.

3) BAINES (et son épouse Wendy), GRUT, KARADIMAS, MEYER, Spyros POYIADJIS, ROBBINS et TAVEL ouvraient des comptes en banque et agissaient en tant que signataires et/ou hommes de paille désignés comme faux ayants droit économiques pour POYIADJIS, KYPRIANOU et MATHEWS afin de vendre des actions d'AremisSoft.

Au moins 50 sociétés *offshore* ont été utilisées pour permettre à l'Organisation de commettre ces crimes. Comme l'Organisation a commis

une partie substantielle de ses activités en Suisse, les autorités helvétiques ont compétence pour poursuivre ses membres.

g. **Crime de blanchiment d'argent aggravé (art. 305$^{bis}$ CP)**: ainsi que cela a été démontré, près de USD 350 millions (et vraisemblablement bien davantage) ont été encaissés et transférés sur une myriade de comptes en Suisse ouverts par des sociétés *offshore*, avec dans plusieurs cas une indication mensongère de l'ayant droit économique. Ces actes sont propres à entraver l'identification de l'origine, la découverte ou la confiscation des avoirs se trouvant sur ces comptes. Les auteurs de ces actes savaient ou devaient savoir que ces avoirs provenaient d'un crime, raison pour laquelle ils ont usé d'une telle dissimulation. Il conviendra de déterminer dans quelles mesures les employés de banque qui ont accepté de recevoir ces avoirs avaient connaissance de leur origine criminelle. Ces comptes ont été ouverts et opérés par au moins une dizaine de membres de l'Organisation et ces services ont, selon toute vraisemblance, donné lieu à une rémunération substantielle. Les conditions du cas grave selon l'alinéa 305$^{bis}$ al. 2 sont dès lors remplies.

h. **Délit de violation de l'article 9 de la Loi fédérale sur le blanchiment d'argent (LBA) :** MEYER et TAVEL sont les administrateurs d'Edifica SA, qui est un intermédiaire financier soumis à la LBA. Ils savaient parfaitement que les avoirs qu'ils avaient sous leur contrôle étaient le produit de crimes, puisqu'ils ont participé à la commission de ceux-ci. Ils savaient également que POYIADJIS, KYPRIANOU et MATHEWS avaient été mis en accusation aux Etats-Unis le 24 juin 2002. Il est avéré qu'en tout cas MEYER jouissait à cette époque de la signature sur les avoirs se trouvant à l'Ile de Man. L'absence de communication de soupçon de blanchiment d'argent viole dès lors l'article 9 LBA et les autorités helvétiques sont compétentes pour poursuivre ce délit.

122. La compétence juridictionnelle des autorités suisses provient également du fait que MEYER, alors qu'il était domicilié en Suisse, a participé, comme auteur, auteur intellectuel ou complice, à la plupart des crimes et délits de l'Organisation. Même s'il s'avérait qu'il avait commis une partie de ses crimes à l'étranger, en tant que citoyen suisse, résidant actuellement en Suisse, ses actes relèvent de la compétence juridictionnelle helvétique selon l'article 6 CP.

123. A ce jour, au moins quatre investisseurs victimes de l'escroquerie AremisSoft ont été identifiés en Suisse (article 5 CP) :

1. Thomas MESSNER, c/o UBS AG, Attention Thomas LANG, P.O. Box 2418, 8098 Zurich, a acquis 1'200 actions AremisSoft le 15 juin 2001: son préjudice est de USD 14'834.-.

2. Jean-Claude MIMRAN, Le Chalet, Hauptstrasse, 3780 Gstaad, a acquis 1'000 actions AremisSoft le 20 novembre 2000: son préjudice est de USD 19'732.-.

3. Jan LOOPUYT, Av. Bosquet de Julie 49, 1815 Clarens, a acquis 6'325 actions d'AremisSoft entre le 24 novembre 2000 et le 27 juillet 2001: son préjudice est de USD 100'595.-.

4. Credit Suisse, P.O. Box 500, 8070 Zurich, a acquis 28'000 actions d'AremisSoft entre le 2 avril et le 18 mai 2001: son préjudice est de USD 320'788.-.

124. Les autorités helvétiques ont dès lors compétence pour poursuivre tous les crimes et délits décrits dans la présente plainte pénale.

125. Selon l'art. 340$^{bis}$ al. 1 CP, les infractions, notamment aux articles 260$^{ter}$ et 305$^{bis}$ CP, ainsi que les crimes qui sont le fait d'une organisation criminelle au sens de l'article 260$^{ter}$ CP, sont soumis à la juridiction fédérale obligatoire si les actes punissables ont été commis pour une part prépondérante à l'étranger, ou s'ils ont été commis dans plusieurs cantons sans qu'il y ait de prédominance évidente dans l'un d'entre eux.

126. En outre, selon l'art. 340$^{bis}$ al. 2 CP, les crimes économiques (notamment art. 146, 158 et 251 CP) sont soumis à la juridiction fédérale facultative si les conditions prévues à l'alinéa 1 sont réalisées et si aucune autorité cantonale de poursuite pénale n'est saisie de l'affaire.

127. Les agissements de l'Organisation Criminelle relevant de la compétence juridictionnelle helvétique ayant eu lieu principalement à l'étranger et, dans une moindre mesure, dans les cantons de Genève, Vaud et Zurich, sans qu'il y ait de prédominance évidente dans l'un d'entre eux, ceux-ci relèvent de la compétence fédérale obligatoire. Subsidiairement, ils relèveraient également de sa compétence facultative.

128.  Au vu de l'importance et de la complexité de cette affaire, il est essentiel que les moyens à disposition du Ministère public de la Confédération soient utilisés pour poursuivre les auteurs de ces crimes et délits et identifier, saisir et confisquer le produit de leurs activités, ainsi que tous avoirs se trouvant sous le contrôle des membres de l'Organisation.

## VIII.    CAPACITE D'ETRE PLAIGNANT ET PARTIE CIVILE

129.  Selon l'article 34 LFPP, tout lésé peut se constituer partie civile.

130.  Les 6'028 personnes et sociétés que je représente, qui ont acheté des actions sur la base des déclarations criminelles de KYPRIANOU, POYIADJIS, MATHEWS et leurs complices, ont subi un préjudice causé directement par les crimes et délits décrits dans la présente plainte pénale.

131.  Ils jouissent dès lors de la qualité de lésés.

132.  Ils n'ont découvert l'identité des auteurs des crimes commis à leur encontre, contre lesquels la présente plainte pénale est dirigée, que récemment (à compter du 22 avril 2004, date de l'ordonnance leur donnant accès à la procédure de l'Ile de Man) et les documents et informations qu'ils peuvent utiliser dans le cadre de la présente procédure pénale qu'encore plus récemment. Le délai de l'art. 29 CP est dès lors respecté.

## IX.    MESURES URGENTES REQUISES

133.  L'escroquerie boursière AremisSoft est un des crimes les plus importants dont le produit ait été blanchi en Suisse.

134.  La Suisse était en particulier le point central à partir duquel les membres de l'Organisation Criminelle concrétisaient leur dessein d'enrichissement à hauteur de plusieurs centaines de millions de dollars, qu'ils ont blanchi dans des banques localisées dans trois cantons.

135.  Il est dès lors essentiel que les autorités fédérales réagissent à ce crime avec la plus grande rigueur et sévérité.

136.  Le préjudice de USD 565 millions subi par mes clients, est loin d'avoir été réparé. Il est dès lors essentiel d'identifier tous actifs qui pourraient être bloqués en vue de confiscation ou de créance compensatrice (art. 59 CP).

137. Les autorités des Etats-Unis, notamment le Procureur du District Sud de New York, ont donné assurance aux Trustees qu'elles collaboreront de manière étroite avec les autorités suisses et leur fourniront toute assistance nécessaire à la poursuite des crimes et délits qui relèvent de la compétence juridictionnelle helvétique.

138. Les mesures urgentes suivantes sont notamment requises pour protéger les intérêts des plaignants et parties civiles :

1. Ordonner une **alerte bancaire** auprès de toutes les banques en Suisse (y compris leurs filiales à l'étranger), sociétés financières et autres intermédiaires financiers en Suisse, leur ordonnant de communiquer si les personnes et sociétés mentionnées aux paragraphes 35 à 54 ci-dessus ont ou ont eu des relations, en tant que titulaires, ayants droit économiques, références, signataires, gérants de fortune ou introducteurs et **ordonner la saisie** de tous comptes, dépôts-titres, comptes métal, dépôts fiduciaires, safes ou autres avoirs sous quelque forme que ce soit concernés :

   En particulier auprès de:

   - Atlas Management SA, Carouge (GE)

   - Banque Edouard Constant, Genève

   - Banque J. Vontobel & Co AG, Zurich,

   - Bordier & Cie, Genève,

   - CGB Compagnie Bancaire Genève, Genève,

   - Credit Suisse, Zurich

   - Dominick Company AG, Zurich,

   - Hentsch Henchoz & Cie, Lausanne,

   - Lloyds Bank Genève,

   - UBS SA, Genève et Zurich,

   - Union Bancaire Privée, Genève.

2. Ordonner une **alerte bancaire** auprès de toutes les banques en Suisse (y compris leurs filiales à l'étranger), sociétés financières et autres intermédiaires financiers en Suisse, leur ordonnant de communiquer si et dans quelles circonstances, en particulier en relation avec quels comptes, ils ont détenu des actions AremisSoft, notamment auprès des établissements suivants:

    - Atlas Management SA, Carouge (GE)

    - Libra Financière SA, Lausanne

    - SEGAInterSettle AG, Olten;

    - Bank J. Vontobel & Co AG, Zurich (en particulier certificat n°364)

    - CBG Compagnie Bancaire Genève, Genève (en particulier certificat n°135)

    - UBS AG, Zurich (en particulier certificat n°133)

    - Banque Edouard Constant, Genève (en particulier certificat n°138)

    - Union Bancaire Privée, Genève (en particulier certificats n°175 et 187)

3. **Ordonner le blocage** de tous comptes vers lesquels ou à partir desquels des fonds provenant ou destinés aux comptes mentionnés aux paragraphe précédent auraient été transférés et/ou qui pourraient se trouver sous le contrôle de l'Organisation Criminelle.

4. **Saisir**, à l'égard des comptes précités, toute la correspondance bancaire entre 1994 et ce jour, ainsi que les documents d'ouverture de compte, les instructions, les télex, les cartons de signatures, les formules A, les profils clients, les notes internes, les notes de réunion, d'entretiens, la correspondance interne et externe, sous forme papier ou électronique, liés aux comptes qui précèdent.

5. **Perquisionner** les bureaux d'Edifica SA (13, route d'Yverdon, 1028 Préverenges), le domicile de Roger André MEYER, 27, Square Clair-Matin, 1213 Petit-Lancy, le domicile de Bernard TAVEL, 13, route d'Yverdon, 1028 Préverenges, et y saisir tous documents pertinents, y compris passeports et relevés de cartes de crédit, ainsi que tous ordinateurs, téléphones mobiles et autres appareils électroniques susceptibles de contenir des informations pertinentes.

6. **Ordonner l'apport** de toutes pièces pertinentes en possession des autorités helvétiques.

7. **Interroger** les personnes mentionnées aux paragraphes 36 à 50 ci-dessus dans la mesure où elles se trouveraient en Suisse, ainsi que toutes personnes susceptibles de fournir des renseignements utiles à l'avancée de l'enquête.

8. **Procéder aux arrestations nécessaires** en vue de prévenir le danger de fuite, de collusion ou de réitération.

9. Demander par voie **de commissions rogatoires internationales** le blocage d'avoirs à l'étranger et la transmission de tous documents pertinents, ainsi que l'interrogation et l'arrestation des personnes concernées.

Je suis à votre disposition pour vous fournir toutes informations supplémentaires que vous pourriez requérir.

D'ici là, je vous prie de croire, Monsieur le Procureur Général, à l'assurance de ma haute considération.

Enrico MONFRINI

Annexes : selon bordereau annexé