# Exhibit 2



# TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Anne Lutz, hereby certify that the following documents are, to the best of my knowledge and belief, true and accurate translations from French into English.

*"the Complaint dated 7 July 2004 signed by Mister Enrico Monfrini addressed to the Prosecutor General of the Confederation, Mister Valentin Roschacher"*

Anne Lutz

Sworn to before me this

9th day of June 2008

Signature, Notary Public

Katharine L Perekslis
Notary Public, State of New York
No. 01PE6181423
Qualified in QUEENS County
Commission Expires Jan 28, 2012

Stamp, Notary Public

# MONFRINI CRETTOL & ASSOCIATES

## Attorneys admitted to the Geneva Bar

3, PLACE DU MOLARD – 1204 GENEVA

ENRICO MONFRINI

GILLES CRETTOL

JAMES BOUZAGLO

ISABELLE TERRIER-HAGMAN

YVES KLEIN

DIDIER OLIVER PRETOT

Mister Valentin ROSCHACHER
Prosecutor General of the Confederation
Federal public ministry
Taubenstrasse 16
3003 Berne

Geneva, July 7, 2004

**Criminal complaint against Lykourgos KYPRIANOU, Roys POYIADJIS, Mannithottathil Cherian "M.C." MATHEWS, Roger Andre MEYER, Peter Nils GRUT, John Trevor BAINES et al. in connection with AremisSoft Corp.**

Mister Prosecutor General,

Mr. Joseph P. LASALA, co-trustee, with Mr. Fred S. ZEIDMAN of AremisSoft (the "Trustees"), gave me the power of attorney (Exhibit No. 1), mainly on behalf of 6,028 claimants in the class action No. 01 CV 2586 (JAP) before the District Court of New Jersey and on the behalf of the estate in bankruptcy, AremisSoft, who they are empowered to represent (Exhibit No. 2, paragraph. 4.3. (v), p. 11 and Exhibit No. 3, p.2), in order to file a criminal complaint with the selection of an address for service of legal notices.

The 6,028 class action claimants mentioned above are individuals and companies who, between April 22, 1999 and July 27, 2001, bought shares from AremisSoft Corp. ("AremisSoft"), a Delaware corporation listed on NASDAQ, which claimed to be a leading supplier of IT services in emerging markets, but in reality was nothing but an **empty facade** set on misleading the public. The shrewd deception committed by the directors at AremisSoft and their accomplices has directly caused these investors **at least 565 million USD in damages** (more than 700 million CHF according to today's exchange rate) (Exhibit No. 4).

AremisSoft was indeed a fraudulent company, whose business, assets or real proceeds represented only a tiny proportion of those alleged by its administration.

TELEPHONE (+4122) 310 22 66 – FAX NUMBER (+4122) 310 24 86 – mail@macsqisslaw.com

As a consequence for the market deception, AremisSoft reached, in early 2001, a capitalized value of over **1 billion USD**. When AremisSoft filed for bankruptcy on March 15th, 2002, this value was not more than **26 million USD**.

The directors and major shareholders of AremisSoft were two Cypriot businessmen, Lykourgos KYPRIANOU (KYPRIANOU) and Roys POYIADJIS (POYIIADJIS), and an Indian engineer, Mannithottathil Cherian "M.C." MATHEWS (MATHEWS). They created a **criminal organization** ("The Criminal Organization" or "The Organization"), whose activities have mainly taken place in the United States, Cyprus, India, Greece, the United Kingdom, Switzerland, Austria, Monaco and the Isle of Man.

The **purpose of the organization** was to widely set up dummy companies, list them on the stock exchange, to artificially increase the value of their shares on the stock exchange by means of false statements in order to sell them through front companies, loot the companies' assets and launder the proceeds of these crimes.

KYPRIANOU, POYIADJIS, and MATHEWS are now **fugitives** from the American justice system, where they have been formally charged with fraud, money laundering, and participation in a criminal organization (*conspiracy*).

They are also the object of **civil proceedings** in the United States and the Isle of Man, initiated by U.S. authorities, including the Securities and Exchange Commission (SEC) and by victims of their actions.

A criminal investigation is underway **in Cyprus** on a Cypriot company, **LK Globalsoft.com**, having been used in the same criminal way by the organization.

The AremisSoft case has been described **as one of the largest stock market scams of its kind** (*"pump and dump scheme"*) in the history of the SEC. Approximately **230 million USD** has already been blocked in the Isle of Man by the request of U.S. authorities. The repatriation of these funds for confiscation will represent the most **important case in the history of the United States.**

**Switzerland** was the center of gravity of the system put in place to receive the proceeds of the crimes and to launder them. Therefore, AremisSoft shares were sold for at least **350 million USD** from accounts opened with Swiss banks by *offshore* companies whose real beneficiaries were the AremisSoft directors of the organization.

**Roger Andre MEYER** (MEYER), a Swiss citizen residing in Geneva, director and shareholder of **Edifica SA**, at Preverenges, Vaud, is a member of the organization who opened and operated the accounts.

In July 2001, with the help of **Peter Nils GRUT** (GRUT) and of **John Trevor BAINES** (BAINES), MEYER transferred funds out of Switzerland to the Isle of Man and Cyprus to prevent their blockage by the Swiss authorities.

The Trustees of the AremisSoft Liquidating Trust, the mass bankruptcy of AremisSoft and 6,028 claimants in the above-mentioned class action file hereby a penal complaint and civil lawsuit for damages, against KYPRIANOU, POYIADJIS, MATHEWS, MEYER, GRUT, BAINES, and other members of the Criminal Organization, which are listed in paragraphs 36 to 50 below, along with any other person to be charged with fraud (art. 146 CP), false information about commercial enterprises (art. 152 CP), aggravated mismanagement (art. 158 CP), abuse of confidential information concerning a foreign company (art. 161 al. 5 CP), forging shares (art. 251 CP), participation and support of a criminal organization (art. 260b CP), aggravated money laundering (art. 305a al. 2 CP) and violation of federal law on money laundering.

During recent weeks, the Trustees of AremisSoft Liquidating Trust have gained access to crucial evidence for the filing of this criminal complaint, a fact that the members of the criminal organization are aware of. There is a real risk that the evidence in Switzerland will be destroyed and assets in invested in Switzerland will be transferred out of the reach of the prosecuting authorities.

Thus, my clients require that the **measures** listed in paragraph 138 below be adopted as a matter of **urgency**.

## <u>TABLE OF CONTENTS</u>

| | | |
|---|---|---|
| I. | STATEMENT OF THE MAIN FACTS | - 4 - |
| II. | PROCEEDINGS UNDERWAY | - 8 - |
| III. | ATTACHED DOCUMENTS | - 9 - |
| IV. | IMPLICATED INDIVIDUALS AND COMPANIES | - 10 - |
| | A. Principal figures at AremisSoft | - 10 - |
| | B. The professional launderers | - 12 - |
| | C. Companies used | - 14 - |
| V. | EXAMPLES OF CLEVER DECEPTION OF INVESTORS | - 20 - |
| | A. Fraudulent acquisition of subsidiaries | - 20 - |
| | 1. Acquisition of e-nnovations.com Pvt. Ltd | - 21 - |
| | 2. Acquisition of E-ChaRM Pvt. Ltd | - 21 - |
| | 3. Acquisition of Denon International Ltd | - 22 - |
| | 4. Acquisition (cancelled) of LK GlobalSoft.com | - 22 - |
| | B. Deceiving statements regarding the contracts | - 24 - |
| | C. Annual report deceit | - 24 - |
| VI. | CASHING IN AND MONEY LAUNDERING BY MEYER | - 25 - |
| | A. First stage: cashing in the proceeds of the scam | - 25 - |
| | B. Second stage: laundering the proceeds of the scam | - 28 - |
| VII. | QUALIFICATIONS AND COMPETENCE | - 29 - |
| VIII. | LEGAL CAPACITY TO BE A CRIMINAL AND CIVIL PLAINTIFF | - 33 - |
| IX. | URGENT REQUIRED MEASURES | - 33 - |

## I.    STATEMENT OF THE MAIN FACTS

1.    AremisSoft Corp. is the result of the merger by acquisition, on October 10, 1997, of the Dutch company controlled by KYPRIANOU, **LK Global Information System BV,** with **Juno Acquisitions Inc.,** a company incorporated in Nevada on November 16, 1992, but which, although listed with NASDAQ, had until then no operational activity. On November 7, 1997, the business name was changed to AremisSoft Corp. On June 1st, 1998, AremisSoft moved its place of incorporation from Nevada to Delaware.

2.    On September 26, 1997, KYPRIANOU became the Chief Executive Officer of Juno Acquisitions Inc. According to documents filed with the SEC[1] immediately after the merger, KYPRIANOU controlled 66.6% of AremisSoft, 9,915,425 shares via its holding **LK Global Holdings NV,** Netherlands Antilles[2]. In reality, it is likely that at the time KYPRIANOU controlled, directly or indirectly, the whole capital of AremisSoft.

3.    In May 1998, POYIADJIS was appointed vice-president of the board of administration and Chief Financial Officer of AremisSoft, where he held 1 million shares (5.8%) via the company **Raleigh Nominees Ltd.**

4.    In the first annual report filed with the SEC on July 1st, 1998[3], under the signature of KYPRIANOU, AremisSoft was reported being the successor of **LK Global Information System (Cyprus) Ltd** founded in Cyprus in 1978. It was claimed that AremisSoft was a multinational company with 520 employees worldwide, active in developing and selling software to medium-sized companies in industry, hotels, health, and construction existing in 12 countries and had subsidiaries and offices in the United Kingdom, the United States, Ireland, India, Cyprus, Mexico and Argentina (p.36).

5.    The net sales figure for 1997 from software licenses (40%), maintenance and service contracts (45%), and equipment sales (15%) was **42.4 million USD,** up 23% compared to previous year (p. 36).

6.    Mainly thanks to acquisitions, AremisSoft (or its predecessors) would have quickly grown during the five previous years; the net sales in 1993 were only 2.67 million USD (p.24).

7.    As it will be shown (see paragraphs 91 *et seq* below), this presentation was **for the most part misleading.** Specifically, neither the net sales, nor the existence of 520 employees could be verified by the SEC, the FBI, or the administration that came after KYPRIANOU, POYIADJIS and MATHEWS.

---

[1] See exhibit No. 10.

[2] KYPRIANOU stated that he was the sole shareholder of LK Global Holdings NV which held 100% of LK Global Information System BV before the merger with Juno Acquisition Inc. After the merger, LK Global Information System BV became a subsidiary of Juno Acquisition Inc. (AremisSoft).

[3] See exhibit No. 11.

8.  In April 1999, KYPRIANOU, POYIADJIS, and MATHEWS, who were then the principals of AremisSoft, and probably its actual shareholders, gave instructions to submit a **very misleading prospectus**[4] to the SEC, to announce AremisSoft's stock market listing. The 1998 net sales were allegedly 52.6 million USD, up 24% compared to 1997. Like the 1997 annual report, the company claimed to have 520 employees worldwide.

9.  According to the prospectus, before the stock market listing, 10,000,051 of AremisSoft's common shares had been issued and were held by 113 different shareholders, including KYPRIANOU, via LK Global Holdings NV (4,693,630 shares, or 46.9%) and POYIADJIS, via Temco Ltd (584,190 shares, or 5.8%). In fact, it is likely the criminal organization controlled almost all of the capital (see paragraphs 98 listed below).

10. On April 22, 1999, AremisSoft made its Initial Public Offer (IPO) on the NASDAQ. This involved the sale of 3.3 million AremisSoft common shares and ended on April 27, 1999. On the basis of the prospectus and the misleading press releases, the public bought these shares at 5.00 USD per unit, permitting AremisSoft to raise near **12.1 USD net million**.

11. From that time on, KYPRIANOU, POYIADJIS, and MATHEWS have continued **to provide false information** on the activities of AremisSoft and its financial situation, particularly in connection with fictitious subsidiary acquisitions in emerging countries and signing of contracts whose actual value represented only a small fraction of the alleged value (see paragraphs 88 listed below).

12. Thus, according to the 2000 annual report (see exhibit No. 7, appendix 1), the net sales had raised 123.6 million USD, up 68% compared to 1999. However, as we shall see, **three quarters** of the alleged revenue in 2000 **could not be verified** (see paragraphs 91 listed below).

13. U.S. authorities have determined that after the stock exchange listing, KYPRIANOU, POYIADJIS, and MATHEWS profited from the inflated price of the AremisSoft shares that they themselves caused, to sell, through the accounts of *offshore* companies, opened in Swiss banks, more than **10 million** shares to the public for a price of nearly **350 million USD** (see paragraphs 101 listed below).

14. These figures are probably lower than what they actually were because at the time its directors left, the company had issued **a total of 39,192,422 shares**[5], of which three quarters after the stock market listing on April 22nd, 1999, under various pretexts (see exhibit No. 8, appendix 8).

15. According to the documents filed with the SEC, AremisSoft issued more than 11 million

---

[4] See exhibit No. 12.
[5] On December 18, 2000, AremisSoft made a free distribution of one share for each share (*two-for one stock split*).

options[6], in which over 7 million were openly attributed to KYPRIANOU and POYIADJIS or to companies that they have admitted to control (**Sincock Holdings Corp.** and **Prime Growth Inc.** respectively)[7]. It is proven[8] that they controlled, via the criminal organization, a substantial part of other options, probably almost all of them.

16.     It should be noted that the price of exercising these options was normally paid after the shares had been delivered and sold to the public, so that the exercising of these **options** was actually **financed by the victims** of the scam.

17.     On the basis of the inspection of AremisSoft's account from the Commerce Bank, New Jersey, proceeds from the sale of shares and the execution of the options amounts to at least **98,793,00 USD[9]**. These funds were subsequently **looted**, partly through fraudulent acquisitions of companies created and controlled by the directors of AremisSoft, and acquired at a price which had nothing to do with their actual value (see paragraphs 58 *et seq* below).

18.     MEYER and his Edifica SA Company, along with its local accomplices, have organized in Switzerland the **cashing** and the **laundering** of the proceeds of these crimes, by opening bank accounts, setting up offshore companies or trusts intended to be an agent the accounts' owners, designating lying front-men as the legal beneficiaries of these accounts, and moving funds between these accounts. MEYER was also involved in crimes committed by the Criminal Organization, notably by being a signatory for offshore companies selling fictitious or inflated assets in order to once again deceive the public about AremisSoft's transactions and loot the assets from the company (see paragraph 46 below).

19.     The **truth** started to be uncovered following an article published on May 17, 2001, on the first page of the business section of the New York Times, referring to a contract with the Bulgarian authorities, where the directors of AremisSoft had claimed their company had a value of 37.5 million USD, which was assessed by the Bulgarian authorities and the World Bank at less than 4 million USD (see exhibit No.7, appendix 67). AremisSoft brought a suit against the publications (TheStreet.Com) and the financial analysts (Apex Capital LLC, Wells Fargo and Rocker Partner), who had revealed these facts, then withdrew its complaint.

20.     On May 17, 2001, AremisSoft's share listings were suspended for the day. On May 23, 2001, the SEC formally opened an **investigation**.

21.     AremisSoft's United States employees then suddenly **lost contact** with several of their offices abroad and most of the documents found in those AremisSoft offices were

---

[6] 2,977,600 options under the plan 1998, 6,001,100 option under the plan 2000, 774,950 outside the plan 2000, and 1,777,900 option under the plan 2001 (see exhibit No. 8, appendix 7).

[7] See exhibit No. 13, p. 6 and exhibit No. 7, appendix 1, p.166.

[8] See paragraph 104 below.

[9] See exhibit No. 8, p.5.

destroyed[10].

22.    On August 30, 2001, AremisSoft, unable to file its 2nd quarterly report, ceased to be listed on the NASDAQ.

23.    During the internal inquiry initiated by the new administration of AremisSoft, along with those launched by the SEC and the FBI, most assets, activities and proceeds alleged by AremisSoft were found to be **non-existent**[11] (see paragraphs 91 listed below).

24.    **Criminal proceedings** were initiated by the U.S. Attorney for the Southern District of New York against KYPRIANOU, POYIADJIS and MATHEWS[12] who in the meantime moved their assets outside Switzerland and have since become fugitives.

25.    AremisSoft **filed for bankruptcy** on March 15, 2002.

26.    At their highest point, on December 12, 2000, AremisSoft shares were exchanged for nearly $48.75 per share. After the true nature of the business and financial conditions of AremisSoft were revealed, the share price **collapsed** to less than $0.67 per share.

27.    We saw that the capitalized value of AremisSoft, which had reached 1 billion dollars in early 2001, was no more than 26 million dollars on March 15, 2002, the day of the bankruptcy.

28.    Beyond numbers, the **personal tragedies** of small investors who had trusted the direction of AremisSoft and had a substantial part of their savings invested in their shares, which have become virtually worthless, should be kept in the mind of all the authorities concerned with the prosecution of the members of the Criminal Organization and the search for their assets.

29.    It is essential that a **large-scale criminal investigation** be initiated, including using a **general bank alert**, in order to shine the light on the crimes which have seriously violated Swiss law and to identify, freeze and confiscate their proceedings held in Switzerland. In this respect, the destination of at least 175 million dollars of funds laundered in Switzerland could not be determined. It is likely that they are in Switzerland again, under the control of members of the organization who believed they would be immune from prosecution.

---

[10] When auditors from Deloitte & Touche, who were hired by the new AremisSoft administration after July 31, 2001, attempted to retrieve the accounting records of the corporation, they discovered that the AremisSoft offices in Cyprus and India had been wiped clean. In fact, the only records that were retrieved were found torn up in a stack of garbage outside the AremisSoft offices in India (see exhibit No. 7, paragraph 43).

[11] With the possible exception of the group's subsidiaries Eltrax acquired on December 19, 2000 for 10 million USD cash and shares in Fourth Shift Corp. acquired on April 30, 2001 for over 40 million USD cash. However, there are suspicions that the price paid for these assets was too high.

[12] In the beginning, only against POYIADJIS (see paragraphs 30 C. listed below).

## II.    PROCEEDINGS UNDERWAY

30.    To date, these following proceedings are underway:

A.    **Criminal proceedings** No.1:01-cr-01177-LTS-ALL before the United States Court for the Southern District of New York for violating the Stock Exchange Law (*Securities Exchange Act of 1934*). In the situation of this proceeding, initiated December 19, 2001 by the United States prosecutor for the Southern District of New York ("US Prosecutor "), only POYIADJIS was primarily **accused for being the head of the stock market scam**. On February 11, 2002, the court rendered, to support of the criminal proceedings, **a freeze order and repatriation** against POYIADJIS concerning the assets identified in the Isle of Man. On June 24, 2002, **14 charges** replacing those of December 19, 2001, were held against POYIADJIS, KYPRIANOU and MATHEWS, including the **stock market scam, insider trading, money laundering**, and **participation in a criminal organization** (*conspiracy*) (Exhibit No. 5)[13]. POYIADJIS, KYPRIANOU and MATHEWS, who refused to appear before United States authorities, are regarded as fugitives and international arrest warrants were issued for their capture.

B.    **Civil proceedings** 1:01-CV-08903-CSH SEC vs. AremisSoft Corp. et al before the United States Court for the Southern District of New York. This procedure was initiated on October 4, 2001 by the SEC, for violation of federal securities law. In this context, on October 19, 2001, AremisSoft, KYPRIANOU and POYIADJIS have been **prohibited** from committing further offences and were ordered to **repatriate** all proceeds from the sales of fraudulent AremisSoft shares.

C.    **Collective civil proceedings** (*class actions*) were started in May of 2001, by shareholder victims of the stock market scam (Exhibit No. 6 for example). According to an order of August 27, 2001, the New Jersey District Court Judge, Joel A. PISANO, ordered the joinder of several class actions under the caption *In re AremisSoft Corporation Securities Litigation No 01CV2486 (JAP)*.

D.    **Bankruptcy proceedings** 02-32621-RG re AremisSoft Corporation before the United States Bankruptcy Court for the District of New Jersey. On March 15, 2002, AremisSoft filed a request for protection under Chapter 11 of the US Bankruptcy Code. A legal agreement endorsed by the Bankruptcy Court was reached between the parties, including the *class action* plaintiffs, the SEC and other creditors, which, among other things, establishes a liquidation trust – **AremisSoft Liquidating Trust** – and requires the trustees of said trust (the Trustees) to recover all their holdings wherever in the world they may be with the purpose of compensating the AremisSoft scam. On October 2002, the trustees initiated civil proceedings in the High Court of Justice at the Isle of Man, the Chancery Division (*Chancery Division*), against POYIADJIS, KYPRIANOU et al. and obtained an **order to block everything located at the Isle of Man up to 447 million USD.**

---

[13] I respectfully refer you especially to paragraphs 5 and 6 of the charges, which adequately summarize the entire content of this document.

E.      **Confiscation proceedings** initiated by the U.S. Attorney in the United States and in the Isle of Man. The U.S. authorities have determined that POYIADJIS and other members of the Criminal Organization, at least in part to avoid the seizure of these funds in Switzerland, had, in July 2001, moved 175 million USD, which were the proceeds of the sale of AremisSoft shares, to four bank accounts in the Isle of Man. At the request of the U.S. Attorney, on October 2, 2001, the general attorney of the Isle of Man obtained from the High Court of Justice of the Isle of Man, Common Law Division, an **order prohibiting** the transfer of all assets in the Isle of Man of which POYIADJIS and/or KYPRIANOU would be the beneficiaries. In addition, 5 million USD related to the sale of fraudulent shares were blocked in Guernsey in an account opened on behalf of **Alcon Opportunity Fund, Inc.** On July 31, 2002, Thomas P. GRIESA, Judge of the United States Court for the Southern District of New York, issued a default judgment, which became final, confiscating the assets contained in the above-mentioned four accounts of the Isle of Man. So far, 230 million USD have been blocked at the Isle of Man. On April 22nd, 2004, the trustees were admitted as parties to the proceedings, taking place before the High Court of Justice of the Isle of Man, Common Law Division. They began to receive copies of documents filed by other parties in the proceedings, but were prohibited, according to the law of the Isle of Man, to use them in other proceedings without prior authorization.

F.      **Judicial assistance:** judicial assistance in civil and criminal cases was initiated by the U.S. Department of Justice at the request of the U.S. Attorney in various jurisdictions, including Switzerland, Cyprus and the Isle of Man.

## III.     **ATTACHED DOCUMENTS**

31.     The documents relating to the actions of the Criminal Organization represent several hundred large binders.

32.     As a first step, the plaintiffs have decided to file only the essential documents to understand and to prove the methods of said organization, not all of which have yet been translated into French.

33.     As a second step, the plaintiffs and the undersigned will submit to the proceeding, without notice or by request, other relevant documents in order to assist the Swiss authorities for prosecution in their inquiry.

34.     The evidence produced in support of this criminal complaint is currently the following (also see attached slip in appendix):

    –      Exhibit No. 1 to 4: documents relating to the undersigned powers of attorney and to the identities of the plaintiffs.

    –      Exhibit No. 5: the indictment from June 24, 2002, against POYIADJIS, KYPRIANOU and MATHEWS.

    –      Exhibit No. 6: class action from May 24, 2001 (01-CV-2486).

    –     Exhibit No. 7: translation and copy of the third affidavit dated August 28, 2003, of FBI special agent Courtney B. WILSON before the High Court of the Isle of Man, as well as the attached documents that the plaintiffs are authorized to use.

    –     Exhibit No. 8 and 9: documents provided by the SEC in June 2004: document titled "Accounting of AremisSoft Corporation" (*Accounting of AremisSoft Corporation*) filed by AremisSoft with the United States Court for the Southern District of New York on October 17, 2001 and its attachments (Exhibit No. 8); Master Transaction Journal stabled by the transfer agent of AremisSoft, Olde Monmouth Stock Transfer Co. Inc. (Exhibit No. 9).

    –     Exhibit No. 10 to 13: documents filed with the SEC by AremisSoft[14]: General statement of acquisition of property SC 13D filed with the SEC on October 31, 1997 (Exhibit No. 10); Annual Report 1997 10-K405 filed with the SEC on July 1, 1998 (Exhibit No. 11); Stock market listing documents filed with the SEC on April 23, 1999 (Exhibit No. 12); General statement of acquisition of property SC 13D with the SEC on November 21, 2000 (Exhibit No. 13).

    –     Exhibit No. 14: correspondence between BARTEL and Edifica SA.

    –     Exhibits No. 15 and 16: press articles (Exhibit No. 15) and financial analyses (Exhibit No. 16).

    –     Exhibits No. 17–24: documents pertaining to persons and companies covered in the present criminal complaint.

## IV.    IMPLICATED INDIVIDUALS AND COMPANIES

35.    This section lists and describes the persons—against whom the present criminal complaint is filed—participating in the Criminal Organization or supporting it, as well as the companies used to commit their crimes.

## A.    Principal figures at AremisSoft

36.    KYPRIANOU, POYIADJIS and MATHEWS became partners in order to give AremisSoft the appearance of respectability, profitability, and expansion. In reality, the company was only a **cover** designed to deceive the public and to commit a stock scam, from which KYPRIANOU, POYIADJIS and MATHEWS profited several hundred million dollars.

37.    Furthermore, KYPRIANOU, POYIADJIS and MATHEWS were also at the center of the acquisitions of several fictitious companies and other fraudulent transactions designed to **plunder the cash assets** of AremisSoft. These transactions originated from some **100 million USD** from issues of shares and annual stock options.

38.    For the particulars on the conduct of KYPRIANOU, POYIADJIS and MATHEWS, I

---

[14] These reports are public and can be found at the SEC website: www.sec.gov.

respectfully refer you to the June 24, 2002 indictment (see exhibit 5).

39. **Lycourgos K. KYPRIANOU**, born in 1945 or 1946, in Cyprus, residing at 123 Strovolos Avenue, Strovolos, Cyprus. Holding a Ph.D. in computer science, he would put into place the LK Global System companies (that became AremisSoft's companies) since 1978[15]. He served as Chairman of the Board and CEO (Chief Executive Officer) until July 31, 2001, when he hastily resigned.[16]

40. **Roys Spyros POYIADJIS**, born August 14, 1965, from Cyprus and the United Kingdom (Exhibit No. 17), residing at Long Beach Group, Kantaras Street, Enalos Villas, Cyprus. An investment banker, he joined KYPRIANOU at least by 1997, while he had joined Alpha Capital Ltd.[17] (after a brief stint at the New York bank Lehman Brothers). From May 1998 to September 26, 2001, he assumed the duties as Vice-President of the Board, as CFO (Chief Financial Officer), and as Co-Chief Executive Officer of AremisSoft. He hastily resigned from his duties on September 26, 2001, citing "personal reasons"[18].

41. **Mannithottathil Cherian "M.C." MATHEWS**, born April 4, 1964, from India (Exhibit No. 18), residing B-1, 1st Floor, Charter House, 36(3) Lavelle Road, 56001 Bangalore, India. A computer programmer, he was present as manager of group projects, then as managing director of software engineering for LK Global Software Engineering (India) Private Ltd.[19], between 1992 and 1999[20]. He became a member of the Board at AremisSoft after it entered the market on April 22, 1999[21]. He resigned from his duties on July 31, 2001, citing personal and health-related motives.

42. **Scott E. BARTEL**, born April 7, 1957, from the United States, residing at 3396 Beatty Drive, El Dorado Hills, California, U.S.A. A partner in the California law firm of Bartel, Eng, Linn, & Schroeder, his services were retained in August 1997 by LK Global Information Systems BV, the Dutch predecessor of AremisSoft. BARTEL made fraudulent acquisitions of AremisSoft—the documents filed with the SEC—made presentations to the Board, prepared various reports and other communications released by AremisSoft. He acted not only as counsel for the company, but he was also a *de facto* corporate figure of the company. Moreover, he held funds for the company, having made the account of his law firm available to receive the proceeds from disposals of AremisSoft shares. He also organized the exercising of stock options of KYPRIANOU, POYIADJIS and MATHEWS through offshore entities with Swiss bank accounts, by giving the necessary instructions to the AremisSoft transfer agent, Old Monmouth Stock Transfer Co. Inc., on the orders of POYIADJIS. He also acted as private consultant for KYPRIANOU, POYIADJIS and MATHEWS. For example, BARTEL was the protector of Atlas Trust and Trident Trust for POYIADJIS. A legal transaction was carried out

---

[15] Exhibit No.12, <PAGE> 54
[16] Exhibit No. 7, appendix 6, p. 4
[17] Exhibit No.12, <PAGE> 54.
[18] Exhibit No.7, appendix 6, p. 5.
[19] This company then became AremisSoft India Pvt. Ltd.
[20] Exhibit No.12, <PAGE> 54.
[21] Exhibit No.12, <PAGE> 54.

between him and the Trustees on December 11, 2003. He is, however, suspected of having holdings in Switzerland for either his account or that of KYPRIANOU, POYIADJIS and MATHEWS.

43. **Paul BLOOM**, United States. From December 1998 to May 2000, he was the analyst of AremisSoft for Roth Capital Partners, Inc. In May 2000, BLOOM was hired by AremisSoft to supervise its acquisitions in the United States, while holding the rank of Vice President. In February 2001, AremisSoft announced that it would acquire Fourth Shift Corp., a minor company pursued by BLOOM while he was the analyst for Roth Capital Partners. BLOOM is suspected of having held stocks in Fourth Shift Corp., a dormant company that AremisSoft acquired for more than 40 million USD (see Exhibit No. 16, p. 2). Notwithstanding the above, BLOOM's favorable analyses made it possible, while he was serving Roth Capital, to artificially support the value of AremisSoft's stocks. As principal of Aremisoft, BLOOM insisted on denying the reality of the fraudulent acquisitions and the contracts whose value were inflated.

44. Other AremisSoft figures, against whom cases were filed then withdrawn following a compromise, include Michael A. TYMVIOS, Dann V. ANGELOFF, H. Tate HOLT, Stan J. PATEY, George/Georgios PAPADOPOULOS, John/Ioannis MAMALAS, Noel R. VOICE, George H. ELLIS and Theodore/Theodoros S. FESSAS, as well as the auditors of the AremisSoft Group, PKF (previously Pannel Kerr Foster), are not considered *a priori* in the present criminal complaint.

## B.    The professional launderers

45. A group of persons, mainly from Switzerland, the Isle of Man, Cyprus, and Austria, were the instruments used outside of the United States by KYPRIANOU, POYIADJIS and MATHEWS to commit their crimes, cash the proceeds, then launder them.

46. The key member of the Criminal Organization in this connection is **Roger André MEYER**, a Swiss citizen born April 28, 1962, residing at 27 Clair-Matin, 1213 Petit Lancy (Exhibit No. 19). From November 1997 to November 1999, he worked as an employee at **Atlas Management SA** in Geneva. In 2000, he became totally independent in his own financial corporation, **Edifica SA**, Préverenges, in association with **Bernard TAVEL** (see exhibit 21). MEYER used his contacts in world banking to open accounts for the Organization in Swiss banks (Bordier & Cie, Geneva; Dominick Company AG, Zurich; Hentsch Henchoz & Cie, Lausanne; UBS SA, Geneva; as well as other institutions yet to be identified), primarily on behalf of offshore companies that he incorporated for the Organization members[22]. In Form A for many of these accounts, he appointed front-men like himself, Georgios KARADIMAS, Spyros POYIADJIS (father of Roys POYIADJIS), and Richard ROBBINS as beneficial owners. With BARTEL, BAINES and GRUT, he was behind the idea of putting in place the trusts Atlas Trust and Trident Trust as instruments designed to hide POYIADJIS's ownership of AremisSoft stocks sold to the public through Swiss banks. He also participated in the implementation of at least one of the fraudulent acquisitions of the fictitious companies. He also played a

---

[22] Exhibit No. 7, paragraph. 48.

significant role in the current affairs of AremisSoft; for example, he was the contact agent for the bank account of AremisSoft's Switzerland branch, AremisSoft Hospitality (Schweiz) GmBH to Credit Suisse, Zurich (see exhibit 8, appendix 2, pp. 1 and 2). Presumably, he also introduced AremisSoft (E.E. M.E. A.) Ltd. to Lloyds Bank, Geneva, (see exhibit 8, appendix 2, p. 3).

47.   **John Trevor Roche BAINES**, born December 19, 1939, from the United Kingdom, residing in Africa House, Woodbourne Road, Douglas, Isle of Man. This very well-off financier based on the Isle of Man is one of the trustees for Atlas Trust and Trident Trust. He also served as director of offshore companies and signer of the Swiss accounts controlled by the Criminal Organization. In July 2001, when the members of the Organization feared that the Swiss authorities would seize their holdings, BAINES organized the transfer of funds outside of Switzerland to two bank accounts on the Isle of Man. For this occasion, he enabled the transfer of more than 45 million USD from the account of his company Baines International Ltd. to the Isle of Man Bank in Douglas.

48.   **Nils Peter GRUT**, born September 10, 1938, from Sweden, residing at 31 Avenue Princesse Grace, MC 98000 Monaco. GRUT acted as trustee for both Atlas Trust and Trident Trust, and director of offshore companies and signer of bank accounts controlled by the Criminal Organization.

49.   The following persons also served as front-men and/or signatories on the Swiss bank accounts on behalf of offshore companies (see paragraph 51 below), which cashed then laundered the proceeds of the Organization's crimes.

  –   Wendy BAINES. Wife of John Trevor Roche Baines. Signed on certain Swiss accounts belonging to the Organization[23].

  –   Georgios KARADIMAS, from Greece. Business partner of Roys POYIADJIS, he accepted a front-man role, designed to be a false beneficial owner of Quantum Group Management Ltd. accounts at Bordier & Cie, Geneva, and Dominick & Co AG, Zurich[24]. He was also the director of Alcon Opportunity Fund Inc., whose Guernsey account containing approximately 5 million USD in proceeds from AremisSoft share disposals was seized. He was also the director and/or contact agent for Fenwick Assets Ltd. and Twenty First Fund Ltd., which were used to hold and dispose of AremisSoft shares.

  –   Nonni KYPRIANOU, from Cyprus. Wife of KYPRIANOU, for whom she is suspected of holding goods derived from his crimes.

  –   Marcos MARCOU, from Greece. He in particular was the contact agent for Fenwick Assets Ltd. (Exhibit 20)[25].

---

[23] See exhibit No. 7, paragraph. 48.
[24] See exhibit No.7, paragraph. 80.
[25] See handwritten notes about BARTEL requesting Fenwick Assets Ltd. to register "Piggyback".[26] See exhibit No. 7, paragraph. 81.

— Donna POYIADJIS, from the United States, in Cyprus. Wife of Roys POYIADJIS, for whom she is suspected of holding goods derived from the Organization's crimes.

— Spyros Savva POYIADJIS, from Cyprus. Father of Roys POYIADJIS, he signed as settler of the Incorporation of Trident Trust, (anti)dated December 29, 2000.

— Micheline RAPIN, from Tannay, Switzerland. Money holder for Edifica SA (see exhibit 21).

— Richard Simon ROBBINS from Great Britain. Accepted a front-man role, designed to be a false beneficial owner of the Drax Trading Ltd. Account at Bordier & Cie, Geneva[26]. Contact agent for First View Ltd.[27].

— Bernard TAVEL, from Yverdon, Switzerland. Associate of MEYER and director of Edifica SA. Signed on Swiss accounts[28]. Signed the fraudulent contract of disposals of shares from LK Globalsoft.com to AremisSoft on behalf of Global Capital Ltd.[29].

50.    The following persons served either as directors, signatories, or company contact agents who signed fraudulent contacts with AremisSoft (see paragraphs 63, 67, 73, 82 and 89 below):

— Maria Aurora CARCIA-PAYR, Austria

— Michael POEHN, Austria

— Alexander PAYR (or POYR), Austria

— Sergei POTACHEV, Austria

— Kurt SEDLMAYER (or SEDELMAYER), Austria

— Michael SWOBODA (or SWOVODA), Austria

— Rouman ANTONOV, Bulgaria

— Manfred UNGER, Austria.

— Johannes ZEHETHOFER (or ZEHETHUFER), Austria

## C.    Companies used

51.    The following offshore companies were used to hold AremisSoft shares, cash them, then

---

[26] See exhibit No. 7, paragraph. 81.
[27] See exhibit No. 8, appendix 6 (letter from January 10, 2001).
[28] See exhibit No. 7, paragraph. 48.
[29] See exhibit No. 7, appendix 103. See paragraph 82 below.

launder the proceeds of the Organization's crimes (see exhibit 7 and 9):

– Alcon Opportunity Fund Inc.[30], British Virgin Islands (Director: Georgios KARADIMAS)

– Alfa Capital Ltd. (Associate: POYIADJIS[31])

– Atlas Asset Management Ltd.[32]

– Aremis Holdings Ltd.[33], British Virgin Islands (Director: KYPRIANOU)

– Aremis Technology Ventures Limited[34], British Virgin Islands (Director: KYPRIANOU)

– Argossy Ltd.[35]

– Atlas Trust[36], Isle of Man (Trustees: BAINES, GRUT and MEYER)

– Baines International Limited[37], Isle of Man (Director: BAINES)

– Bayford Shipping Corporation[38]

– Cronos Captial[39]

– Denmore Investments Ltd.[40] [41], British Virgin Islands

– Drax Trading Ltd.[42], British Virgin Islands (Director: BAINES)

– Edifica SA, Préverenges (Directors: MEYER, President; Bernard TAVEL, Secretary) (Exhibit 21)

– Egmont International Associates Inc.[43]

---

[30] See exhibit 7, paragraph. 80.
[31] See exhibit 7, appendix 10, p. 65.
[32] See exhibit 9, pp. 1 ss.
[33] See exhibit 7, appendix 6, p. 6.
[34] See exhibit 7, appendix 6, p. 6.
[35] See exhibit 7, paragraph. 53, 85, 93.
[36] See exhibit 7, paragraph. 80.
[37] See exhibit 7, paragraph. 86.
[38] See exhibit 9, pp. 20 ss.
[39] See exhibit 7, paragraph. 90.
[40] See exhibit 9, pp. 14 ss.
[41] See exhibit 8, appendix 8, p. 5.
[42] See exhibit 9, pp. 1 ss and exhibit 7, paragraph. 50, 61, 78, 80 and 81.
[43] See exhibit No. 7.

–    Emerging Markets Capital Ltd.[44], Isle of Man

–    Emerson Capital Management Ltd.[45]

–    Fenwick Assets Ltd.[46] (Contact agent: Marcos MARCOU)

–    First View Ltd.[47] Isle of Man (Director: Richard ROBBINS)

–    Groupe Nova S.A., British Virgin Islands

–    Harglen Financial Ltd.[48], British Virgin Islands (Director: Manfred UNGER; representative: Simon C. GROOM)

–    Info-quest SA[49], Greece

–    Inlay Group Ltd.[50], British Virgin Islands

–    Isola Investment Services Ltd.[51]

–    Jason S.A.M.[52], Monaco

–    Libra Financiere SA, Lausanne (Exhibit No. 22)

–    L.K. Global Holdings N.V.[53], the Netherlands Antilles (Director: KYPRIANOU)

–    Lomond Finance Inc.[54], British Virgin Islands

–    Olympus Capital Investments Inc.[55] British Virgin Islands (Director: BAINES).

–    Onyx Capital Inc.[56], British Virgin Islands (Director: Egmont International Associates Inc.)

–    Oracle Capital Inc.[57], British Virgin Islands (Directors: MEYER, GRUT and BAINES)

---

[44] See exhibit No. 7, paragraph. 50. See also paragraph 82 below.
[45] See exhibit No 9, pp. 36 ss.
[46] See exhibit No. 9, pp. 1 ss.
[47] See exhibit No. 8, schedule 6 and exhibit 9, p. 2.
[48] See exhibit No. 9, pp. 1 ss.
[49] See exhibit No. 9, pp. 1 ss.
[50] See exhibit No. 7, paragraph. 50, and exhibit 9, pp. 58 ss.
[51] See exhibit No. 9, pp. 15 ss.
[52] See exhibit No. 7, appendix 47.
[53] See paragraph 4 below.
[54] See exhibit 9, pp. 58 ss.
[55] See exhibit No. 7, appendix 50. See exhibit 9, pp. 87 ss.
[56] See exhibit No. 7, paragraph. 50, 54, 55, 58, 59, 61, 62, 65, 67–69, 74 and 78.

–     Petrolcom SA[58]

–     Prime Growth Inc.[59], British Virgin Islands (POYIADJIS)

–     Quantum Group Management Ltd.[60], Panama

–     Raleigh Nominees Ltd.[61]

–     Sincock Holdings Corporation[62], British Virgin Islands (director: Tasso PATSALIDES)

–     Southwood Management Ltd.[63], Cyprus

–     Temco Ltd.[64]

–     Trident Trust[65], Isle of Man (Trustees: BAINES, GRUT and MEYER)

–     Twenty First Fund Ltd.[66] (Director: Georgios KARADIMAS)

–     Valerian Communications Ltd.[67]

–     Valinor Management Ltd.[68]

–     Westminster International Securities Ltd., British Virgin Islands (Contact agent: Maria Aurora CARCIA-PAYR)

52.     The following offshore companies were used to sell, fraudulently, overvalued assets to AremisSoft (see paragraphs 58 ss. below):

–     Barrington Assets Management Ltd.[69], British Virgin Islands; contact address: Riemergasse 10/8 A – 1010 Vienna; director: Kurt SEDLMAYER

---

[57] See exhibit No. 7, paragraph. 50, 52, 53, 59, 61, 62, 68, 72, 73, 78, 82, 86–89 and 97.
[58] See exhibit No. 9, pp. 15 ss.
[59] See exhibit No. 7, appendix 1, p. 166.
[60] See exhibit No. 7, appendix 75 and 76.
[61] See exhibit No. 9, p. 47.
[62] See exhibit No. 7, appendix 1, p. 153 ss.
[63] See exhibit No. 9, pp. 3 ss.
[64] See exhibit No. 12, <PAGE> 60, and exhibit 9, pp. 4 ss.
[65] See exhibit No. 7, paragraph. 47, 53, 68, 73, 75, 85 and 93.
[66] See exhibit No. 9, pp. 1 ss.
[67] See exhibit No. 9, pp. 1 ss.
[68] See exhibit No. 9, pp. 15 ss.
[69] See exhibit 7, schedule 20.

     –     Capital Growth Overseas Partners Inc.[70], British Virgin Islands; contact address: Le Coronado, 20 avenue Fontvievieille, MC – 98000 Monaco; contact agent: Alexander PAYR.

     –     Global Capital Management Ltd., St Vincent and Grenadines; director: Bernard TAVEL[71]

     –     Jupiter Venture Capital Ltd.[72], Saint Vincent and the Grenadines; contact address: Africa House, Woodbourne Road, Douglas, Isle of Man; director: BAINES.

     –     Momentum Equities Inc.[73], British Virgin Islands; contact address: 4F2 Parkville Condominium, Dao Corner, Guijo Street, San Antonio Village, Mukati City, Metro Manilla, Philippines; director: Johannes ZEHETHUFER.

     –     Morgan Capital Partners Ltd., British Virgin Islands; contact address: Boschstrasse 55/18 A – 1190 Vienna; director: Erich SPAHN.

     –     Palatine Asset Management Ltd. (or Palantine Asset Management Ltd.), British Virgin Islands; contact address: 315 Hawaii Street, Green Park Village, Pasig City, Philippines; director: Sergei POTACHEV.

     –     Spahn & Partner Finanz Consult GmbH, Parkring 10/1/3/10, 1010 Vienna, Austria. Directors: Kurt SEDLMAYER; Erich SPAHN; Sergei POTACHEV.

     –     Still & Life GmbH, Austria, Bauernmarkt 24/36, 1010 Vienna, Austria; CEO: Michael POEHN.

53.     The following companies deceitfully claimed to be the sales representatives of AremisSoft or executed fraudulent contracts with them (see paragraphs 92 listed below):

     –     Agra Prime Production Inc.[74] Philippines, 7th floor, ALAP 1 building, Leviste Street, Malaki City, Manila; Vice-President Johannes ZEHETHUFER.

     –     Agroservice S.A.S.[75], Monaco, Le Coronado, 20 avenue de Fontvieille. 98000 Monaco.

     –     Con-Imp.[76]

     –     Gravitas[77]

---

[70] See exhibit 7, schedule 103.
[71] Associate of MEYER and director of Edifica SA.
[72] See exhibit 7, schedule 105.
[73] See exhibit 7, schedule 105.
[74] See exhibit No. 7, appendix 7.
[75] See exhibit No. 7, appendix 7, 8.
[76] See exhibit No. 7, appendix 5.

—    Insyst Electronic Ltd[78], Bulgaria, 9, Tintyava Street, PO Box 46, Sofia, Bulgaria (Director: Asen KOINOV)

—    MC Invest GmbH[79], Austria, Parkring 10/1/3/10, 1010 Vienna, Austria; administrator: Kurt SEDLMAYER

—    Orimix[80]

—    Poche and Co GmbH[81], Bauernmarkt 24, 1010 Vienna, Austria

—    Zen Trade Ltd[82]; contact address: Riemergasse 10/8, 1010 Vienna, Austria; contact person: Kurt SEDLMAYER.

54.    The following companies were the main subsidiaries of AremisSoft[83]. Since the majority of bank documents concerning the accounts held by these companies have disappeared, it is suspected that the said accounts were used to appropriate the assets of the group AremisSoft:

—    AremisSoft Australia Pty Ltd, Australia

—    AremisSoft (E.E.M.E.A.) Ltd, Cyprus

—    AremisSoft (Overseas) Ltd, British Virgin Isles

—    AremisSoft GmbH, Germany

—    AremisSoft Hospitality (Switzerland) GmbH, Baar, Zoug

—    AremisSoft Hospitality (UK) Ltd, London

—    AremisSoft Hospitality (US), Inc., subsidiary of Belgium, Brussels

—    AremisSoft (India) Pvt Ltd, Bangalore, India

—    AremisSoft Norway A.S.,

—    Impact Level (M) Sdn. Bhd, Malaysia

—    Latin America One Pte. Ltd, Singapore

---

[77] See exhibit No. 7, appendix 5.
[78] Refer to paragraph 89 below.
[79] See exhibit No. 7, appendix 8.
[80] See exhibit No. 7, appendix 5.
[81] See exhibit No. 7, appendix 5 and 8.
[82] See exhibit No. 7, appendix 5 and 7.
[83] See exhibit No. 8, appendix 13; not counting the subsidiary from Fourth Shit Corp, acquired April 30, 2001.

      –     LK Global Information Systems BV, the Netherlands

      –     LK Global Information Systems (US), Inc., United States

      –     LK Global Manufacturing Systems de Argentina, Argentina

      –     LK Global Manufacturing Systems de Mexico, Mexico

      –     M.L.L.-Logistix Israel Ltd, Israel

      –     Sulcus Espana SL, Spain

      –     Sulcus Hospitality Group BV, the Netherlands

      –     Sulcus South Africa Pty. Ltd, South Africa

## V.    **EXAMPLES OF CLEVER DECEPTION OF INVESTORS**

55.    Inquiries pursued by the new management of AremisSoft, Davis Polk & Wardwell, the Firm of American lawyers retained by the latter, the SEC, the US attorney and the FBI have led to the conclusion that the majority of activities mentioned in the prospectus for the IPO, in reports and documents submitted to the SEC and in press declarations made by KYPRIANOU, POYIADJIS, MATHEWS, BLOOM and BARTEL, were grossly fraudulent (See exhibit No. 7, paragraphs 8 to 9 and document no. 5, paragraphs 5 - 6).

56.    These deceitful declarations were made with a view to cheat the public so as to induce them to acquire shares of AremisSoft at prices which had no relation to the true worth of the company.

57.    The intention of KYPRIANOU, POYIADJIS and MATHEWS, while committing these frauds, was to benefit from them by selling shares held by themselves to the public through *offshore* companies, in the process realizing several millions of dollars of profit.

## A.    **Fraudulent acquisition of subsidiaries**

58.    KYPRIANOU, POYIADJIS and MATHEWS acted in an astute manner in order to give the public the impression that AremisSoft was pursuing a growth strategy by acquisitions.

59.    Between December 1999 and January 2001, AremisSoft announced the acquisition of three companies supposedly active in emerging markets, e-nnovations.com Pvt. Ltd, E-ChaRM India Pvt Ltd and Denon International Ltd, for a total amount of 32.74 million USD, which sum was recognized not to have any basis by the new management of AremisSoft after the internal inquiry, the amount having been inflated by at least 32.1 million USD (See exhibit No. 7, paragraph 22).

60.    Moreover, contracts for acquisition of shares in the Cypriot company LK Global Soft Com. for a sum of more than 340 million USD, were executed in April 2001 with nine *offshore* companies and precipitately cancelled in June 2001.

61.    There are also suspicions that crimes were committed with respect to acquisitions of subsidiaries of the Eltrax group (including the Swiss company AremisSoft Hospitality (Switzerland) GmbH, Baar- ZG – document no. 23) for 10 million USD and of the American company Fourth Shift Corporation, Minnesota, for 43 million USD.

1.    Acquisition of e-nnovations.com Pvt. Ltd

62.    The first acquisition reported after the stock market listing was that of all the shares of the Indian company e-nnovations.com Pvt. Ltd, a company with 120 employees supposedly active in software solutions, with which AremisSoft was collaborating since two years, **for 14.5 million USD**.

63.    An acquisition contract dated 17 December 1999 was entered into between AremisSoft and the Austrian company **Spahn & Partner Finanz Consult GmbH**.

64.    In reality, during 1999, e-nnovations.com Pvt. Ltd had, through **pre-dated contracts**, acquired five small Indian IT companies for a consideration of almost 300,000 USD, following the publication of an announcement in the Economic Times, an Indian newspaper, dated 4 March 1999, mentioning that an American company listed on NASDAQ wanted to acquire interests in Indian IT companies (See exhibit No. 7, paragraphs 23 – 30 and the mentioned appendix; See exhibit No. 5, paragraphs 13 – 23).

65.    Thus, e-nnovations.com Pvt. Ltd was an empty shell, established for the occasion, and in all probability held as a subsidiary by Spahn & Partner Finanz Consult GmbH for the main members of the Criminal Organization.

2.    Acquisition of E-ChaRM Pvt. Ltd

66.    Similarly, in December 2000, AremisSoft announced acquisition of all shares of the Indian company E-ChaRM Pvt. Ltd for 10.9 million USD.

67.    A contract was signed on 28 November 2000 between AremisSoft (E.E.M.E.A.) Ltd, Cyprus, and Still & Life GmbH, an Austrian company supposedly active in the internet, represented by its CEO, Michael POEHN.

68.    In fact, a few weeks previously, three Indian companies, Nortech Systems, MediSoft Systems and Acenet Solutions were acquired for 290,000 USD and formed the only assets of E-ChaRM Pvt. Ltd (see document no. 7, paragraphs 31 -33 and the mentioned appendix; see document no. 5, paragraphs 24 - 36).

69.    E-ChaRM Pvt. Ltd was a shell company, formed for the occasion. The real name of Still & Life GmbH was "STILL a LIFE studio für Werbefotographie GmbH", a photographic studio for fashion (document no. 24).

70.    In all probability, Michael POEHN held E-ChaRM Pvt. Ltd as a subsidiary from that time on, through this Austrian company, for the account of the main members of the Criminal Organization.

3.    Acquisition of Denon International Ltd

71.    On 22 December 2000, AremisSoft announced the acquisition of Denon International Ltd, supposedly an internet company based in Dubai, for 7.34 million USD.

72.    In reality, at this time, Denon International Ltd had not a single asset. On 31 January 2001, Denon International Ltd acquired shares of Vision Group llc, a company based in Dubai, for 250,000 USD.

73.    The contact person for Denon International Ltd was Michael SWOVODA (actually Michael SWOBODA), and the contact address was Bauernmarkt 24, Vienna, the same as that of Poche & Co GmbH and STILL a LIFE studio für Werbefotographie GmbH (See exhibit No. 7, paragraphs 34 - 39 and the appendix mentioned; See exhibit No. 5, paragraphs 37 - 48).

74.    It seemed that Michael SWOBODA was holding Denon International Ltd in trust on behalf of the main members of the organization.

4.    Acquisition (cancelled) of LK GlobalSoft.com

75.    In a memorandum dated 4 October 1999 (See exhibit No. 7, appendix 100), KYPRIANOU and POYIADJIS had recommended selling 80% of the shares of AremisSoft's subsidiary AremisSoft (Cyprus) Ltd for 400,000 USD to the board of directors of AremisSoft, after the former had ceded its activities, which were carried on out of Cyprus, to a new subsidiary of AremisSoft, AremisSoft (E.E.M.E.A) Ltd., Cyprus.[84]

76.    The purported reason that AremisSoft had to discontinue its activities in Cyprus was that the sales turnover was only 850,000 USD which was not profitable.

77.    The proposed acquirers of AremisSoft (Cyprus) Ltd were ready to prepare a stock exchange listing in Cyprus. According to KYPRIANOU and POYIADJIS, this sale could potentially transform a 100% stake in a loss-making company into a minority stake in a company valued at its stock market price. AremisSoft (Cyprus) Ltd needed to change its name to LK GlobalSoft.com. KYPRIANOU would be the Chairman of its Board of Directors. Finally, they recommended that this transaction not be reported to the SEC.

78.    The proposal was accepted by the Board of Directors of AremisSoft and implemented by KYPRIANOU and POYIADJIS.

79.    Barely a year later, on 5 November 2000, KYPRIANOU and POYIADJIS addressed a new memorandum to the Board of Directors of AremisSoft, explaining to them that since their first memorandum, LK GlobalSoft.com had had so much success that it had become a major competitor to AremisSoft. They recommended obtaining a majority stake in LK GlobalSoft.com at that time.

---

[84] E.E.M.E.A. meant Eastern Europe, Middle East, Africa.

80.    In a press report on 30 April 2001 (See exhibit No. 7, appendix 102), AremisSoft indicated that it had entered into an agreement with certain institutional investors, who had sold it an option allowing it to increase its stake in LK GlobalSoft.com from 7.1% to 25%. The agreements would also supposedly allow AremisSoft to investors over a period extending up to September 2002. The total acquisition cost would be 341.7 million USD.

81.    According to the report, LK GlobalSoft.com had more than 5,000 customers and 600 employees and had a sales turnover of 68.6 million USD in the year 2000.

82.    The "institutional investors" who had entered into contracts with AremisSoft were the following:

    –    Barrington Assets Management Ltd, represented by Kurt SEDLMAYER, contact address: Riemergasse 10/8, A – 1010 Vienna.

    –    Capital Growth Overseas Partners Inc., represented by Alexander PAYR, contact address: Le Coronado, 20, avenue de Fontvieille, MC - 98000 Monaco.

    –    Emerging Markets Capital Ltd., represented by Roger MEYER, contact address: Africa House, Woodbourne Road, PO Box 15, Douglas, Isle of Man.

    –    Global Capital management Ltd., represented by Bernard TAVEL, contact address: P.O. Box 1693, Murray's Road.

    –    Jupiter Venture Capital Ltd, represented by Trevor BAINES, contact address: Africa House, Woodbourne Road, PO box 15, Douglas. Isle of Man.

    –    Momentum Equities Inc., represented by Johannes ZEHETHOFER, contact address: Philippines, 4F2 Parkville Condominium, Dao Corner, Guijo Street, San Antonio Village, Mukati City, Metro Manilla Philippines.

    –    Morgan Capital Partners Ltd, represented by Erich SPAHN, contact address: Boschstrassse 55/18, A-1190 Vienna.

    –    Palantine Asset Management Ltd, represented by Sergei POTACHEV, contact address: Wohnpark Roemersee No. 385, A – 7202 Bad Sauerbrunn

    –    Westminster International Securities Ltd, represented by Maria Aurora CARCIA-PAYR, contact address: 315 Hawaii Street, Green Park Village, Pasig City, Philippines.

83.    Everything leads to believe that all of these so called institutional investors were in fact offshore companies controlled by KYPRIANOU and POYIADJIS through their usual accomplices, coordinated by MEYER.

84.    On May 31, 2001, the options were exercised at a price of 109,145,135 USD paid at the rate of 25 million USD cash (via Ms. BARTEL's account, date of June 5, 2001) and 84,145,375 USD in AremisSoft bonds carrying a 4% interest.

85.    On June 13, 2001, the operation was suddenly canceled by rescission contracts and the 25 million USD were reimbursed, June 14, 2001. No convincing explanation was given either for the reason why AremisSoft decided to cancel the contracts, or the motives why the "institutional investors" accepted.

86.    Even though this transaction was canceled, it allowed AremisSoft to stay on track for six weeks, which notably allowed the Criminal Organization to exercise an option for 40,000 AremisSoft shares attributed to MATHEWS and to sell said shares in the market around May 8, 2001 (see exhibit No. 9, pp. 80 and 81 and paragraph 110 below), with a significant profit.

87.    In addition, this operation was equally aimed to keep LK GlobalSoft.com in place. Regarding this, there are serious suspicions, according to which this company would have been used by the Criminal Organization the same way than AremisSoft to deceive investors about their value and to allow their officers and/or shareholders to sell their shares to the public at made up prices. An investigation was initiated in Cyprus about this. (See exhibit No. 16, p.3).

**B.    Deceiving statements regarding the contracts**

88.    KYPRIANOU, POYIADJIS and MATHEWS also deceived the public by grossly inflating the proceeds of closing contracts with AremisSoft.

89.    One of the most shocking examples is the contract made with the National Health Insurance Fund (NHIF) in Bulgaria, through the Bulgarian company **Insyst Electronic Ltd** and **Ruman ANTONOV**, who according a press report from December 17, 1999 was worth **37.5 million USD**. Subsequently, on May 17, 2001 AremisSoft management (Paul BLOOM) confirmed the payments received at this time exceeded **7 million USD.**

90.    In fact, the total value of the contract was only 3.9 million USD and has only generated an income of **1.7 million USD** (see exhibit No. 15)

**C.    Annual report deceit**

91.    The quick-witted deceit regarding the alleged acquisition of important companies and the closing of contracts were the necessary basis to allow the inflation of the business figures by AremisSoft.

92.    After KYPRIANOU, POYIADJIS, and MATHEWS suddenly resigned, AremisSoft's accountant, Peter FRANCIS, under orders from the new administration, found out that practically all the business figures assigned to the 2000 accounts to clients in emerging markets were **completely made up.** (See exhibit No. 7, paragraph 10-20 and appendix 5).

93.    Thus, AremisSoft's alleged proceeds for the 2000 financial year, of 123,609,000 USD, according to the annual report submitted to the SEC on March 26, 2001 (See exhibit No. 7, appendix 1), was inflated by 90 million USD, i.e. 73%.

94.    It appears that KYPRIANOU, POYIADJIS, and MATHEWS succeeded in deceiving

PKF, AremisSoft audit body, stating that AremisSoft proceeds were held by foreign sales agents who spent them entirely in acquisition expenses.

## VI.    CASHING IN AND MONEY LAUNDERING BY MEYER

95.    As already mentioned, the false statements regarding AremisSoft finances had one purpose, to deceive the public to acquire shares at completely artificial prices.

96.    In order to cash in the proceeds of this scam, a complex system of money laundering was put in place by MEYER, first in Switzerland, then at the Isle of Man.

### A.    First stage: cashing in the proceeds of the scam

97.    The first stage consisted in selling the shares from AremisSoft through offshore companies that did not seem to be linked to KYPRIANOU, POYIADJIS, and MATHEWS.

98.    Before entering the exchange on April 22, 1999, AremisSoft had issued 10,000,051 shares that were held as follows:

–    KYPRIANOU: 4,693,630 shares (held by LK Global Holdings NV.)

–    POYIADJIS: 584,190 shares (held by Temco Ltd.)

–    The rest was allegedly held by 111 other shareholders, in order to give SEC the impression that the shares were spread among a big number of people and to facilitate the entry to the exchange. It is possible that in fact, most of these 11 other shareholders were controlled or acted as trustees for KYPRIANOU, POYIADJIS, and MATHEWS.

99.    Furthermore, until April 20, 2001, KYPRIANOU and POYIADJIS officially granted themselves more than **7 million options.**

100.    Finally, on October 1999, 3.2 million new shares were issued and sold to Info-quest SA for 17.6 million USD.

101.    Between the month of August 2000 and the month of May 2001, over **10 million** AremisSoft shares were sold trough Swiss bank accounts by the members of the Criminal Organization, amounting to approximately **350 million USD** (see exhibit No.7, paragraph 47-64).

102.    To do so, MEYER opened at least 15 accounts at Bordier & Cie, Geneva, Dominick Company, AG, Zurich, Hentsch Henchoz and Cie, Lausanne and UBS SA, Geneva and Zurich, for the following companies in the British Virgin Islands:

–    Drax Trading Ltd; Bordier & Cies; Dominick Company AG

–    Emerging Markets Capital Ltd; Bordier & Cie; Dominick Company AG

–  Group Nova S.A. Dominick Company AG

–  Inlay Group Corp.; Bordier & Cie; Dominick Company

–  Olympus Capital Investment Inc.; Bordier & Cie.

–  Onyx Capital Investment Inc.; Bordier & Cie; Dominick Company

–  Oracle Capital Inc: Dominick Company AG; Hentsch Henchoz & Cie, UBS SA

–  Quantum Group Management, Ltd; Bordier & Cie; Dominick Company

103.  Furthermore, the Master Transactions Journal (see exhibit No. 9) held by AremisSoft transfer agent, Olde Monmouth Stock Transfer Co. Inc., showed that only share certificates that were issued before being traded on the exchange (and that were then most likely in their majority held in trust by KYPRIANOU, POYIADJIS, and MATHEWS)[85] were transferred by other Swiss banks:

–  February 24, 1999: 60,000 shares were issued to the order of Bank J. Vontobel & Co AG, Zurich (certificate No. 364)[86]

–  July 15, 1999: Certificate No. 135 representing 245,380 shares delivered by CBG Compagnie Bancaire, Geneva, to Drax Trading Ltd (140,206

–  shares) and the New York bank Brown Brothers Harriman & Co (105,154) shares towards a sale at the exchange that took place on July 21, 1999[87].

–  July 26, 1999: certificate No. 133 representing 245,380 shares delivered by Swiss Bank Corporation, Zurich to Brown Brothers Harriman & Co, New York towards a sale at the exchange that took place August 3, 1999.[88]

–  July 26 1999 certificate No. 138 representing 239,518 shares delivered by Banque Edouard Constant, Geneva to Drax Trading Ltd.[89]

–  November 1, 1999: Certificate No. 175 representing 11,684 shares, exchanged by Union Bancaire Privee, Geneva, for a new certificate No. 1,144 sold on the exchange on September 14, 2000[90].

---

[85] The certificates issued before December 31, 1998 carried numbers lower than 322. The certificates issue before the exchange entry had numbers lower than 1,021(see exhibit No. 9, pp 1 and 5).

[86] See exhibit No. 9 p. 1.

[87] See exhibit No. 9, p. 10.

[88] See exhibit No. 9, p. 10.

[89] See exhibit No. 9, p. 10.

[90] See exhibit No. 9, pp. 16 and 52.

    –      December 10, 1999: Certificate No. 187 representing 23,238 shares surrendered by Union Bancaire Privee, Geneva to the exchange agent Egger & Co, New York, for an exchange sale that took place December 16, 1999[91].

104.     The fact that several previous share certificates were delivered to Drax Trading Ltd., clearly indicate the fiduciary character of their holding.

105.     The following example describes how 3 million shares of AremisSoft were deposited in the account of Quantum Group Management Ltd. at Bordier & Cie, Geneva, and how the members of the Organization joined efforts with the purpose of cashing in on their crimes.

106.     The Quantum Group Management, Ltd account was opened at Bordier & Cie, Geneva by MEYER, who fraudulently designated Georgios KARADIMAS as the sole beneficiary on the account. (See exhibit No. 7, paragraph 80).

107.     Between November 11 2000 and May 2001 a total of 3,101,320 AremisSoft shares were delivered to the account of Quantum Group Management, Ltd. under instructions from MEYER, and sold in the exchange market.

108.     The options were allegedly allocated to Prime Growth, Inc. (POYIADJIS) and to Sincock Holding Corp., (KYPRIANOU), to MATHEWS and to AremisSoft's Indian employees.

109.     POYIADJIS gave the instructions to the lawyer Scott BARTEL, who passed them on to Olde Monmouth Stock transfer Com. Inc., transfer agent for AremisSoft, who then re-issued the appropriate share certificates and sent them according to the instructions received from MEYER.

110.     According to the instructions from POYIADJIS, the options were delivered to Drax trading Ltd, Emerging Capital Markets Ltd and Quantum Group Management Ltd, with the directive to wait for orders from MEYER, who systematically indicated the account number 172,408 from Quantum Group Management Ltd under Bordier & Cie (see exhibit No. 7, paragraph 70 and 100 and appendixes 65 and 68, see exhibit No. [MISSING NUMBER]).

---

[91] See exhibit No. 9, p. 20.

| AremisSoft Shares | Options issued payable to | Options surrendered to | Date of Fax from BARTEL | Instructions from MEYER dated |
|---|---|---|---|---|
| 400,000 | ? | ? | ? | 11.20.2000 |
| 133,333 | Prime growth, Inc | Drax trading Ltd | 12.12.200 | 12.12.2000 |
| 500,000 | Prime growth, Inc | Drax trading Ltd | 12.12.200 | 12.12.2000 |
| 566,666 | Sincock Holding Corp | Quantum Group Management Ltd | 15.12.2000 | 12.18.2000 |
| 11,322 | 17 Indian employees | Emerging Capital Markets Ltd | 01.11.2001 | 01.11.2001 |
| 300,000 | 15 Indian employees | Emerging Capital Markets Ltd | 01.15.2001 | 01.16.2001 |
| 750,000 | Sincock Holding Corp | Quantum Group Management Ltd | 02.27.2001 | 02.27.2001 |
| 266,666 | Sincock Holding Corp | Quantum Group Management Ltd | 04.23.2001 | 04.26.2001 |
| 133,333 | Prime growth, Inc | Drax Trading Ltd | 04.23.2001 | 04.26.2001 |
| 40,000 | M.C. MATHEWS | Emerging Capital Markets Ltd | 04.30.2001 | 05.01.2001 |
| 3,101,320 | TOTAL | | | |

111.  The members of the Criminal Organization did not make any distinction between the shares that were supposed to belong to KYPRIANOU, POYIADJIS, or MATHEWS, since they were all being received and sold by MEYER through an account at Quantum Group Management Ltd.

112.  This way of mixing the profits from the scam among the members of the Criminal Organization is a new confirmation of its existence.

113.  Questioned by the investigation team put in place by the new management of AremisSoft, the Indian employees who were supposed to be the beneficiaries of the options stated that they had not received any benefits from them.

**B.     Second Stage: Laundering the proceeds of the scam**

114.  After the shares were sold, MEYER would transfer the proceeds of the sale from the Quantum Group Management account into the other Swiss bank accounts in Cyprus and in Greece, before the funds came back to Switzerland (see exhibit 7, paragraph 50 and 51).

115.  In May 2001, when KYPRIANOU, POYIADJIS, and MATHEWS learned that the SEC had started an investigation, steps were taken to move the funds out of Switzerland, mainly to the Isle of Man.

116.  In July 2001, the Swiss accounts were closed and 175 million USD were transferred to four accounts in the name of Olympus Capital Investment Inc. and Oracle Capital Inc. at Fleming Isle of Man Ltd. (now Gerrard Private Bank, Isle of Man, Ltd.), Douglas and Isle of Man Bank Ltd, Douglas where they could now block the requests of the American justice and the victims of the scam.

117.  The rest of the 350 million USD laundered in Switzerland were probably transferred overseas before being transferred back to the Swiss banks or to their offshore

subsidiaries. It is probable that MEYER and TAVEL used their contacts in Switzerland to open such accounts which could not be identified yet.

118.   Thus, we can see that MEYER did not hesitate to use front-men to be named as beneficiaries in Form A.

119.   The search for the accounts that he opened himself or through somebody else must be extremely wide and meticulous in order to be able to identify and block the funds stemming from the AremisSoft scam.

## VII.   QUALIFICATIONS AND COMPETENCE

120.   The Swiss penal code is applicable:

A.   To the crimes and offences committed in Switzerland and if necessary including the cases where the perpetrator's wealth accumulation is made in Switzerland or damage has been caused to the victim in Switzerland (Article 3 and 7 PC) (FRA 117 Ib 210 C IIIb /CC and TI: CCRP 30.04.1982 Prep. 1984 p. 415); or

B.   To the crimes or offences committed abroad against a Swiss national if the perpetrator is in Switzerland and is not extradited abroad (Article 5 PC); or

C.   To the crimes or offences made abroad by a Swiss national who can be subjected to extradition according to Swiss law, if the act is also repressed in the State where it was made and if the perpetrator is in Switzerland (Article 6 PC).

121.   According to Swiss Penal code, the facts described above can be qualified as follows:

a.   **Fraud (Article 146 PC):** the shrewd manner in which members of the Criminal Organization misled the public and the legal entity AremisSoft by making false statements and concealing facts so as to make people buy AremisSoft's shares which did not really have any value, which was detrimental to their financial interests and led AremisSoft to bankruptcy constitutes fraud (FRA 113Ib 170; FRA 122 II 422). As the main objective and result of this fraud was to make it possible for the members of the Organization to sell their AremisSoft's shares at overrated prices and these sales took place from the time when the accounts were opened in Swiss banks, the Swiss authorities have jurisdiction to prosecute the perpetrators of these crimes. Moreover, insofar as at least four Swiss residents were cheated in this manner, Swiss competence also follows from this circumstance.

b.   **Giving false information on commercial enterprises (Article 152 PC):** by making false statements about AremisSoft's activities, its directors POYIADJIS, KYPRIANOU and MATHEWS knew that they would not only be read in United States but in other countries also. The communications with the public and the reports submitted to the SEC contained false and incomplete information which was very significant, likely to make the investors use their capital in a detrimental way to their financial interests. At least four Swiss residents were misled by such

information and bought AremisSoft's shares at overrated prices to suffer huge losses. Consequently, Swiss authorities have jurisdiction to prosecute this offence.

c.  **Aggravated mismanagement (Article 158 PC):** POYIADJIS, KYPRIANOU and MATHEWS were held under their authorization to manage AremisSoft's financial interests as directors. By acquiring false companies in AremisSoft's name for millions of dollars and by making up for the most part the sales performance and the company's proceeds, POYIADJIS, KYPRIANOU and MATHEWS seriously violated their duties with regard to AremisSoft and caused such a significant loss that the company had to file for bankruptcy. This action was intended to overvalue the company's shares and consequently profit POYIADJIS, KYPRIANOU and MATHEWS by selling them. As the wealth accumulation took place in Switzerland, Swiss authorities have jurisdiction in the prosecution of this crime.

d.  **Misusing the knowledge of a foreign company's confidential facts (Article 161 §5 PC):** in the capacity of directors as well as other members of the Criminal Organization POYIADJIS, KYPRIANOU and MATHEWS knew that the actual value of AremisSoft's shares was close to zero, since its sales performance and their company acquisition value were largely inflated. It was clear that disclosing such confidential information would influence remarkably the course of AremisSoft's shares quoted in the stock market, which was exactly the case as the value of the quoted shares plunged as soon as this information started to circulate. The members of the Criminal Organization made a financial profit amounting to hundreds of million dollars by selling their shares at a price close to 49.00 USD per share to the public, whereas these shares did not have any value. Insofar as these shares were sold from Swiss accounts, Swiss penal authorities have jurisdiction to prosecute this offense.

e.  **Forgery (intellectual) of title deeds (Article 251 PC):** the issue of false prospectus (FRA 120IV 122 C 4b), fake accounts (FRA 126 IV 68 C 2a), fraudulent contracts related to false acquisitions (FRA 96 IV 152 C 2a), false beneficiary declaration A Forms (FRA from November 30, 1999, SJ 2000, p. 234), as well as false documents submitted to the SEC which are documents that constitute an objective guarantee specially from those who draw them up and hence they are charged as forgers. These title deeds were used in Switzerland, intentionally in case of A Forms (see paragraph 46 above) and recklessly in case of other documents, which led four Swiss resident fraud victims to acquire AremisSoft's shares. Moreover, insofar as the intention of wealth accumulation was made in Switzerland, Swiss authorities are competent for the prosecution of these crimes.

f.  **Involvement in a criminal organization (Article 260th PC):** these crimes were committed by approximately twenty individuals, who organized and structured themselves secretly in order to defraud AremisSoft's investors. This fraud is not the only one to bring profit to the Organization, since it is also involved in stock

exchange fraud related to LK GlobalSoft.com Cyprus. The tasks were precisely distributed in the Organization as follows:

1)      KYPRIANOU, POYIADJIS, MATHEWS, BLOOM and BARTEL were the well-known part of the Organization. They led AremisSoft to make decisions related to fraudulent asset acquisition, issue of shares, and emission of stock options and repurchase of shares. Moreover, they prepared the press statements and fake documents submitted to the SEC in order to mislead the public.

2)      From Switzerland, the Island of Man, Monaco and Austria, BAINES, GRUT, MEYER, PAYR, POEHN, POTACHEV, SEDLMAYER, SPAHN, TAVEL and ZEHETHOFER set up offshore companies where they were the executive body and/or signed and completed fraudulent contracts in order to give the impression to the public that the sales proceedings as well as the value of AremisSoft's subsidiary companies were continuously increasing as well as that AremisSoft was in connection with many companies.

3)      BAINES (and his wife Wendy), GRUT, KARADIMAS, MEYER, Spyros POYIADJIS, ROBBINS and TAVEL opened bank accounts and acted as signatories and/or front-men designated as beneficiaries for POYIADJIS, KYPRIANOU and MATHEWS in order to sell AremisSoft's shares.

At least 50 offshore companies were used by the Organization to commit these crimes.

As the Organization conducted a substantial part of its activities in Switzerland, Swiss authorities have jurisdiction to prosecute its members.

g.   **Aggravated money laundering (Article 305$^{bis}$ PC):** as it has been shown, close to 350 USD million (and probably more) were taken and transferred in a myriad of accounts in Switzerland opened by offshore companies with fake beneficiary information in most cases. These acts block the identification of the origin, discovery or confiscation of the assets in these accounts. The perpetrators of these acts knew or must have known that these assets came from a crime and therefore they committed such concealment. It will be appropriate to determine the extent to which the bank staff agreed to receive these assets despite knowing of their criminal origin. These accounts were opened and operated by at least ten members of the Organization and in all likelihood were compensated for these services substantially. Hence, the conditions of a serious case according to the subparagraph 305$^{bis}$ al. 2 are fulfilled.

h.   **Violation of the article 9 of Federal Law on money laundering (LBA):** MEYER and TAVEL are Edifica SA's directors, which is a financial intermediary subject to LBA. They knew perfectly that the assets under their control were criminal in nature since they shared their commission. They also knew that POYIADJIS, KYPRIANOU and MATHEWS had been indicted in United States on June 24, 2002. In any case, it is proven that MEYER was the signatory of the assets of the Isle of Man. The absence of communication regarding suspected

money laundering hence violates LBA article 9 and Swiss authorities are competent to prosecute this offense.

122. The jurisdictional competence of Swiss authorities also arises because MEYER participated in most of the Organization's crimes and offences as principal or accomplice perpetrator when he was domiciled in Switzerland. Even if it was proved that he had committed part of his crimes abroad, his acts fall within Swiss jurisdiction according to article 6 PC as a Swiss citizen currently residing in Switzerland.

123. At present, at least 4 investors who were victims of the AremisSoft scam were identified in Switzerland (article 5 PC):

   1. Thomas MESSNER, c/o UBS AG, Attention Thomas LANG, P.O. Box 2418, 8098 Zurich, has bought 1,200 shares AremisSoft since June 15, 2001: his loss is 14,834 USD.

   2. Jean-Claude MIMRAN, Le Chalet, Hauptstrasse, 3780 Gstaad, has bought 1,000 shares AremisSoft on 20 November 2000: his loss is 19,732 USD.

   3. Jan LOOPUYT, Avenue Bouquet de Julie 49, 1815 Clarens, has bought 6,325 AremisSoft shares between 24 November 2000 and 27 July 2001: his loss is 100,595 USD.

   4  Credit Suisse, P.O Box 500, 8070 Zurich has bought 28,000 AremisSoft shares between 2 April and 18 May 2001: their loss is 320,788 USD.

124. The Swiss authorities have hence the authority to prosecute all crimes and offenses described in the present criminal complaint.

125. In accordance with article 340$^{bis}$, paragraph 1 CP, the offenses, in particular in articles 260th and 305$^{bis}$ CP, as well as the crimes committed by the Criminal Organization as presented in article 260th CP, are subject to mandatory federal legislation if the punishable deeds have been performed outside the country or if they were performed in several cantons without an obvious predominance in one of the cantons.

126. Moreover, in accordance with article 340$^{bis}$ paragraph 2 CP, the financial crimes (in particular articles 146, 158 and 251 PC) are subject to optional federal jurisdiction if the circumstances set in paragraph 1 are met and if a case on this matter is not submitted to any cantonal authority for prosecution.

127. The deeds of the Criminal Organization under the jurisdiction of Switzerland are subject to federal mandatory jurisdiction as they have been performed mainly outside the country and to a lesser extent in the cantons of Geneva, Vaud and Zurich, without predominance in any of these cantons. In addition, they would equally be subject to its optional jurisdiction.

128. Taking into account the importance and complexity of this matter, it is of outmost importance that the resources and means allocated to the "Ministere Public de la

Confederation" (Public Ministry of the Confederation) are used to prosecute the authors of these crimes and offenses and to identify, seize and confiscate the proceeds of their activities as well as all possessions controlled by the members of the Organization.

## VIII. <u>LEGAL CAPACITY TO BE A CRIMINAL AND CIVIL PLAINTIFF</u>

129.    In accordance with article 34 LFPP, any defrauded party may act in the capacity of plaintiff.

130.    The 6,028 individuals and corporations that I represent who have bought shares based on the criminal statements from KYPRIANOU, POYIADJIS, MATHEWS and their accomplices have sustained damages caused directly by the crimes and offenses outlined in the present criminal complaint.

131.    They hence benefit from being the plaintiffs.

132.    The identity of the perpetrators of these crimes was not discovered until recently (as of April 22, 2004, date of the ordinance which gave them access to the Isle of Man procedure). They have ascertained even more recently the documents and information which they can use in this criminal law proceedings. The delay in article 29 PC is hence fulfilled.

## IX. <u>URGENT REQUIRED MEASURES</u>

133.    AremisSoft's stock exchange scam is one of the biggest crimes resulting in money laundering in Switzerland.

134.    Switzerland in particular was the central point from where the members of the Criminal Organization implemented their plans to get rich by several hundred million dollars, money they laundered in banks located in three cantons.

135.    It is therefore essential that the federal authorities react to this crime with the utmost vigor and severity.

136.    The loss of 565 USD million sustained by my clients is far from being redeemed. This is why it is essential to identify all the assets that could be blocked to be confiscated or to be used as claim compensation (article 59 PC).

137.    The United States authorities, in particular the Southern District of New York Prosecutor have assured the Trustees that they will closely work together with the Swiss authorities and that they will provide all necessary assistance in prosecuting the crimes and offenses under Swiss jurisdiction.

138.    The following urgent measures are required in particular to protect the interests of the plaintiffs:

1.    Enact a **bank alert** throughout all Swiss banks (including their foreign branches), financial corporations and other financial intermediaries, ordering them to report if the

individuals and corporations mentioned in the above paragraphs 35 – 54 have or have had any contact as account holders, holders of financial rights, references, signatories, asset managers or facilitators and **order the freezing** of all accounts, certificate of deposit, fine metals, escrows, safes or other holdings in any form.

In particular with:

- Atlas Management SA, Carouge (GE)

- Edouard Constant Bank, Geneva

- J. Vontobel Bank & Co AG, Zurich,

- Bordier & Cie, Geneva

- CGB Compagnie Bancaire, Geneva

- Credit Suisse, Zurich

- Dominick Company AG, Zurich

- Hentsch Henchoz & Cie, Lausanne

- Lloyds Bank, Geneva

- UBS SA, Geneva and Zurich

- Union Bancaire Privee, Private Bank Union, Geneva

2.  Issue a **bank alert** to all banks in Switzerland (including their foreign branches), financial corporations and other financial intermediaries in Switzerland requesting them to report if and under what circumstances, mainly in regards to which accounts, they have owned AremisSoft shares, in particular with the following institutions:

- Atlas Management SA, Carouge (GE)

- Libra Financiere SA, Lausanne

- SEGAInterSettle AG, Olten

- Bank J. Vontobel & Co AG, Zurich(in particular certificate number 364)

- CBG Compagnie Bancaire Geneve, Geneva (in particular certificate number 138)

- UBS Ab, Zurich (in particular certificate number 133)

- Banque Edouard Constant, Geneva (in particular certificate number 138)

- Union Bancaire Privee, Geneva (in particular certificate numbers 175 and 187)

3. **Order the freezing** of all accounts where funds are deposited or withdrawn originated from, transferred or destined to the accounts mentioned in the above paragraph and which could have been controlled by the Criminal Organization.

4. **Confiscate** all banking correspondence since 1994 to present, related to the above mentioned accounts, as well as the documents regarding opening accounts, the instructions, the telecommunications, the signature samples, the A Forms, client profiles, internal correspondence, conference meeting minutes, internal and external correspondence in paper or electronic format

5. **Search** the Edifica SA offices (13 d'Yverdon street, 1028 Preverenges), the residence of Roger Andre MEYER, 27, Square Clair-Matin, 1213 Petit-Lancy, the residence of Bernard TAVEL, 13 Route d'Yverdon, 1028 Preverenges and seize all relevant documents, included passports and credit card reports, as well as all computers, mobile phones and other electronic devices likely to contain relevant information.

6. **Order the return** of all relevant items in possession of Swiss authorities.

7. **Interrogate** the individuals included in the above paragraphs 36 to 50 if they remain in Switzerland, as well as anyone likely to provide useful information to the progress of this inquest.

8. **Proceed with the necessary arrests** in order to prevent the risk of escape, concealing or reiteration.

9. Request through **international service of process commissions** to freeze overseas assets and the transfer of all relevant documents as well as the interrogation and the arrest of involved individuals.

I look forward to providing any additional information that you might require.

Please accept my highest regards.

[SIGNATURE]
Enrico MONFRINI

Attachments: as per appendix notes.