# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- v. -

HANS BODMER,

Defendant.

- - - - - - - - - - - - - - - - - - - - X

**03 CRIM.    947**

INDICTMENT

03 Cr.

U.S. DISTRICT COURT
FILED
AUG 5 2003
S. D. OF N.Y.

<u>COUNT ONE</u>

<u>Conspiracy to Violate the Foreign Corrupt Practices Act</u>

The Grand Jury charges:

<u>GENERAL ALLEGATIONS</u>

1.    The Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for United States persons, businesses, and residents, directly or indirectly through an agent, to use any means or instrumentality of interstate or foreign commerce, including the United States mails, in furtherance of an offer, promise, authorization, or payment of money or anything else of value to a foreign government official to obtain or retain business for, or direct business to, any person.

MICROFILM
SEP - 4 2003
9:00 AM

## BACKGROUND

### Azerbaijan and Privatization

2.    The Republic of Azerbaijan ("Azerbaijan") is located in the Caspian Sea region in southwestern Asia and borders Russia, Georgia, Armenia, Turkey, and the Caspian Sea. Formerly a Republic within the Soviet Union, Azerbaijan has been a sovereign nation since 1991, with its capital in Baku. Azerbaijan has substantial deposits of oil within its territory, both on land and offshore under the Caspian Sea.  Azerbaijan's oil assets are held by the State Oil Company of the Azerbaijan Republic ("SOCAR").

3.    At all times relevant to this Indictment, Azerbaijan was undertaking a program to privatize certain of its state-owned enterprises.  The privatization process in Azerbaijan was governed by the State Program of State Property Privatization for 1995-1998, and a number of related decrees and regulations. Privatization was administered principally by Azerbaijan's State Property Committee (the "SPC").  By Azeri law, enterprises of oil and gas production and processing -- such as SOCAR -- could only be privatized at the will of the president of Azerbaijan.  As part of Azerbaijan's privatization program, each of its citizens (approximately 7 million in 1995) received at no cost a voucher booklet of four voucher coupons.  The vouchers were bearer instruments, freely tradable, and could be used to bid for shares

-2-

of privatized enterprises at auction.  Typically, some shares of

an enterprise that was being privatized were sold for vouchers at

auction, other shares were sold for cash at auction, and still

other shares were reserved for sale to the enterprise's

employees.  Foreigners intending to participate in privatization

or use vouchers at auction were required to purchase instruments

called "options" — specifically, in the ratio of one option for

each voucher coupon held.  The SPC sold options at an official

government price.

### The Investment Consortium

4.   At all times relevant to this Indictment, Oily

Rock Group, Ltd. ("Oily Rock"), a corporation organized under the

laws of the British Virgin Islands and having its principal place

of business in Baku, Azerbaijan, invested in Azeri privatization

vouchers and options for the primary purpose of acquiring at

auction a controlling interest in SOCAR.  Oily Rock was created

in approximately July 1997, and thereafter issued shares of its

stock to various individual and corporate investors and,

eventually, an Azeri government official.  Oily Rock also entered

into co-investment agreements with various investors (hereafter

the "co-investors"), whereby the parties agreed to pursue a joint

investment strategy in acquiring, safeguarding, and exercising at

auction Azeri privatization vouchers and options for the primary

purpose of acquiring a controlling interest in SOCAR.

- 3 -

5.    At all times relevant to this Indictment, Minaret
Group, Ltd. ("Minaret"), a corporation organized under the laws
of the British Virgin Islands and having its principal place of
business in Baku, Azerbaijan, engaged in various investment
banking activities, including the acquisition and safeguarding of
Azeri privatization vouchers and options on behalf of Oily Rock,
its shareholders, and its co-investors.  To this end, Minaret was
a party to the co-investment agreement between Oily Rock and the
co-investors.  Minaret was created in approximately July 1997,
along with Oily Rock.  (Oily Rock, Minaret, Oily Rock's
shareholders, and the co-investors collectively will be referred
to herein as the "investment consortium.")

6.    At all times relevant to this Indictment, HANS
BODMER, the defendant, was a Swiss citizen and a lawyer with the
Swiss law firm von Meiss Blum & Partners.  BODMER represented
Oily Rock, Minaret, Omega Advisors, Inc. (described below in
paragraph 7) and various other investors in connection with their
investment in Azeri privatization vouchers and options with Oily
Rock and Minaret.  BODMER also served as a member of the board of
directors of Hyposwiss Bank.  As the lawyer and agent of Omega
Advisors, Inc., and various other members of the investment
consortium, BODMER was an agent of a "domestic concern," as that
term is defined in the Foreign Corrupt Practices Act of 1977, 15
U.S.C. § 78dd-2(h)(1)(B).

-4-

7.    At all times relevant to this Indictment, Omega Advisors, Inc. was a corporation organized under the laws of Delaware and having its principal place of business in New York, New York.  On or about March 24, 1998, Omega Advisors, Inc. entered into a letter of intent with Oily Rock and Minaret. Omega Advisors, Inc. entered into a co-investment agreement with Oily Rock and Minaret on or about April 30, 1998 through subsidiaries and affiliates called Omega Group Holdings Ltd., Pine Street Investment Ltd., and Pharos Finance Ltd.; on or about June 8, 1998, through a subsidiary and affiliate called Pinford Portfolio, Inc.; and on or about September 30, 1998, through subsidiaries and affiliates called Telos Finance Investment Ltd. and Helendale Trading Corp.  Omega Advisors, Inc. and various of its subsidiaries and affiliates, namely Omega Group Holdings Ltd., Pine Street Investment Ltd., Pinford Portfolio, Inc., Telos Finance Investment Ltd., Helendale Trading Corp., Ossian Overseas Ltd., Hilgore Overseas Inc., Shireton Financial Corp., Clifftop Invest Ltd., Conak International Inc., Babson Invest S.A., Villisham Holding Corp., Kays Holdings S.A., Kaypark Enterprises Corp., Reno Financial Inc., and Penasco Business Inc., each had their principal places of business in New York, New York.  Two of these subsidiaries and affiliates, namely Pharos Finance Ltd. and Global Securities Investor Ltd., had their principal place of business in New York, New York until in or about September 1998,

-5-

and in Red Bank, New Jersey, thereafter.  The above subsidiaries

and affiliates were formed for the purpose of effecting

investments by Omega Advisors, Inc. in Azeri privatization

vouchers and options.  As such, Omega Advisors, Inc. and the

above subsidiaries and affiliates (hereafter referred to

collectively as "Omega") were "domestic concerns", as that term

is defined in the Foreign Corrupt Practices Act of 1977, 15

U.S.C. § 78dd-2(h)(1)(B).  Between on or about March 20, 1998 and

on or about July 23, 1998, Omega purchased a total of

approximately $126 million in Azeri privatization vouchers and

options through its letter of intent and co-investment agreement

with Oily Rock and Minaret.  Between on or about March 27, 1998

and on or about June 11, 1998, Omega wired funds for such

purchases.

     8.  At all times relevant to this Indictment, Pharos

Capital Management, L.P. was a limited partnership organized

under the laws of Delaware and having its principal place of

business in New York, New York until in or about September 1998,

and in Red Bank, New Jersey, thereafter.  Pharos Capital

Management, L.P. was in the business of investing in emerging

markets.  On or about March 24, 1998, Pharos Capital Management,

L.P. entered into a Letter of Intent with Oily Rock and Minaret.

Pharos Capital Management, L.P. entered into a co-investment

agreement with Oily Rock and Minaret on or about April 30, 1998

through a subsidiary and affiliate called Pharos Finance Ltd.,
and on or about June 8, 1998 through a subsidiary and affiliate
called Pinford Portfolio, Inc. Relevant subsidiaries and
affiliates of Pharos Capital Management, L.P., namely Pharos
Finance Ltd. and Global Securities Investor Ltd., each had its
principal place of business in New York, New York until in or
about September 1998, and in Red Bank, New Jersey, thereafter.
Other relevant subsidiaries and affiliates of Pharos Capital
Management, L.P., namely Pinford Portfolio, Inc., Villisham
Holding Corp., and Kays Holding S.A., each had their principal
place of business in New York, New York. The above subsidiaries
and affiliates were formed to effect investments by Pharos
Capital Management, L.P. in Azeri privatization vouchers and
options. Until in or about August 1998, the sole principal of
Pharos Capital Management, L.P. was also a principal of Omega
Advisors, Inc. At all relevant times, Pharos Capital Management,
L.P. and its subsidiaries and affiliates (hereafter referred to
collectively as "Pharos") were "domestic concerns", as that term
is defined in the Foreign Corrupt Practices Act of 1977, 15
U.S.C. § 78dd-2(h)(1)(B).

The Azeri Government Officials

9.   At all times relevant to this Indictment, the
intended recipients of corrupt payments were senior officials of
the Government of Azerbaijan, specifically: (a) a senior official

-7-

of the Government of Azerbaijan (the "Senior Azeri Official");
(b) a senior official of SOCAR, Azerbaijan's national oil company
(the "SOCAR Official"); and (c) two senior officials of the SPC
(SPC Official #1 and SPC Official #2, respectively, and together,
the "SPC Officials"). Each of these senior officials of the
Government of Azerbaijan was a "foreign official" as that term is
defined in the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §
78dd-2(h)(2)(A). (These four senior Azeri government officials
collectively shall be referred to as the "Azeri Officials" in
this Indictment.)

**Overview of the Conspiracy to Bribe**

10.   Beginning in or about August 1997 and continuing
until in or about 1999, HANS BODMER, the defendant, as an agent,
and others known and unknown to the Grand Jury, as principals and
agents, paid bribes and authorized the payment of bribes (a) to
induce the Azeri Officials to allow the investment consortium's
continued participation in privatization, (b) to privatize SOCAR,
(c) and to permit the investment consortium to acquire a
controlling interest in SOCAR.

11.   Beginning in or about March 1998 up to and
including in or about September 1998, Omega and Pharos entered
into various agreements in order to participate in Azeri
privatization, and between in or about March 1998 and in or about
June 1998, funded their respective investments in privatization

-8-

vouchers and options, alongside and in concert with Oily Rock and Minaret. Persons known and unknown to the Grand Jury recommended and caused Omega and Pharos to fund substantial investments with Oily Rock and the investment consortium -- and caused various employees to administer those investments -- based on their understanding that persons associated with Oily Rock, known and unknown to the Grand Jury, paid bribes to the Azeri Officials to ensure the privatization of SOCAR and to ensure that Oily Rock and, later, the investment consortium, acquired control of SOCAR through the privatization process.

12.   Beginning in or about July 1997 up to and including in or about September 1998, persons associated with Oily Rock, known and unknown to the Grand Jury, acting on their own behalf and as agents of certain investors known and unknown to the Grand Jury, agreed to pay and authorized the payment of bribes to the Azeri Officials. In furtherance of the scheme to bribe the Azeri Officials, HANS BODMER, the defendant, effected certain of the bribe payments as an agent of, among others, Oily Rock and certain other investors known and unknown to the Grand Jury.

13.   The bribes offered and/or paid to the Azeri Officials took numerous forms, including (a) cash payments of millions of dollars; (b) a share of profits from the privatization of SOCAR; (c) the transfer of Oily Rock's vouchers

-9-

and options; (d) wire transfers of millions of dollars; (e) Oily
Rock stock; and (f) gifts of things of value and other favors.

## STATUTORY ALLEGATIONS

14.   From in or about May 1997, up to and including in
or about 1999, in the Southern District of New York and
elsewhere, HANS BODMER, the defendant, and others known and
unknown to the Grand Jury, unlawfully, willfully, and knowingly
combined, conspired, confederated, and agreed together and with
each other to commit offenses against the United States, to wit,
violations of Title 15, United States Code, Section 78dd-2.

15.   It was a part and an object of the conspiracy
that HANS BODMER, the defendant, being an agent of a "domestic
concern," as that term is defined in the Foreign Corrupt
Practices Act, and others known and unknown to the Grand Jury,
being American citizens, "domestic concerns", and agents of
"domestic concerns," would and did make use of the mails and
other means and instrumentalities of interstate commerce
corruptly in furtherance of an offer, payment, promise to pay,
and authorization of the payment of any money, and offer, gift,
promise to give, and authorization of the giving of anything of
value to foreign officials for purposes of (a) influencing acts
and decisions of such foreign officials in their official
capacity, (b) inducing such foreign officials to do and omit to
do acts in violation of the lawful duty of such officials, and

(c) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentality, in order to assist BODMER, the defendant, and others known and unknown in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Section 78dd-2.

## Pharos and Omega Investments

16. On or about February 27, 1998, persons known and unknown to the Grand Jury met with representatives of Omega to solicit Omega's investment in Azeri privatization.

17. While conducting due diligence on behalf of Omega and Pharos, persons known and unknown to the Grand Jury learned that Oily Rock and persons associated with Oily Rock known and unknown to the Grand Jury had entered into a corrupt relationship with Azeri officials, including the senior Azeri Official, in connection with Oily Rock's investment in Azeri privatization, and had obtained non-public information of the Azeri government's imminent privatization of SOCAR.

18. On or about March 24, 1998, Omega, Pharos, Oily Rock and Minaret executed a letter of intent in connection with investments by Omega and Pharos in Azeri privatization. Then, on or about April 30, 1998, Omega, Pharos, Oily Rock and Minaret executed a co-investment agreement governing investments by Omega

-11-

and Pharos in Azeri privatization and the acquisition by Omega and Pharos of privatization vouchers and options.

19.    Between on or about March 20, 1998 and on or about July 23, 1998, Omega purchased a total of approximately $126 million in Azeri privatization vouchers and options through its letter of intent and co-investment agreement with Oily Rock and Minaret. Between on or about March 27, 1998 and on or about June 11, 1998, Omega wired funds to make such purchases.

20.    Between on or about March 20, 1998 and on or about June 10, 1998, Pharos purchased a total of approximately $25 million in Azeri privatization vouchers and options through its letter of intent and co-investment agreement with Oily Rock and Minaret. Between on or about March 27, 1998 and on or about May 8, 1998, Pharos wired funds to make such purchases.

## MEANS AND METHODS OF THE FCPA CONSPIRACY

21.    Among the means and methods by which HANS BODMER, the defendant, and others known and unknown to the Grand Jury, carried out the object of the conspiracy were the following:

a.    The Azeri Officials had the authority and the ability to preclude entirely Oily Rock, Minaret, and the investment consortium's participation in Azeri privatization, including the power to stop Oily Rock and Minaret acquisition of vouchers and options and the power to arrest Oily Rock and Minaret's personnel. Oily Rock, its shareholders, Minaret, and

-12-

the entire investment consortium were therefore dependent upon the goodwill of the Azeri Officials to permit their participation in Azeri privatization generally, their accumulation of privatization vouchers and options, and their acquisition of a controlling interest in SOCAR.

b. The SPC Officials had the authority to administer Azerbaijan's privatization program, including the power to recommend to the Senior Azeri Official the privatization of particular enterprises including SOCAR, as well as the timing and features of any such privatization. Oily Rock, its shareholders, Minaret, and the entire investment consortium were therefore dependent upon the goodwill of the SPC Officials to accomplish their investment objective of obtaining a controlling interest in SOCAR.

c. The SOCAR Official wielded great influence with respect to any privatization of SOCAR, including great influence with the senior Azeri official. Oily Rock, its shareholders, Minaret, and the entire investment consortium were therefore dependent upon the goodwill of the senior SOCAR Official to accomplish their investment objective of obtaining a controlling interest in SOCAR.

d. The Senior Azeri Official had the discretion to sign a decree in order to effect the privatization of SOCAR, and the privatization of SOCAR could not take place without such

-13-

a decree.  The Senior Azeri Official was the ultimate decision maker with respect to all significant aspects of privatization. Oily Rock, its shareholders, Minaret, and the entire investment consortium were therefore dependent upon the goodwill of the Senior Azeri Official to accomplish their investment objective of obtaining a controlling interest in SOCAR.

e.  To enrich the Azeri Officials at the expense of the Republic of Azerbaijan and its citizens, and to improperly influence the Azeri Officials in order to obtain and retain business for themselves and others, HANS BODMER, the defendant, and others known and unknown to the Grand Jury, used various methods to offer to pay and to pay money and other things of value to the Azeri Officials.

f.  As part of the scheme to pay Azeri Officials, HANS BODMER, the defendant, and persons known and unknown to the Grand Jury, participated in numerous meetings with the SOCAR Official and the SPC Officials.

g.  As a further part of the scheme, HANS BODMER, the defendant, and persons known and unknown to the Grand Jury, created a number of shell companies, incorporated in the British Virgin Islands and other offshore jurisdictions and controlled variously by Investor #1, BODMER, and the Azeri Officials.

h.  As a further part of the scheme, HANS BODMER, the defendant, opened Swiss bank accounts for the benefit of

-14-

Officials, including documents pertaining to: (a) various holding companies; (b) various parent companies; (c) credit facilities; and (d) side letters suspending interest payments on the credit facilities.

   k.   HANS BODMER, the defendant, and others known and unknown to the Grand Jury, caused U.S. currency to be flown from Switzerland on private jets and charter planes to Baku, Azerbaijan.

   l.   HANS BODMER, the defendant, served as legal counsel to, among others, Oily Rock, Minaret, Omega, Pharos, and the Azeri Officials.

   m.   HANS BODMER, the defendant, and others known and unknown to the Grand Jury, caused funds to be wired to various bank accounts, including accounts in Switzerland, the Netherlands, and the United Arab Emirates, for the benefit of the Azeri Officials.

   n.   As part of an agreement to benefit the Azeri Officials, HANS BODMER, the defendant, and others known and unknown to the Grand Jury, caused the cancellation of the old share certificates of Oily Rock's shareholders reflecting share capital of $150 million, and the issuance of new share certificates reflecting share capital of $450 million.

## OVERT ACTS

22.    In furtherance of said conspiracy and to effect the object thereof, the defendants, and others known and unknown committed the following overt acts in the Southern District of New York and elsewhere:

a.    On or about September 29, 1997, HANS BODMER, the defendant, met in Zurich, Switzerland with an American investor interested in purchasing shares of Oily Rock.

b.    On or about January 9, 1998, HANS BODMER, the defendant, received instructions in Zurich, Switzerland to wire transfer $1 million to a Dutch bank account for the benefit of an individual beneficiary identified by SPC Official #2.

c.    On or about March 10, 1998, HANS BODMER, the defendant, caused a chartered jet to convey from Zurich, Switzerland to Baku at least $5,380,000 in U.S. currency in order to purchase privatization vouchers and/or options.

d.    On or about March 30, 1998, HANS BODMER, the defendant, and others known and unknown to the Grand Jury met in New York, New York.  On the same day, a representative of Omega in New York, New York directed the wire transfer of nearly $20 million to BODMER's law firm in Zurich, Switzerland "for a retainer on legal fees related to Azerbaijan trading matters" on behalf of Omega and Pharos.

e.   On or about March 30, 1998, HANS BODMER, the defendant, and others known and unknown to the Grand Jury received authorization to wire $25 million held in a client account maintained by BODMER's law firm on Omega's behalf to Minaret in connection with purchases of privatization vouchers and options.

f.   On or about April 1, 1998, HANS BODMER, the defendant, caused a chartered jet to convey from Zurich, Switzerland to Baku approximately $21,423,200 in U.S. currency from Omega in order to purchase privatization vouchers and/or options.

g.   On or about April 6, 1998, a representative of Omega and Pharos caused a fax to be sent from Omega and Pharos' offices in New York, New York to HANS BODMER, the defendant, in Zurich, Switzerland, advising that the representative of Omega and Pharos had instructed that $55 million be wire transferred to a Swiss bank account held by BODMER's law firm, and directing BODMER to have the funds "converted to cash and delivered to Baku in two separate deliveries as soon as practically possible".

h.   On or about April 15, 1998, HANS BODMER, the defendant, caused a chartered jet to convey from Zurich, Switzerland to Baku approximately $20 million in U.S. currency from Omega in order to purchase privatization vouchers and/or

-18-

options.

i. Between in or about April 1998 and in or about June 1998, HANS BODMER, the defendant, opened bank accounts for the benefit of the SPC Officials and certain of their family members.

j. On or about July 8, 1998, HANS BODMER, the defendant, participated in a telephone conference call with others known and unknown to the Grand Jury in which BODMER advised the participants that the issuance of an additional 300 million shares of Oily Rock had been authorized and that these shares would be issued in exchange for vouchers.

k. On or about August 19, 1998, HANS BODMER, the defendant, caused a facsimile to be transmitted from Zurich, Switzerland to Baku, Azerbaijan in which BODMER confirmed that he had sponsored the application of the son of SPC Official #2 for admission to graduate school at a university in the United States.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### Money Laundering Conspiracy

The Grand Jury further charges:

23. Paragraphs one through thirteen and sixteen through twenty-two are repeated and realleged as if set forth in full herein.

-19-

24.    From in or about August 1997, up to and including in or about September 1998, in the Southern District of New York and elsewhere, HANS BODMER, the defendant, and others known and unknown to the Grand Jury, unlawfully, wilfully, and knowingly did combine, conspire, confederate and agree together and with each other to violate Section 1956(a)(2) of Title 18, United States Code.

25.    It was a part and an object of the money laundering conspiracy that HANS BODMER, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate and foreign commerce, unlawfully, wilfully, and knowingly would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit, felony violations of the Foreign Corrupt Practices Act, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## MEANS AND METHODS OF THE MONEY LAUNDERING CONSPIRACY

26.    During the time period of the money laundering conspiracy, HANS BODMER, the defendant, and others known and unknown to the Grand Jury laundered more than $150,000,000 in investment funds from the United States through various bank accounts in Switzerland and elsewhere outside the United States

by, among other methods, transmitting and causing to be
transmitted funds by wire transfer from bank accounts in New
York, New York and elsewhere in the United States, and through
correspondent banks in New York, New York, to bank accounts in
Zurich, Switzerland and Jersey, Channel Islands. After the
investment funds were transferred from the United States into the
Swiss and Jersey bank accounts, most of those funds, along with
other funds, were transported, transmitted and transferred to
Baku, Azerbaijan. The investment funds were then used, among
other things, to purchase vouchers and options which were to be
used to bid on shares of SOCAR at auction. Other parts of those
investment funds were transferred by wire to accounts for the
benefit of the Azeri Officials.

### OVERT ACTS

27.     In furtherance of the conspiracy and to effect
the illegal objects thereof, the following overt acts, among
others, were committed in the Southern District of New York and
elsewhere:

a.     On or about April 8, 1998, a co-
conspirator not named herein caused approximately $55,000,000 in
investment funds to be wire transferred from bank accounts in New
York, New York to bank accounts in Zurich, Switzerland under the
control of HANS BODMER, the defendant.

-21-

b.    On or about May 14, 1998, a co-conspirator not named herein caused approximately $3,000,000 in investment funds to be wire transferred from a bank account in New York, New York to a bank account in Zurich, Switzerland under the control of HANS BODMER, the defendant.

(Title 18, United States Code, Section 1956(h).)

### FIRST FORFEITURE ALLEGATION

28.    As the result of committing offense of conspiracy to violate the Foreign Corrupt Practices Act in violation of 18 U.S.C. § 371, alleged in Count One of this Indictment, defendant HANS BODMER shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to a sum of money equal to $150,000,000 in United States currency, representing the amount of proceeds obtained as a result of the offense, conspiracy to violate the Foreign Corrupt Practices Act.

### Substitute Asset Provision

29.    If any of the above-described forfeitable property, as a result of any act or omission of HANS BODMER, the defendant:

(a)    cannot be located upon the exercise of due diligence;

-22-

(b)   has been transferred or sold to, or deposited with, a
third person;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be
subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. §

853(p), to seek forfeiture of any other property of said

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981; and Title 28 United
States Code, Section 2461.)

## SECOND FORFEITURE ALLEGATION

30.    As the result of committing the money laundering

offense in violation of 18 U.S.C. § 1956, alleged in Count Two of

this Indictment, HANS BODMER, the defendant, shall forfeit to the

United States, pursuant to 18 U.S.C. § 982, all property, real

and personal, involved in the money laundering offense and all

property traceable to such property, including but not limited to

a sum of money equal to $150,000,000 in United States currency,

in that such sum in aggregate is property which was involved in

the money laundering offense or is traceable to such property.

### Substitute Asset Provision

31.    If any of the above-described forfeitable

property, as a result of any act or omission of HANS BODMER, the

defendant:

(a)   cannot be located upon the exercise of due diligence;

-23-

(b)   has been transferred or sold to, or deposited with, a
      third person;

(c)   has been placed beyond the jurisdiction of the Court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be
      subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. §
982(b) and 21 U.S.C. § 853(p), to seek forfeiture of any other
property of said defendant up to the value of the forfeitable
property.

(Title 18, United States Code, Sections 982 and 1956.)


FOREPERSON                          JAMES B. COMEY
                                    United States Attorney


- 24 -

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### HANS BODMER,

Defendant.

### INDICTMENT

03 Cr. ____

(Title 18, United States Code,
Section 371, and Title 15, United States
Code, Section 78dd-2; Title 18, United
States Code, Section 1956(h))

JAMES B. COMEY
United States Attorney.

### A TRUE BILL

*[signature]*

Foreperson:

*under seal*

8/5/03: Filed indictment A/W signed by Judge Fox for Hans Bodmer. Case *[illegible]* *[illegible]* Fox, K.N., U.S.M.J.

9/4/03 - Case assigned to Judge Scheindlin for all purposes.

Eaton, J. U.S. M.J.

H.L.