UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/4/09
```

UNITED STATES OF AMERICA,                  :
                                           :
              Plaintiff,                   :        07 Civ. 9235 (CSH)
                                           :
       v.                                  :
                                           :        **MEMORANDUM OPINION**
LLOYDS TSB BANK PLC,                       :        **AND ORDER**
                                           :
              Defendant.                   :
                                           :

HAIGHT, Senior District Judge:

Plaintiff United States of America ("the Government") sued Defendant Lloyds TSB Bank plc ("Lloyds TSB" or "the Bank") to impose a civil penalty upon the Bank pursuant to the Money Laundering Control Act of 1986 as amended ("the MLCA"), 18 U.S.C. § 1956(b)(1). The Court dismissed the Government's original Complaint ("the OC") for lack of subject matter jurisdiction, stating its reasons in an opinion reported at 2009 WL 874040 (S.D.N.Y. March 31, 2009) ("*Lloyds TSB I*"), with which familiarity is assumed. The Clerk entered judgment dismissing the OC without prejudice.

The Government now moves the Court "for an order amending its judgment of March 31, 2009 dismissing the Plaintiff's Complaint against Lloyds TSB Bank plc without prejudice in order to grant the Plaintiff leave to file the Proposed Amended Complaint, attached hereto as Exhibit A." Notice of Motion dated April 14, 2009. The Government's Notice of Motion does not specify the Rule or Rules of Federal Procedure upon which it is based.

1

The Bank opposes the motion on procedural and substantive grounds. Procedurally, the Bank contends that the Rules do not afford the Government a remedy and its only recourse is a direct appeal from this Court's opinion and order in *Lloyds TSB I*. Substantively, the Bank contends that the proposed amendment should be disallowed as futile, since it would not withstand a motion to dismiss under Rule 12.

I

While its Notice of Motion is silent on the point, the Government's briefs show that principal reliance is placed on Federal Rule of Civil Procedure 59(e). Rule 59 is captioned: "New Trial; Altering or Amending a Judgment." Rules 59(a)-59(d) deal with various aspects of a motion for a new trial. Rule 59(e) deals with a motion to alter or amend a judgment. It provides: "A motion to alter or amend a judgment must be filed no later than 10 days after the entry of the judgment."

Lloyds TSB argues that Rule 59 cannot apply to the case at bar "because the text of the Rule makes it plain that it addresses motions for new trials after a trial has been completed and the amendment of judgments entered after trial." Brief at 4-5. The argument misreads the Rule and disregards cases construing it. While Rules 59(a)-(d) by their terms apply only to cases that have been tried, Rule 59(e) is not limited by its language to judgments entered after trial. The use of the semi-colon in Rule 59's caption indicates that a different subject is being introduced. A case may be dismissed on motion, as this one was, and judgment entered accordingly; courts routinely consider Rule 59(e) motions to alter or amend such a judgment. In *Acito v. Imcera Group, Inc.*, 47 F.3d 47 (2d Cir. 1995), the district court dismissed a securities fraud case on defendants' motion. Plaintiffs moved under Rule 59(e) to amend the judgment of dismissal and grant them leave to amend their

2

complaint: precisely the relief the Government seeks on this motion. The district court denied plaintiffs' Rule 59(e) motion. The Second Circuit affirmed, on the ground that the amendment would be futile; but there was no suggestion that plaintiffs' motion did not lie under the Rule. In *Exportaciones del Futuro S.A. de C.V. v. Iconix Brand Group*, No. 07 Civ 4145, 2007 WL 3306699 (S.D.N.Y. Nov. 6, 2007), Judge Sand dismissed on motion a complaint sounding in contract and tort, entertained plaintiff's Rule 59(e) motion for relief, adhered to his prior judgment, but granted plaintiff leave to amend the complaint.

Private plaintiffs alleging securities fraud opposing motions to dismiss for failure to plead with the particularity required by Rule 9(b) routinely ask, in the alternative, for leave to replead if the motion succeeds. Courts routinely grant such leave, at least once. In the case at bar the Government, with apparent total confidence in the sufficiency of its OC, did not include that alternative prayer; and the Court dismissed the pleading without granting leave to replead *sua sponte*. In such circumstances, the Second Circuit has explicitly approved a motion for plaintiff for relief under Rule 59(e). *See Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) ("A party seeking to file an amended complaint postjudgment must first have the judgment vacated or set aside pursuant to Fed. R. Civ. P. 59(e) or 60(b)." (citation omitted)).[1] The Government follows that course in this case. Further citations are unnecessary. The applicability of Rule 59(e) to judgments entered on motions to dismiss is well established.

A court's consideration under Rule 59(e) of a motion to amend a dismissed complaint serves the interests of justice. A plaintiff is entitled to assert all claims or theories of entitlement available

---

[1]     In *Ruotolo* the Second Circuit denied on the merits plaintiff's motion to amend the complaint.

3

to it on the facts and the law. Amending the complaint is sometimes necessary to achieve that purpose. The Rules favor amendments. Before trial and judgment, amendments to pleadings are governed by Rule 15(a), which provides that leave to amend "shall be freely given when justice so requires." In *Acito*, 47 F.3d at 55, the Second Circuit applied that standard to a post-judgment motion under Rule 59(e) ("Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b)."). The dismissal of the Government's complaint in the instant case was not based on Rule 9(b), but the principle of liberality in amending pleadings applies to all civil cases.

The Bank's substantive objections to the Government's proposed amended complaint are considered *infra*. But its procedural objection fails. The Government properly invokes Rule 59(e). The relief it seeks is accordingly before the Court for decision on the merits.

II

A

Lloyds TSB is a banking institution organized and existing under the laws of the United Kingdom. It maintains a branch in Geneva, within the Confederation of Switzerland. The OC began with the allegation, in its first sentence, that the Bank "knowingly violated the money laundering laws of the United States by knowingly concealing or disguising the nature, the location, the source, the ownership, and the control of proceeds of specified unlawful activity in furtherance of a fraud perpetrated against AremisSoft Corporation by Lycourgos Kyprianou and his co-conspirators." OC, ¶ 1 (parentheses omitted). The OC went on to describe in detail the execution of a "pump and dump" securities fraud scheme, by which Kyprianou and Roys Poyiadjis, two

4

Cypriots who were officers in AremisSoft, a publicly traded Delaware company, defrauded AremisSoft shareholders of approximately $500 million. OC, ¶¶ 6-15.

Kyprianou owned or controlled a number of accounts maintained in Lloyds TSB's Geneva branch. The OC alleged five counts against the Bank. Count V, captioned "For Civil Penalties for Conspiracy to Commit Money Laundering under 18 U.S.C. §§ 1956(h) and (b)," alleged that "[f]rom in or about June 2000 through in or about January 2004, Lloyds and Kyprianou unlawfully, willfully and knowingly did combine, conspire, confederate and agree together and with each other" to violate the MLCA. That conspiracy, the OC alleged, allowed Kyprianou to launder proceeds of the AremisSoft pump and dump stock fraud. The preceding four substantive counts alleged that certain Bank transactions violated specific provisions of the MLCA. Those transactions were summarized in ¶38 of the OC, which contained a list of 80 separate banking transfers, the earliest occurring on December 15, 2000 and the latest on October 17, 2002. The OC characterized this activity as "transactions engaged in at Lloyds by Kyprianou bearing the classic hallmarks of money laundering."

As I noted in *Lloyds TSB I*, 2009 WL 874040, at \*4: "There is no dispute that (1) all these transfers were in or out of accounts Kyprianou maintained at the Bank's branch in Geneva, Switzerland; and (2) the transfers were from or to accounts at other banking institutions in Europe."

B

The Government posited that, in respect of the claims alleged in the OC, this Court's subject matter jurisdiction should be based upon the extraterritorial jurisdictional provisions found in the MLCA. The Government relied principally upon 18 U.S.C. § 1956(f), which provides that "[t]here is extraterritorial jurisdiction over the conduct prohibited by this section if – (1) . . . in the case of a non-United States citizen, the conduct occurs in part in the United States." The Government's

5

brief in opposition to the Bank's motion to dismiss the OC on jurisdictional grounds argued that § 1956(f) "explicitly provides for jurisdiction over Lloyds' conduct in this case, because the underlying conduct occurred 'in part in the United States,'" the underlying conduct being that "in furtherance of a massive fraudulent scheme perpetrated on a United States company and involving insider trading on an United States market, Lloyds participated in laundering the fruits of that illegal insider trading." *Lloyds TSB I*, 2009 WL 874040, at *4.[2]

*Lloyds TSB I* held that the allegations of the OC were insufficient to demonstrate subject matter jurisdiction under the MLCA. The reasons for that conclusion are stated in the opinion and need not be repeated here. However, to set the stage for the PAC, it is useful to recall *Lloyds TSB I*'s observation that the only conspiracy in which the OC alleged the Bank participated was a conspiracy with Kyprianou to launder money. In that regard, I said:

> The Government's complaint and its brief describe at length and justly condemn the AremisSoft securities fraud conspiracy. However, if Lloyds TSB was not a participant in that underlying conspiracy – and the Government does not even allege that it was – then conduct by others in furtherance of that fraud is irrelevant to the existence *vel non* of the Court's subject matter jurisdiction over the Bank in respect of the money laundering conspiracy which the Government does allege against the Bank.

*Id.* at *5. For these propositions, I cited *United States v. Columba-Colella*, 604 F.2d 356 (5th Cir. 1979), and *United States v. Cabrales*, 524 U.S. 1 (1998). 2009 WL 874040 at *5-*9.

---

[2]     The OC also alleged a claim for civil penalties under 18 U.S.C. § 1957, which provides for limited extraterritorial jurisdiction over "[w]hoever, in any of the circumstances set forth in subsection (d), knowingly engages in a monetary transaction in criminally derived property," § 1957(a), one circumstance being "that the offense under this section takes place in the United States . . . " § 1957(d)(1). However, in determining the existence *vel non* of subject matter jurisdiction over the Bank, the focus of the prior motion was upon § 1956(f). The Government's present briefs in support of the PAC refer solely to that section.

*Lloyds TSB I* holds that the money-laundering conduct of Kyprianou and the Bank, involving deposits into and transfers between Lloyds TSB and other European banks as alleged in the OC, did not "occur in the United States" in sufficient part to establish subject matter jurisdiction over the Bank under § 1956(f) of the MLCA.

As an alternative ground for dismissing the OC, I concluded that even if "the MLCA could be read as an attempt by Congress to create exterritorial jurisdiction over Lloyds TSB on the facts of this case, I would decline to exercise that jurisdiction, because to do so would be unreasonable and therefore impermissible." *Lloyds TSB I*, 2009 WL 874040, at *9. For that proposition, I cited *United States v. Javino*, 960 F.2d 1137 (2d Cir. 1992); *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998); and Restatement (Third) of Foreign Relations Law of the United States § 403(1) (1987).

C

On the present motion, the Government professes its belief that the OC's allegations "are sufficient to establish subject matter jurisdiction" over the Bank. Main Brief at 1. The Government is entitled to that belief, but for the present *Lloyds TSB I* constitutes the law of the case. Recognizing that reality, the Government proffers the PAC which, it says, "provides more specific allegations establishing subject matter jurisdiction and address[es] certain other issues" raised by the prior motion. *Ibid.* The Bank contends that the PAC does not cure the OC's failure to demonstrate subject matter jurisdiction. It is necessary to consider the PAC's allegations at some length.

The PAC's description of the AremisSoft "pump and dump" securities fraud engineered by Kyprianou and Poyiadjis is essentially the same as in the OC. But the PAC edits the OC's descriptions of the conduct of Lloyds TSB.

7

That editing begins with the first sentence of the PAC, which reads:

> Defendant Lloyds TSB Bank plc, a financial institution,
> violated the money laundering laws of the United States by, among
> other things, knowingly engaging in financial transactions involving
> proceeds of securities fraud, mail fraud, wire fraud, and money
> laundering violations.

PAC, ¶ 1. That paragraph also alleges:

> Lloyds's conduct furthered a broader conspiracy, members of which
> included Lycourgos Kyprianou, Roys Poyiadjis, Lloyds, and others,
> to defraud AremisSoft Corporation, a public company whose stock
> was traded on the NASDAQ National Market, and its investors, the
> overwhelming majority of whom were citizens of the United States,
> *and* to launder the proceeds of this fraud.

*Id.* (emphasis added). While the PAC advances the concept of a single "broader" conspiracy, its use

of the conjunctive allows the pleading to be read as alleging Lloyds's participation in multiple

conspiracies: one to commit securities fraud, and another to launder money.

That reading is reinforced by criminal indictment No. S1 Cr. 1177, arising out of the same

events, that the Government obtained against Kyprianou, Poyiadjis, and a third individual.[3] Count

One charges a "Conspiracy to Commit Securities Fraud, Mail Fraud, and Wire Fraud." Counts Two

through Five charge substantive crimes in furtherance of that conspiracy. Count Six charges a

separate "Conspiracy to Commit Money Laundering." Counts Seven through Fourteen charge

substantive crimes in furtherance of that conspiracy, involving transfers of the proceeds of the fraud

to foreign financial institutions.[4]

---

[3]     A copy of the indictment is attached as Ex. 5 to the declaration of Marc J. Gottridge in
opposition to the Government's motion.

[4]     The money laundering conduct charged against Poyiadjis involved transfers from Brown
Brothers in New York to banks on the Isle of Man. The money laundering conduct charged
against Kyprianou involved transfers from Brown Brothers to a bank in Greece and a bank in

Notwithstanding the concept of multiple conspiracies, considered further *infra*, the PAC

treats the case as one of a single broad conspiracy. Thus ¶ 1, after describing in detail the operation

of the underlying fraud, concludes with the allegation: "Lloyds directly aided and abetted the

criminal fraud and, as part of *the* conspiracy, committed overt acts in furtherance of *the* criminal

scheme." (emphasis added). Paragraph 3 alleges: "Lloyds was an active member of *this* conspiracy

and it committed overt acts in three principal ways to aid *the* criminal scheme." (emphasis added).

That paragraph continues:

> *First*, Lloyds prepared and delivered a confirmation of cash balances
> which falsely "confirmed" to AremisSoft's auditors that it held in
> December 2000 almost $ 10 million, approximately one-third of the
> total cash reported by AremisSoft on its balance sheet for that year,
> blocked in favor of AremisSoft. That was false. At that time
> AremisSoft had no account whatsoever at Lloyds and no money had
> been blocked for AremisSoft. *Second*, with knowledge that
> Kyprianou held criminal proceeds in accounts with which he claimed
> to have no legal or beneficial relation, Lloyds accepted from those
> accounts approximately $44 million in proceeds of the criminal
> insider trading. *Third*, Lloyds, together with Kyprianou and others,
> engaged in an ongoing pattern of financial transactions involving the
> $44 million in proceeds of criminal insider trading, as well as
> additional funds, for the purpose of promoting *the* criminal scheme
> and making it difficult to trace and locate the proceeds of *the* scheme.

(fourth and fifth emphases added).

The PAC alleges in ¶ 4:

> Among the consequences of Lloyds's overt acts as a conspirator were
> (i) AremisSoft's financial statements for the year 2000, as filed and
> disclosed in the United States, were false and misleading in violation
> of the United States securities laws and rules; (ii) the insider trading
> "pump and dump" scheme which was *a* principal object of *the*
> conspiracy, continued for additional months, thereby defrauding more
> U.S. investors because detection of the criminal scheme was delayed;

Cyprus. Lloyds TSB was not referred to in the indictment.

and (iii) $44 million of Kyprianou's criminal proceeds were transferred outside the United States and concealed through an ongoing pattern of financial transfers, thereby frustrating efforts to recover such amounts. These money laundering operations were primarily executed by Lloyds through accounts at its correspondent bank in the United States.

(emphases added).[5]

The PAC alleges in ¶¶ 5 and 6 that the Government brings the action to obtain monetary civil

penalties for Lloyds's violation of the MLCA, "including conspiracy to commit such conduct," and

that

> extraterritorial jurisdiction over the *money laundering* by Lloyds exists pursuant to 18 U.S.C. § 1956(f) because the alleged prohibited conduct occurred in part in the United States. Lloyds entered into *a* broad and ongoing conspiracy with the primary goals of defrauding AremisSoft, a United States public company, organized under the laws of Delaware, and its investors residing throughout the United States, *and* laundering the proceeds of this fraud. Conduct in furtherance of that conspiracy occurred in the United States, including actions constituting securities fraud, mail fraud, wire fraud, and money laundering.

(emphases added).

In a reprise of earlier allegations, ¶ 22 of the PAC alleges:

> Throughout the period of the fraud, Lloyds participated in the conspiracy and aided and abetted the underlying criminal fraud by knowingly (i) maintaining numerous bank accounts beneficially owned or controlled by Kyprianou – but identified by pseudonyms – into which the insider trading proceeds were transferred and in which the money laundering transactions were conducted; (ii) receiving insider trading proceeds from accounts in which Kyprianou, in public filings required by the SEC, denied any pecuniary or beneficial interest or control; (iii) executing money laundering transactions involving proceeds of the AremisSoft fraud; (iv) facilitating

---

[5]    Lloyds's "correspondent bank" referred to in the last sentence of this paragraph was the New York branch of Bankers Trust (now Deutsche Bank). PAC ¶ 27.

10

> concealment of AremisSoft fraud proceeds by anonymously transferring proceeds from and to accounts controlled by Kyprianou, without reference to Kyprianou's name or account number, and without reference to the counterparty's name or account number; and (v) crafting a false confirmation of nonexistent AremisSoft cash holdings, to give the false impression of cash in AremisSoft's accounts at year end 2000, thereby disguising the falsity of revenue and profits reported by AremisSoft in its SEC filings.

A further editing difference between the OC and the PAC has to do with the particular financial transactions that form the basis of the Government's case against Lloyds TSB. Paragraph 38 of the OC contained "a list of 80 separate banking transfers, the earliest occurring on December 15, 2000[6] and the latest on October 17, 2002, which the Government characterizes as 'transactions engaged in at Lloyds by Kyprianou bearing the classic hallmarks of money laundering,'" all the transfers having been "into or out of accounts Kyprianou maintained at the Bank's branch in Geneva, Switzerland," and "from or to accounts at other banking institutions in Europe." *Lloyds TSB I* at 2009 WL 874040, \*4. The PAC at ¶ 32 lists the same eighty transactions. In the PAC, that list is preceded by ¶ 30, which alleges that "Lloyds operated numerous accounts out of its Geneva branch for the benefit of Kyprianou. Kyprianou, or nominee companies that he controlled, opened at least twenty-eight accounts at Lloyds, including the following:" nine account names are then listed. Their names appear as accounts to which or from which the eighty transactions were made. And ¶ 31 of the PAC alleges:

> From at least in or about November 2000 through at least in or about January 2004, in furtherance of the ongoing conspiracy, Kyprianou and Lloyds transferred hundreds of millions of dollars in proceeds of the AremisSoft fraud through Kyprianou's accounts at Lloyds via almost 200 financial transactions. The vast majority of the financial

---

[6]     In fact, the OC listed the first and earliest of the 80 transactions as having occurred on December *13*, 2000.

11

> transactions occurred after the story of the AremisSoft fraud first
> broke in the worldwide press in May 2001. At least 50 of those
> transactions occurred after Kyprianou was indicted by a federal grand
> jury for, *inter alia*, securities fraud and money laundering. These
> financial transactions at Lloyds were a critical part of *the
> conspirators' overall unified scheme to defraud U.S. investors* of over
> $500 million dollars and launder the money in the United States and
> abroad. Lloyds and Kyprianou engaged in money laundering
> transactions aggregating more than $130 million in proceeds of the
> AremisSoft fraud.

(emphasis added).

The PAC at ¶¶ 38-41 contains allegations with respect to the state of Lloyds's knowledge.

Those paragraphs, captioned "Lloyds Knew the Money Laundering Transactions Involved the

Proceeds of the Fraud," allege that "Lloyds knew that the criminal proceeds deposited at Lloyds were

proceeds of Kyprianou's illegal activities," ¶ 38; Jane Moore, a Lloyds officer, "had full knowledge

of the amounts of money being transferred by Kyprianou, as well as the sources of the funds and the

value dates," and was told by Poyiadjis's financial manager "that the funds being transferred to

Kyprianou's accounts at Lloyds were proceeds of his AremisSoft share sales," and that Sylvie

Orsatti, an officer at Lloyds's Geneva branch, "co-signed correspondence confirming AremisSoft

cash holdings at Lloyds, knowing that such confirmation was false," ¶ 39;[7] "Lloyds also knew that

Kyprianou publicly reported that he had gifted in late 2000 all of his stock options and 1.6 million

shares of AremisSoft to two entities in which he claimed 'he had no voting, beneficial or pecuniary

interest,' when records at Lloyds contained information casting doubt upon that assertion, ¶ 40; and

"Lloyds also knew that the funds transferred into accounts controlled by Kyprianou" from accounts

at other banks "were proceeds from sales of AremisSoft stock owned for the benefit of Kyprianou"

---

[7] This is a reference to the $10 million confirmation of cash balance by Lloyds, alleged in
a number of the PAC's paragraphs, the first being ¶ 3, quoted in text *supra*.

and were from accounts of entities "in which Kyprianou was not identified as legal or beneficial owner," Lloyds being aware "at that time that Kyprianou filed required disclosures denying any legal or beneficial interest in said accounts." ¶ 41. *See also* fn. 11, *infra*.

The PAC differs from the OC in that the conspiracy count appears as the first of the five counts rather than the last. Count I, comprising ¶¶ 60-67 of the PAC, asserts a claim "For Civil Penalties for Conspiracy to Commit Money Laundering" in violation of the MLCA.

Paragraph 61 alleges that from in or about June 2000 through in or about January 24, 2004, Lloyds, Kyprianou, Poyiadjis "and others ('Co-conspirators') unlawfully, willfully and knowingly did conspire to commit offenses defined" in the MLCA.

Paragraph 62 alleges: "It was a part and object of the conspiracy that Lloyds and other Co-conspirators engaged in financial transactions involving the proceeds of unlawful activity by Kyprianou and other Co-conspirators in order to promote fraud in the sale of securities, mail fraud, wire fraud, and money laundering (the 'Specified Unlawful Activities'). These Specified Unlawful Activities were committed by Kyprianou, Poyiadjis, and other Co-conspirators." (citations to statutes omitted).

The allegations of ¶¶ 63-66 focus upon money laundering. "It was a further part and an object of the conspiracy that Lloyds, Kyprianou and other Co-conspirators engaged in financial transactions designed in whole or in part to conceal the nature, location, source, ownership and control of the proceeds of the Specified Unlawful Activities," ¶ 63; "did transport, transmit and transfer monetary instruments" from and to places in the United States "with the intent to promote the Specified Unlawful Activities," ¶ 64; "with knowledge that the funds and monetary instruments involved the proceeds of a form of unlawful activity," engaged in such transfers "to conceal and

13

disguise the nature, location, source, ownership or control of the proceeds of the Specified Unlawful Activities," ¶ 65; and "engaged in an ongoing and continuing series of financial transactions involving proceeds of the Specified Unlawful Activities for the purpose of concealing the nature, location, source, ownership or control of these proceeds and enabling Kyprianou and other Co-conspirators to retain these concealed funds," the series of transactions beginning "[o]nce the proceeds entered the network of money laundering accounts controlled by Lloyds, Kyprianou, and other Co-conspirators," ¶ 66.

Counts II through V of the PAC track Counts I though IV of the OC.

These allegations make it plain that the Government, in drafting the PAC, discarded the form of the indictment it obtained in the criminal case, which charged two separate conspiracies, fraud and money laundering. In the case at bar, the PAC alleges a single conspiracy with two objectives: securities fraud and money laundering. The theory of the Government's case against Lloyds TSB, as pleaded in the PAC, is that the Bank entered into that single, broader conspiracy, with knowledge of the underlying securities fraud and the unlawful sources of the funds it received and transferred in accounts owned or controlled by Kyprianou, and with the intent to further the securities fraud by its acts in laundering the proceeds of the fraud. The Government's ultimate pleading objective is to characterize Lloyds TSB as one of the conspirators in an "overall unified conspiracy to defraud U.S. investors" whose "conduct occurs in part in the United States," in order to satisfy the extraterritorial jurisdiction requirement of § 1956(f) of the MLCA.

The questions presented by this motion are (1) whether the PAC pleads factual matter that, if taken as true, states a claim against Lloyds TSB; and if so (2) whether such a claim would confer subject matter jurisdiction upon the Court under the MLCA.

14

III

A

While the PAC alleges that the conduct of Lloyds and other co-conspirators was intended "to promote fraud in the sale of securities, mail fraud, wire fraud, and money laundering," ¶ 62, wire and mail fraud are the means by which the underlying securities fraud was accomplished. The AremisSoft securities fraud is the heart of the matter. The theory of the case the Government attempts to plead in the PAC is that Lloyds was a member of a conspiracy whose objectives included securities fraud, in violation of § 10(b) of the Securities Exchange Act of 1934, 78 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. PAC ¶ 62.

B

The first question is whether the Government has pleaded facts sufficient to state a claim against Lloyds TSB for conspiring with Kyprianou and others to commit securities fraud. At the outset, one must put aside any allegation that the Bank aided and abetted the underlying fraud, such as the allegation in ¶ 22 of the PAC that "[t]hroughout the period of the fraud, Lloyds participated in the conspiracy *and aided and abetted the underlying criminal fraud*" by engaging in the transactions involving Kyprianou's accounts at the Bank (emphasis added). This is a civil complaint, not a criminal indictment, and "[t]he § 10(b) implied private right of action does not extend to aiders and abettors. The conduct of a secondary actor must satisfy each of the elements or preconditions of liability; and we consider whether the allegations here are sufficient to do so." *Stonebridge Investment Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 128 S.Ct. 761, 769 (2008) (citing and discussing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164

15

(1994)).

This limitation upon § 10(b)'s implied private right of action applies to the case at bar, notwithstanding that the Government is the plaintiff. In 2004 the Government entered into a "Coordination Agreement" with the Trustees of the AremisSoft Liquidating Trust, a bankruptcy court-created entity responsible for recovering assets for the benefit of victims of the AremisSoft securities fraud. Ex. 1 to Gottridge declaration. The Coordination Agreement requires the Government to pay any recovery obtained from third parties such as Lloyds TSB, minus only the Government's out-of-pocket costs, directly to the Trustees, *id.* at 21-22 §§ 5.1, 5.2, an arrangement in keeping with the Government's public policy "to assist victims of fraud perpetrated within the United States," *id.* at 10. Thus the present action, while in form a public action, is in substance a private action on behalf of defrauded investors. There is no principled reason why the rule of *Central Bank* and *Stonebridge* should not apply.

C

The PAC alleges that the Bank and others conspired to commit securities fraud. Rule 8(a) of the Federal Rules of Civil Procedure governs the sufficiency of these conspiracy allegations, rather than the heightened pleading requirements of Rule 9(b) that apply in cases of fraud and mistake. In *Hecht v. Commerce Clearing House, Inc.*, the Second Circuit said:

> On its face, Rule 9(b) applies only to fraud or mistake, not to conspiracy. Hecht's pleading of a conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a). Even so, the complaint must allege some factual basis for a finding of conscious agreement among the defendants.

897 F.2d 21, 26 n.4 (2d Cir. 1960) (internal citations omitted); *see also Kottler v. Deutsche Bank*

16

*AG,* 607 F. Supp. 2d 447, 463 (S.D.N.Y. 2009) (action by taxpayers against banks and an investment advisory firm alleging, *inter alia,* conspiracy to defraud in the formation and promotion of illegal tax shelters) ("The Court does not hold the Plaintiffs to the stricter Rule 9(b) standards on the conspiracy claim, but rather the normal Rule 8(a) standards." (citing *Hecht*)).

Rule 8(a)(2) provides that a pleading must "contain a short and plain statement of the claim showing that the pleader is entitled to relief." Two recent Supreme Court cases construe and apply Rule 8(a)(2): *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* — U.S. —, 129 S.Ct. 1937 (2009) ("*Iqbal*"). The briefs of counsel on the present motion, filed in April and May 2009, cite and discuss *Twombly.*[8] The Court decided *Iqbal* May 18, 2009. While *Iqbal* amplifies and expands upon the Court's reasoning in *Twombly,* it introduces no new concepts, and neither party in the case at bar has asked leave to discuss *Iqbal* in a supplemental brief. This opinion looks to both decisions for guidance.

The plaintiff in *Iqbal* was a Muslim citizen of Pakistan. Following the 9/11 attacks, he was arrested on criminal charges and detained by federal officials. Plaintiff claimed he was deprived of various constitutional protections while in federal custody. After his removal to Pakistan, plaintiff filed a *Bivens* action[9] against 34 current and former federal officials and 19 "John Doe" federal corrections officers. The defendants included John Ashcroft, the former Attorney General of the United States, and Robert Mueller, the Director of the Federal Bureau of Investigation (FBI). As to those two defendants, "the complaint alleges that they adopted an unconstitutional policy that subjected respondent [plaintiff] to harsh conditions of confinement on account of his race, religion,

---

[8]    The last submission was the Government's Reply Brief, dated May 19, 2009.

[9]    *See Bivens v. Six Unknown Fed. Narcotics Agents* 403 U.S. 388 (1971).

or national origin." 129 S.Ct. at 1942. *Iqbal* considered only the sufficiency of the allegations against these two federal officers, and posed the question for decision: "Did respondent, as the plaintiff in the District Court, plead factual matter that, if taken as true, states a claim that petitioners deprived him of his clearly established constitutional rights." *Id.* at 1942-43. The Court held that "respondent's pleadings are insufficient." *Id.* at 1943.

The Court quoted the complaint in *Iqbal* at some length, and it is useful to reproduce that portion of its opinion:

> The complaint contends that petitioners [Ashcroft and Mueller] designated respondent a person of high interest on account of his race, religion or national origin, in contravention of the First and Fifth Amendments to the Constitution. The complaint alleges that "the [FBI], under the direction of defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." It further alleges that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." Lastly, the complaint posits that petitioners "each knew of, condoned, and willfully and maliciously agreed to subject" respondent to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race and/or national origin and for no legitimate penological interest." The pleading names Ashcroft as the "principal architect" of the policy, and identifies Mueller as "instrumental in [its] adoption, promulgation, and implementation."

129 S.Ct. at 1944 (citations to pages of complaint omitted).

In assessing the sufficiency of these allegations under Rule 8(a)(2), the *Iqbal* Court turned first to the principles it articulated in *Twombly*, 550 U.S. 544. "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S.Ct. at 1949 (citing and quoting

18

*Twombly*). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id* (quoting *Twombly*).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Iqbal*, 129 S.Ct. at 1949 (citing and quoting *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*

The *Iqbal* Court identified "[t]wo working principles" that underlie *Twombly*:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – "that the pleader is entitled to relief."

129 S.Ct. at 1949-1950 (quoting Rule 8(a)(2); further citations omitted).

The PAC in the case at bar alleges that Lloyds TSB entered into a conspiracy with the objective, *inter alia,* of defrauding investors in AremisSoft. The complaint in *Twombly* also alleged

19

a conspiracy; and it is instructive to note what the *Iqbal* Court said about that aspect of the case:

> There, we considered the sufficiency of a complaint alleging that
> incumbent telecommunications providers had entered an agreement
> not to compete and to forestall competitive entry, in violation of the
> Sherman Act, 15 U.S.C. § 1. Recognizing that § 1 enjoins only
> anticompetitive conduct "effected by a contract, combination, or
> conspiracy," *Copperweld Corp. v. Independence Tube Corp.*, 467
> U.S. 752, 775 (1984), the plaintiffs in *Twombly* flatly pleaded that the
> defendants "ha[d] entered into a contract, combination or conspiracy
> to prevent competitive entry . . . and ha[d] agreed not to compete with
> one another." The complaint also alleged that the defendants'
> "parallel course of conduct . . . to prevent competition" and inflate
> prices was indicative of the unlawful agreement alleged.
>
> The Court held the plaintiffs' complaint deficient under Rule
> 8. In doing so it first noted that the plaintiffs' assertion of an
> unlawful agreement was a "legal conclusion" and, as such, was not
> entitled to the assumption of truth. Had the Court simply credited the
> allegation of a conspiracy, the plaintiffs would have stated a claim for
> relief and been entitled to proceed perforce. The Court next addressed
> the "nub" of the plaintiffs' complaint – the well-pleaded,
> nonconclusory factual allegation of parallel behavior – to determine
> whether it gave rise to a "plausible suggestion of conspiracy."
> Acknowledging that parallel conduct was consistent with an unlawful
> agreement, the Court nevertheless concluded that it did not plausibly
> suggest an illicit accord because it was not only compatible with, but
> indeed was more likely explained by, lawful, unchoreographed
> free-market behavior. Because the well-pleaded fact of parallel
> conduct, accepted as true, did not plausibly suggest an unlawful
> agreement, the Court held the plaintiffs' complaint must be
> dismissed.

129 S.Ct. at 1950 (quoting *Twombly* throughout; citations omitted).

In order to apply these principles in a given case, the *Iqbal* Court suggested a two-pronged

approach:

> In keeping with these principles a court considering a motion
> to dismiss can choose to begin by identifying pleadings that, because
> they are no more than conclusions, are not entitled to the assumption
> of truth. While legal conclusions can form the framework of a

> complaint, they must be supported by factual allegations. When there
> are well-pleaded factual allegations, a court should assume their
> veracity and then determine whether they plausibly give rise to an
> entitlement to relief.

129 S.Ct. at 1950.

Applying that approach to the complaint against Ashcroft and Mueller, the Court concluded that its allegations against these two defendants were insufficient to satisfy Rule 8(a)(2). First, the Court disregarded as conclusions, not entitled to the assumption of truth, the plaintiff's allegations that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions "as a matter of policy, solely on account of [his] religion, race and/or national origin and for no legitimate penological interest," a policy of which Ashcroft was the "principal architect" and Mueller was "instrumental" in executing. "These allegations," the Court said, "are conclusory and not entitled to be assumed true," but not because "they are unrealistic or nonsensical" (which would have reflected an impermissible assessment of their truthfulness); "[i]t is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." 129 S.Ct. at 1951.

Second, the Court considered "the factual allegations in respondent's complaint to determine if they plausibly suggest an entitlement to relief." *Id.* Those were the allegations that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of the investigation of the events of September 11," and "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." *Id.* These allegations, the Court held, were insufficient to state a claim

21

under Rule 8(a)(2):

> Taken as true, these allegations are consistent with petitioners' purposefully designating detainees "of high interest" because of their race, religion or national origin. But given more likely explanations, they do not plausibly establish this purpose. . . .
>
> . . .
>
> . . . All it plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity. . . .
>
> . . .
>
> . . . [R]espondent's complaint fails to state a claim for purposeful and unlawful discrimination against petitioners.

*Id.* at 1951-54.

## IV

### A

The Government is not entitled to file the PAC if the amendment would be futile. Futility is established if the PAC would not survive the Bank's motion to dismiss it. Motions to dismiss complaints commonly invoke Rule 12(b)(6), on the ground that the pleading fails to state a claim upon which relief can be granted. *Twombly* arose out of a Rule 12(b)(6) motion to dismiss.

The case at bar is procedurally different because the Bank's motion to dismiss the PAC would invoke Rule 12(b)(1), on the ground of lack of subject matter jurisdiction. In a Rule 12(b)(6) motion to dismiss, subject matter jurisdiction is not at issue. The single question presented is whether the pleading's factual allegations state a claim in a case undisputably lying within the district

22

court's subject matter jurisdiction. The case at bar presents that question, but a second one as well. The first question asks if the PAC's factual allegations are sufficient to state a claim or claims upon which relief could be granted in any case. The second question asks if the PAC's factual allegations, even if sufficient to state a claim, also allege sufficient conduct within the United States to establish subject matter jurisdiction under the extraterritorial jurisdictional provisions of the MLCA.

Because this second question arises, the PAC's allegations of securities fraud lie at the heart of the matter. If the PAC's well-pleaded factual allegations do no more than reassert a claim against Lloyds TSB for participating in a money laundering conspiracy, the PAC fails to establish the Court's subject matter jurisdiction for the same reason *Lloyds TSB I* held the OC failed to do so: Kyprianou's and the Bank's money laundering conduct, as alleged in the OC, did not occur in sufficient part in the United States to confer subject matter jurisdiction on this Court under the MLCA.

While the Government does not concede the deficiency of the OC, it seeks to avoid the holding in *Lloyds TSB I* by alleging in the PAC that Lloyds, Kyprianou, Poyiadjis, and others entered into a "broader conspiracy," ¶ 1, whose first "primary goal[]" was "defrauding AremisSoft" and "its investors," and second, "laundering the proceeds of this fraud." ¶ 6. The AremisSoft securities fraud occurred in the United States. In order to use that fraud as a vehicle for establishing subject matter jurisdiction over the Bank, the PAC must allege sufficient facts to demonstrate that the Bank was a member of the securities fraud conspiracy.

B

I turn to the sufficiency of the PAC's allegations. At the outset, Lloyds TSB makes much of the fact that whereas the OC alleged Kyprianou and the Bank "did conspire, confederate *and*

23

*agree together and with each other*" to violate the MLCA, Brief at 3 (emphasis in original), the PAC alleges that the Bank "did conspire" with Kyprianou, Poyiadjis and others to enter into a broader conspiracy including securities fraud, without using the verb "agree." The Bank says that "in the PAC the Government takes pains not to plead that Lloyds actually *agreed* to join such a conspiracy," and the pleading should be construed as not having "ever alleg[ed] any conspiratorial *agreement* to which Lloyds was a party." *Id.* at 3-4 (emphases in original).

There is no substance to this argument. To "conspire" means to "agree." "The essence of any conspiracy is, of course, agreement," *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990). The use of "conspire" instead of "agree" reflects the law's ingrained preference for a ten-dollar word over a one-dollar word with the same meaning. The OC used both verbs and the PAC uses only one. This shows no more than the elimination of excess verbiage. It certainly does not affect the legal sufficiency of the latter pleading. That question turns upon the sufficiency of the PAC's allegations that the Bank entered an agreement with others to defraud AremisSoft investors.

C

I approach that question by following the *Iqbal* protocol and first identifying those allegations that, because they are no more than conclusions, are not entitled to the presumption of truth.

The PAC is replete with such allegations. An example appears in ¶ 6: "Lloyds entered into a broad and ongoing conspiracy with the primary goals of defrauding AremisSoft, a United States public company, and its investors residing throughout the United States, and laundering the proceeds of this fraud." This sort of allegation fares no better than the allegations in *Twombly* that the defendants had "entered into a contract, combination or conspiracy to prevent competitive entry" and "agreed not to compete with each other," allegations which *Iqbal* stressed that *Twombly* discounted

24

entirely: "The Court . . . first noted that the plaintiffs' assertion of an unlawful agreement was a 'legal conclusion,' and, as such, was not entitled to the presumption of truth." 129 S.Ct. at 1950.

The PAC also contains a number of allegations gathered under the caption: "Lloyds's Knowledge of, and Participation in, The Pump and Dump and Money Laundering Scheme." PAC, p. 13, captioning ¶¶ 29-59. It is crucial to the Government's theory of the Bank's participation in a single "broader" conspiracy that the Bank knew Kyprianou and Poyiadjis were defrauding AremisSoft investors by pumping up the price of the company's shares prior to dumping them. The allegations of that knowledge, set forth under a conclusory caption, are in that particular respect equally conclusory. *See Iqbal* 129 S.Ct. at 1951 (disregarding as conclusory the similar allegation that the high-ranking defendants "*knew of*, condoned and willfully and maliciously agreed" to the harsh conditions of confinement imposed on plaintiff by lower ranking federal officers (emphasis added)).

The Second Circuit recently cited and applied *Iqbal* in *South Cherry Street, LLC v. Hennessee Group LLC*, — F.3d — , 2009 WL 2032133 (2d Cir. July 14, 2009) ("*South Cherry*"). Plaintiff investors asserted contract and securities fraud claims against investment advisors for failure to disclose that Bayou, a hedge fund recommended by the advisors, was part of a Ponzi scheme. The district court granted defendants' motion to dismiss under Rule 12(b)(6). The Second Circuit affirmed, citing *Iqbal,* and stated:

> Despite the Complaint's conclusory allegation that Hennessee Group "*knowingly* or recklessly (a) made untrue statements . . . and (b) engaged in acts . . . that operated or would operate as a fraud or deceit upon South Cherry," nowhere in the Complaint is there any allegation that Hennessee Group had knowledge that any representation it made as to the records or circumstances of Bayou Accredited, or its predecessor Bayou Fund, was untrue. Instead, the Complaint is

25

replete with allegations that HG "would" have learned the truth as to those aspects of the Bayou funds if HG had performed the "due diligence" it promised.

Nor, to the extent that South Cherry sought to allege recklessness, does the Complaint contain an allegation of any fact relating to Bayou Accredited that (a) was *known* to Hennessee Group and (b) created a strong inference that HG had a state of mind approximating an actual intent either to relay false or misleading information about Bayou Accredited or to aid in the fraud being perpetrated by the Bayou Accredited principals.

2009 WL 2032133, at *13 (first emphasis in original, second emphasis added; citations omitted).

The securities fraud complaint in *South Cherry* failed the *Twombly/Iqbal* plausibility test

because, the Second Circuit reasoned:

Given the disclosures after the summer of 2005 as to the Bayou Family Funds principals' fraudulent conduct, it would be plausible to infer that Hennessee Group had been negligent in failing to discover the truth. It is far less plausible to infer that an industry leader that prides itself on having expertise that is called on by Congress, that emphasizes its thorough due diligence process, that values and advertises its credibility in the industry – and that evaluates 550 funds – would deliberately jeopardize its standing and reliability, and the viability of its business, by recommending to a large segment of its clientele a fund as to which it had made, according to South Cherry, little or no inquiry at all.

2009 WL 2032133, at *14.

*South Cherry* furnishes a useful analogy to the case at bar. The Second Circuit's reasoning, just quoted, reflects the court's awareness of *Iqbal*'s command that "[d]etermining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950 (cited and quoted in *South Cherry* at 2009 WL 2032133, *11). Applying such common sense as I may have to the Government's securities fraud conspiracy claim against Lloyds TSB, and accepting as true the

26

PAC's factual allegations of the sources of public awareness of the stock fraud engineered by Kyprianou and Poyiadjis,[10] and the suggestive nature and surrounding circumstances of the many financial transactions into and out of accounts Kyprianou owned or controlled at the Bank's Geneva branch, it is plausible to infer that officers at that branch were negligent in failing to detect Kyprianou's money laundering, or even complicit in it. But it is less plausible to infer that Bank officers knew Kyprianou and Poyiadjis were planning a pump and dump scheme to defraud AremisSoft investors, or were executing that fraud, and acted in furtherance of it. That scenario is implausible on two levels. First, Kyprianou and Poyiadjis would naturally wish to conceal their fraud as long as possible, and were unlikely to jeopardize that secrecy by telling Bank officers in Geneva all about it. Second, common sense counsels against inferring that a substantial international bank, bearing an historic name and presumably wishing to maintain a global reputation for integrity and honorable dealing, would, with no stake in the criminal securities fraud itself, and no financial incentive other than to maintain the patronage of a fee-generating client, enter into a conspiracy with two Cypriot depositors to defraud investors in the United States.

These differing evaluations of plausibility are not inconsistent. It is one thing for a bank to

---

[10] "By May 2001, worldwide attention began to focus on AremisSoft for reporting fraudulently inflated income" (citing an article in *The New York Times* on May 17, 2001, the filing of an investors' class action lawsuit against AremisSoft and its directors on May 24, and reporting by unnamed "international news organizations" that "Kyprianou and Poyiadjis fraudulently misrepresented the value and profitability of AremisSoft"), PAC ¶ 15; "When the truth about AremisSoft's financial condition was revealed, the price of AremisSoft's publicly held shares plummeted," *id.* ¶ 16; "Trading in AremisSoft was halted by NASDAQ on July 30, 2001"and "NASDAQ delisted the Company's securities on August 20, 2001," *id.* ¶ 17; on December 19, 2001 "a federal grand jury in the Southern District of New York indicted Poyiadjis for securities fraud in connection with the AremisSoft fraud" and on June 24, 2002 "the grand jury returned a superseding indictment that charged Poyiadjis, Kyprianou," and an AremisSoft executive "with securities fraud, . . . money laundering, and conspiracy to commit securities fraud, money laundering, mail fraud and wire fraud," *id.* ¶ 18.

27

turn a blind institutional eye to apparent money laundering by a major depositor, without inquiring into the depositor's motivation for laundering or the source of the laundered funds, and without monitoring events in another country, even if either inquiry would suggest fraudulent conduct on the depositor's part. That is dishonorable banking practice, but as events in banking circles in this City not so long ago demonstrated, it may be plausible enough.[11] It is quite another thing, and far less plausible, for a bank to indulge its depositor to the extent of knowingly entering into a criminal conspiracy with him to defraud investors in another country and acting with the intent to further that conspiracy's objectives.[12]

It bears repeating that to sustain statutory subject matter jurisdiction over Lloyds TSB, the Government must do more than allege the Bank's knowledge of and participation in a money laundering conspiracy. It must sufficiently allege the Bank's knowledge of the underlying securities fraud conspiracy that generated the laundered funds and its intent to join, contribute to or otherwise further the securities fraud conspiracy. While the PAC contains a number of allegations with respect

---

[11]    *See* Andrew E. Kramer, *Major Investor In Russia Sees Wide Fraud Scheme*, N.Y. Times, July 31, 2009, at B1 (stating that a current claim of Russian stock market fraud "has echoes of the Bank of New York money-laundering scandal in the late 1990s").

[12]    The only act on the part of the Bank's Geneva branch managers described in the PAC that cannot be characterized as "turning a blind eye" is that of Mmes. Moore and Orsatti, who are alleged to have co-signed the Confirmation Letter in March 2001 falsely stating that funds were on deposit in the account of an AremisSoft subsidiary in December 2000 when in fact there were no such funds. I accept those allegations as true. An honest explanation for such conduct is not discernible. However, the Government's further allegation that Moore and Orsatti knew about the securities fraud conspiracy and intended to further it by this act is conclusory and speculative, and does not flow naturally from the pleading. The PAC alleges that the Geneva branch managers sent the false Confirmation Letter to an auditor in Cyprus. It does not allege that the document was sent to anyone in the United States, or that it was included in any AremisSoft securities filing or other public disclosure in the United States.

to the Bank's knowledge,[13] to the extent they state or imply that the Bank knew the funds were the
proceeds of the securities fraud and intended its actions to advance that fraud, they are entirely
conclusory, and must be disregarded under *Twombly* and *Iqbal*. The PAC does not "allege some
factual basis for a finding of conscious agreement" by the Bank to enter into the securities fraud
conspiracy. *Hecht*, 897 F.2d at 26 n.4. To the extent these allegations of knowledge are based upon
well-pleaded facts, they are as consistent with a money laundering conspiracy as with a securities

---

[13]     Lloyds was "knowingly engaging in financial transactions involving proceeds of
securities fraud, mail fraud, wire fraud, and money laundering violations," PAC ¶ 1; "with
knowledge that Kyprianou held criminal proceeds in accounts with which he claimed to have no
legal or beneficial relation, Lloyds accepted from those accounts approximately $44 million in
proceeds of the criminal insider trading," ¶ 3; "Lloyds knowingly concealed from this
investigation [by the AremisSoft board] the ongoing efforts of Lloyds and Kyprianou to launder
the proceeds of the AremisSoft fraud," ¶ 6; "knowing that the funds [deposited in Lloyds's New
York correspondent bank] were the result of stock sales on behalf of Kyprianou by entities in
which he disclaimed any legal or beneficial interest," ¶ 14; "Lloyds participated in the conspiracy
and aided and abetted the underlying criminal fraud by knowingly" engaging in the financial
transactions and other conduct alleged in the PAC, ¶ 22; "Lloyds knew that the criminal proceeds
deposited at Lloyds were proceeds of Kyprianou's illegal activities" and "also knew that the
purpose of the Lady Moura account [at the Geneva branch] was to deposit the proceeds of the
sale of AremisSoft securities," ¶ 38; "Moore [the Lloyds Geneva branch manager] had full
knowledge of the amounts of money being transferred by Kyprianou, as well as the sources of the
funds and the value dates," ¶ 39; Moore and Orsatti, the Geneva branch assistant manager, co-
signed correspondence confirming AremisSoft holdings at Lloyds, "knowing that such
confirmation was false," *id.*; Lloyds "knew that Kyprianou publicly reported" he had given
AremisSoft stock options and shares to two entities in which he claimed no interest, followed by
transfers of related funds "through Kyprianou's personal account as well as the Lloyds Lady
Moura account, which Lloyds knew was beneficially owned and controlled by Kyprianou," ¶ 40;
"Lloyds also knew that the funds transferred into accounts controlled by Kyprianou that came
from accounts at Dominick and Bordier [two Swiss banks] were proceeds from sales of
AremisSoft stock" and were from accounts concerning which "Lloyds was aware at that time"
Kyprianou had filed "required disclosures denying any legal or beneficial interest" in them, ¶ 41;
Moore and Orsatti "knew or should have known" that the confirmation letter they signed was
false, and "Lloyds knew that the information in the Confirmation Letter would be relied on in
AremisSoft's annual audit of its financial statements," ¶ 42; Lloyds participated in a conspiracy
to violate the MLCA "with knowledge that the funds and monetary instruments involved the
proceeds of a form of unlawful activity," ¶ 65.

fraud conspiracy; and a complaint pleading facts "that are merely consistent with defendant's liability" stops short "of the line between possibility and plausibility of entitlement to relief." *Iqbal,* 129 S.Ct. 1948.

*United States v. Rosenblatt,* 554 F.2d 36 (2d Cir. 1977), is instructive. Rosenblatt, a college dean, laundered through the college's bank account eight checks his alleged co-conspirator, Brooks, had given him. Rosenblatt retained ten percent of the checks' face values for his services and gave the cash balance to Brooks. Brooks, a postal employee, had obtained the checks by making false entries in account payable records at the Manhattan Postal Services headquarters. The checks were payable to individuals who had no claim to payment from the Postal Service. Brooks and Rosenblatt were indicted for conspiring to defraud the United States, in violation of 18 U.S.C. § 317. Brooks pleaded guilty. Rosenblatt went to trial. The jury found him guilty of the conspiracy charged.

The Second Circuit reversed Rosenblatt's conviction for conspiring to defraud the United States. "Our difficulty with Rosenblatt's conviction," the court said, "arises from the lack of any agreement between him and Brooks concerning the type of fraud in which they were engaged." 554.F.2d at 37. While "[i]t is clear that Brooks was defrauding the United States by obtaining payment for government checks which he had caused to be printed without authorization," Rosenblatt "did not know the truth about Brooks' activities. Brooks led him to believe the checks were valid." *Id.* at 38. The Second Circuit accepted Rosenblatt's argument on appeal that "proof of an agreement to defraud, without further qualification as to the nature of the fraud, is insufficient to support a conviction under § 371," and went on to hold:

> The law of conspiracy requires agreement as to the object of
> the conspiracy. This does not mean that the conspirators must be

> shown to have agreed on the details of their criminal enterprise, but
> it does mean that the essential nature of the plan must be shown.
>
> The problem of identifying the essential nature of the
> conspirators' plan often arises in cases in which knowledge is in
> issue.

*Id.* (citations and internal quotation marks omitted). The *Rosenblatt* court cited as illustrative of this

issue *Ingram v. United States,* 360 U.S. 672 (1959), which the Second Circuit summarized thus:

> [T]wo individuals who had assisted in the operation of a lottery that
> was illegal under state law were convicted of conspiracy to evade
> federal wagering taxes for which their employers were liable. The
> Supreme Court reversed because there had been no evidence that the
> individuals knew of the tax liability. Absent such knowledge, tax
> evasion could not have been one of the objectives of their conspiracy,
> and the convictions could not stand.

554 F.2d at 38. The *Rosenblatt* opinion continued:

> Proof of the essential nature of the plan is required because
> the gist of the offense remains the agreement, and it is therefore
> essential to determine what kind of agreement or understanding
> existed as to each defendant. . . . Nobody is liable in conspiracy
> except for the fair import of the concerted purpose or agreement as he
> understands it.

*Id.* at 39 (internal quotation marks and citations omitted). While Rosenblatt laundered the checks

Brooks gave him, Rosenblatt did not know Brooks had defrauded the United States to generate those

checks. Lacking that knowledge, Rosenblatt could not be convicted for conspiring to defraud the

United States: "In this case the government neither *pled* nor proved an agreement on the essential

nature of the fraud." *Id.* at 42 (emphasis added). The Second Circuit remanded the case to the

district court with instructions to dismiss the indictment.

So in the case at bar: While the PAC pleads a plausible claim that officers of Lloyds TSB

laundered funds Kyprianou deposited in his Geneva branch accounts, it does not sufficiently allege

31

that the Bank knew Kyprianou and others had defrauded AremisSoft investors to generate those funds. This case is at the pleading stage and *Rosenblatt* was decided after trial, but the principles articulated in *Rosenblatt* apply, as the Second Circuit's reference to what the indictment *pled* makes plain. It follows that the PAC does not sufficiently allege the Bank's participation in the underlying securities fraud conspiracy. Because that is so, the Government is left with the separate money laundering conspiracy, which does not bring the case within the MLCA's extraterritorial jurisdiction for the reasons stated in *Lloyds TSB I*.

It is, of course, conceptually possible for the concealment of funds illicitly obtained to be part of a single conspiracy to obtain and spend those funds. The Second Circuit stated in *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (1990) that "the mere fact that an operation consists first of a robbery, planned and executed with the aid of an insider, and then of concealment of the money, executed by persons other than the insider, does not necessarily entitle the defendants to a multiple-conspiracy charge," since the government may prove a single conspiracy by proof "that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." (citations and internal quotation marks omitted). A single conspiracy was proved in *Maldonado-Rivera* because the government's evidence showed that all the conspirators knew "the overarching goal of the conspiracy was the theft of a large amount of money to fund the activities of Los Macheteros." *Id*. at 964.

In contrast to the single-conspiracy indictment in *Maldonado-Rivera*, the criminal indictment the Government obtained against Poyiadjis and Kyprianou charged securities fraud and money

32

laundering in separate counts as separate conspiracies.[14] If the Government had gone to trial on that indictment, the question of single-versus-multiple conspiracies would not have arisen, and the jury would have returned separate verdicts as to each defendant and conspiracy. In the civil case at bar, the Government, in order to establish subject matter jurisdiction, uses the PAC to fold these two conspiracies into a single "broader" conspiracy, and at the conclusion of a trial it seems clear that a multiple conspiracy charge would have to be given. At the pleading stage, the question is whether the PAC's well-pleaded factual allegations state a plausible claim against Lloyds TSB with respect to the only conspiracy which would establish MLCA extraterritorial jurisdiction: the securities fraud conspiracy. For the reasons stated, the PAC does not do so.

Applying the *Twombly* and *Iqbal* analyses, I conclude that the PAC's allegations state a plausible conspiracy claim against Lloyd's TSB for *money laundering*, but not for *securities fraud*. The Government's editing of the OC to produce the PAC changes the cover but not the book. When

---

[14]     That perception was shared by the AremisSoft Trustees, who stated in their brief in opposition to Lloyds TSB's motion to dismiss their complaint against the Bank:

> The AremisSoft Trust does not allege that Defendants made any
> misrepresentation or omission, or engaged in any manipulative or
> deceptive act, *in connection with the purchase or sale of a security.*
> Indeed, Lloyds' participation in laundering money came after
> Kyprianou's illicit trading was completed. There is no allegation
> that Lloyds participated in any illegal stock trades.

Plaintiff Trustees' Brief in *LaSala v. Lloyds TSB Bank, PLC,* No. 06-CV-4335, at 20-21 (emphasis in original). The Trustees made that argument in an effort to avoid the provisions of the Securities Litigation Uniform Standards Act ("SLUSA"), relied upon by the Bank in moving to dismiss the Trustees' action against it. The Court did not reach that issue. It dismissed the Trustees' suit on the ground of *forum non conveniens. See* 514 F.Supp.2d 447 (S.D.N.Y. 2007).

33

the PAC is stripped of its conclusory and speculative statements, what remain are factual allegations of multiple conspiracies: securities fraud conducted in the United States, and money laundering conducted in Europe – the same conspiracies the Government charged in separate counts in the criminal indictment against Kyprianou and others arising out of the same nexus of facts. The PAC, like the OC, sufficiently alleges a plausible claim against Lloyds TSB for participating in a money laundering conspiracy with Kyprianou, conducted through financial transfers between the Bank's Geneva branch and other European banks. But the PAC's factual pleadings do not allege a plausible claim against the Bank for participating in a securities fraud conspiracy conducted through the purchase and sale of securities in the United States. In consequence, the PAC suffers from the same jurisdictional defect as the OC. The PAC does not allege conduct by or chargeable to the Bank which occurred in the United States to an extent sufficient to justify subjecting the Bank to extraterritorial jurisdiction under the MLCA.

Accordingly, the PAC would not survive a motion to dismiss. The Court refuses the proposed amendment on the ground of futility.

V

As noted at p. 7, *supra*, in *Lloyds TSB I*, I dismissed the OC on the alternative ground that "even if the MLCA could be read to extend subject matter jurisdiction over the claims the Government asserts against Lloyds TSB in this case, that exercise in extraterritorial jurisdiction is unreasonable, and hence impermissible in law," citing Second Circuit cases and § 403 of the Restatement (Third) of Foreign Relations Law of the United States (1987). 2009 WL 874040, at *10.

34

On the present motion, the Government argues that because the PAC's allegations "demonstrate that Lloyds was a part of a conspiracy to commit securities fraud, mail fraud, wire fraud, and money laundering in the United States, . . . it would be unreasonable if the Court declined to exercise the jurisdiction granted by the MLCA." Main Brief at 10 n.2. But the Government's basic premise fails, for the reasons stated in Parts II, III, and IV of this opinion. Accordingly, I adhere to the alternative holding in *Lloyds TSB I.*

VI

For the foregoing reasons, the Government's motion for an order amending the Court's Judgment of March 31, 2009 dismissing the Government's Complaint against Defendant Lloyds TSB Bank plc, without prejudice for lack of subject matter jurisdiction, and for leave to file the Proposed Amended Complaint attached to the motion papers, is DENIED in all respects.

The Court does not reach the other grounds for dismissal urged by Defendant in the papers submitted on its prior motion to dismiss the original Complaint.

It is SO ORDERED.

Dated: New York, New York
August 4th, 2009

Charles S. Haight Jr.
_____
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE